IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ST. CROIX CHIPPEWA INDIANS )
OF WISCONSIN )
                                )
         Plaintiff, )
                                )
      v. )           Case No. 07-CV-02210 RWR
                                )
DIRK KEMPTHORNE )
in his official capacity as SECRETARY OF )
INTERIOR )
                                )
and )
                                )
CARL J. ARTMAN )
in his official capacity as ASSISTANT )
SECRETARY – INDIAN AFFAIRS )
                                )
         Defendants. )

## NOTICE OF THE FILING OF A MOTION
## FOR A TEMPORARY RESTRAINING ORDER
## AND A MOTION FOR A PRELIMINARY INJUNCTION

Please take notice that the St. Croix Chippewa Indians of Wisconsin, by and through

counsel, in connection with the above styled case, have filed with this Court its Motion for a

Temporary Restraining Order as well as a Preliminary Injunction. Appended hereto is a copy of

the Complaint filed this day in this action together with all other papers filed to date in this

matter or otherwise to be presented to the Court at the time of any hearing on the Motion for

Temporary Restraining Order.

Respectfully submitted,


_____/s/ Robert M. Adler_____
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1400
Fax:  202-887-6186
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com

*Attorneys for the St. Croix Chippewa*
*Indians of Wisconsin*

Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893


Dated:  December 7, 2007

IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-02210 RWR |
| | ) | |
| DIRK KEMPTHORNE in his official capacity as SECRETARY OF INTERIOR | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| CARL J. ARTMAN in his official capacity as ASSISTANT SECRETARY – INDIAN AFFAIRS | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

The Plaintiff, the St. Croix Chippewa Indians of Wisconsin ("The St. Croix Tribe"), by and through counsel, hereby move this Court, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and LCvR 65.1(a) for a Temporary Restraining Order.

The Court's attention is respectfully directed to the attached Memorandum of Points and Authorities filed in support hereof together with the Declaration of Tribal Chairperson Hazel Hindsley and the Affidavit of Robert M. Adler with its attached exhibits.

A proposed Order is also appended to this Motion.

151944

WHEREFORE, for the premises considered, the Plaintiff respectfully submits that a Temporary Restraining Order should be entered by this Court.

Respectfully submitted,


     /s/ Robert M. Adler
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1428
Fax:  (202) 887-6186
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com


*Attorneys for the St. Croix Chippewa*
*Indians of Wisconsin*


Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893


Dated:  December 7, 2007

IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-02210 RWR |
| | ) | |
| DIRK KEMPTHORNE in his official capacity as SECRETARY OF INTERIOR | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CARL J. ARTMAN in his official capacity as ASSISTANT SECRETARY – INDIAN AFFAIRS | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

The Plaintiff, the St. Croix Chippewa Indians of Wisconsin ("The St. Croix Tribe"), by

and through counsel, hereby move this Court, pursuant to Rule 65(b) of the Federal Rules of

Civil Procedure and LCvR 65.1(a) for a Preliminary Injunction.

The Court's attention is respectfully directed to the attached Memorandum of Points and

Authorities filed in support hereof together with the Declaration of Tribal Chairperson Hazel

Hindsley and the Affidavit of Robert M. Adler with its attached exhibits.

A proposed Order is also appended to this Motion.


WHEREFORE, for the premises considered, the Plaintiff respectfully submits that a

Preliminary Injunction should be entered by this Court.

151944

_/s/ Robert M. Adler_
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1428
Fax:  (202) 887-6186
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com


*Attorneys for the St. Croix Chippewa*
*Indians of Wisconsin*


Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893


Dated:  December 7, 2007

IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 07-CV-02210 RWR |
| DIRK KEMPTHORNE in his official capacity as SECRETARY OF INTERIOR | ) ) ) ) | |
| and | ) ) | |
| CARL J. ARTMAN in his official capacity as ASSISTANT SECRETARY -- INDIAN AFFAIRS | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

The St. Croix Chippewa Indians of Wisconsin ("St. Croix Tribe"), by and through counsel, hereby submits this Memorandum in support of the above-referenced Motions. The Declaration of Tribal Chairperson Hazel Hindsley and the Affidavit of Robert M. Adler and its attached exhibits are submitted in support hereof.

### A. Introduction

This is an action brought by the St. Croix Tribe, a Chippewa Tribe whose reservation lands are located in rural Wisconsin. The St. Croix Tribe, together with the Bad River Band of Lake Superior Chippewa Indians (collectively, the "Tribes) have diligently pursued for the past six years the approval by the Bureau of Indian Affairs ("BIA") to establish a casino in Beloit,

151944

Wisconsin. The ancestors of the Tribal members resided in the Beloit region and they were parties to peace treaties ceding land in that area to the United States.

The St. Croix Tribe seeks a Temporary Restraining Order and a Preliminary Injunction so that the status quo can be maintained until a hearing on the merits can be held and an adjudication reached in this important matter.

The St. Croix Tribe faces significant challenges to economic development and diversification. The St. Croix Tribe has significant unemployment and a substantial percentage of its employed members earn wages which are below the poverty level. Declaration of Tribal Chairperson Hazel Hindsley, ¶ 3 ("Hindsley Dec.").

The St. Croix Tribe's ability to accumulate the resources to meet its substantial unmet needs, to obtain the capital for further economic development, to increase employment for tribal members, and to decrease its dependence on funding from the federal government, is largely dependant on the approval of the Beloit Casino Project. Hindsley Dec., ¶ 4. This will be a large destination resort expected to attract several million visitors a year, principally from the densely populated greater Chicagoland area. In addition to its casino, the project will include a 500-room hotel, several restaurants, a conference center, a theater and a water park. The general region anticipates that the casino will generate significant revenues for a wide variety of service industries in the area. The Beloit Casino Project will involve construction costs of at least $300 million. Once built, it will provide some 3,000 full-time jobs. This project dominates the local scene in terms of its future economic planning and hopes for its economic revitalization. Local elected officials have repeatedly written BIA officials, as well as attending numerous meetings in Washington, D.C. with BIA representatives, to express their strong and unequivocal support for the project. Hindsley Dec., ¶ 4.

The Beloit Casino Project was originally the idea of the City of Beloit itself as a viable course by which it could restore the local economy which had seriously declined due to the loss of thousands of jobs due to factory closings. The Beloit Casino Project has been supported unanimously for many years by resolutions of the Beloit City Council. It has also received favorable resolutions of support from Rock County (where Beloit is located) as well as from other nearby townships. Hindsley Dec., ¶ 5.

## B. Factual Statement

The Tribes jointly filed in July 2001 an application with the BIA Regional Office in St. Paul, Minnesota to take 26 acres of land into trust for gaming purposes in Beloit, Wisconsin. To date, the Tribe has spent in excess of $1 million in pursuit of the approval of this project, including consultant costs, legal fees and option payments made to a local developer for the would-be trust land and adjoining lands necessary for the casino project. Hindsley Dec., ¶ 6. Throughout the process of seeking approval from the BIA, the St. Croix Tribe has incurred these significant expenses without the financial assistance of an outside developer or promoter. Hindsley Dec., ¶ 7.

The Tribes have taken inordinate measures to ensure that they were fully complying with all of the BIA's exacting requirements for the approval of the Beloit Casino Project, including the significant requirements imposed by the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act. This included the substantial expenditure of time and financial resources that went into the preparation of an Environmental Assessment ("EA"). After the completion of the EA, the Tribes were informed by the Department of Justice that it would require an Environmental Impact Statement ("EIS") to be prepared for all off-reservation casino applications. (Otherwise, the Department of Justice indicated it would not defend any lawsuit

brought to challenge a Finding of No Significant Impact ("FONSI") issued by the BIA based on

an EA.) That, in turn, required the Tribes to start all over again (beginning with the scoping

process required for an EIS). That took an additional three years of time, effort and expense.

Tribal representatives were informed several weeks ago that the draft filed by the EIS had been

approved by the Solicitor's Office of the BIA. Hindsley Dec., ¶ 8, Affidavit of Robert M. Adler,

¶ 3 ("Adler Aff.').

     In order to be assured that the Tribes correctly understood the procedures which would be

required in order to gain approval for their project, Tribal leaders, staff members and attorneys

have had numerous meetings with representatives of the BIA in both its Regional Office located

in St. Paul, Minnesota as well as with senior officials of the BIA in its Central Office in

Washington, D.C. During these meetings, numerous issues have been addressed and resolved.

During the six years of discussions with BIA representatives in the Regional Office, the BIA

continuously represented to Tribal representatives that the Section 20 ("IGRA") decision would

be made first by the Central Office; and if the Governor concurred, the BIA would then proceed

to make the fee-to-trust determination under Part 151. Hindsley Dec., ¶ 9.

     On January 8, 2007, Regional Director Terry Virden, wrote the Tribes' Chairmen,

informing them that their application had been forwarded to the Central Office in Washington,

D.C. with a favorable recommendation. Adler Aff., ¶ 5 and Exhibit A. thereto. Almost

immediately thereafter in mid-January 2007, Tribal leaders and representatives, together with

elected officials from the Beloit area, met in Washington, D.C. with George Skibine, Director of

the BIA's Indian Gaming Management Staff. At that time, Mr. Skibine informed the numerous

individuals present that the BIA would complete its staff review of the Tribes' application within

sixty days. Adler Aff., ¶ 5. From that date until June 2007, Tribal leaders and their

representatives continued to be informed by BIA officials in meetings in the Central Office that the two-part determination would be made before the Part 151 determination. Adler Aff., ¶¶ 2 and 4.

After the January 2007 meeting with Mr. Skibine, it became apparent that the review process (other than for the ongoing review of the draft EIS) had essentially become frozen in that it was clear that this application, and other similar applications, were not going to be favorably approved by virtue of Secretary Kempthorne's strong negative views of off-reservation fee-to-trust gaming applications. Adler Aff., ¶ 6. It was also apparent to the Tribes that Secretary Kempthorne's views found no basis in either IGRA or Part 151 and that he was nonetheless determined not to approve these applications, including Beloit, whether that meant making no decision at all during the remainder of his term as Secretary or crafting some artifice by which to deny the applications. This reality led to a virtual standstill within the BIA of not taking various interim steps in the decision-making process for pending off-reservation casino applications -- such as failing to permit Notices of Availability to be published in the *Federal Register* for draft or final EIS's. This, in fact, was the subject of testimony and critical comments made by Chairman Byron Dorgan at an October 4, 2007 Oversight Committee of the Senate Indian Affairs Committee. Assistant Secretary Artman appeared and testified at that hearing. Senator Dorgan strongly expressed his dissatisfaction with how the BIA had been conducting itself in a number of areas, including the processing of fee-to-trust applications. The Chairman stated that he will hold another Oversight Hearing in six months in order to gauge whether progress had been made by the BIA. See http://indian.senate.gov/public.

After little or no progress was perceived by the Tribes and their representatives in the Central Office's review of the Beloit application, the St. Croix Tribe's outside counsel,

Robert M. Adler, wrote to Assistant Secretary Artman by letter dated July 13, 2007. Adler Aff.,
¶ 7 and Exhibit B thereto. In that letter, he: (a) requested (in view of the delay by the BIA in
reviewing the application) that Assistant Secretary Artman inform him when the staff review of
the application would be completed; and, (b) asked Assistant Secretary Artman to inform him
whether the rumors were accurate that the Part 151 determination would be made before the
two-part IGRA determination. Mr. Adler also expressed serious concerns about the use of
Part 151 as the appropriate standards to be applied in making decisions to approve (or deny)
off-reservation casino applications, pointing out that to do so would be contrary to Congressional
intent. Id.

By letter dated August 21, 2007, a response was sent to Mr. Adler by George Skibine,
Acting Deputy Assistant Secretary-Policy and Economic Development. Adler Aff., ¶ 8 and
Exhibit C thereto. Mr. Skibine indicated that he had been asked to respond to Mr. Adler's letter
of July 13, 2007. This letter proceeded to state, in pertinent part:

> We will make a determination on whether to take land into trust
> pursuant to Part 151 prior to making the two-part secretarial
> determination under IGRA. We believe that it is the appropriate
> and logical sequence for the decision-making process. We do not
> believe that this represents a policy change since the Department
> has never before specified a particular sequence from making the
> two decisions involved in this process. (emphasis supplied).

This was the only written communication from the Department of the Interior to the
Tribes that the Part 151 decision would be made prior to the two-part determination. Adler Aff.,
¶ 9.

On information and belief, the Department of the Interior has not informed in writing
other Indian tribes or the public at large (whether through publication in the *Federal Register* or
otherwise) that for fee-to-trust off-reservation gaming applications pending in the Central Office,

the Department of the Interior will make the Part 151 determination prior to the two-part

determination under IGRA.  Adler Aff., ¶ 10.

Despite the representation in Mr. Skibine's letter of August 21, 2007 that "the

Department has never before specified a particular sequence from making the two decisions",

this has not actually been the case.  During the Clinton Administration and later during the Bush

Administration, it was made quite clear to the public that the two-part determination would be

made first.  And, in point of fact, during the past six years, the two-part determination has been

made prior to the Part 151 decision in at least two instances.

In a letter dated December 21, 2006 from James E. Cason, the Associate Deputy

Secretary of the Department of the Interior, to the then-Governor of New York, George Pataki,

Mr. Cason wrote that he was providing him with an opportunity to concur in the two-part

determination which had been made on the St. Regis Mohawk application for an off-reservation

casino.  Adler Aff., ¶ 11 and Exhibit D thereto.  Mr. Cason stated, in pertinent part:

> Your affirmative written concurrence is required before the
> Department will proceed with the consideration of the St. Regis
> Mohawk Tribe's application to take a portion of the Monticello
> Raceway in trust pursuant to the Department's land acquisition
> regulations in 25 U.S.C. Part 151.  Please be mindful that your
> concurrence and its two-part determination under Section
> 20(b)(1)(A) of IGRA should not be construed as a future
> commitment from the Department to take the land into trust.
> That decision has yet to be made and will be made only after
> consideration of all of the regulatory requirements contained in
> 25 C.F.R. Part 151.  (emphasis supplied).

A similar letter was earlier sent on February 20, 2001 to Wisconsin Governor Scott

McCallum by James H. McDivitt, Deputy Assistant Secretary-Indian Affairs (Management).

This letter pertained to the pending application of three Wisconsin Tribes to take land into trust

in Hudson, Wisconsin for the purpose of operating an off-reservation casino.  Adler Aff., ¶ 12

and Exhibit E thereto.  As explained in this letter, a favorable two-part determination had been

made.  Deputy Assistant Secretary McDivitt made it crystal clear that the two-part determination

preceded the Part 151 determination which would be made if the Governor concurred in the

IGRA decision.  Deputy Assistant Secretary McDivitt wrote, in pertinent part:

> Pursuant to Section 20(b)(1)(A) of the IGRA, before the
> Hudson parcel can be acquired in trust for gaming purposes,
> I must determine that a gaming facility on the land would
> be in the best interests of the Tribes and their members and
> not detrimental to the surrounding community and then you
> must concur in that determination.  If you concur in this
> determination, the land can be acquired by the United States
> in trust for the Tribes for gaming purposes, provided all the
> requirements of the Bureau of Indian Affairs' land
> acquisition regulations found in 25 CFR Part 151 are met.
> (emphasis supplied).

An action had been filed several years before by the three Tribal applicants for the

Hudson casino against then-Secretary of the Interior Babbitt.  Sokaogon Chippewa Community,

et al. v. Bruce C. Babbitt, Secretary, in the United States District Court for the Western District

of Wisconsin (Civil Action No. 2000-1137).  Significantly, in a brief filed in that action on

March 9, 2000 by the Department of Justice, on which attorneys in the Solicitor's Office of the

Department of the Interior appeared "Of Counsel," the Government stated, in pertinent part at 2-

3:

> Pursuant to guidelines issued on September 28, 1994, by the
> Acting Deputy Commission of the Indian Affairs, area offices of
> the Bureau of Indian Affairs must make the initial determination
> of whether an applicant tribe has satisfied their requirements of
> § 2719(b)(1)(A) (emphasis supplied).

The Government's brief proceeded to articulately set out why the two-part determination

was necessary made before the Part 151  decision.  It stated at 22:

> As explained above (p. 5), the Department may not exercise its
> authority under 25 U.S.C. Section 465 to acquire land in trust if it
> will be used for gaming purposes unless an applicant tribe can
> show that a proposed gaming operation will be in its best interest

and that the operation will not be detrimental to the surrounding community. 25 U.S.C. § 2719(b)(1)(A).

Adler Aff., ¶ 13 and Exhibit F thereto.

The District Court in the Hudson litigation issued a decision which clearly recognized that the two-part determination was made by the BIA before to the Part 151 decision. Sokaogon Chippewa Community, et al. v. Bruce C. Babbitt, Secretary, et al., 929 F.Supp. 1165, 1169-1170 (USDC for the Western District of Wisconsin, 1996). The Court stated:

> A request to establish an off-reservation gaming facility must be approved by the Secretary of the Interior in accordance with the Indian Gaming Regulatory Act, which provided at 25 U.S.C. § 2719(b)(1)(A) that off-reservation is permitted only if [the two-part determination is favorably decided by the Secretary]. Even if the secretary finds that the proposed off-reservation gaming establishment is in the best interest of the applicant tribes and would not be detrimental to the surrounding community and the governor concurs in that determination, the secretary must decide whether to exercise his discretion to acquire the land in trust pursuant to the Indian Reorganization Act, 25 U.S.C. § 465.

Quite recently, on September 21, 2007, Assistant Secretary Artman issued a memorandum to all of the BIA Regional Directors. Adler Aff., ¶ 14 and Exhibit G thereto. In this memorandum, Assistant Secretary Artman explained an attached September 2007 revision of the "checklist for gaming acquisitions." Assistant Secretary Artman stated that the newly revised checklist differed from the earlier (March 2005) checklist in only two respects. The first, which is pertinent herein, was that the first page of the checklist contained a modification "… to clarify that an application for two-part secretarial determination pursuant to § 20(b)(1)(A) of IGRA should not be processed until the land is already in trust or, if not in trust, until after the publication of a notice to take the land in trust has been published pursuant to 25 C.F.R. 151.12." (emphasis supplied). Despite Assistant Secretary Artman's representation that this was a

clarification, this was, in fact, a complete reversal of the practice followed by the BIA for many

years.  Adler Aff., ¶ 14

    **C.**    **The Department of the Interior's Artifice By Which It Will Likely Proceed Within the Next Several Weeks to Deny the Beloit  Application and Similar Applications Submitted by Other Indian Tribes.**

It has recently become apparent that the efforts of the Tribes and elected officials in

Beloit (and the surrounding region) to have the BIA approve this project will, in all probability,

be a futility.  Hindsley Dec., ¶ 10.  This is strictly due, the St. Croix Tribe submits, to Secretary

Dirk Kempthorne's personal views opposing off-reservation gaming for reasons which do not

find a basis in either the standards set out by IGRA or for taking fee land into trust pursuant to

Part 151.  Secretary Kempthorne's personal animus towards off-reservation gaming fee-to-trust

applications is the subject of a recent Complaint filed in this Court.  See St. Regis Mohawk Tribe

v. Dirk Kempthorne (Civil Action No. 07-CV-01958-RWR).

The St. Croix Tribe submits that the Department of the Interior is improperly attempting

to carry this out by making the Part 151 determination prior to the two-part determination.  This

is because the Department of the Interior is fully aware that if the two-part determination of

IGRA were made first, there would be no realistic way to deny the Beloit application (and

similar applications) in that the Tribal applications fully meet the requirements of IGRA's

two-part determination.  Further, the St. Croix Tribe submits that senior officials of the DOI have

concluded that once a favorable two-part determination is made (assuming concurrence by the

Governor), this would leave little or no room for the BIA to deny the applications under Part 151

and have any realistic belief that this decision would be upheld by a Federal Court.  In other

words, the IGRA determinations would effectively require the BIA to make favorable findings

under Part 151 on a number of the important issues presented under the regulations such as

whether the trust land is needed and whether the trust acquisition would promote self-determination and economic development. 25 C.F.R. § 151.3(a)(3) and 151.10(b). For these reasons, the St. Croix Tribe submits that the Department of the Interior decided to make the Part 151 determination first because it will leave it free to deny a fee-to-trust gaming application under the "self-determination," "economic development," "need" and other factors outlined in Part 151 without having prior inconsistent findings made by virtue of its two-part determination. As set forth below, by adopting this new procedure, the Department of the Interior has completely ignored the requirements of the Administrative Procedure Act ("APA") Congressional intent set out in IGRA, and the requirements mandated by case law for an agency, which has changed its policy and procedure, to provide to the public a reasonable explanation as to why it has changed its historical practice.

The St. Croix Tribe seeks Declaratory and Injunctive Relief from this Honorable Court in order to prevent the Department of the Interior from denying the Beloit fee-to-trust application, as well as others, by using its newly adopted procedure to make the Part 151 decision prior to the two-part IGRA determinations. Unless Injunctive relief is entered, the Department of the Interior will likely proceed in the next several weeks to deny the Beloit application as well as a number of other pending off-reservation casino applications submitted by other Tribes. This will cause inordinate damage to the St. Croix Tribe by the loss of not only the more than $1 million paid to date on this project but also for its loss of the future significant anticipated revenues from this project of which the St. Croix Tribe, and its members, are in tremendous need. Hindsley Dec., ¶ 11.

## Argument

### A. <u>Statutory and Regulatory Requirements</u>

Section 5 of the Indian Reorganization Act, 25 U.S.C. § 465, enacted in 1934, and its

implementing regulations at 25 C.F.R. Part 151 (promulgated in 1980) authorize the Secretary of

the Interior to acquire lands for Indian tribes in the name of the United States to hold such lands

in trust for Indian tribes and to take action on a tribe's request to acquire such lands. This statute

and the Part 151 regulations apply to all tribal requests to take land into trust for any purpose.

In 1988, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*

("IGRA"). Congress intended IGRA "to provide a statutory basis for the operation of gaming by

Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong

tribal governments[,] ... to ensure that the Indian tribe is the primary beneficiary of the gaming

operation, . . . and to protect such gaming as a means of generating tribal revenue." 25 U.S.C.

§ 2702. The Senate Committee on Indian Affairs Report, in describing IGRA's exceptions,

made it clear that they were meant to set "forth policies with respect to lands acquired in trust

after [IGRA's] enactment. S. Rep. No. 100-446, at 20 (1988), *reprinted in* 1988 U.S.C.C.A.N.

3071, 3090.

Under Section 20 of IGRA, 25 U.S.C. § 2701, tribes are prohibited from engaging in any

gaming on land acquired after the date of IGRA's enactment, October 17, 1988, unless certain

exceptions are satisfied. The exception, pertinent herein, is § 2719(b)(1)(A), which provides that

the prohibition of gaming on post-1988 land does not apply when:

> the Secretary, after consultation with the Indian tribe and
> appropriate State and local officials, including officials of other
> nearby Indian tribes, determines that a gaming establishment on
> newly acquired lands [1] would be in the best interest of the Tribe
> and its members, and [2] would not be detrimental to the
> surrounding community, but only if the Governor of the State in

> which the gaming activity is to be conducted concurs in the
> Secretary's determination ...

This exception is commonly referred to as the "two-part determination."

Thus, Section 5 of the Indian Reorganization Act, 25 U.S.C. § 465 (and its regulations falling under Part 151) and IGRA, § 2719 (b)(1)(A), both apply to the acquisition of trust lands for gaming purposes. Section 5 of the Indian Reorganization Act is very general in nature in that it, together with the Part 151 regulations, apply to the determination as to whether fee land will be taken into trust for any purpose, whether that be for grazing, Indian housing, a grocery store or a casino. They authorize the Secretary of the Interior to acquire lands that are either "within or without existing reservations," for Indian tribes in the name of the United States to hold those lands in trust for Indian tribes. The criteria governing when land will be taken into trust for an Indian tribe under this statute were promulgated by Interior in regulations at 25 C.F.R. Part 151. The criteria relevant to this case appear at 25 C.F.R., §§ 151.3, 151.10 and 151.11.

25 C.F.R., § 151.3, provides, in pertinent part, that:

> land not held in trust ... may only be acquired for an individual
> Indian or a tribe in trust status when such acquisition is
> authorized by an act of Congress. No acquisition of land in trust
> status ... shall be valid unless the acquisition is approved by the
> Secretary.
>     (a) Subject to the provisions contained in the acts of
> Congress which authorize land acquisitions, land may be acquired
> for a tribe in trust status:
>
>                 *        *        *
>
>     (3) When the Secretary determines that the acquisition of
> the land is necessary to facilitate tribal self-determination,
> economic development, or Indian housing.

25 C.F.R., § 151.10, provides that for on-reservation trust acquisitions:

> The Secretary will consider the following criteria in
> evaluating requests for the acquisition of land in trust status when

the land is located within or contiguous to an Indian reservation, and the acquisition is not mandated:

(a) The existence of statutory authority for the acquisition and any limitations contained in such authority;

(b) The need of the individual Indian or the tribe for additional land;

(c) The purposes for which the land will be used;

(d) *[provision relating to acquisition for individual Indian, not applicable to tribal application]*;

(e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;

(f) Jurisdictional problems and potential conflicts of land use which may arise; and

(g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

(h) The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.

25 C.F.R, § 151.11, which governs off-reservation trust acquisitions, provides, in pertinent part, that:

The Secretary shall consider the following requirements in evaluating tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation, and the acquisition is not mandated:

(a) The criteria listed in Sect. 151.10(a) through (c) and (e) through (h);

(b) The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation, shall be considered as follows: as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition. The Secretary shall give greater weight to the concerns raised pursuant to paragraph (d) of this section.

(c) Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed land.

## B.  The Required Standards For the
## Court Entering of a Preliminary Injunction

Pursuant to the D.C. Circuit's decision in Mova Pharmaceutical v. Shalala, 140 F.3d

1060, 1066 (D.C. Cir. 1998), in order for a party to demonstrate entitlement to Preliminary

Injunction, it must show:  (1) a substantial likelihood of success on the merits; (2) that it would

suffer irreparable injury if the Injunction is not granted; (3) that an Injunction will not

substantially injure other interested parties; and (4) that the public interest will be furthered by

the Injunction.  See also Omar, et al. v. Francis J. Harvey, Secretary of the Army, et al., 479 F.3d

1, 28 (D.C. Cir. 2007), petition for cert. filed (U.S. Sept. 21, 2007)(No. 07-394).  The St. Croix

Tribe respectfully submits that these requirements are satisfied herein.

(1)    **There is a substantial likelihood of success on the merits.**

(a)    **The August 21, 2007 letter from George Skibine constitutes final**

**agency action.**

The August 21, 2007 letter from Mr. Skibine constitutes "final agency action" under the

Administrative Procedure Act, 5 U.S.C. § 704[1] and is actionable as such under 5 U.S.C. §§ 702

and 706.

In deciding whether a biological opinion issued by the Fish and Wildlife Service was a

final agency action, the Supreme Court in Bennett v. Spear, 520 U.S.154 (1997), identified the

two conditions that must be met:

> As a general matter, two conditions must be satisfied for agency
> action to be "final": First, the action must mark the

---

[1] Under the APA, a policy statement is a "rule" and actionable as such by an aggrieved party.
The term "rule" is defined at 5 U.S.C. § 551(4) as:  "…the whole or a part of an agency
statement of general or particular applicability and future effect designed to implement, interpret,
or prescribe law or policy or describing the organization, procedure, or practice requirements of
an agency…. (emphasis supplied).

"consummation" of the agency's decisionmaking process, *Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp., 333 U.S. 103, 113, 92 L. Ed. 568, 68 S. Ct. 431 (1948)*--it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 27 L. Ed. 2d 203, 91 S. Ct. 203 (1970).*

Bennett at p. 177-178.

In applying these conditions in determining whether BIA letters determining a tribal leadership issue were final agency action, the district court in Tarbell v. Department of Interior, 307 F. Supp. 409 (N.D.N.Y. 2004) found the letters were final agency action because the matter addressed by the letters were on "…a matter entrusted to BIA expertise, and was expected to have concrete legal significance to the [Tribe]." Tarbell at p. 427.

The letter from Mr. Skibine meets the two conditions set forth by the Supreme Court in Bennett. First, the letter states the decision was made to make the Part 151 determination prior to the two-part IGRA determination. It is not of a preliminary nature. The letter communicates an actual agency decision. As held by the Court in Tarbell, supra, the letter addresses a matter within the BIA's expertise and was expected to have concrete legal significance to the Tribes.

(b)    **Mr. Skibine's letter fails to meet the requirements set by the Supreme Court in State Farm.**

Mr. Skibine's letter takes the position that there was no change in policy in deciding to make the Part 151 decision prior to the two-part determination. As has been set forth in the Affidavit of Mr. Adler and its attached exhibits, this is not the case. Having denied that a change in policy and procedure took place, the Department of the Interior has hopelessly failed to comply with the requirements set out by the Supreme Court in Motor Vehicle Manufacturers

151944                                    16

Association of the United States, Inc v. State Farm Mutual Automobile Insurance Company, 463 U.S. 29 (1983) the requirements for an agency when it wants to change the direction of a policy embodied in existing policy or procedure.

In State Farm, the Court held that the National Highway Traffic Safety Administration's rescission of a motor vehicle safety standard regulations was arbitrary and capricious because the agency failed to give an adequate basis and explanation for rescinding the regulation.  In reaching this conclusion, the Court reasoned that an agency decision would be arbitrary and capricious:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

462 U.S. at 43.

Furthermore, the Court held that when an agency subsequently wants to change settled policies, it has an obligation to supply a reasoned analysis for the change beyond what may have been required when the policy was first issued.  462 U.S. at 44.

The U.S. Court of Appeals for the Second Circuit recently followed State Farm in Yale-New Haven Hospital et al. v. Leavitt, 470 F.3d 71 (2nd Cir. 2006) ("Yale").

In Yale, the Secretary of Health and Human Services ("HHS") denied reimbursement for Medicare coverage filed by the hospital for treatment involving investigational cardiac devices provided to some 48 patients.  The Secretary denied reimbursement on the ground that the devices had not received "premarket approval" from the FDA.  The District Court reversed the Secretary's denial of the claims.  This was affirmed by the Court of Appeals.

Under a 1980 HHS regulation, reimbursement was authorized for the purchase of investigational devices even though they had not obtained premarket approval. However, in 1986, HHS issued a Medicare Reimbursement Manual which provided that only medical devices which had received FDA premarket approval for commercial distribution were covered under Medicare. This was identified in the 1986 Manual as a "New Policy." Yale, supra at 74.

The underlying lawsuit arose out of efforts by the Secretary to recover $1.5 million paid to reimburse Yale for Medicare claims submitted between 1994 and 1995 with respect to devices which had not received premarket approval from the FDA.

The District Court held that the 1986 Manual Provision was "interpretive" and, as a result, was not subject to the procedures governing notice-and-comment rule making. Yale, supra at 77. However, the Court further held that: (1) the 1986 Manual Provision was entitled to little deference because of reliance on FDA premarket approval constituted a shift from historical practice that the Secretary did not adequately explain; (2) there was an inadequate explanation of the reasons for following the premarket approval requirement and therefore the decision was arbitrary and capricious; and (3) the devices in question, although not having received premarket approval, had the requisite level of safety and acceptance in the medical community.

On appeal, Yale challenged the validity of the 1986 Manual Provision on the grounds that: (1) despite the Secretary claiming it was only "interpretative," it was actually a legislative rule that was void because its promulgation did not comply with the notice-and-comment rule making requirements of the APA; (2) it was an impermissible interpretation of the Medicare Act; and (3) in promulgating the 1986 Manual Provision, the Secretary acted arbitrarily and capriciously (relying on State Farm). The Court in Yale assumed for purposes of its decision that it was interpretative. Yale, supra at 79, n.7.

The Court of Appeals, following State Farm, held that the 1986 Manual Provision was adopted in a manner which was arbitrary and capricious. Yale, supra at 79. According to the Court:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Yale, supra at 79.

The Court continued that its review was "particularly searching" in that the record indicated that the 1986 Manual Provision "altered historical practice." Id. The Court continued that a settled course of behavior embodied the agency's informed judgment that, by pursuing that course, it was carrying out the policies committed to it by Congress. Id. Accordingly, following State Farm, the Court held that an agency when changing its course by rescinding a rule is ". . .obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." Id.

Significantly, in promulgating the 1986 Manual Provision, the Secretary of the Department of Health and Human Services did not provide any contemporaneous explanation as to the reasons or rationale for the changes. The Secretary argued that the 1986 Manual merely expressed Medicare's de facto historical practice, " . .and that therefore nothing required explanation." Yale, supra at 80. However, the Second Circuit rejected this argument and held that the Secretary had acted arbitrarily and capriciously under 5 U.S.C. § 706(2)(A) in promulgating the 1986 Manual Provision and it was therefore invalid and unenforceable. Yale, supra at 86. For this reason, the Court of Appeals remanded the matter to the District Court with

instructions to remand it to the Secretary for proceedings consistent with the Court's opinion. The Court further instructed that on remand, Yale's claims were to adjudicated under the rules and procedures in place at the time Yale submitted its claims without reference to the 1986 Manual Provision. Yale, supra at 87.

The pertinent facts presented in Yale are quite similar to those presented herein with respect to the August 21, 2007 letter from George Skibine which proffered no rationale for the change in historical practice, claiming that no change had taken place. A similar result is suggested.

In a more recent decision in the Second Circuit, the Court held (following State Farm and Yale) that an agency's decision to change its policy will be set aside as arbitrary and capricious if the agency fails to provide a reasoned explanation for its decision. Fox TV Stations v. Federal Communications Commission, 489 F.3d 444, 457 (2nd Cir. 2007), petition for cert. filed (U.S. Nov. 1, 2007) (07-582).

The D.C. Circuit Court of Appeals has rendered opinions which are consistent with Yale. In Ramaprakash v. Federal Aviation Administration, et al., 346 F.3d 1121, 1124 (D.C. Cir. 2003) the Court held that:

> Our review under the APA is highly deferential, but agency action is arbitrary and capricious if it departs from agency precedent without explanation. Agencies are free to change course as their expertise and experience may suggest or require, but when they do so they must provide a "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." (citations omitted). An agency's failure to come to grips with conflicting precedent constitutes "an inexcusable departure from the essential requirement of reasoned decision making." (citation omitted).

Ramaprakash has been followed by the D.C. Circuit in recent decisions. New York Cross Harbor Railroad v. Surface Transportation Board, et al., 374 F.3d 1177, 1183 (D.C. Cir.

151944                                          20

2004); Owner-Operator Independent Drivers Association, Inc. v. Federal Motor Carrier Safety Administration, 494 F.3d 188, 203 (D.C. Cir. 2007), reh'g. en banc. denied, 2007 U.S. App. Lexis 23114 (D.C. Cir. Sept. 28, 2007).

Finally, and of some real significance to the Injunctive relief requested herein, the United States District Court for the Northern District of California granted a Preliminary Injunction within the last two months based upon Homeland Security's failure to explain a change in its prior position. American Federation of Labor, et al. v. Michel Chertoff, et al., 2007 U.S. Dist. Lexis 75233 (N.D. Cal. Oct. 10, 2007). In that case, the Court held that Homeland Security had changed course but did not supply reasoned analysis for the change and therefore ran afoul of State Farm. American Federation of Labor, supra at **27-29.

> (c)    **The D.C. Circuit itself has recognized that the Department of the Interior's established policy is to make the Section 20 determination before deciding whether land should be taken under trust under Part 151.**

The D.C. Circuit in Exposing Truth About Casinos v. Kempthorne, 492 F.3d 460 (D.C. Cir. 2007) addressed a situation which is analogous to the issues presented herein. At issue was the authority of Secretary Kempthorne to designate land for the benefit of an Indian tribe which fell within the "initial reservation" exemption of Section 20. In finding that the Secretary had such authority, the court opined that:

> The Secretary's determination that the "initial reservation" exception applied to the Sackrider property was intended to have the force of law, as it formed the basis for the Secretary's decision under the IRA to acquire the property in trust for the Band.[2]

---

[2] The IRA refers to the Indian Reorganization Act, 25 U.S.C. § 465, and is the same authority for Department of the Interior to promulgate 25 C.F.R. Part 151.

Exposing Truth About Casinos at pp 466-67.

(d)  **The Department of the Interior's Action Is Invalid in That It Is In Conflict With IGRA.**

The Department of Interior has run afoul (or basically ignored) State Farm and the cases following it.  An agency's action must be set aside if it is not consistent with the statute adopted by Congress.  5 U.S.C. §§ 706(2)(A) and (C).  An agency's interpretation of the governing statute is reviewed under the familiar two-part test set out in Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984).  The first step requires the Court to determine if Congress' intent is clear. Id. at 842.  "[T]he court, as well as the agency, must give effect to the unambiguously expressed intent of congress."  Id. at 842-43.  In ascertaining Congressional intent, Courts look to the text, to the legislative purpose and history, and to the overall structure of the act.  Gonzalez v. Oregon, 546 U.S. 243 (2006).  "If the intent of Congress is clear, that is the end of the matter."  Chevron, 467 U.S. at 842, and the Courts set aside that an agency action that is not consistent with that intent.

In the case at bar, Congressional intent is clear.  The standards set forth in the two-part determination under IGRA are the standards to be used in determining whether or not a Tribal applicant for an off-reservation casino has satisfactorily demonstrated the merits of the proposed casino.  The Senate Committee on Indian Affairs Report, in describing IGRA's exceptions, made it clear that they were meant to set "forth policies with respect to lands acquired in trust after [IGRA's] enactment.  S. Rep. No. 100-446, at 20 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3090.  The Part 151 regulations are not to be used for that purpose.[3]

---

[3] By way of analogy, when there are two statutes arguably in conflict with each other, the later enacted statute prevails and will trump any conflict with the earlier statute.  State of Rhode

Given that the Department of the Interior's decision to make the Part 151 determination prior to the two-part IGRA determination is contrary to IGRA itself, it is not entitled to Chevron deference. Gonzalez v. Oregon, supra.

For similar reasons, the Department of the Interior's decision to make the Part 151 determination first runs afoul of the Supreme Court's decision in State Farm in that ". . .the agency has relied on factors which Congress has not intended to consider. . . ." State Farm, supra at 43. Just as the Government itself so articulately set out in its brief filed in the Sokaogon Chippewa litigation at 22 (Adler Aff., ¶ 13, Exhibit F), the Department of the Interior cannot exercise its authority under 25 U.S.C. § 465 unless and until an applicant tribe has satisfied the standards of the two-part determination in IGRA. It is axiomatic that this cannot take place unless and until the Department of the Interior has actually made the two-part determination.

     (e)     **Even if there is any arguable ambiguity (which the Plaintiff believes there is not), as to whether the two-part determination should be made before or after the Part 151 decision, any such ambiguity must be interpreted in the light most favorable to the St. Croix Tribe.**

IGRA was enacted by Senate bill S. 555. After S. 555 was passed by the Senate, it was considered by the House of Representatives. The floor manager for this legislation in the House of Representatives was Congressman Morris K. Udall, who was the then Chairman of the House Committee on Interior and Insular Affairs.

In asking the House to pass S.555, Chairman Udall stated in his opening statement his intent as to how the canons of construction would be applied to this legislation:

---

Island v. Narragansett Indian Tribe, 19 F.3d 685, 704-05 (1st Cir. 1994), cert. denied, 513 U.S. 919 (1994).

> Mr. Speaker, while this legislation does impose new restrictions on tribes and their members, it is legislation enacted basically for their benefit. I would expect that the Federal courts, in any litigation arising out this legislation, would apply the Supreme Court's time-honoring rule of construction that any ambiguities in legislation enacted for the benefit of Indians will be construed in their favor.

134 Cong. Rec. H8146, H8153 (Sep. 26, 1988).

The Supreme Court's time-honoring rule of construction to which Chairman Udall referred has held that statutes passed for the benefit of Indian tribes are to be liberally construed and ambiguous terms must be interpreted in a light most favorable to the Indian tribes. This canon of construction is set forth in <u>Alaska Pacific Fisheries v. United States</u>, 248 U.S. 78, 39 S. Ct. 40, 42 (1918), citing <u>Choate v. Trapp</u>, 224 U.S. 665, 32 Sup. Ct. 565, 569 (1912).

(f)    **The Defendants' Actions Constitute a Breach of Its Trust Obligations to the St. Croix Tribe as well as Other Tribes Having Similar Fee-to-Trust Applications Which Are Pending.**

The actions by the Defendants, in unlawfully deciding to make the Part 151 determination prior to the two-part determination and the anticipated denial of the Beloit (and other) pending off-reservation casino applications is in violation of the trust responsibilities owed by it to Indian tribes. <u>United States v. Mitchell, et al.</u>, 463 U.S. 206, 226 (1983); <u>Cobell, et al. v. Gale A. Norton, Secretary of the Interior, et al.</u>, 240 F.3d 1081, 1099 (D.C. Cir. 2001). In substance, Secretary Kempthorne and Assistant Secretary Artman have totally revamped the process by which fee-to-trust applications will be decided so as to have a mechanism by which to carry out, upon information and belief, Secretary Kempthorne's personal bias against off-reservation casinos and their expansion in total disregard of the rights and interests of the

effected Indian tribes who are attempting to improve their Tribal self-determination and economic development.

(2)    **The St. Croix Tribe Would Suffer Irreparable Injury If The Requested Injunction is Not Granted.**

Should the St. Croix Tribe's requested Injunction not be granted, the BIA, during the next several weeks will assuredly send letters to it and the Bad River Band denying, under Part 151, the Beloit fee-to-trust application.  Adler Aff., ¶ 15.  The denial of this application would mean the loss of approximately $1 million which the St. Croix Tribe has spent to date in its efforts to have a Beloit casino.[4]  Moreover, the denial of the application would mean that the St. Croix Tribe would be deprived of the anticipated revenues from the Beloit casino, its planned hotel and other related Tribal-owned businesses.  Courts have recognized that these circumstances constitute irreparable harm.  See Cabo Distrib. Co., Inc. v. Brady, 821 F.Supp. 582, 600 (N.D. Cal. 1992) (issuing preliminary injunction where business would suffer financial losses and have no claim for damages against Government defendant for such losses).  In National Wildlife Federation v. Burford, et al., 835 F.2d 305(D.C. Cir. 1987), the Court of Appeals affirmed a Preliminary Injunction against the Department of the Interior.  The Court stated at 325:

> . . .Mountain States appears to misunderstand the purpose of the preliminary injunction; it is designed precisely to prevent the Secretary from exercising his discretion in circumstances in which it likely would lead to irreparable injury.

---

[4] This includes expenses of environmental consultants, lawyers and substantial amounts paid to a local developer as earnest money payments on the land.

**(3)    The Issuance of a Preliminary Injunction Will Not Cause Substantial Harm to the Department of the Interior.**

The issuance of a Preliminary Injunction, until the trial on the merits, should not cause substantial harm to the Department of the Interior.  The Department of the Interior, during the Presidency of George W. Bush, has operated for almost seven years using established procedure by which the two-part determination would be made before the Part 151 decision.  Moreover, on information and belief, most, if not all, of the pending off-reservation casino applications at the BIA's Central Office have been lodged there for many months.  Accordingly, a further delay until this matter is resolved cannot prejudice the Government.

In sum, the preservation of the status quo until this matter can be decided on the merits should not cause any significant harm to the Department of the Interior.

**(4)    The Public Interest Will Be Served by the Issuance of a Preliminary Injunction.**

The public interest weighs strongly in favor of the issuance of a Preliminary Injunction so that time is allowed for a thorough judicial review on the merits of the issues raised herein. National Treasury Employees Union v. U.S. Department of Treasury, 838 F.Supp. 631, 640 (D.D.C. 1993) ("The preservation of. . .the legality of the process by which government agencies function certainly weighs heavily in the public interest.")l Clarke v. Ofc. of Fed. Housing Enterp. Oversight, 355 F.Supp.2d 56, 66 (D.D.C. 2004) ("There is a substantial public interest in ensuring that [the agency] acts within the limits of its authority.")

## Conclusion

For the foregoing reasons, the St. Croix Tribe submits that this Court should enter a Temporary Restraining Order and, thereafter, a Preliminary Injunction so that the status quo is preserved until there can be a hearing and adjudication on the merits.

Respectfully submitted,


_/s/ Robert M. Adler_____
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1428
Fax:  (202) 887-6186
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com

_Attorneys for the St. Croix Chippewa_
_Indians of Wisconsin_


Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893


Dated:  December 7, 2007

IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ST. CROIX CHIPPEWA INDIANS )
OF WISCONSIN )
 )
   Plaintiff, )
 )
  v. )  Case No. 07-CV-02210 RWR
 )
DIRK KEMPTHORNE )
in his official capacity as SECRETARY OF )
INTERIOR )
 )
and )
 )
CARL J. ARTMAN )
in his official capacity as ASSISTANT )
SECRETARY – INDIAN AFFAIRS )
 )
   Defendants. )

## CERTIFICATE OF COUNSEL AS REQUIRED BY LCvR 65.1(a)

  Pursuant to LCvR 65.1(a), the undersigned counsel for the St. Croix Chippewa Indians of

Wisconsin hereby states that:  (a) actual notice of the time of making this application for a

Temporary Restraining Order and copies of all pleadings and papers filed in this action to date or

to be presented at the hearing for a Temporary Restraining Order have been furnished to the

following, electronically at 6:50 - 7:00 P.M. on December 7, 2007:

  Secretary of the Interior Dirk Kempthorne.  (Secretary Kempthorne apparently does not

have an e-mail address.  The papers were e-mailed to Brian Waidmann, his Chief of Staff, at

brian_waidmann@ios.doi.gov.)

  Assistant Secretary-Indian Affairs Carl J. Artman (Carl_Artman@ios.doi.gov).

151945

Respectfully submitted,


   /s/ Robert M. Adler
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1400
Fax:  202-887-6186
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com


*Attorneys for the St. Croix Chippewa*
*Indians of Wisconsin*


Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893


Dated:  December 7, 2007

IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 07-CV-02210 RWR |
| DIRK KEMPTHORNE in his official capacity as SECRETARY OF INTERIOR | ) ) ) ) | |
| and | ) ) | |
| CARL J. ARTMAN in his official capacity as ASSISTANT SECRETARY – INDIAN AFFAIRS | ) ) ) ) | |
| Defendants. | ) | |

**SUPPLEMENTAL CERTIFICATE OF COUNSEL AS REQUIRED BY LCvR 65.1(a)**

Pursuant to LCvR 65.1(a), the undersigned counsel for the St. Croix Chippewa Indians of Wisconsin hereby states that in addition to the notice provided in the initial Certificate of Counsel, courtesy copies of actual notice of the time of making this application for a Temporary Restraining Order and copies of all pleadings and papers filed in this action to date or to be presented at the hearing for a Temporary Restraining Order were furnished by hand delivery to the following on December 10, 2007 at the time set forth below as well as in the manner described below:

Secretary of the Interior Dirk Kempthorne  (10:43 a.m.; Jim Weiner, Acting Assistant Solicitor)

Assistant Secretary-Indian Affairs Carl J. Artman  (10:43 a.m.; Jim Weiner, Acting Assistant Solicitor)

151945

The United States Attorney's Office  (11:02 a.m.; Gary Nails)

The United States Attorney General (10:35 a.m.; Willow Lee)

Respectfully submitted,


      /s/ Robert M. Adler
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1400
Fax:  202-887-6186
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com


*Attorneys for the St. Croix Chippewa
Indians of Wisconsin*


Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893

Dated:  December10, 2007

IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ST. CROIX CHIPPEWA INDIANS
OF WISCONSIN
24663 Angeline Avenue,
Webster, Wisconsin 94893

               Plaintiff,

     v.

DIRK KEMPTHORNE
in his official capacity as SECRETARY OF
INTERIOR
U.S. Department of the Interior
1849 C Street, NW
Room 6156
Washington, DC 20240

and

CARL J. ARTMAN
in his official capacity as ASSISTANT
SECRETARY – INDIAN AFFAIRS
U.S. Department of the Interior
1849 C Street, N.W., Room 4160
Washington, D.C. 20240

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

## <u>COMPLAINT</u>

    The Plaintiff, the St. Croix Chippewa Indians of Wisconsin ("The St. Croix Tribe"), files

this Complaint against the Defendants, Secretary of the Interior Dirk Kempthorne and Assistant

Secretary – Indian Affairs, Carl J. Artman (collectively, the "Defendants") and state and allege

as follows:

151936

## INTRODUCTION

1.      This is an action brought by The St. Croix Tribe, a federally-recognized Chippewa Tribe, located in remote areas of northern Wisconsin.  The St. Croix Tribe, together with the Bad River Band of Lake Superior Chippewa Indians (collectively, the "Tribes") for the past six years have diligently pursued the approval by the Bureau of Indian Affairs ("BIA") to establish a casino in Beloit, Wisconsin.

2.      The St. Croix Tribe, whose reservation lands are located in remote areas of Wisconsin, faces significant challenges to economic development and diversification.  It currently has two casinos (located on Tribal lands).  They produce insufficient revenues to fund badly-needed tribal needs.  The St. Croix Tribe has significant unemployment and a substantial percentage of its employed members earn wages which are below the poverty level.

3.      The St. Croix Tribe's ability to accumulate the resources to meet their substantial unmet needs, to obtain the capital for further economic development, to increase employment for tribal members, and to decrease its dependence on funding from the federal government, is largely dependant on the approval of the Beloit Casino Project.  This would be a large destination resort expected to attract several million visitors a year, principally from the densely populated greater Chicagoland area.  In addition to its casino, the project will include a 500-room hotel, several restaurants, a conference center, a theater and a water park.  The general region anticipates that the casino will generate significant revenues for a wide variety of service industries in the area.  The Beloit Casino Project will involve construction costs of at least $300 million.  Once built, it will provide some 3,000 full-time jobs.  This project dominates the local scene in terms of its future economic planning and hopes for its economic revitalization.  Local

elected officials have repeatedly written BIA officials, as well as attending numerous meetings in Washington, D.C. with BIA representatives, to express their strong and unequivocal support for the project.

4.    The Beloit Casino Project was originally the idea of the City of Beloit itself as a viable course by which it could restore the local economy which had seriously declined due to the loss of thousands of jobs due to factory closings. The Beloit Casino Project has been supported unanimously for many years by resolutions of the Beloit City Council. It has also received favorable resolutions of support from Rock County (where Beloit is located) as well as from other nearby townships.

5.    The Tribes have ancestral and historical ties to the Beloit region. The Tribes' ancestors resided in the Beloit area and were parties to peace treaties ceding lands in this area to the United States.

6.    The Tribes jointly filed in July 2001 an application with the BIA Regional Office to take 26 acres of land into trust for gaming purposes in Beloit, Wisconsin. To date, the Tribes have collectively spent in excess of $2 million in pursuit of the approval of this project, including consultant costs, legal fees and option payments made to a local developer for the would-be trust land and adjoining lands necessary for the casino project. The St. Croix Tribe itself has, to date, spent well in excess of $1 million on this project.

7.    Throughout the process of seeking approval from the BIA, the Tribes have incurred these significant expenses without the financial assistance of an outside developer/promoter. The Tribes have taken inordinate measures to ensure that they were fully complying with all of the BIA's exacting requirements for the approval of the Beloit Casino

Project, including the significant requirements imposed by the National Environmental Policy

Act ("NEPA") and the National Historic Preservation Act. This included the substantial

expenditure of time and financial resources that went into the preparation of an Environmental

Assessment ("EA"). After the completion of the EA, the Tribes were informed by the

Department of Justice that it would require an Environmental Impact Statement ("EIS") to be

prepared for all off-reservation casino applications. (Otherwise, the Department of Justice

indicated it would not defend any lawsuit brought to challenge a Finding of No Significant

Impact ("FONSI") issued by the BIA based on an EA.) That, in turn, required the Tribes to start

all over again (beginning with the scoping process required for an EIS). That took an additional

three years of time, effort and expense. Tribal representatives were informed several weeks ago

that the draft filed by the EIS had been approved by the Solicitor's Office of the BIA.

8.     In order to be assured that the Tribes correctly understood the procedures which

would be required in order to gain approval for their project, Tribal leaders, staff members and

attorneys have had numerous meetings with representatives of the BIA in both its Regional

Office located in St. Paul, Minnesota as well as with senior officials of the BIA in its Central

Office in Washington, D.C. During these meetings, numerous issues have been addressed and

resolved. During the six years of discussions with BIA representatives in the Regional Office, it

was continuously represented by the BIA to Tribal representatives that the Section 20 ("IGRA")

decision would be made first by the Central Office; and if the Governor concurred, the BIA

would then proceed to make the fee-to-trust determination under 25 C.F.R. Part 151 ("Part 151").

9.     The Tribes' application was forwarded (with a favorable recommendation) by the

Regional Office to the Central Office in January 2007. From that moment until August 2007,

Tribal leaders and their representatives were informed by BIA officials in meetings in the Central

Office that the two-part determination would be made before the Part 151 determination as had been the practice followed by the BIA. However, in August 2007, the Tribes were first notified that this process would be reversed and that the Part 151 decision would be made <u>before</u> the two-part determination required under IGRA. This represented a 100% reversal of the decision-making process during both the Clinton Administration and, thereafter, the Bush Administration.

10.    Despite all of this, it has recently become apparent that the efforts of the Tribes and elected officials in Beloit (and the surrounding region) to have the BIA approve this project will, in all probability, be a futility. This is strictly due, on information and belief, to Secretary Dirk Kempthorne's personal views opposing off-reservation gaming for reasons which do not find a basis in either the standards set out by IGRA or for taking fee land into trust pursuant to Part 151. Secretary Kempthorne's personal animus towards off-reservation gaming is set forth in a recent Complaint filed in this Court. <u>See</u> <u>St. Regis Mohawk Tribe v. Dirk Kempthorne</u> (Civil Action No. 07-CV-01958-RWR).

11.    On information and belief, Secretary Kempthorne's negative personal views toward off-reservation gaming have led the BIA to craft an artifice by which it can plausibly proceed to deny a number of pending off-reservation casino applications, including Beloit.

12.    The Department of the Interior ("DOI") is unlawfully attempting to carry this out by making the Part 151 determination first. Upon information and belief, it is doing so because it is fully aware that if the two-part determination of IGRA were made first, there would be no realistic way to deny the Beloit application (and a number of other similar pending applications awaiting decision) in that the Tribal applications fully meet the requirements of IGRA's two-part determination. Further, on information and belief, senior officials of the DOI have concluded

that once a favorable two-part determination is made (assuming concurrence by the Governor), this would leave no room for the BIA to deny the applications under Part 151 and have any realistic belief that this decision would be upheld by a Federal Court. In other words, the IGRA determinations would effectively require the BIA to make favorable findings under Part 151 on a number of the important issues presented under the regulations such as whether the trust land is needed and whether the trust acquisition would promote self-determination and economic development. 25 C.F.R. § 151.3(a)(3). For these reasons, on information and belief, the DOI has decided to make the Part 151 determination <u>first</u> because it will leave it free to deny a fee-to-trust gaming application under the "self-determination," "economic development," "need" and other factors outlined in Part 151. As set forth below, by adopting this new procedure, the DOI has completely ignored the requirements of the Administrative Procedure Act ("APA") as well as Congressional intent set out in IGRA.

13.    The Tribes seek Declaratory and Injunctive Relief from this Honorable Court in order to prevent the DOI from denying the Beloit fee-to-trust and similar applications by using its newly adopted unlawful procedure to make the Part 151 decision prior to the two-part IGRA determinations. Unless Injunctive relief is entered, on information and belief, the DOI will proceed in the next several weeks to deny the Beloit application as well as a number of other pending off-reservation casino applications submitted by other Tribes.

## Jurisdiction and Venue

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1362 and 5 U.S.C. §§ 701-706. This Court has authority to issue Declaratory and Injunctive Relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 555(b) and 701-706.

15.     Venue is proper in this District Court pursuant to 28 U.S.C. § 1391(e) because this is an action in which the Defendants are officers and employees of the United States acting in their official capacities, and a substantial part of the events or omissions giving rise to the claims herein have occurred or will occur in this judicial district.

## Parties

16.     The St. Croix Tribe is a federally recognized Indian tribe whose reservation is located in Burnett, Polk and Barron counties in northwestern Wisconsin.  The Tribe qualifies under IGRA, 25 U.S.C. § 2701 *et seq.* to operate class III gaming in the proposed Beloit Casino.

17.     Dirk Kempthorne is the Secretary of the Interior and is charged by law with carrying out the duties and responsibilities of the United States as a trustee for the Tribes.  In his official capacity, Secretary Kempthorne is authorized to make the required determinations under IGRA, § 2719(b)(1)(A), that the proposed Beloit Casino is in the best interest of the Tribes and is not detrimental to the surrounding community.  Thereafter, if the Governor concurs in a favorable determination, Secretary Kempthorne is authorized to acquire the proposed land in trust for the Beloit Casino Project in the name of the United States and to hold such land in trust for the Tribes, and to take all necessary action on the Tribes' request to acquire such lands.

18.     Carl J. Artman is the Assistant Secretary – Indian Affairs and is charged by law with carrying out the duties and responsibilities of the United States as a trustee for the Tribes.  In his official capacity, Assistant Secretary Artman is authorized to make the required determinations under IGRA, § 2719(b)(1)(A), that the proposed Beloit Casino is in the best interests of the Tribes and is not detrimental to the surrounding community.  Thereafter, if the Governor concurs in this determination, Secretary Kempthorne is authorized to acquire the

151936                                7

proposed land in trust for the Beloit Casino Project in the name of the United States and to hold

such land in trust for the Tribes, and to take all necessary action on the Tribes' request to acquire

such lands.

## BACKGROUND

### A. Statutory and Regulatory Requirements

19.     Section 5 of the Indian Reorganization Act, 25 U.S.C. § 465, enacted in 1934, and

its implementing regulations at 25 C.F.R. Part 151 (promulgated in 1980) authorize the Secretary

of the Interior to acquire lands for Indian tribes in the name of the United States to hold such

lands in trust for Indian tribes and to take action on a tribe's request to acquire such lands.  This

statute and the Part 151 regulations apply to all tribal requests to take land into trust for any

purpose.

20.     In 1988, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701

*et seq.* ("IGRA").  Congress intended IGRA "to provide a statutory basis for the operation of

gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency,

and strong tribal governments[,] ... to ensure that the Indian tribe is the primary beneficiary of

the gaming operation, . . . and to protect such gaming as a means of generating tribal revenue."

25 U.S.C. § 2702.  The Senate Committee on Indian Affairs Report, in describing IGRA's

exceptions, made it clear that they were meant to set "forth policies with respect to lands

acquired in trust after [IGRA's] enactment.  S. Rep. No. 100-446, at 20 (1988), *reprinted in* 1988

U.S.C.C.A.N. 3071, 3090.

21.     Under Section 20 of IGRA, 25 U.S.C. § 2701, tribes are prohibited from engaging

in any gaming on land acquired after the date of IGRA's enactment, October 17, 1988, unless

certain exceptions are satisfied. The exception, pertinent herein, is § 2719(b)(1)(A), which

provides that the prohibition of gaming on post-1988 land does not apply when:

> the Secretary, after consultation with the Indian tribe and
> appropriate State and local officials, including officials of other
> nearby Indian tribes, determines that a gaming establishment on
> newly acquired lands [1] would be in the best interest of the Tribe
> and its members, and [2] would not be detrimental to the
> surrounding community, but only if the Governor of the State in
> which the gaming activity is to be conducted concurs in the
> Secretary's determination ...

This exception is commonly referred to as the "two-part determination."

22.    Thus, Section 5 of the Indian Reorganization Act, 25 U.S.C. § 465 (and its

regulations falling under Part 151) and IGRA, § 2719 (b)(1)(A), both apply to the acquisition of

trust lands for gaming purposes. Section 5 of the Indian Reorganization Act is very general in

nature in that it, together with the Part 151 regulations, apply to the determination as to whether

fee land will be taken into trust for any purpose, whether that be for grazing, Indian housing, a

grocery store or a casino. They authorize the Secretary of the Interior to acquire lands that are

either "within or without existing reservations," for Indian tribes in the name of the United States

to hold those lands in trust for Indian tribes. The criteria governing when land will be taken into

trust for an Indian tribe under this statute were promulgated by Interior in regulations at 25

C.F.R. Part 151. The criteria relevant to this case appear at 25 C.F.R., §§ 151.3, 151.10 and

151.11.

23.    25 C.F.R., § 151.3, provides, in pertinent part, that:

> land not held in trust ... may only be acquired for an individual
> Indian or a tribe in trust status when such acquisition is
> authorized by an act of Congress. No acquisition of land in trust
> status ... shall be valid unless the acquisition is approved by the
> Secretary.
>     (a) Subject to the provisions contained in the acts of
> Congress which authorize land acquisitions, land may be acquired
> for a tribe in trust status:

\*     \*     \*

(3)  When the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.

24.    25 C.F.R., § 151.10, provides that for on-reservation trust acquisitions:

The Secretary will consider the following criteria in evaluating requests for the acquisition of land in trust status when the land is located within or contiguous to an Indian reservation, and the acquisition is not mandated:

(a)  The existence of statutory authority for the acquisition and any limitations contained in such authority;

(b)  The need of the individual Indian or the tribe for additional land;

(c)  The purposes for which the land will be used;

(d)  *[provision relating to acquisition for individual Indian, not applicable to tribal application]*;

(e)  If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;

(f)  Jurisdictional problems and potential conflicts of land use which may arise; and

(g)  If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

(h)  The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.

25.    25 C.F.R, § 151.11, which governs off-reservation trust acquisitions, provides, in

pertinent part, that:

The Secretary shall consider the following requirements in evaluating tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation, and the acquisition is not mandated:

(a)  The criteria listed in Sect. 151.10(a) through (c) and (e) through (h);

(b) The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation, shall be considered as follows: as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition. The Secretary shall give greater weight to the concerns raised pursuant to paragraph (d) of this section.

(c) Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed land.

(d) Contact with state and local governments pursuant to Sect. 151.10(e) and (f) shall be completed as follows: Upon receipt of a tribe's written request to have lands taken in trust, the Secretary shall notify the state and local governments having regulatory jurisdiction over the land to be acquired. The notice shall inform the state and local government that each will be given 30 days in which to provide written comment as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

## B. The Tribes' Application for Land To Be Taken Into Trust for Gaming Purposes in Beloit

26.     In July 2001, the Tribes submitted an application to the BIA's Regional Office in St. Paul, Minnesota for the Secretary of the Interior to acquire a 26-acre parcel in trust for gaming purposes in Beloit, Wisconsin.

27.     On January 8, 2007, Regional Director Terry Virden, wrote the Tribes' Chairmen, informing them that their application had been forwarded to the Central Office in Washington, D.C. with a favorable recommendation. Almost immediately thereafter, Tribal leaders and representatives, together with elected officials from the Beloit area, met in Washington, D.C. with George Skibine, Director of the BIA's Indian Gaming Management Staff. At that time, Mr. Skibine informed the numerous individuals present that the BIA would complete its staff review of the Tribes' application within sixty days. However, after that meeting, it became apparent that the review process (other than for the ongoing review of the draft EIS) had

essentially become frozen in that it was clear that this application, and other similar applications, were not going to be favorably approved by virtue of Secretary Kempthorne's strong negative views towards off-reservation fee-to-trust gaming applications. It was also apparent to the Tribes that Secretary Kempthorne's views found no basis in either IGRA or Part 151 and that he was nonetheless determined not to approve these applications, including Beloit, whether that meant making no decision at all during the remainder of his term as Secretary or crafting some artifice by which to deny the applications. This reality, on information and belief, led to an informal freeze within the BIA of taking various interim steps in the decision-making process for pending off-reservation casino applications such as failing to take the necessary steps to permit Notices of Availability to be published in the *Federal Register* for draft or final EIS's. This, in fact, was the subject of testimony and critical comments made by Senator Dorgan at a recent Oversight hearing of the Senate Indian Affairs Committee in which Assistant Secretary Artman appeared.

28.     After little or no progress was perceived by the Tribes and their representatives in the review of the Beloit application, the St. Croix Tribe's outside counsel, Robert M. Adler, wrote to Assistant Secretary Artman by letter dated July 13, 2007. In that letter, he: (a) requested (in view of the delay by the BIA in reviewing the application) that Assistant Secretary Artman inform him when the staff review of the application would be completed; and, (b) asked Assistant Secretary Artman to inform him whether rumors were accurate that the Part 151 determination would be made before the two-part IGRA determination. Mr. Adler also expressed serious concerns about the use of Part 151 as the appropriate standards to be applied in making decisions to approve (or deny) off-reservation casino applications. Mr. Adler pointed out that to do so would be contrary to Congressional intent.

29.     By letter dated August 21, 2007, a response was sent to Mr. Adler by George Skibine, Acting Deputy Assistant Secretary-Policy and Economic Development.  Mr. Skibine indicated that he had been asked to respond to Mr. Adler's letter of July 13, 2007.  This letter proceeded to state, in pertinent part:

> We will make a determination on whether to take land into trust pursuant to Part 151 prior to making the two-part secretarial determination under IGRA.  We believe that it is the appropriate and logical sequence for the decision-making process.  We do not believe that this represents a policy change since the Department has never before specified a particular sequence from making the two decisions involved in this process.  (emphasis supplied).

On information and belief, the DOI has not informed other Indian tribes or the public at large (whether through publication in the *Federal Register* or otherwise) that for fee-to-trust off-reservation gaming applications pending in the Central Office, the DOI will make the Part 151 determination prior to the two-part determination under IGRA.

30.     Despite the representation in Mr. Skibine's letter of August 21, 2007 that "the Department has never before specified a particular sequence from making the two decisions", this has not actually been the case.  During the Clinton Administration and later during the Bush Administration, it was made quite clear to the public that the two-part determination would be made first.  And, in point of fact, during the past six years, the two-part determination has been made prior to the Part 151 decision in at least two instances.

31.     In a letter dated December 21, 2006 from James E. Cason, the Associate Deputy Secretary of the Department of the Interior, to the then-Governor of New York, George Pataki, Mr. Cason wrote that he was providing him with an opportunity to concur in the two-part determination which had been made on the St. Regis Mohawk application for an off-reservation casino.  (A favorable decision under the two-part IGRA determination had previously been made.)  Mr. Cason stated, in pertinent part:

Your affirmative written concurrence is required before the Department will proceed with the consideration of the St. Regis Mohawk Tribe's application to take a portion of the Monticello Raceway in trust pursuant to the Department's land acquisition regulations in 25 U.S.C. Part 151. Please be mindful that your concurrence and its two-part determination under Section 20(b)(1)(A) of IGRA <u>should not be construed as a future commitment from the Department to take the land into trust. That decision has yet to be made and will be made only after consideration of all of the regulatory requirements contained in 25 C.F.R. Part 151.</u> (emphasis supplied).

32. A similar letter was sent on February 20, 2001 to Wisconsin Governor Scott McCallum by James H. McDivitt, Deputy Assistant Secretary-Indian Affairs (Management). This letter pertained to the pending application of three Wisconsin Tribes to take land into trust in Hudson, Wisconsin for the purpose of operating an off-reservation casino. Deputy Assistant Secretary McDivitt made it crystal clear that the two-part determination preceded the Part 151 determination which would be made if the Governor concurred in the IGRA decision. Deputy Assistant Secretary McDivitt wrote, in pertinent part:

Pursuant to Section 20(b)(1)(A) of the IGRA, before the Hudson parcel can be acquired in trust for gaming purposes, I must determine that a gaming facility on the land would be in the best interests of the Tribes and their members and not detrimental to the surrounding community and then you must concur in that determination. <u>If you concur in this determination, the land can be acquired by the United States in trust for the Tribes for gaming purposes, provided all the requirements of the Bureau of Indian Affairs' land acquisition regulations found in 25 CFR Part 151 are met.</u> (emphasis supplied).

Deputy Assistant Secretary McDivitt then stated:

The Department has completed its review of the Tribes' application for the two-part determination. Based on this application and its supporting documentation, including the comments received from the State and local government officials, and officials of nearby Indian tribes,

the Department has made findings of fact supporting the
two-part determination.

Mr. McDivitt proceeded to inform Governor McCallum that this letter was

being sent to him in order to seek his concurrence on the BIA's favorable two-part

determination.

33.     An action had been filed several years before by the three Tribal applicants for the

Hudson casino against then-Secretary of the Interior Babbitt. Sokaogon Chippewa Community,

et al. v. Bruce C. Babbitt, Secretary, in the United States District Court for the Western District

of Wisconsin (Civil Action No. 2000-1137). Significantly, in a brief filed on March 9, 2000 in

that action by the Department of Justice, in which attorneys in the Solicitor's Office of the

Department of the Interior appeared "Of Counsel," the Government stated, in pertinent part at 2-

3:

>       Pursuant to guidelines issued on September 28, 1994, by the
>       Acting Deputy Commission of the Indian Affairs, area offices of
>       the Bureau of Indian Affairs must make the initial determination
>       of whether an applicant tribe has satisfied their requirements of
>       § 2719(b)(1)(A) (emphasis supplied).

The Government's brief further stated at 22:

>       As explained above (p. 5), the Department may not exercise its
>       authority under 25 U.S.C. Section 465 to acquire land in trust if it
>       will be used for gaming purposes unless an applicant tribe can
>       show that a proposed gaming operation will be in its best interest
>       and that the operation will not be detrimental to the surrounding
>       community. 25 U.S.C. § 2719(b)(1)(A).

34.     The District Court in the Hudson litigation issued a decision which clearly

recognized that the two-part determination was made by the BIA prior to the Part 151 decision.

Sokaogon Chippewa Community, et al. v. Bruce C. Babbitt, Secretary, et al., 929 F.Supp. 1165,

1169-1170 (USDC for the Western District of Wisconsin, 1996). The Court stated:

> A request to establish an off-reservation gaming facility must be
> approved by the Secretary of the Interior in accordance with the
> Indian Gaming Regulatory Act, which provided at 25 U.S.C.
> § 2719(b)(1)(A) that off-reservation is permitted only if [the
> two-part determination is favorably decided by the Secretary].
> Even if the secretary finds that the proposed off-reservation
> gaming establishment is in the best interest of the applicant tribes
> and would not be detrimental to the surrounding community and
> the governor concurs in that determination, the secretary must
> decide whether to exercise his discretion to acquire the land in
> trust pursuant to the Indian Reorganization Act, 25 U.S.C. § 465.

35.     On September 21, 2007, Assistant Secretary Artman, issued a memorandum to all

of the BIA Regional Directors.  In this memorandum, Assistant Secretary Artman explained that

attached to it was a September 2007 revision of the "checklist for gaming acquisitions."

Assistant Secretary Artman further stated that the newly revised checklist differed from the

earlier (March 2005) checklist in only two respects.  The first, which is pertinent to the purposes

herein, was that the first page of the checklist contained a modification "… to clarify that an

application for two-part secretarial determination pursuant to § 20(b)(1)(A) of IGRA should not

be processed until the land is already in trust or, if not in trust, until after the publication of a

notice to take the land in trust has been published pursuant to 25 C.F.R. 151.12." (emphasis

supplied).  Despite Assistant Secretary Artman's representation that this was a clarification, this

was, in fact, a complete reversal of the practice followed by the BIA for many years.


### Count I
### Violation of 5 U.S.C. § 706(2)(A)

36.     The Plaintiff incorporates by reference Paragraphs 1 through 35 as if more fully

set forth herein.

37.     The actions by the Defendants, both taken to date and likely to occur in the near

future, are arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law.

They are or will be in violation of 5 U.S.C. § 706(2)(A). Herein, the Defendants, in their

respective positions, have caused the DOI to depart from its established practice of making the

two-part determination prior to the Part 151 determination without the requisite notice to Indian

Tribes or the public at large that the DOI had changed its practice and procedure. The DOI

likewise failed to offer a reasoned explanation supporting its change in procedure and practice.

Finally, in deciding to make the Part 151 determination prior to the two-part determination, the

DOI has acted contrary to Congressional intent expressed in IGRA and its legislative history and

has further failed to publicly explain why the DOI is of the view that its new practice and

procedure is consistent with Congressional intent.


## Count II
## Violation of 5 U.S.C. § 706 (2)(B)

38.    The Plaintiff incorporates by reference Paragraphs 1 through 37 as if more fully

set forth herein.

39.    The Defendant's actions, both taken to date and likely to occur in the near future,

in deciding to make the Part 151 determination prior to the two-part determination, and thereafter

planning to deny the Tribes' off-reservation gaming application (and similar ones submitted by

other Indian Tribes) constitute *ultra vires* actions which violate the Due Process clause of the

United States Constitution; and, therefore, are contrary to The St. Croix Tribe's Constitutional

rights, power or privilege and are therefore unlawful to 5 U.S.C. § 706(2)(B).

**Count III**
**Violation of 5 U.S.C. § 706(2)(C)**

40.     The Plaintiff incorporates by reference Paragraphs 1 through 39 as if more fully set forth herein.

41.     The Defendant's actions, both taken to date and likely to occur in the near future, in deciding to make the Part 151 determination prior to the two-part determination, and thereafter planning to deny the Tribes' off-reservation gaming application (and similar ones submitted by other Indian Tribes) constitute *ultra vires* actions which are in excess of the agency's statutory jurisdiction, authority or limitations, or short of statutory right and are therefore unlawful pursuant to 5 U.S.C. § 706(2)(C).

**Count IV**
**Violation of 5 U.S.C. § 706(2)(D)**

42.     The Plaintiff incorporates by reference Paragraphs 1 through 41 as if more fully set forth herein.

43.     The Defendant's actions, both taken to date and likely to occur in the near future, in deciding to make the Part 151 determination prior to the two-part determination, and thereafter planning to deny the Tribes' off-reservation gaming application (and similar ones submitted by other Indian Tribes) constitute *ultra vires* actions which are without observance of procedure required by law and are therefore unlawful pursuant to 5 U.S.C. § 706(2)(D).

**Count V**
**Violation of Trust Responsibilities**

44.     The Plaintiff incorporates by reference Paragraphs 1 through 43 as if more fully set forth herein.

151936                                     18

45.     The Defendant's actions, both taken to date and likely to occur in the near future, in deciding to make the Part 151 determination prior to the two-part determination, and thereafter planning to deny the Tribes' off-reservation gaming application (and similar ones submitted by other Indian Tribes) are violations of the trust responsibilities owed by the Defendants to Indian tribes.

## Count VI
## Declaratory Judgment (28 U.S.C. §§ 2201 and 2202)

46.     The Plaintiff incorporates by reference Paragraphs 1 through 45 as if more fully set forth herein.

47.     Upon hearing the merits, this Court should enter a Declaratory Judgment that the Department of the Interior's decision to make the Part 151 determination prior to the two-part determination under IGRA is invalid and unlawful.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that this Honorable Court:

1.     Enter a Temporary Restraining Order and a Preliminary Injunction, pending a decision on the merits, that enjoins the Defendants and those persons in active concert or participation with them receive actual notice of this Order by personal service or otherwise:

(a)     implementing or otherwise carrying out the Department of Interior's recently announced policy and procedure that it will make the Part 151 determination prior to the two-part determination under IGRA (25 U.S.C. § 2719(b)(1)(A)) with respect to Plaintiff and the Bad River Band's pending off-reservation fee-to-trust application for gaming purposes in Beloit,

Wisconsin, as well as with respect to pending off-reservation fee-to-trust applications for gaming purposes submitted by other Indian tribes; and

(b)      making any decision or determination with respect to the Plaintiff and the Bad River Band's pending application to take land into trust for gaming purposes in Beloit, Wisconsin (as well as from making any decisions or determinations with respect to similar off-reservation applications filed by other Indian tribes to take land into trust for gaming purposes) unless it first makes the required two-part determinations appearing in 25 U.S.C. § 2719(b)(1)(A).

2.      Upon hearing the merits, enter a Declaratory Judgment that the Department of the Interior's decision to make the Part 151 determination prior to the two-part determination under IGRA is invalid and unlawful; and, enter a Permanent Injunction which prohibits the Defendants, or anyone working with or associated with them, from implementing or otherwise carrying out this decision, by way of making any decisions or determinations on fee-to-trust applications, for either the pending Beloit fee-to-trust application or other similar off-reservation fee-to-trust applications for gaming purposes submitted by other tribes.

3.      Award the Plaintiff its cost and expenses, including reasonable attorney's fees; and

151936                                  20

4.    Award such other and further relief as is just and proper.

Respectfully submitted,

Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1400
Fax: 202-887-6186
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com

*Attorneys for the St. Croix Chippewa
Indians of Wisconsin*

Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893

Dated: December 7, 2007

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 07-CV-02210 RWR |
| DIRK KEMPTHORNE in his official capacity as SECRETARY OF INTERIOR | ) ) ) ) ) | |
| and | ) ) | |
| CARL J. ARTMAN in his official capacity as ASSISTANT SECRETARY - INDIAN AFFAIRS | ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF HAZEL HINDSLEY

HAZEL HINDSLEY, declares and states that:

1.      I am the elected Tribal Chairperson for the St. Croix Chippewa Indians of Wisconsin ("St. Croix Tribe"). I was elected to that position during June 2007. I have served as an elected Council member for the St. Croix Tribe from 1999 to 2001 and from 2003 to 2007.

2.      During the time that I have served on the St. Croix Council, the Council has had numerous discussions and meetings over the years pertaining to the Beloit casino project. I am very familiar with that project and set forth below the following based upon my own firsthand knowledge and information.

151921

3.     The St. Croix Tribe, whose reservation lands are located in remote areas of Wisconsin, faces significant challenges to economic development and diversification. The St. Croix Tribe currently has approximately 1100 enrolled members, of which 838 are 18 years of age and older. The Tribe's current enrolled member unemployment rate is approximately 25%. The overall unemployment rate for northwest Wisconsin is 4% to 7%. Of those enrolled Tribal members with jobs, some 20% earn wages below the poverty level. The Tribal government has unmet needs in a variety of facets, including but limited to: reservation housing needs, health care costs and education. Currently, the Tribe's clinic in Hertel, Wisconsin, which the Tribe administers pursuant to the Indian Self-Determination Act, 25 U.S.C. § 450-458aaa-18)(ISDA), is federally under-funded due to contract shortfalls and miscalculated rates.

4.     The St. Croix Tribe's ability to accumulate the resources to meet their substantial unmet needs, to obtain the capital for further economic development, to increase employment for tribal members, and to decrease its dependence on funding from the federal government, is largely dependant on the approval of the Beloit Casino Project. This would be a large destination resort expected to attract several million visitors a year, principally from the densely populated greater Chicagoland area. In addition to its casino, the project will include a 500-room hotel, several restaurants, a conference center, a theater and a water park. The general region anticipates that the casino will generate significant revenues for a wide variety of service industries in the area. The Beloit Casino Project will involve construction costs of at least $300 million. Once built, it will provide some 3,000 full-time jobs. This project dominates the local scene in terms of its future economic planning and hopes for its economic revitalization. Local

elected officials have repeatedly written BIA officials, as well as attending numerous meetings in Washington, D.C. with BIA representatives, to express their strong and unequivocal support for the project.

5.     The Beloit Casino Project was originally the idea of the City of Beloit itself as a viable course by which it could restore the local economy which had seriously declined due to the loss of thousands of jobs due to factory closings. The Beloit Casino Project has been supported unanimously for many years by resolutions of the Beloit City Council. It has also received favorable resolutions of support from Rock County (where Beloit is located) as well as from other nearby townships.

6.     The St. Croix Tribe and the Bad River Band of Lake Superior Chippewa Indians (the "Tribes") jointly filed in July 2001 an application with the BIA Regional Office to take 26 acres of land into trust for gaming purposes in Beloit, Wisconsin. To date, the Tribes have collectively spent in excess of $2 million in pursuit of the approval of this project, including consultant costs (primarily environmental), legal fees and option payments made to a local developer for the would-be trust land and adjoining lands necessary for the casino project. The St. Croix Tribe itself has to date spent well in excess of $1 million on this project.

7.     Throughout the process of seeking approval from the BIA, the Tribes have incurred these significant expenses without the financial assistance of an outside developer/promoter.

8.     The Tribes have taken inordinate measures to ensure that they were fully complying with all of the BIA's exacting requirements for the approval of the Beloit Casino Project, including the significant requirements imposed by the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act. This included the substantial

expenditure of time and financial resources that went into the preparation of an Environmental

Assessment ("EA"). After the completion of the EA, the Tribes were informed by the

Department of Justice that it would require an Environmental Impact Statement ("EIS") to be

prepared for all off-reservation casino applications. (Otherwise, the Department of Justice

indicated it would not defend any lawsuit brought to challenge a Finding of No Significant

Impact ("FONSI") issued by the BIA based on an EA.) That, in turn, required the Tribes to start

all over again (beginning with the scoping process required for an EIS). That took an additional

three years of time, effort and expense. Tribal representatives were informed several weeks ago

that the draft filed by the EIS had been approved by the Solicitor's Office of the BIA.

9.      In order to be assured that the Tribes correctly understood the procedures which

would be required in order to gain approval for their project, Tribal leaders, staff members and

attorneys have had numerous meetings with representatives of the BIA in both its Regional

Office located in St. Paul, Minnesota as well as with senior officials of the BIA in its Central

Office in Washington, D.C. During these meetings, numerous issues have been addressed and

resolved. During the six years of discussions with BIA representatives in the Regional Office, it

was continuously represented by the BIA to Tribal representatives that the Section 20 ("IGRA")

decision (the so-called two-part determination), would be made <u>first</u> by the Central Office; and if

the Governor concurred, the BIA would then proceed to make the fee-to-trust determination

under Part 151.

10.     Despite all of this, it has recently become apparent that the efforts of the Tribes

and elected officials in Beloit (and the surrounding region) to have the BIA approve this project

will, in all probability, be a futility absent intervention by the Court. This is because, as I view it,

there is an apparent effort to find some pretext by which to deny the Tribes' pending fee-to-trust

application for gaming in Beloit, Wisconsin. The Department of the Interior put this into place by deciding to make the Part 151 determination <u>before</u> the two-part determination under IGRA. Other than a letter dated August 21, 2007 received by our attorney, Robert Adler, the St. Croix Tribe has received absolutely no notification from the Department of the Interior that it will make the Part 151 determination for our application before the required two-part determination under IGRA. It is obvious that this is a total change in policy and procedure. Absolutely no written explanation has been given to the St. Croix Tribe as to the reasons for this change in policy and procedure.

11.   Unless this Court enjoins the Department of the Interior from proceeding to deny the fee-to-trust application submitted for the proposed casino in Beloit, Wisconsin, by its unlawful use of Part 151 of the regulations, the St. Croix Tribe will be inordinately damaged by not only the loss of the more than $1 million paid to date (which is money it cannot afford to lose) on the project but also for its loss of the future significant anticipated revenues from this project of which the St. Croix Tribe, and its members, are in tremendous need..

The above is true and correct and is stated under the penalty of perjury.

Dated: December __7__, 2007

HAZEL HINDSLEY

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE ST. CROIX CHIPPEWA INDIANS<br>OF WISCONSIN<br><br>                **Plaintiff,**<br><br>**v.**<br><br>DIRK KEMPTHORNE<br>in his official capacity as SECRETARY OF<br>INTERIOR<br><br>and<br><br>CARL J. ARTMAN<br>in his official capacity as ASSISTANT<br>SECRETARY - INDIAN AFFAIRS<br><br>          **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **CASE NO. 07-CV-02210 RWR** |

## AFFIDAVIT OF ROBERT M. ADLER

ROBERT M. ADLER, being duly sworn, deposes and sayeth that:

1.     I am the lead counsel for the St. Croix Chippewa Indians of Wisconsin (the "St. Croix Tribe") in this action. On behalf of the St. Croix Tribe I have served in that capacity since March 2002 for matters relating to the Federal regulatory approval of the fee-to-trust application for gaming in Beloit, Wisconsin submitted to the BIA Regional Office in St. Paul, Minnesota by the St. Croix Tribe and the Bad River Band of Lake Superior Chippewa Indians (hereinafter, the "Tribes").

151913

2.      During this time period, I have had a number of meetings relating to this

application with George Skibine, Director of the BIA's Indian Gaming Management Staff,

several of which have been attended by Tribal officials and elected officials from the Beloit area.

As set forth below, until quite recently, the Tribal leaders and I have been informed during these

meetings that the process by which the Department of the Interior would make a decision on the

Beloit off-reservation casino application would be the same as historically had taken place.  That

is, the first decision which would be made by the Department of the Interior would be whether or

not it would make a favorable decision under IGRA, 25 U.S.C. § 2719 (b)(1)(A).  This is the

well-known two-part decision.  The two factors which must be decided under it are:  (1) whether

the proposed off-reservation casino would be in the best interests of the applicant Tribes; and (2)

whether there was detriment to the surrounding community.

3.      Beginning with the first days of the Administration of President George W. Bush,

Mr. Skibine and others at the Department of the Interior have emphasized the fact that, as they

viewed it, an essential aspect of the "detriment issue" is whether or not there is strong support for

the project by the local elected officials.  Since this project has had such support for a number of

years, we were never led to believe that the "detriment" issue would be a problem in having the

application approved.  (There has never been an environmental concern raised by anyone at the

BIA in connection with this project -- and, in fact, I was informed several weeks ago by Maria

Wiseman of the BIA's Solicitor's Office that she had approved the draft final EIS.)

4.      However, beginning sometime in June of this year, I began to hear in discussions,

on a very informal basis, with Department of Interior officials and lawyers representing other

tribes (having similar pending applications) that consideration was being given by the

Department of the Interior to reversing the order of the decision making process by having the

Part 151 decision made before the two-part determination under IGRA. This was almost astounding to me. Historically, from my own involvement in these matters for some ten years, if an affirmative determination was made by the Department of the Interior under IGRA, and the Governor thereafter concurred (as required by the statute) then the remaining issues under Part 151 of the regulations were easily satisfied by the Tribal applicants. They primarily dealt with how the given Tribe would restore, if at all, to the local taxing authority its lost revenues by virtue of the property being placed into trust. Other issues were what are generally known as "jurisdictional" questions involving how the given Tribe and the local jurisdiction(s) had agreed that various health and safety matters would be handled. For example, would the Tribe's own plumbing code be used on the trust property as opposed to that of the local jurisdiction? These issues are normally dealt with in what is known as an Intergovernmental Agreement ("IGA") negotiated at some length between a given Tribe and local jurisdictions. In this case, such an IGA had been successfully negotiated between the Tribes and the City of Beloit. Throughout, it was my understanding that this Agreement more than adequately dealt with all of the issues which are raised by Part 151. In fact, no one from the BIA ever informed me (or to my knowledge, either of the two Tribes) that the present IGA was in any way inadequate or otherwise presented a problem for BIA approval under Part 151 of the regulations.

5.    On January 8, 2007, Regional Director Terry Virden, wrote the Tribes' Chairmen, informing them that their application had been forwarded to the Central Office in Washington, D.C. with a favorable recommendation. A true and accurate copy of that letter is appended hereto as Exhibit A. Almost immediately thereafter (in mid-January), Tribal leaders and representatives, together with elected officials from the Beloit area, met in Washington, D.C. with George Skibine, Director of the BIA's Indian Gaming Management Staff. I was present at

that meeting. At that time, Mr. Skibine informed those present that the BIA would complete its staff review of the Tribes' application within sixty days. He also confirmed that the two-part determination would be made by the BIA; and, if favorable, then the BIA would proceed to make the Part 151 determination if the Governor had previously concurred in the BIA's favorable two-part determinations (as required by the statute, 25 U.S.C. § 2719(b)(1)(A)).

6.    After this meeting with Mr. Skibine, it became apparent to me that the review process at the BIA (other than for the ongoing review of the draft EIS) had essentially become frozen in that it was clear that this application, and other similar applications, were not going to be favorably approved by virtue of Secretary Kempthorne's negative views towards off-reservation fee-to-trust gaming applications.

7.    I perceived little or no progress was being made by the BIA in its review of the Beloit application (other than for the Solicitor's Office review of the draft final EIS); accordingly, I wrote to Assistant Secretary Carl J. Artman by letter dated July 13, 2007. A true and accurate copy of that letter is appended hereto as Exhibit B. In that letter: (a) I requested (in view of the delay by the BIA in reviewing the application) that Assistant Secretary Artman inform me when the staff review of the application would be completed; and, (b) I asked Assistant Secretary Artman to inform me whether rumors were accurate that the Part 151 determination would be made before the two-part IGRA determination. I also expressed serious concerns about the use of Part 151 as the appropriate standards to be applied in making decisions to approve (or deny) off-reservation casino applications. Finally, I pointed out that to do so would be contrary to Congressional intent.

8.      I received a response to my July 13, 2007 letter in a letter dated August 21, 2007

from George Skibine, Acting Deputy Assistant Secretary-Policy and Economic Development.  A

true and accurate copy is appended hereto as Exhibit C.  Mr. Skibine indicated that he had been

asked to respond to my letter of July 13, 2007.  This letter proceeded to state, in pertinent part:

> We will make a determination on whether to take land into trust
> pursuant to Part 151 <u>prior</u> to making the two-part secretarial
> determination under IGRA.  We believe that it is the appropriate
> and logical sequence for the decision-making process.  We do not
> believe that this represents a policy change since the Department
> has never before specified a particular sequence from making the
> two decisions involved in this process.  (emphasis supplied).

9.      To my knowledge, Mr. Skibine's letter dated August 21, 2007 was the only

written communication from the Department of the Interior to the Tribes, or either of them, in

connection with their fee-to-trust application for gaming in Beloit which stated that the Part 151

decision would be made prior to the two-part determination.  At no time was there any written

communication from the Department of the Interior to the Tribes, or either of them, explaining

why the Department of the Interior had decided to make the Part 151 determination prior to the

two-part determination under IGRA.  Indeed, this may have been motivated by the Department

of the Interior's position, as expressed in Mr. Skibine's letter of August 21, 2007 (Exhibit C

hereto), that there was no change in policy at all.

10.     To the best of my knowledge, the Department of Interior has not publicly stated,

whether by Notice in the *Federal Register* or otherwise, that a decision had been made by it that

for off-reservation fee-to-trust gaming applications pending in the BIA's Central Office, the

Part 151 determination will be made prior to the two-part determination under IGRA.

11.    In a letter dated December 21, 2006 from James E. Cason, the Associate Deputy

Secretary of the Department of the Interior, to the then-Governor of New York, George Pataki,

Mr. Cason wrote that he was providing him with an opportunity to concur in the two-part

determination which had been made on the St. Regis Mohawk application for an off-reservation

casino.  A true and accurate copy of this letter is appended hereto as Exhibit D.  (As explained in

the letter, a favorable two-part IGRA determination had previously been made.)  Mr. Cason

stated, in pertinent part:

> Your affirmative written concurrence is required before the
> Department will proceed with the consideration of the St. Regis
> Mohawk Tribe's application to take a portion of the Monticello
> Raceway in trust pursuant to the Department's land acquisition
> regulations in 25 U.S.C. Part 151.  Please be mindful that your
> concurrence and its two-part determination under Section
> 20(b)(1)(A) of IGRA should not be construed as a future
> commitment from the Department to take the land into trust.
> That decision has yet to be made and will be made only after
> consideration of all of the regulatory requirements contained in
> 25 C.F.R. Part 151.  (emphasis supplied).

12.    A similar letter was sent on February 20, 2001 to Wisconsin Governor Scott

McCallum by James H. McDivitt, Deputy Assistant Secretary-Indian Affairs (Management).  A

true and accurate copy of this letter is appended hereto as Exhibit E.  This letter pertained to the

pending application of three Wisconsin Tribes to take land into trust in Hudson, Wisconsin for

the purpose of operating an off-reservation casino.  As explained in this letter, the BIA had made

a favorable two-part determination.  Deputy Assistant Secretary McDivitt made it crystal clear

that the two-part determination preceded the Part 151 determination which would thereafter be

made if the Governor concurred in the favorable two-part IGRA determination.  Deputy

Assistant Secretary McDivitt wrote, in pertinent part:

> Pursuant to Section 20(b)(1)(A) of the IGRA, before the
> Hudson parcel can be acquired in trust for gaming purposes,

> I must determine that a gaming facility on the land would
> be in the best interests of the Tribes and their members and
> not detrimental to the surrounding community and then you
> must concur in that determination. <u>If you concur in this
> determination, the land can be acquired by the United States
> in trust for the Tribes for gaming purposes, provided all the
> requirements of the Bureau of Indian Affairs' land
> acquisition regulations found in 25 CFR Part 151 are met.</u>
> (emphasis supplied).

13.    A lawsuit had been filed several years earlier by the three Tribal applicants for the

Hudson casino against then-Secretary of the Interior Babbitt.  <u>Sokaogon Chippewa Community,</u>

<u>et al. v. Bruce C. Babbitt, Secretary,</u> in the United States District Court for the Western District

of Wisconsin (Civil Action No. 2000-1137).  Significantly, in a brief filed on March 9, 2000 in

that action by the Department of Justice, in which attorneys in the Solicitor's Office of the

Department of the Interior appeared "Of Counsel," the Government stated, in pertinent part at 2-

3:

> Pursuant to guidelines issued on September 28, 1994, by the
> Acting Deputy Commission of the Indian Affairs, area offices of
> the Bureau of Indian Affairs must make the <u>initial</u> determination
> of whether an applicant tribe has satisfied their requirements of
> § 2719(b)(1)(A) (emphasis supplied).

The Government's brief further stated at 22:

> As explained above (p. 5), the Department may not exercise its
> authority under 25 U.S.C. Section 465 to acquire land in trust if it
> will be used for gaming purposes unless an applicant tribe can
> show that a proposed gaming operation will be in its best interest
> and that the operation will not be detrimental to the surrounding
> community.  25 U.S.C. § 2719(b)(1)(A).

A true and accurate copy of this brief is appended hereto as Exhibit F.

14.    On September 21, 2007, Assistant Secretary Artman, issued a memorandum to all

of the BIA Regional Directors.  In this memorandum, Assistant Secretary Artman explained that

attached to it was a September 2007 revision of the "checklist for gaming acquisitions."  A true

and accurate copy of Assistant Secretary Artman's transmittal memorandum, together with the revised Checklist for Gaming Acquisitions, is appended hereto as Exhibit G. Assistant Secretary Artman further stated that the newly revised checklist differed from the earlier (March 2005) checklist in only two respects. The first, which is pertinent to the purposes herein, was that the first page of the checklist contained a modification "… to clarify that an application for two-part secretarial determination pursuant to § 20(b)(1)(A) of IGRA should not be processed until the land is already in trust or, if not in trust, until after the publication of a notice to take the land in trust has been published pursuant to 25 C.F.R. 151.12." (emphasis supplied). Despite Assistant Secretary Artman's representation that this was a clarification, it is my view that this was, in fact, a complete reversal of the practice followed by the BIA for many years.

15.    On November 29, 2007, Andrew Adams III, General Counsel for the St. Croix Tribe, and I met with Assistant Secretary Artman in his office. The Assistant Secretary's legal advisor, Andrea Lord, and Nancy Pierskalla (an assistant to Mr. Skibine in the Indian Gaming office) were also present. During that meeting, Assistant Secretary Artman confirmed that the Part 151 determination would be made for the Beloit application prior to the two-part IGRA determination. I tried to convince Assistant Secretary Artman, to no avail, that the decision to make the Part 151 determination prior to the two-part determination was legally flawed under the Supreme Court's decision in State Farm and other decisions which followed it. While Assistant Secretary Artman did not say what the decision on the Beloit application would be, he made it quite clear that decisions would be made within the next several weeks on not only the Beloit application but other similar pending applications. From this meeting with Assistant Secretary Artman, and my earlier meetings with him, this left no doubt in my mind that a letter would be

151913                                           8

sent by the BIA before Christmas to the St. Croix Tribe and the Bad River Band denying, under

Part 151, their fee-to-trust gaming application for Beloit.

FURTHER, AFFIANT SAYETH NOT.

Dated:  December 7, 2007

ROBERT M. ADLER

District of Columbia        )
                            )   ss:
City of Washington          )

Subscribed and sworn to before me this 7th day of December, 2007.

My commission expires:

Notary Public

Joanne K. Comisiak
Notary Public, District of Columbia
My Commission Expires 09-30-2008

151913                                    9

# EXHIBIT A



# United States Department of the Interior
### BUREAU OF INDIAN AFFAIRS
Midwest Regional Office
Bishop Henry Whipple Federal Building
One Federal Drive, Room 550
Ft. Snelling, MN 55111



IN REPLY REFER TO:

Tribal Operations                    JAN  8 2007

Honorable Eugene Bigboy, Sr.                 Honorable David Merrill
Chairman, Bad River Band of Lake Superior    President, St. Croix Chippewa
  Chippewa Indians of Wisconsin                Indians of Wisconsin
Chief Blackbird Center                       24663 Angeline Avenue
P.O. Box 39                                  Webster, Wisconsin  54893
Odanah, Wisconsin  54861

Dear Chairman Bigboy and President Merrill:

We are writing to you to let you know we have sent our recommendation regarding your

joint application for a gaming site in Beloit, Wisconsin, to the Office of Indian Gaming

Management located in Washington, D.C.  Our favorable recommendation was by

memorandum dated January 8, 2007, and mailed out on this same date.

If you have any questions, please contact Chanda M. Joseph, Tribal Operations

Specialist, at 612-725-4542.


                    Sincerely,


                    Terrance L. Virden

                    Regional Director

EXHIBIT B

# O'CONNOR & HANNAN, L.L.P.

### ATTORNEYS AT LAW

ROBERT M. ADLER
(202) 887-1428
FAX: (202) 887-6186
Radler@oconnorhannan.com

SUITE 500
1666 K STREET, N.W.
WASHINGTON, D.C. 20006-2803
(202) 887-1400

July 13, 2007

Carl J. Artman
Assistant Secretary-Indian Affairs
U.S. Department of the Interior
1849 C Street, N.W., Mail Stop 4141
Washington, D.C. 20240

RE:    *Beloit Casino Project*

Dear Mr. Artman:

When we met with you and Michael Bogert on June 19, 2007, I indicated that we would appreciate some indication as to the time frame within which you anticipate that the staff review of the St. Croix Tribe and Bad River Band's application will be completed. As you have probably heard, at the time the application and decision package were received by the Central Office in mid-January of this year, George Skibine projected that the staff review would be completed within 60 days. Obviously, we are well past this. We accordingly request that you kindly inform us when you believe the staff review of the application will be completed. We would also appreciate your informing us of the anticipated time frame within which a decision will be made by the BIA with respect to the application.

As I indicated to you at our meeting on June 19, 2007, I had heard (through the rumor mill) that a decision had either been made, or is close to being made, that for off-reservation casino applications like our own, a Part 151 determination would be made before the Section 20 determination is made. We request that you inform us if such a decision has been made. If a decision has been made that the Part 151 determination will be made first, we respectfully request that you provide an explanation as to the reasoning behind this policy change. As I indicated to you at our meeting, we would be concerned about the use of Part 151 as the more appropriate vehicle to make a determination on these applications because it imparts more discretion to the Secretary. It is our considered view that the standards appearing as the two-part determination in IGRA reflect Congressional intent that they, and not Part 151, are the appropriate standards to be applied in making decisions whether to approve off-reservation casino applications.

Finally, if Secretary Kempthorne or you are inclined to deny this application, then the St. Croix Tribe and the Bad River Band respectfully request formal consultations before a final decision is made.

149804

**O'CONNOR & HANNAN, L.L.P.**

Carl J. Artman, Assistant Secretary-Indian Affairs
July 13, 2007
Page 2

We appreciate your courtesies in meeting with us and most particularly your prompt responses to our inquiries. We look forward to a continuing dialogue with you with respect to the Beloit casino application.

Sincerely,

Robert M. Adler

RMA/jkc
cc:    George Skibine

149804

# EXHIBIT C



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



AUG 2 1 2007



Mr. Robert M. Adler
1666 K Street, NW, Suite 500
Washington, D.C. 20006

Dear Mr. Adler:

Thank you for your letter dated July 13, 2007, requesting the timeframe within which a decision will be made regarding the St. Croix Tribe and Bad River Band's fee to trust application to establish a gaming facility in Beloit, Wisconsin and whether a 25 CFR Part 151 determination will be made before the Section 20 determination is made. Your letter was referred to this office for response.

The application of the Bad River Band of Lake Superior Chippewa Indians and the St. Croix Band of Chippewa Indians to take land into trust near Beloit, Wisconsin, into trust for gaming purposes pursuant to 25 C.F.R. Part 151, and for a two-part determination pursuant to Section 20(b)(1)(A) of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. 2719(b)(1)(A), is currently under review in this office and a decision will be made only after an exhaustive and deliberative review of all relevant criteria, factual information, and legal requirements. We will make a determination on whether to take the land into trust pursuant to Part 151 prior to making the two-part Secretarial determination under IGRA. We believe that it is the appropriate and logical sequence for the decision-making process. We do not believe that this represents a policy change since the Department has never before specified a particular sequence for making the two decisions involved in this process.

Thank your for your interest in this important issue.

Sincerely,

Acting Deputy Assistant Secretary -
Policy and Economic Development

EXHIBIT D



THE ASSOCIATE DEPUTY SECRETARY OF THE INTERIOR
WASHINGTON, DC 20240

DEC 2 1 2006

The Honorable George E. Pataki
Governor of New York
Albany, New York 12224

Dear Governor Pataki:

This letter provides you with current information regarding the status of the application of the St. Regis Mohawk Tribe to have land placed in trust for the purpose of gaining approval to conduct off-reservation gaming activities in the State of New York.

While the St. Regis Mohawk Tribe already has an existing reservation of almost 15,000 acres of land in the State of New York, which is held in restricted fee status, the Tribe has proposed that the United States take another 29.31 acres of land into trust for a proposed casino project. The subject property is located in the Village of Monticello over 450 miles from the Tribe's reservation.

Generally, the Indian Gaming Regulatory Act (IGRA) permits Indian Tribes to establish gaming operations on Indian lands upon which the tribe exercised jurisdiction as of October 17, 1988. It is my understanding that the Tribe currently conducts gaming operations on its reservation, but seeks to conduct gaming on the subject property in hopes of achieving greater economic return.

Clearly, the Tribe did not exercise jurisdiction on the subject parcel in 1988, therefore it cannot be used for gaming purposes as a matter of law. However, IGRA also provides several exceptions in Section 20. The application from the Tribe seeks to obtain approval under the "two-part determination" exception referred to in Section 20 of IGRA.

Please recall that former Assistant Secretary Gover, an official of the former Clinton Administration, sent you a letter on April 6, 2000, pursuant to Section 20 (b)(1)(A) of IGRA to provide you with an opportunity to concur in the two-part determination process. A copy of former Assistant Secretary Gover's April 6, 2000, letter, and associated Findings of Fact are enclosed for your reference.

It is our understanding that you had decided not to act on this matter pending the completion of an environmental evaluation. The Tribe has submitted an Environmental Analysis (EA) and we have completed our review of the EA. We have determined that, pursuant to the National Environmental Policy Act, the EA is sufficient, an Environmental Impact Statement (EIS) is not required, and approving the "finding of no significant impact" (FONSI) is appropriate for the proposed project as it is currently defined. I have included a copy of the approved FONSI for your review.

The Honorable George E. Pataki

2

Please be aware that we consider this action to be narrow in scope and should not be regarded as suggesting a commitment to take the subject land into trust or to approve a compact to conduct gaming on that property.

It is our understanding that representatives of the St. Regis Mohawk Tribe will be contacting you to urge you to concur in the April 6, 2000, two-part determination. Please be advised that no further action will be taken on this application, pending receipt of clear, written confirmation that the State of New York concurs with the two-part determination that this off-reservation project meets the requirements of IGRA.

Your affirmative written concurrence is required before the Department will proceed with the consideration of the St. Regis Mohawk Tribe's application to take a portion of the Monticello Raceway in trust pursuant to the Department's land acquisition regulations in 25 CFR Part 151. Please be mindful that your concurrence in the two-part determination under Section 20(b)(1)(A) of IGRA should not be construed as a future commitment from the Department to take the land into trust. That decision has yet to be made and will be made only after consideration of all the regulatory requirements contained in 25 CFR Part 151.

Governor, please note that we share the concerns that many have expressed about the implications of off-reservation gaming and so-called "reservation shopping." As you are no doubt aware, within the past year, legislation has been introduced in both the United States Senate and the House of Representatives that would significantly restrict or eliminate the options currently available to Indian tribes under Section 20.

As a result of the public concerns being reflected in the aforementioned proposed legislation and other concerns advanced by local jurisdictions, the Department is reviewing the regulations that govern the processing of fee-into-trust applications (25 CFR Part 151). We anticipate changes to the rules that may result in fewer off-reservation properties being accepted into trust. In particular, we expect to consider a paradigm where the likelihood of accepting off-reservation land into trust decreases with the distance the subject parcel is from the Tribe's established reservation or ancestral lands and the majority of tribal members.

We understand that there are many competing issues and interests to consider before we act to permit gaming to occur in our communities. Please let me know if you need further information to facilitate your evaluation of this matter.

Sincerely,

James E. Cason

James E. Cason

Enclosures

# EXHIBIT E



# United States Department of the Interior



**OFFICE OF THE SECRETARY**
Washington, D.C. 20240

FEB 20 2001

Honorable Scott McCallum
Governor
State of Wisconsin
15 E. State Capitol
Madison, Wisconsin   53707

Dear Governor McCallum:

Pursuant to the Settlement Agreement dated October 8, 1999, in the case *Sokaogon Chippewa Community, et al., v. Babbitt, et al.,* Case No. 95-C-659-C (W.D. Wis.), the Assistant Secretary - Indian Affairs agreed to resume consideration of the March 4, 1994, application of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin, Sokaogon Chippewa Community of Wisconsin and the Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin (Tribes). The Tribes have made application for a trust land acquisition of a 55.82 acre parcel of land located in Hudson, Wisconsin and for a Secretarial two-part determination pursuant to Section 20(b)(1)(A) of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2719(b)(1)(A).

Gaming on the Hudson parcel is subject to the Secretarial two-part determination in Section 20(b)(1)(A) of the IGRA, because the land will be acquired in trust after October 17, 1988, is located outside of the Tribes' reservations, nor does it fall within any of the specific exemptions to the prohibition against gaming on trust lands acquired after October 17, 1988. Pursuant to Section 20(b)(1)(A) of the IGRA, before the Hudson parcel can be acquired in trust for gaming purposes, I must determine that a gaming facility on the land would be in the best interests of the Tribes and their members and not detrimental to the surrounding community and then you must concur in that determination. If you concur in this determination, the land can be acquired by the United States in trust for the Tribes for gaming purposes, provided all the requirements of the Bureau of Indian Affairs' land acquisition regulations found in 25 CFR Part 151 are met.

The Department has completed its review of the Tribes' application for the two-part determination. Based on this application and its supporting documentation, including the comments received from the State and local government officials, and officials of nearby Indian tribes, the Department has made findings of fact supporting the two-part determination.

Based on these findings, I have determined that a gaming establishment on the 55.82 acre parcel of land located in Hudson, Wisconsin would be in the best interests of the Tribes and their members and would not be detrimental to the surrounding community. These findings of fact are enclosed (under separate cover) along with the supporting documentation for your review.    The materials we are providing to you contain commercial and financial information which we might not normally release as we believe it may be protected under Exemption 4 of the Freedom of Information Act.   We are releasing it to you as we are required by law to seek your concurrence on our two-part determination pursuant to 25 U.S.C. § 2719(b)(1)(A).   We believe, therefore, that this information is necessary for you to make an informed decision regarding this matter.  If you receive a request for release of this information, we ask that you contact us before making any determination regarding its release.

Pursuant to Section 20 of IGRA, I seek your concurrence in this determination.

Sincerely,

James H. McDivitt
Deputy Assistant Secretary - Indian Affairs
(Management)

Enclosure

EXHIBIT F – PART 1

*75*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SOKAOGON CHIPPEWA COMMUNITY, et al., | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Case No. 95-C-0659-C |
| BRUCE C. BABBITT, Secretary, U.S. DEPARTMENT OF INTERIOR, et al. | ) |
| | ) |
| Defendants. | ) |

00-1137

U.S.C.A. — 7th Circuit
FILED
MP  MAR 0 9 2000
GINO J. AGNELLO
CLERK
DOC. #

### DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' APPEAL OF JULY 14, 1995, DECISION OF MICHAEL J. ANDERSON

Mark A. Cameli
David E. Jones
Assistant United States Attorney
660 W. Washington Avenue
Madison, WI 53701-1585
(608) 264-5158

OF COUNSEL:

Troy Woodward
Scott Keep
Office of the Solicitor
U.S. Department of the Interior
1849 C. Street, N.W.
Washington, D.C. 20240

August 23, 1996

Lois J. Schiffer
Assistant Attorney General
Edward J. Passarelli
Michael K. Martin
U.S. Department of Justice
Environment and Natural Resource
 Division
P.O. Box 663
601 Pennsylvania Avenue, N.W.
Washington DC 20044-0663



# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.     THE DEPARTMENT DID NOT VIOLATE ITS DUTY TO
       CONSULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   1.  THE DEPARTMENT SATISFIED THE REQUIREMENTS OF
       25 U.S.C. § 2719 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   2.  THE DEPARTMENT DID NOT VIOLATE THE
       CHECKLIST FOR ACQUISITIONS . . . . . . . . . . . . . . . . . 15

   3.  THE DEPARTMENT DID NOT TRANSGRESS THE
       TERMS OF THE DUFFY LETTER . . . . . . . . . . . . . . . 18

B.     SECRETARY ANDERSON'S DECISION UNDER 25 U.S.C.
       WAS NOT ARBITRARY OR CAPRICIOUS . . . . . . . . . . . . . . 21

   1.  SECRETARY ANDERSON PROPERLY CONSIDERED
       VIEWS OF LOCAL OFFICIALS . . . . . . . . . . . . . . . . . 25

   2.  SECRETARY ANDERSON PROPERLY CONSIDERED THE
       ECONOMIC IMPACTS ON NEARBY TRIBES . . . . . . . . . . 27

   3.  SECRETARY ANDERSON PROPERLY CONSIDERED THE
       INADEQUACIES OF THE ENVIRONMENTAL
       DOCUMENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . 30

   4.  SECRETARY ANDERSON DID NOT VIOLATE
       APPLICABLE REGULATIONS . . . . . . . . . . . . . . . . . . . 32

   5.  SECRETARY ANDERSON WAS NOT REQUIRED TO
       SUGGEST ALTERNATIVES FOR THE APPLICANT
       TRIBES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

i

C.    SECRETARY ANDERSON'S DECISION WAS NOT BASED ON IMPROPER POLITICAL INFLUENCE . . . . . . . . . . . . . . . 34

D.    SECRETARY ANDERSON'S DECISION DID NOT VIOLATE PAST POLICIES OR PRACTICES OF THE DEPARTMENT . . . 34

E.    SECRETARY ANDERSON'S DECISION CONSTITUTED AN APPROPRIATE EXERCISE OF AUTHORITY UNDER 25 U.S.C. § 465 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

## CASES

Page

*American Legion v. Derwinski,*
54 F.3d 789 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Asarco, Inc. v. EPA,*
616 F.2d 1153 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Atchinson, Topeka & Sante Fe Railway Co. v. Wichita Board of Trade,*
412 U.S. 800 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,*
419 U.S. 281 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Burlington Truck Lines v. United States,*
371 U.S. 156 (1962), . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Buttrey v. United States,*
690 F.2d 1170 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cerro Copper Products Co. v. Ruckelshaus,*
766 F.2d 1060 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Chase v. McMasters,*
573 F.2d 1011 (8th Cir. 1978)
*cert. denied,* 439 U.S. 965 (1978) . . . . . . . . . . . . . . . . . . . . . 42

*City of Eagle Butte v. Aberdeen Area Director,*
17 I.B.I.A. 192 (July 25, 1989) . . . . . . . . . . . . . . . . . . . . . 38, 39

*Colburn v. Trustees of Indiana University,*
739 F. Supp. 1268 (S.D. Ind. 1990)
*aff'd another grounds,* 973 F.2d 581 (7th Cir. 1992) . . . . . . . . . . . . . 17

*Confererated Tribes of Siletz Indians of Oregon v. United States of America,*
841 F.Supp. 1479 (D. Ore. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 2

*Cotton Petroleum Corp. v. United States Dep't of Interior,*
870 F.2d 1515 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 22

Diaz v. INS,
    648 F. Supp. 638 (E.D. Cal. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Equal Employment Opportunity Commission v. Chicago Club,
    86 F.3d 1423 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FCC v. National Citizens Committee for Broadcasting,
    436 U.S. 775 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Florida, Dep't of Business Regulation v. United States Dep't of Interior,
    768 F.2d 1248 (11th Cir. 1985)
    cert. denied, 475 U.S. 1011 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Foust v. Lujan,
    942 F.2d 712 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Gallagher & Ascher Co. v. Simon,
    687 F.2d 1067 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Gottlieb v. Pena,
    41 F.3d 730 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Hatco Corp. v. W.R. Grace & Co.,
    849 F. Supp. 931 (D.N.J. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Homemakers N. Shore v. Bowen,
    832 F.2d 408 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 35

Hoopa Valley Tribe v. Joe Christie, et al.
    812 F.2d 1097 (9th Cir. 1987) (citing
    Joint Tribal Council of the Passamaquoddy Tribe v. Morton,
    528 F.2d 370 (1st Cir. 1975)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 28

In re Grand Jury Proceedings,
    632 F. Supp. 374 (E.D. Tex. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Koniag, Inc., Village of Uyak v. Andrus,
    580 F.2d 601 (D.C. Cir.),
    cert. denied, 439 U.S. 1052 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Lower Brule Sioux Tribe v. Deer,
    911 F. Supp. 395 (D.S.D. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

McDonnell Douglas Corp. v. United States,
    35 Fed. Cl. 358 (Ct. Fed. Cl 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Miami Tribe of Oklahoma v. Muskogee Area Director,
   28 I.B.I.A. 52 (Jun. 8, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 40

Mobil Oil Corp. v. Department of Energy,
   610 F.2d 796 (Temp. Emer. Ct. App. 1979) . . . . . . . . . . . . . . . . . . . 41

Motor Vehicle Manufacturers Association of the United States v.
State Farm Automobile Insurance Company,
   463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33

Natural Resources Defense Council, Inc. v. Herrington,
   768 F.2d 1355 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . 38

Nguyen v. INS,
   53 F.3d 310 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Ogalala Sioux Tribe of Indians v. Andrus,
   603 F.2d 707 (8th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

PBGC v. LTC, Inc.,
   496 U.S. 633 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Pennzoil v. FPC,
   534 F.2d 627 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . 27, 30, 41

Pozzie v. U.S. Dep't of Housing and Urban Development,
   48 F.3d 1026 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Scenic Hudson Preservation Conference v. FPC,
   354 F.2d 608 (2d Cir. 1965),
   cert. denied, 384 U.S. 941 (1966) . . . . . . . . . . . . . . . . . . . . . . . 30

Sokaogon Chippewa Community v. Babbitt,
   929 F.Supp. 1165 (W.D. Wis. 1996) . . . . . . . . . . . . . . . . . . . . . 37

Thomas Jefferson University v Shalala,
   114 S. Ct. 2381 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. An Article of Drug,
   540 F.Supp. 363 (N.D. Tex. 1982) . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Morgan,
   313 U.S. 409 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Roberts,
    904 F.Supp. 1262 (E.D. Okl. 1995)
    aff'd in part, rev'd in part and remanded on other grounds,
    1996 WL 379777 (10th Cir. July 8, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States Dep't of Interior v. South Dakota
    69 F.3d 878 (8th Cir. 1995), petition for cert.
    filed, 64 U.S.L.W. 3823 (Jun. 3, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 39

Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Counsel,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Von Kahl v. Brennan,
    855 F. Supp. 1413 (M.D. Penn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Winnebago Tribe of Nebraska v. Babbitt,
    915 F. Supp. 157 (D.S.D. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## STATUTES & REGULATIONS

25 C.F.R. Part 151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

25 C.F.R. § 151.3(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

25 C.F.R. § 151.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

25 C.F.R. § 151.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5 U.S.C. § 557 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

5 U.S.C. § 557(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 753(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

25 U.S.C. § 465 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

25 U.S.C. § 2719 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

25 U.S.C. § 2719(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25 U.S.C. § 2719(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

25 U.S.C. § 2719(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SOKAOGON CHIPPEWA COMMUNITY, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Case No. 95-C-659-C |
| BRUCE C. BABBITT, Secretary, U.S. DEPARTMENT OF INTERIOR, et al. | ) ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' APPEAL OF JULY 14, 1995, DECISION OF MICHAEL J. ANDERSON

## I. INTRODUCTION

Defendants, by Peggy A. Lautenschlager, United States Attorney for the Western District of Wisconsin, and by undersigned counsel, submit this brief in opposition to plaintiffs' appeal of the July 14, 1995, decision of Michael Anderson, Deputy Assistant Secretary of Interior. Plaintiffs' objections to the Department's decision denying their application center on three areas: (1) the Department did not discharge its duty to consult as required by 25 U.S.C. § 2719; (2) the Department's decision regarding detriment to the local community under 25 U.S.C. § 2719 was arbitrary or capricious; and (3) the Department did not consider factors required by the regulations implementing 25 U.S.C. § 465. We consider each objection below.

## II. STATEMENT OF FACTS

On March 4, 1994, the plaintiff Tribes submitted an application asking the Secretary of Interior to take into trust a former greyhound racing track called St. Croix

Meadows in Hudson, Wisconsin. R. Binder 1, p. 0008. The Tribes wanted to establish a gaming casino on the property, which is located just off of U.S. Interstate 94 and is within a thirty-mile radius of the Minneapolis-St. Paul metropolitan area. Complaint ¶ 11; R. Binder 1, p. 0140.

Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. § 465, confers broad authority on the Secretary of Interior to acquire property in trust for Indian tribes.[1] Certain conditions on this authority, however, were enacted in section 20 of the Indian Gaming Reform Act of 1988, 25 U.S.C. § 2719, which placed a general prohibition on acquiring property if it were to be used for gaming purposes. Section 2719(b)(1)(A) grants tribes an exception to this prohibition if they can demonstrate that "a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A).[2]

Pursuant to guidelines issued on September 28, 1994, by the Acting Deputy Commissioner of Indian Affairs, Area Offices of the Bureau of Indian Affairs must make the initial determination of whether an applicant tribe has satisfied the

---

[1]    The U.S. Court of Appeals for the Eighth Circuit held recently that 25 U.S.C. § 465 violates the delegation doctrine and is therefore unconstitutional. South Dakota v. Department of Interior, 69 F.3d 878, 880 (8th Cir. 1995), petition for cert. filed, 64 U.S.L.W. 3823 (Jun. 3, 1996). The validity of § 465 is not at issue in this action.

[2]    A U.S. District Court in Oregon found 25 U.S.C. § 2719(b)(1)(A) unconstitutional because it grants state governors veto power over federal agency decisions in violation of the Appointments Clause. Confederated Tribes of Siletz Indians of Oregon v. United States of America, 841 F. Supp. 1479, 1482-86 (D. Ore. 1994). The validity of § 2719(b)(1)(A) is not at issue in this action.

requirements of § 2719(b)(1)(A).  Checklist for Acquisitions for Gaming Purposes (attached as Ex. B to Pls.' Complaint).  Accordingly, the plaintiff Tribes submitted their request to obtain St. Croix Meadows to the Minneapolis Area Office, which endorsed the application and forwarded it to the Central Office of the Bureau of Indian Affairs in the Department of Interior on November 14, 1994, for final review and action.  R. Binder 5, p. 1227.

During the Central Office's review of the application, the Town of Troy, which borders the St. Croix Meadows facility, passed a resolution on December 12, 1994, expressing opposition to the proposed trust acquisition.  R. Binder 12, pp. 2699-2701. Shortly thereafter, the City Council of Hudson passed a resolution on February 6, 1995, recording its opposition to casino gambling at the St. Croix Meadows dog track.  R. Binder 12, pp. 2713-14.  Additionally, members of the Minnesota Congressional Delegation wrote the Department on January 11, 1995, requesting a meeting on the proposed acquisition (R. Binder 12, p. 2672), and on February 8, 1995, Minnesota lawmakers and officials from Indian tribes in Minnesota and Wisconsin expressed their concerns about the effect of a new casino on revenues earned by existing Indian casinos near Hudson, Wisconsin.  R. Binder 10, p. 2154 (letter to plaintiff Tribes discussing meeting); R. Binder 13, p. 3132 (meeting notes prepared by George Skibine, head of the Indian Gaming Management Staff ("IGMS")). To ensure that it was fully informed about opposition to the proposed acquisition, the Department of Interior agreed to accept comments on the plaintiff Tribes' application until April 30, 1995.  R. Binder 10, p. 2154.

After completing its review process, the Department of Interior declined the plaintiff Tribes' request to acquire the St. Croix Meadows property. In a decision letter executed on July 14, 1995, the Deputy Assistant Secretary of Interior for Indian Affairs, Michael Anderson, explained that the declared opposition of the localities ringing the St. Croix Meadows and of state lawmakers indicated that the Tribes had failed to show that the acquisition would not have a detrimental impact on the surrounding community. R. Binder 12, pp. 2914-16. The Secretary also cited the likely harm that would befall the nearby St. Croix band of Chippewa, as the plaintiff Tribes' casino would be in direct competition with the casino operated by the St. Croix. The last factor affecting the Secretary's analysis under § 2719(b)(1)(A) was his concern that the Tribes had not discussed adequately the proposed casino's effect on the St. Croix Scenic Riverway. R. Binder 12, p. 2915.

Finally, the Secretary stated that even if these considerations did not support his decision under § 2719(b)(1)(A), they were still of sufficient significance to convince the Secretary not to use his discretionary power under § 465 to take the property into trust. Thus, had the Department of Interior found that the Tribes could satisfy the § 2719(b)(1)(A) exception to the ban on new acquisitions for gaming purposes, the concerns raised during the application process convinced the Secretary that he should not exercise his authority to take the St. Croix Meadows in trust. R. Binder 12, p. 2916.

On September 15, 1995, plaintiffs brought suit under the Administrative Procedure Act to overturn this decision. Their complaint alleges principally that the

Department of Interior failed to provide the applicant Tribes with any opportunity to rebut the opposition raised by the surrounding communities and nearby tribes and that the Department's decision was arbitrary or capricious. The case is now set for dispositive motions on the merits.

## III. ARGUMENT

Before discussing the specific arguments raised by plaintiffs, it is important to bring into sharp focus the statutory background of this appeal. As noted above (p. 2), although 25 U.S.C. § 465 grants the Secretary of Interior broad discretion to take land into trust for Indians, Congress erected a prohibition in section 20 of the Indian Gaming Regulatory Act of 1988 ("IGRA") against trust acquisitions of noncontiguous land if the land were to be used for gaming purposes. 25 U.S.C. § 2719(a). Congress then carved an exception to this prohibition, and allowed the Secretary to acquire lands for gaming if, after consultation with the applicant tribe, nearby tribes, and state and local officials, the Secretary determines that a new gaming establishment "would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A) (emphasis added).

Four important features emerge from this background: first, the statutory framework, with its general prohibition on new trust acquisitions for gaming purposes tempered only by a narrow exception, places the burden on the applicant Tribes to show that they fit within the exception, for "one who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his claim

comes within the exception." Equal Employment Opportunity Commission v. Chicago Club, 86 F.3d 1423, 1429 (7th Cir. 1996) (internal quotations and alterations omitted). Second, to carry this burden, the plaintiff Tribes must demonstrate that they can satisfy both prongs of the § 2719(b)(1)(A) exception -- the acquisition must be in the Tribes' best interest and the acquisition must not be detrimental to the surrounding community. This statutory test is not fulfilled by balancing the factors developed under the two prongs; rather, the statute commands that if an applicant tribe fails one prong, it will not be granted an exception to the prohibition, regardless of its ability to satisfy the other prong.

Third, much of the argument in this appeal involves whether the Secretary properly construed the terms "consultation" and "detrimental to the surrounding community," which are found in 25 U.S.C. § 2719. In such a challenge, plaintiffs must overcome a strong presumption that the Department has properly construed these terms, as "the agency possesses broad discretion in administering the law so long as its actions are based on a permissible construction of its enabling statute." Nguyen v. INS, 53 F.3d 310, 311 (10th Cir. 1995); see Thomas Jefferson University v. Shalala, 114 S. Ct. 2381, 2386 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations."); Homemakers N. Shore v. Bowen, 832 F.2d 408, 411 (7th Cir. 1987) ("An agency's construction of its own regulations binds a court in all but extraordinary cases."). Finally, a trust acquisition is only permitted, not mandated, once a tribe demonstrates that it fits within the § 2719(b)(1)(A) exception. Since § 2719 does not itself confer authority to take land into trust, the Secretary

must still decide to exercise the trust acquisition authority granted by 25 U.S.C § 465. The § 2719(b)(1)(A) exception simply allows an applicant tribe to survive the general prohibition against gaming acquisitions, and the exception does not diminish the Secretary's responsibility to then exercise appropriate discretion under § 465.  See 25 U.S.C. § 2719(c).  With these four features in mind, defendants discuss below the specific contentions raised by the plaintiff Tribes.

One final prefatory note:  plaintiffs' brief contains a number of good-faith factual assumptions and allegations that defendants, also in good faith, dispute. Rather than fighting every factual battle in the body of this already-lengthy brief, however, the Court is referred to defendants' response to plaintiffs' proposed statement of findings of fact, where those issues are joined.

A.    The Department Did Not Violate Its Duty to Consult

Plaintiffs argue that the Department did not follow proper procedures in its review of their application to obtain the St. Croix Meadows dog track in trust. Specifically, plaintiffs contend that the Department failed to fulfill its obligation to consult with them as required by 25 U.S.C. § 2719, by internal Departmental guidelines, and by a letter from defendant John Duffy to the Tribes.  As already noted, an agency's interpretation and administration of its own governing statutes and regulations is afforded great deference, so plaintiffs have a substantial hurdle to overcome in trying to demonstrate that the Department committed reversible error. Cerro Copper Products Co. v. Ruckelshaus, 766 F.2d 1060, 1067 (7th Cir. 1985) (holding that courts "are to accord great deference to an executive department's

7

construction of a statutory scheme it is entrusted to administer") (internal quotations omitted).  As discussed below, plaintiffs have not shown that the Department interpreted impermissibly its consultation obligations, and thus plaintiffs' claim for relief on this ground should be denied.

       1.    <u>The Department satisfied the requirements of 25 U.S.C. § 2719.</u>

Plaintiffs first contend that the Department did not comply with the consultation requirement set forth in 25 U.S.C. § 2719.  As the Court is aware, section 20 of the Indian Gaming Regulatory Act, 25 U.S.C. § 2719, prohibits the Department from using its authority under 25 U.S.C. § 465 to take land that is not adjacent to an Indian reservation into trust for gaming purposes unless,

> after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, [the Department] determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.

25 U.S.C. § 2719(b)(1)(A).

Thus, a "consultation" requirement arises from § 2719, and it mandates that the Department consult with the applicant tribe, with officials of nearby tribes, and with state and local officials before deciding whether a proposed trust acquisition would be beneficial to the applicant tribe and would not be detrimental to the surrounding community.  The statute does not define "consultation," nor does it provide applicant tribes with a superior procedural status -- the obligation of the Department to consult applies equally to all the listed entities.  Indeed, the Department's trust responsibility,

8

which applies to all Indian tribes, would demand that it take into account equally the views of applicant tribes and nearby tribes. <u>Hoopa Valley Tribe v. Christie</u>, 812 F.2d 1097, 1102 (9th Cir. 1987) ("The Bureau as the agent of the United States does have a fiduciary obligation to the Indians; but it is a fiduciary obligation that is owed to all Indian tribes.").

In their brief, the plaintiff Tribes cite a number of cases for the proposition that the Department had an obligation to consult with the Tribes before issuing a decision on their application. Since § 2719 itself requires pre-decisionmaking consultation with the applicant Tribes, as well as with officials from nearby tribes and surrounding communities, citation to caselaw for this proposition is unnecessary. The Department has never contested its obligation to consult, and the Department avers that it met that obligation squarely as follows:

a.    The Department accepted for inclusion in the record a December 24, 1993, letter from the leaders of the plaintiff Tribes to Secretary Babbitt expressing their rebuttal to arguments made against the application by nearby tribes. R. Binder 10, pp. 2014-16. The letter places importance on the views of the local community, as it states that the "local unit of Government, The City of Hudson, is supportive of this innovative venture." R. Binder 10, p. 2016. The elected officials from the City of Hudson later clarified their opposition to the proposed casino. See R. Binder 10, pp. 2080-81 (letter from City Attorney of Hudson to Tribal Chairman of Sokaogon explaining City's position on

9

proposed casino); R. Binder 12, pp. 2713-14 (City of Hudson Resolution 2-95, opposing casino gambling at St. Croix Meadows).

    b.    The Department accepted for inclusion in the record a June 7, 1995, letter from the leaders of the plaintiff Tribes to Secretary Babbitt expressing their views on economic impact studies submitted during the extended comment period by tribes opposing the acquisition. R. Binder 12, pp. 2897-98.

    c.    The Department accepted for inclusion in the record an April 8, 1995, letter from the leaders of the plaintiff Tribes to Secretary Babbitt expressing their views in support of their application, including their belief that the Hudson area could "easily accommodate" the planned casino. R. Binder 12, pp. 2946-47. This letter appears to be a rebuttal to an opposition letter sent by Wisconsin lawmakers on March 28, 1995, (R. Binder 12, pp. 2156-58), and to opposition raised by nearby tribes.

    d.    The Department accepted for inclusion in the record a June 16, 1995, letter from one of the applicant Tribes' representatives, Anthony Varda, which sought to rebut local opposition arguments raised in an earlier letter from Congressman Steve Gunderson to Secretary Babbitt. R. Binder 11, pp. 2329-31 (Gunderson letter) & pp. 2384-86 (Varda rebuttal letter).

    e.    Counselor to the Secretary John Duffy and George

Skibine, head of the Indian Gaming Management Staff ("IGMS"), met with two representatives of the plaintiff Tribes to discuss the application on May 17, 1995. The meeting with Duffy lasted for forty-five minutes and a follow-on meeting with Skibine and other IGMS officials lasted approximately two hours. Additionally, Skibine met again with representatives of the plaintiff Tribes to discuss the application on or about May 31, 1995. R. Binder 12, pp. 3004-05 (letter responding to a request from U.S. Senate Majority Leader Tom Daschle, R. Binder 12, p. 2888, that Secretary Babbitt meet with two representatives for the plaintiff Tribes).

Save for the Tribes' letter of December 24, 1993, these consultation opportunities all occurred after the Area Office submitted the Tribes' application to the Central Office for final review and action. The plaintiff Tribes were timely informed about opposition raised by nearby tribes (R. Binder 10, p. 2154) and were given copies of the economic analyses prepared by these tribes, which plaintiffs tried to rebut. R. Binder 12, pp. 2897-98. Moreover, plaintiffs were fully aware of local opposition. The Town of Troy had recorded its dissatisfaction with the proposal during and after the Area Office's review of the application. R. Binder 3, pp. 612-16; see also R. Binder 12, pp. 2699-2701 (December 12, 1994, Town of Troy Resolution opposing proposed casino and incorporating earlier comments). Further, the Tribes knew of the opposition expressed by the City of Hudson, as Sokaogon Chippewa Tribal Chairman Arlyn Ackley noted in a February 16, 1995, letter to the County of St.

Croix that it was "unfortunate that the City of Hudson has decided to oppose the project at this time." R. Binder 10, p. 2086 (the County's response to this letter is located at R. Binder 10, p. 2149); see also R. Binder 12, pp. 2706-08 (newspaper articles reporting opposition by City Council of Hudson). The Tribes' response to this opposition was to declare it a breach of the April 18, 1994, Agreement for Government Services and to file a notice of claim against the City of Hudson demanding that the City "cease and desist" its opposition. R. Binder 11, pp. 2398-2402; see also R. Binder 11, pp. 2320-21 (newspaper article reporting that an attorney representing the Tribes, Anthony Varda, addressed the City Council and sought a retraction of its opposition by warning of potential legal liability).

Given these numerous opportunities for predecisional consultation and the public nature of local opposition, it is clear that this case does not fall afoul of the "consultation" cases cited by plaintiffs. Pls.' Br. at 7-10. In Lower Brule Sioux Tribe v. Deer, 911 F. Supp. 395 (D.S.D. 1995), and in Winnebago Tribe of Nebraska v. Babbitt, 915 F. Supp. 157 (D.S.D. 1996), the Department of Interior did not provide any opportunities for predecisional consultations with tribes affected by certain personnel actions taken by the Department. Lower Brule, 911 F. Supp. at 400; Winnebago, 915 F. Supp. at 161. In the same way, Ogalala Sioux Tribe of Indians v. Andrus, 603 F.2d 707 (8th Cir. 1979), is distinguishable in that the Department did not advise an affected tribe of a personnel action before reaching a final decision on the action. Id. at 710. Here, the Tribes knew about the opposition to their application and were provided timely opportunities for rebuttal and discussion.

Another distinction that plaintiffs fail to mention is that in each of the cases they cite, the Department tried to implement an internally-generated action, a personnel move, that could not have been known by the affected tribes. In such cases, the courts found that it was especially important for the Department to inform the affected tribe about the proposed move and the reason therefor so that the tribe could provide its views on the proposal. This explains why the court in <u>Lower Brule</u> observed that a proper consultation would consist of a Department official "notifi[ng] the [Tribal] Council of the BIA's proposed action, [and] justifying his reasoning." 911 F. Supp. at 401.

But this does not mean that when a tribe has submitted an application to the Department seeking an exception from the general prohibition on trust acquisitions for gaming, then the tribe has a right to be advised of and to comment on a proposed decision by the Department before it issues its decision. The right to review an agency's proposed decision is a special procedural protection afforded parties in formal adjudications under the Administrative Procedure Act ("APA"), 5 U.S.C. § 557(c), which is only triggered when a governing statute dictates such procedures. See <u>Gallagher & Ascher Co. v. Simon</u>, 687 F.2d 1067, 1072 (7th Cir. 1982) (holding that formal procedures required by 5 U.S.C. §§ 556 & 557 will not be imposed on an agency unless mandated by a governing statute). The statute at issue here, § 2719, with its bare consultation requirement that applies equally to applicant tribes and to officials of nearby tribes and local communities, cannot be said to convey this right.

In contrast, the governing statute at issue in <u>Koniag, Inc., Village of Uyak v. Andrus</u>, 580 F.2d 601 (D.C. Cir.), <u>cert. denied</u>, 439 U.S. 1052 (1978), (cited at Pls.' Br. 10-11), was found to trigger the formal adjudication procedures of the APA because the statute granted the right to "maximum participation by Natives in decisions affecting their rights and property." <u>Id.</u> at 609. No similar language can be found in § 2719, and, as the D.C. Circuit found in <u>Gottlieb v. Pena</u>, 41 F.3d 730 (D.C. Cir. 1994), absent this type of statutory command, due process will be satisfied if a party is given an opportunity to comment on negative submissions provided to an agency decisionmaker. <u>Id.</u> at 737 (construing <u>Koniag</u> and refusing to require an agency to provide its proposed findings to a petitioner). Here, plaintiffs were given this opportunity. <u>See supra</u> pp. 9-11. Accordingly, plaintiffs' claim that they had a right to receive a draft, internal IGMS report (Pls.' Br. at 15-16) has no statutory or due process basis, and indeed smacks of a prohibited attempt to probe the thought processes of agency decisionmakers. <u>United States v. Morgan</u>, 313 U.S. 409, 422 (1941). Consultation means having an opportunity to express views -- it does not mean that an applicant tribe has the right to pass final review on the Department's decision.

If Congress is silent regarding specific procedures, as it was when requiring in § 2719 that the Department consult, courts are not free to impose additional procedures, even when those procedures may provide parties with important protections, such as the right to cross-examination. <u>Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Counsel</u>, 435 U.S. 519, 523-25 (1978) (refusing

to impose a cross-examination procedure); <u>PBGC v. LTC, Inc.</u>, 496 U.S. 633, 653-55 (1990) (refusing to impose procedural rules not required by statue or regulation on an informal adjudication).  Plaintiffs ignore this principal of administrative law, as they ask the Court to impose procedures like those required in <u>Koniag</u>, despite the absence of any statutory justification for such procedures.  As discussed above, the Department implemented a permissible interpretation of the consultation requirement by providing the applicant Tribes with a substantial opportunity to rebut comments received by the Department.  <u>See Gottlieb</u>, 41 F.3d at 737.  The record therefore demonstrates that the plaintiff Tribes received the full measure of the process due them.

> 2.    <u>The Department did not violate the Checklist for Acquisitions.</u>

To provide guidance on the consultation requirement, the Central Office of the Department of Interior issued internal guidance on September 28, 1994, to its Area Offices for performing the initial review of an application for a trust acquisition subject to § 2719.  <u>See Checklist for Acquisitions for Gaming Purposes</u> (attached as Ex. B to Pls.' Complaint).  The cover memorandum from the Central Office to the Area Offices explains that the <u>Checklist</u> "should be used as a tool to assure that the transaction is fully documented prior to its submission to Central Office for review."  The <u>Checklist</u> provides extensive advice to Area Offices on initiating the consultations required by § 2719, and it includes this specific guidance regarding comments that oppose an application:

> Upon completion of the consultation process, (i.e. receipt of responses, expiration of allowed response time), the Area Director will review and prepare a summary of the comments and responses received from the officials contacted.  When a response raises an issue with actual or

potential for adverse or negative implications which may affect the potential for a favorable two-part determination [under § 2719], the Area Director will analyze the issue and determine what action may be appropriate. The Area Director should request the applicant tribe to make an effort to resolve the issue. The tribe should be given a reasonable period of time to resolve the issue.

Checklist, p. 12 (attached as Ex. B to Pls.' Complaint).

Plaintiffs, relying on the "Accardi doctrine" (which requires agencies to follow their own regulations in certain circumstances), insist that this passage obligated the Central Office to advise the applicant Tribes about negative comments and to give them an opportunity to resolve those comments. Pls.' Br. at 5-6, 17. Without conceding the applicability of the Accardi doctrine to this internal rule,[3/] a plain reading of the passage shows that the Accardi doctrine cannot forward the Tribes' argument: the Checklist applies by its terms only to Area Offices, not to the Central Office. Thus, the Central Office could not violate the Checklist because the Checklist does not apply to the Central Office's review of trust applications.[4/]

---

[3/]    See Von Kahl v. Brennan, 855 F. Supp. 1413, 1421 (M.D. Penn. 1994) (refusing to apply Accardi doctrine to prison regulations and observing that "courts must balance the interests at stake in the context of the rights at issue and proceedings under consideration"); In re Grand Jury Proceedings, 632 F. Supp. 374, 375 (E.D. Tex. 1986) ("The so-called Accardi doctrine is inapplicable . . . [to the] United States Attorney's Manual.").

[4/]    The Department has not issued regulations binding on the Central Office's final review because, as a practical matter, the Central Office's review will involve a comprehensive consideration of the factors relevant to both authorities, with the broad review envisioned by 25 C.F.R. § 151.11 playing a significant role. See R. Binder 12, p. 2670 (letter from Assistant Secretary Deer explaining that the Department considers an application under both § 465 and § 2719, and advising that the "decision to take land into trust for gaming purposes is made only after an exhaustive deliberative review of all relevant facts and criteria"). This comprehensive

(continued...)

Even if the Checklist were applied to the review conducted by the Central Office, the Checklist guidance highlighted by plaintiffs is not mandatory. The only mandatory requirement placed on Area Office directors is that they "will" analyze issues casting doubt on the two-part determination and that they "will" determine what action may be appropriate. Area Offices are then advised that they "should" give applicant tribes an opportunity to rebut opposition comments, but the Offices are not told that they "shall" provide this opportunity. See Colburn v. Trustees of Indiana University, 739 F. Supp. 1268, 1294-95 (S.D. Ind. 1990) (collecting cases and holding that the term "should" in a guidance handbook confers discretion on a decisionmaker and is not mandatory), aff'd on other grounds, 973 F.2d 581 (7th Cir. 1992). Accordingly, the Central Office acted within the discretion afforded to the Area Offices by the Checklist when it did not specifically ask the applicant Tribes to resolve opposition comments received by the Department.

Nevertheless, the Central Office did provide the applicant Tribes with copies of the economic analyses prepared by the opposition tribes, and the Department accepted the applicant Tribes' attempt to rebut these analyses. R. Binder 12, pp. 2897-98. Additionally, the applicant Tribes were aware that significant local opposition had arisen regarding their proposal, and they had ample opportunity, if

---

4/(...continued)
review explains why the Central Office requires the Area Office to discuss the § 465 factors (25 C.F.R. § 151.10) as well as the § 2719 factors in the package submitted to the Central Office for final review and decision. See Checklist, supra, at 1, 13. Deputy Assistant Secretary Anderson's decision in this case, which rested equally on § 2719 and § 465, demonstrates the inclusive nature of the Department's decisionmaking process. R. Binder 12, p. 2914.

not an invitation, to address this opposition before the Department reached its final decision. The doors of the Department did not close on the applicant Tribes.

The plaintiff Tribes now appear to say that, in addition to an open door, they needed the Department to tell them to take the opposition seriously before they would bother to submit rebuttal. Pls.' Br. at 15. Yet, the applicant Tribes needed no invitation to submit three letters addressing the opposition raised by nearby tribes. R. Binder 12, p. 2976 (letter of March 30, 1995); p. 2946 (letter of April 8, 1995); and p. 2897 (letter of June 7, 1995). Moreover, the fact of opposition from the local communities is largely uncontrovertible, which may explain why the applicant Tribes attempted to muzzle this opposition by threatening legal action. R. Binder 11, pp. 2398-2402 (notice of claim filed with the City of Hudson by the applicant Tribes). As Professors Davis and Pierce have observed, "[i]f the agency and the individual disagree only with respect to the way in which the law applies to an uncontroverted set of facts, additional procedures cannot possibly enhance the accuracy of the factfinding process, simply because the agency does not need to resolve any factual controversies." 3 K. Davis & R. Pierce, Administrative Law Treatise § 9.5, at 54 (3d ed. 1994). Simply stated, plaintiffs have no legitimate complaint about the process afforded them, and their real contention is with the policy judgments that the Department employed in evaluating the facts.

     3.     The Department did not transgress the terms of the Duffy letter.

Finally, plaintiffs contend that a March 27, 1995, letter from John Duffy to leaders of the applicant Tribes lulled them into believing that the Department would

notify them of any "areas of concern" with their application. Pls.' Br. at 3, 14-15. The Department counters that plaintiffs misinterpreted the letter, but that, in any event, plaintiffs were not prejudiced by this misinterpretation.

John Duffy sent the March 27, 1995, letter to advise the applicant Tribes about the meeting he attended with Senator Wellstone and leaders from tribes opposed to the application. R. Binder 10, p. 2154. He explained that the Department would give the opposition tribes until April 30, 1995, to submit their comments on the application. Duffy concluded by stating as follows:

> Please be assured that our commitment regarding the submission of additional information will not delay consideration of other aspects of your application by the BIA's Indian Gaming Management Staff. Should areas of concerns [sic] with the application be identified, you will be so notified.

R. Binder 10, 2154.

Plaintiffs read this paragraph as obligating the Department to keep them notified about areas of concern that might arise regarding their application. Defendants agree that this reading is reasonable, but the Department avers that it intended to convey to the applicant Tribes only that the IGMS would continue to review the "other aspects" of the application; namely, whether the acquisition was in the best interest of the Tribes; and that it would advise the applicant Tribes if any areas of concern regarding this "best interest" aspect arose. The Department did not intend to assume the obligation of advising the applicant Tribes about areas of concern that might arise regarding whether the acquisition would be detrimental to the surrounding community, the aspect of the application that had generated

# EXHIBIT F – PART 2

comments from the opposing tribes. In hindsight, the Department should have drafted this letter more carefully to convey precisely its intentions.

Regardless of the interpretation one affixes to this paragraph, the record shows that the applicant Tribes had full notice of opposition comments and had a full opportunity to rebut them. The thrust of plaintiffs' argument is not so much that the letter served as a quasi-regulation binding the agency, see United States v. An Article of Drug, 540 F. Supp. 363, 372 (N.D. Tex. 1982) ("Erroneous letters do not necessarily bind an agency."), but that the applicant Tribes relied to their detriment on their interpretation of the letter and so did not react to opposition comments. The record shows otherwise. As explained above, the Department provided the plaintiff Tribes with the comments submitted by the opposition tribes, and plaintiffs provided rebuttal to these comments. R. Binder 12, p. 2976 (letter of March 30, 1995); p. 2946 (letter of April 8, 1995); and p. 2897 (letter of June 7, 1995). Additionally, plaintiffs knew about the public resolutions by the surrounding communities expressing opposition to the application, and they chose to rebut this opposition through letters (R. Binder 11, pp. 2384-86 (Varda rebuttal letter), R. Binder 12, p. 2946), and through legal process (R. Binder 11, pp. 2398-2402 (notice of claim filed with the City of Hudson by the applicant Tribes)). Thus, the Tribes were not, due to their reading of the Duffy letter, kept in the dark about opposition comments, nor were they foreclosed from responding to opposition comments. Any claim of detrimental reliance, therefore, must ring hollow.

20

* * *

In sum, plaintiffs have not made the case that they were deprived of their right to consultation. Nor have they tried to show how any alleged procedural defects prejudiced them, for the fact opposition existed was largely uncontrovertible, leaving the policy implications of this opposition solely within the hands of the Department. It is also important to recognize that the government action complained of by the Tribes, the denial of an application, is considered less serious for due process purposes than the revocation of a license or a welfare benefit. <u>Buttrey v. United States</u>, 690 F.2d 1170, 1177-78 (5th Cir. 1982). That is particularly true here, where no res judicata or other preclusive doctrines apply to the Secretary's denial of the Tribes' request. Accordingly, the Tribes are free to resubmit tomorrow a renewed application, which the Department will review based on its independent merit. R. Binder 12, p. 2915 ("Each case is reviewed and decided on the unique or particular circumstances of the applicant tribe."). Considering all these factors, and the substantial opportunities provided the Tribes to present their views during the Central Office's review of their application, the Court should reject the Tribes' claim that they were denied their right to consultation.

B.    **Secretary Anderson's Decision Under 25 U.S.C. § 2719**
       <u>Was Not Arbitrary or Capricious</u>

Plaintiffs urge this Court to set aside the Department's decision because it was arbitrary or capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Pls.' Br. at 18-19. "The 'arbitrary or capricious' standard of review is a deferential one which presumes that agency actions are valid as long as the

21

decision is supported by a 'rational basis.'" <u>Pozzie v. U.S. Dep't of Housing and</u> <u>Urban Development</u>, 48 F.3d 1026, 1029 (7th Cir. 1995). The Court's task, therefore, is to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." <u>Foust v. Lujan</u>, 942 F.2d 712, 714 (10th Cir. 1991). If the reviewing court, applying this deferential standard, finds that the agency "considered all relevant factors in reaching [its] decision and made no clear error of judgment, [the agency] action cannot be overturned." <u>Cotton Petroleum Corp. v. United States Dep't of</u> <u>Interior</u>, 870 F.2d 1515, 1525 (10th Cir. 1989). As the following discussion shows, Secretary Anderson's decision letter provided a reasoned explanation of why the Department exercised its discretion to decline the Tribes' application based on the record evidence -- accordingly, plaintiffs' plea to have the decision declared arbitrary or capricious is without merit.

As explained above (p. 5), the Department may not exercise its authority under 25 U.S.C. § 465 to acquire land in trust if it will be used for gaming purposes unless an applicant tribe can show that a proposed gaming operation will be in its best interest and that the operation will not be detrimental to the surrounding community. 25 U.S.C. § 2719(b)(1)(A). In his decision letter, Secretary Anderson concluded that the applicant Tribes failed to show that their gaming operation would not be detrimental to the surrounding community, and so he was obliged to decline their

trust application. R. Binder 12, pp. 2914-15. Secretary Anderson based his decision on a full consideration of the record, and he found compelling the following information:

     a.    The elected officials of the Town of Troy registered their strong opposition to the acquisition proposed by the applicant Tribes based on their determination that a casino would negatively affect traffic congestion, the social structure in the community, infrastructure, land use patterns, and delivery of services. R. Binder 3, pp. 612-16 & R. Binder 12, pp. 2699-2701 (this resolution incorporated the concerns expressed earlier (R. Binder 3, pp. 612-16) by Troy).

     b.    The elected officials of the City of Hudson registered their strong objection to the acquisition proposed by the applicant Tribes based on their determination that a casino would negatively affect infrastructure, future residential and commercial development plans, and the availability of labor. R. Binder 12, pp. 2713-14 & R. Binder 11, pp. 2318-19 & 2394-97. Contrary to plaintiffs' assertions (Pls.' Br. at 27), the record does not show that the City of Hudson ever retracted its opposition to this acquisition -- certainly the record contains no communications from the City Council or Mayor issuing a retraction.

     c.    Lawmakers from the State of Wisconsin, including the State Senator representing the district in which the proposed acquisition was located, registered their strong opposition to the acquisition

proposed by the applicant Tribes based on their concerns about the adequacy of governmental services agreements, the desire of Wisconsin citizens to limit the expansion of gaming, and the effect of a new casino near an urban center on the vitality of current tribal gaming operations in less-populous regions.  R. Binder 10, pp. 2156-58.

d.    Documentation received by the Department showed that the St. Croix Chippewa would suffer a loss of market share and revenues if the applicant Tribes operated a casino at the St. Croix Meadows site in Hudson, Wisconsin.  R. Binder 12, pp. 2791-2864 (redacted comments prepared by St. Croix Chippewa); R. Binder 13, pp. 3198-3201 (staff analysis of economic effects on the St. Croix Chippewa).

e.    IGMS staff concluded that the environmental analyses prepared by the applicant Tribes' was inadequate.  R. Binder 13, pp. 3083-84, 3134, 3178 and R. Binder 11, pp. 2517-78 (respectively, staff input regarding environmental concerns and letters from the public regarding the St. Croix Riverway).

Thus, Secretary Anderson's decision letter rested on uncontroverted record facts from which it was reasonable to conclude that the Tribes had failed to prove that their casino would not be detrimental to the surrounding community.  Based on the record, the degree of discretion afforded the Secretary, and the placement of the burden of persuasion on the applicant Tribes to fit within the § 2719(b)(1)(A)

24

exception, the Department's decision cannot be described as arbitrary or capricious.

1.  Secretary Anderson properly considered the views of local officials.

Plaintiffs attack Secretary Anderson at length for basing his decision in part on the opposition of state and local government officials, claiming that the Checklist for Acquisitions for Gaming Purposes precludes the Department from entertaining such considerations. Pls.' Br. at 20-28. There are two short answers to this criticism: first, as stated above (pp. 15-16), the Checklist applies only to Area Offices and does not bind the review and decision process conducted by the Central Office. Second, the Checklist itself does not forbid consideration of such views, as it encourages Area Offices to forward "[a]ny other information which may provide a basis for a Secretarial determination that the gaming establishment is not detrimental to the surrounding community." Checklist p. 12. In fact, the Checklist goes on to advise as follows:

> Because the impacts of a gaming facility established on newly acquired land will be difficult to quantify in concrete or tangible terms, the officials consulted should also be invited to address such additional concerns or factors which they believe more fully demonstrate the actual or potential impact of the proposed gaming facility. The responding officials should not be limited to the listed items.

Id.

More fundamentally, though, Congress required the Department, through the consultation requirement of § 2719(b)(1)(A), to obtain and consider the views of state and local officials. While plaintiffs dismiss these views as mere "political opposition," the record reveals that the elected officials from the Town of Troy, City of Hudson, and Wisconsin legislature expressed their opposition in terms of the possible impacts

of a new casino on traffic congestion, infrastructure, and future development plans. See supra pp. 23-24. These concerns go to the quality of life and to the future economic and social direction of the surrounding communities -- areas in which politically accountable officials have considerable insight.

That these officials relied on their experience in formulating these concerns without producing exhaustive studies is hardly remarkable given the press of their responsibilities and is consistent with the Checklist, which states that "[r]esponding officials should be advised that the fact that an official does not have extensive information or documented proof on the items listed above should not prevent the responding official from addressing the items to the extent possible." Checklist p. 12. Plaintiffs offer no support beyond the Checklist for their assertion that the Central Office was required to make extensive factual findings to support the objections of the local communities. In this, they have failed to establish that Secretary Anderson's decision was arbitrary or capricious. And to deem reliance on the opposition of local and state officials a "clear error of judgment" is to suggest that the Department act contrary to the statute's requirement that such officials be consulted. Consequently, plaintiffs' assertion that Secretary Anderson abdicated his responsibility and refused to make an independent decision strains logic and credulity.

Furthermore, plaintiffs' attempt to characterize Secretary Anderson's decision as woefully incomplete and worthy of reversal pursuant to the Supreme Court's holding in Burlington Truck Lines v. United States, 371 U.S. 156 (1962), is misguided. Pls.' Br. at 25. Contrary to plaintiffs' contention, the decision at issue in Burlington

was not similar to Secretary Anderson's, as plaintiffs maintain, but rather included "no findings and no analysis," and "no indication of the basis on which the commission exercised its expert discretion." 371 U.S. at 167. Here, Secretary Anderson made findings supported by the record about the opposition raised by local and state officials, about the economic effects of a new casino on the St. Croix Chippewa, and about the inadequacies of the environmental documentation. R. Binder 12, pp. 2914-15. From these findings, Secretary Anderson concluded that the applicant Tribes failed to meet their burden of showing that their casino would not be detrimental to the surrounding community. Id. As such, this reasoned, record-supported decision is in no manner akin to the cryptic, conclusory decisionmaking remanded by the Supreme Court in Burlington.[5]

2.   Secretary Anderson properly considered the economic impacts on nearby tribes.

Plaintiffs argue that the decision was "[i]mproperly" based on opposition to competition by other nearby Indian tribes. Pls.' Br. at 29. But plaintiffs ignore again the Department's statutory obligation to consult with nearby tribes in determining whether a casino will have a detrimental effect on the surrounding communities, an

---

[5]   Nor can the decision be deemed arbitrary or capricious because all of the factors on the Checklist were not discussed in the decision letter. The decision meets the test set forth in Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281 (1974), requiring that it show consideration of relevant factors, and it substantially exceeds the one-paragraph explanation rejected by the D.C. Circuit in Pennzoil v. FPC, 534 F.2d 627 (D.C. Cir. 1976), where the Federal Power Commission explained its decision to release information over protests by interested parties by stating simply the "public interest" outweighed any potential harm caused by the release.

obligation that is meaningless unless the Department can consider precisely the economic concerns raised by the St. Croix Chippewa and the other nearby tribes. Moreover, the Department has a larger responsibility pursuant to its "fiduciary obligation that is owed to all Indian tribes." Hoopa Valley Tribe v. Joe Christie, et al., 812 F.2d 1097, 1102 (9th Cir. 1987) (citing Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370, 378-79 (1st Cir. 1975)). In fulfilling his statutory obligation to consult with local officials, "including officials of other nearby Indian tribes," Secretary Anderson had to keep this larger fiduciary duty in mind. His doing so cannot render his decision arbitrary or capricious.

Plaintiffs' contention (Pls.' Br. at 31) that the projected impact of their operation on the St. Croix "would have been minimal" concedes the Department's basic point that the "St. Croix will suffer a loss of market share and revenues." R. Binder 12, p. 2915. According to the IGMS staff analysis quoted by plaintiffs, the St. Croix projected that they would lose 181,000 customers from their projected attendance of 1,225,000 in 1995, a loss of 14.7%. Whether one terms this loss as minimal or substantial, the fact remains that the Secretary correctly found that the St. Croix would suffer some loss as a result of the Tribes' proposed casino. See Defs.' Res. to Conf. Findings of Fact. ¶ 8. Once the Secretary found that a loss would occur, he was not required to balance the loss against possible gains that the applicant Tribes might enjoy, as the two-prong analysis of § 2719(b)(1)(A) precludes a comparative analysis and demands that the Department find that a proposed casino is both in the Tribes' best interest and will not be detrimental to the surrounding community.

Additionally, Secretary Anderson was clearly not concerned that plaintiffs wanted to locate a casino off-reservation, but that their chosen location would give them a substantial competitive advantage over already-existing Indian gaming operations. Plaintiffs believe that the Department should have embraced go-go free enterprise (Pls.' Br. at 32), a legitimate policy choice, yet it cannot be said that the Secretary acted unreasonably by deciding instead to further the Department's trust responsibility owed to all Indian tribes. Also, plaintiffs' varied complaints about distances from the Hudson site and the quality of road access simply go to whether the St. Croix would indeed suffer some loss from the proposed casino, which plaintiffs themselves already concede.

The Tribes' last allegation is that the Secretary should have considered the effect of a revenue sharing agreement on the competitive impacts of the proposed casino, citing the Department's discussion of just such an agreement negotiated by the Sault St. Marie Tribe in Michigan. Pls.' Br. at 35-36. That the Secretary looked approvingly on the revenue sharing agreement negotiated by the Sault St. Marie Tribe demonstrates that the Department has a consistent practice of taking into consideration the economic effects of a proposed trust acquisition on nearby tribes. Thus, had the applicant Tribes negotiated such an agreement with the other tribes, this would have affected the Secretary's analysis of the application. The onus, however, is on the applicant Tribes, not the Secretary, to propose and negotiate a revenue sharing agreement, as the applicant Tribes have the burden of showing that they fit within the exception to the ban on trust acquisitions created by

29

§ 2719(b)(1)(A).

Unlike the situations discussed in the cases cited by plaintiffs, Pls.' Br. at 36, here an applicant sought an exception to a general statutory prohibition on new trust acquisitions, and neither applicable regulations nor statutes required the Department to engage in any sort of alternatives analysis. In contrast, the Court in Motor Vehicle Manufacturers Association of the United States v. State Farm Automobile Insurance Company, 463 U.S. 29 (1983), chastised the Department of Transportation for failing to discuss in a final rulemaking an alternative that the Department had previously put forward, id. at 46 & n.11; in Pennzoil Co. v. FPC, 534 F.2d 627 (5th Cir. 1976), the court employed a heightened standard of review and ordered some consideration of alternatives when it reviewed a federal agency order requiring regulated entities to disclose information that they believed was proprietary, id. at 631-32, -- a far different situation from that of the applicant Tribes; and in Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied, 384 U.S. 941 (1966), the court found that statutory and regulatory mandates required the agency to give consideration to an alternative posited by a party before the agency, id. at 612, 618-20. Therefore, the cases cited by plaintiffs do not relieve the applicant Tribes of the burden of coming forward with alternatives for fitting within the § 2719 exception, and they cannot now demand that the Department conjure up ways by which the Tribes may satisfy their burden.

3.  Secretary Anderson properly considered the inadequacies of the environmental documentation.

Plaintiffs assert that the Secretary's concern over the potential impact of the

proposed casino on the St. Croix National Scenic Riverway was "arbitrary and capricious on its face." Pls.' Br. at 37. Plaintiffs err, however, when they state that the Department had the sole obligation to obtain additional information sufficient to satisfy the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, as the Checklist for Acquisitions for Gaming Purposes, cited by plaintiffs, requires applicants to address environmental issues: "To assist the Secretary determine whether the gaming establishment on newly acquired land will not be detrimental to the surrounding community, the officials consulted and the applicant tribe should be requested to address items such as the following: 1. Evidence of environmental impacts and plans for reducing any adverse impacts." Checklist for Acquisitions for Gaming Purposes p. 12 (attached as Ex. B to Pls.' Complaint). Thus, the applicant Tribes had the responsibility for providing the Department with adequate information on which to judge the environmental consequences of a proposed casino, and the Tribes' failure to provide this information cannot be blamed on the Department.

In this case, the record shows that the plaintiff Tribes did submit the environmental analyses reviewed by the Area Office and found wanting by the Central Office. R. Binder 4, pp. 780-85. Since the proposed federal action was being considered at the behest of an applicant rather than on an agency's own volition (such as when constructing a dam or building a federal highway), plaintiffs had the duty to provide the Department with environmental documentation of sufficient quality to comply with NEPA before the agency could approve the application. The Central

31

applicants, found that the Tribes failed to perform this duty. R. Binder 13, pp. 2083-86, 3134, 3178 (IGMS staff analysis of the environmental documentation submitted by the Tribes). This failure was especially acute regarding the St. Croix Scenic Riverway: "The fact that the nearby riverway has received a special designation was not revealed in the environmental document which had been submitted [by the Tribes] in connection with the other documents in support of the proposed casino. The potential impact, if any, of the proposed casino on the riverway was also not adequately addressed." R. Binder 13, p. 3134. This staff analysis, coupled with the substantial number of comments regarding the Riverway (R. Binder 11, pp. 2517-78), more than supports the Secretary's ultimate conclusion that "the potential impact of the proposed acquisition on the Riverway was not adequately addressed in environmental documents submitted in connection with the application." R. Binder 12, p. 2915.

> 4. <u>Secretary Anderson did not violate applicable regulations.</u>

Plaintiffs also contend that the Department's decision was arbitrary or capricious because it "repeatedly violated its own regulations." Pls.' Br. at 40. Plaintiffs fail to offer, however, examples of such regulatory violations other than to state that they are "set forth at length, throughout this brief." <u>Id.</u> at 41. Defendants have set forth throughout this brief their refutation of these allegations, and will leave it at that.

5. <u>Secretary Anderson was not required to suggest alternatives for the applicant Tribes.</u>

In a final catch-all argument, plaintiffs reiterate their previous contentions that the Department did not consider alternatives, did not consider all options, did not analyze all the facts, and did not allow plaintiffs an opportunity to challenge its views. Pls.' Br. at 41-46. In fact, as we have demonstrated above, alternatives and options that were not presented could not have been considered. Nor is the Supreme Court's decision in <u>Motor Vehicle Manufacturers Association of the United States v. State Farm Automobile Insurance Company</u>, 463 U.S. 29 (1983), of any assistance to plaintiffs, as in that case the Court required an agency to consider in a rulemaking an alternative that it had previously put forward. <u>Id.</u> at 46 & n.11.

Likewise, the decision in <u>Asarco, Inc. v. EPA</u>, 616 F.2d 1153 (9th Cir. 1980), garners plaintiffs little, for there the court was confronted with a highly fact-based agency decision regarding technological alternatives to reduce particulate formation in smoke stacks. The present action, however, presents no such complex questions of fact. Rather, the Department's decision not to acquire property under §§ 465 & 2719 involved making predictive policy judgments: has the tribe shown that a casino will not have a detrimental effect on the community, including nearby tribes; is this a proper case in which to exercise the Department's broad discretion to acquire property. In this type of decisionmaking, "to the extent that factual determinations were involved . . . they were primarily of a judgmental or predictive in nature" and therefore "complete factual support in the record for the [agency's] judgment is not possible or required." <u>FCC v. National Citizens Committee for Broadcasting</u>, 436 U.S.

775, 813-14 (1978).

The Department's decision letter of July 14, 1995, clearly identified the facts relied upon to support its judgments, and those facts are reflected in the record. R. Binder 12, p. 2914. It may not be possible to prove that a new casino will have a detrimental effect, but such proof in the record is not mandated by statute, regulation, or principles of administrative law. Moreover, plaintiffs were aware of the opposition comments submitted to the Department and were afforded every opportunity for rebuttal. Consequently, plaintiffs may disagree with the decision, but they cannot claim that it is unreasonable.

C.   Secretary Anderson's Decision Was Not Based On Improper Political Influence

The Court has previously considered and rejected the argument that the Department's decision resulted from improper political influence. Pls.' Br. at 47-53. For the record, the Government incorporates its prior briefs on this issue, which repudiated these allegations, and relies on the Court's June 11, 1996, Opinion and Order. The Government will waste no more time on plaintiffs' unsubstantiated allegations.

D.   Secretary Anderson's Decision Did Not Violate Past Policies or Practices of the Department

Plaintiffs next complain that the Department deviated from a laundry list of past practices and policies. Pls.' Br. at 53-54. The case relied on by plaintiffs, Atchinson, Topeka & Sante Fe Railway Co. v. Wichita Board of Trade, 412 U.S. 800 (1973), did criticize the ICC for failing to explain its departure from past policy, but there the

34

Court discussed at length the past ICC decisions from which the agency departed. Id. at 808-09. Beyond listing a number of putative policies, however, plaintiffs cite no Department regulations or decisions. Moreover, it is also difficult to imagine how the Department could have built up much in the way of past practices or policies regarding § 2719 trust acquisitions, for the record shows that only three class III applications had been submitted at the time the Tribes' application was before the agency. R. Binder 12, p. 2780. Because the state Governors had not concurred in those three applications, none of them were taken in trust. Id.; see also Homemakers North Shore, Inc. v. Bowen, 832 F.2d 408, 413 (7th Cir. 1987) ("An inconsistent administrative position means flip-flops by the agency over time, rather than reversals within the bureaucratic pyramid."). Therefore, plaintiffs have not shown that the Department deviated impermissibly from its past practices and policies when it denied the Tribes' request to take St. Croix Meadows into trust.

E.    Secretary Anderson's Decision Constituted An Appropriate Exercise of Authority Under 25 U.S.C. § 465

In their last argument, plaintiffs assert that the Department's denial of their application was arbitrary or capricious because Secretary Anderson's decision letter does not show that he considered each of the factors listed at 25 C.F.R. § 151.10 (1995). Pls.' Br. at 55-58.[6] This argument lacks merit in that the Tribes appear to demand that Secretary Anderson's decision letter, which addressed the relevant

---

[6]    The parties do not dispute that the regulations in force during the review of the Tribes' application were those contained in the 1995 version of the Code of Federal Regulations. These regulations were subsequently amended. See 60 Fed. Reg. 32878.

factors for decision, should have also discussed factors listed in § 151.10 that were of no moment due to the denial of the Tribes' application. Since Secretary Anderson's consideration of relevant factors lead him to decline the Tribes' application, there was no need to discuss superfluous acquisition-specific factors, and accordingly his decision was not arbitrary or capricious. See American Legion v. Derwinski, 54 F.3d 789, 798 (D.C. Cir. 1995) ("[T]he court will uphold agency action that, considered in its entirety, is based on appropriate considerations and otherwise complies with relevant statutes and the Administrative Procedure Act.") (internal quotations omitted).

Secretary Anderson's decision letter of July 14, 1995, began by discussing the record evidence demonstrating opposition by state and local officials and nearby tribes and then found that this evidence prevented the Department from finding under 25 U.S.C. § 2719(b)(1)(A) that the proposed acquisition would not be detrimental to the surrounding community. R. Binder 12, pp. 2914-15. The letter then concluded as follows:

> Finally, even if the factors discussed above were insufficient to support our determination under Section 20(b)(1)(A) of the IGRA, the Secretary would still rely on these factors, including the opposition of the local communities, state elected officials and nearby Indian tribes, to decline to exercise his discretionary authority, pursuant to Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. 465, to acquire title to this property in Hudson, Wisconsin, in trust for the Tribes. This decision is final for the Department.

R. Binder 12, p. 2916.

As the Court is aware, even if a tribe satisfies the requirements of § 2719 and the Department determines that "the proposed off-reservation gaming establishment is in the best interest of the applicant tribes and would not be detrimental to the

36

surrounding community and the governor concurs in that determination, the secretary must decide whether to exercise his discretion to acquire land in trust pursuant to the Indian Reorganization Act, 25 U.S.C. § 465." Sokaogon Chippewa Community v. Babbitt, 929 F. Supp. 1165, 1170 (W.D. Wis. 1996); see also Checklist, p. 13 (attached as Ex. B to Pls.' Complaint) ("It should be noted that the Secretary's determination under Section 20 does not constitute a final decision to acquire the land in trust under Part 151."). Thus, Secretary Anderson's decision letter quite properly went on to conclude that despite whether the Tribes had satisfied the two-part test in § 2719(b)(1)(A), the Secretary would not exercise his discretion under § 465 to take the St. Croix Meadows into trust because of the record evidence of opposition from nearby tribes, state lawmakers, and surrounding communities.

Plaintiffs criticize the § 465 portion of the decision letter because Secretary Anderson did not go through each of the factors listed in 25 C.F.R. § 151.10. But to require such obeisance to each of the listed factors, regardless of its relevance in a particular situation, elevates form over substance. The factors in § 151.10 are a means, not an end, by which the Department determines whether taking land into trust would be appropriate under § 465. Thus, the key task for a court is to ascertain if a trust acquisition decision comports with the discretion granted by § 465 as informed by the § 151 factors, not simply to see if the Department put a checkmark next to each factor.

Decisions of the Interior Board of Indian Appeals confirm this understanding. Miami Tribe of Oklahoma v. Muskogee Area Director, 28 I.B.I.A. 52, 56 (Jun. 8, 1995)

37

("[T]he Board has held that BIA may deny a trust acquisition request on the basis of only some, or even one, of the factors in 25 C.F.R. 151.10 if BIA's analysis shows that factor or factors weighed heavily against the trust acquisition.") (internal quotations omitted); City of Eagle Butte v. Aberdeen Area Director, 17 I.B.I.A. 192, 197 n.3 (July 25, 1989) ("A decision to approve a trust acquisition must show that all of the factors were considered.  A decision to disapprove . . . may be based on a more limited analysis of only some of the factors, if BIA's analysis shows that those factors weigh heavily against the trust acquisition.").  Decisions of the federal courts agree.  United States v. Roberts, 904 F.Supp. 1262, 1268 (E.D. Okl. 1995) (reviewing trust acquisition under § 465 and holding that proper inquiry focuses on whether Department properly exercised its discretion, not on whether Department complied strictly with procedures), aff'd in part, rev'd in part and remanded on other grounds, 1996 WL 379777 (10th Cir. July 8, 1996); see also Florida, Dep't of Business Regulation v. United States Dep't of Interior, 768 F.2d 1248, 1256 (11th Cir. 1985) ("[§ 151.10] does not purport to state how the agency should balance these factors in a particular case, or what weight to assign each factor."), cert. denied, 475 U.S. 1011 (1986); cf. Natural Resources Defense Council, Inc. v. Herrington, 768 F.2d 1355, 1416 (D.C. Cir. 1986) ("[A]gencies rightfully enjoy very broad discretion in determining what aspects of a problem warrant investigation.").[7]

---

[7]     See also Hatco Corp. v. W.R. Grace & Co., 849 F. Supp. 931, 964-65 (D.N.J. 1994) (observing that a regulation mandating that a decisionmaker "shall consider" certain enumerated factors does not require that each factor be specifically considered depending on the decisional context); McDonnell Douglas Corp. v. United
(continued...)

This understanding of the § 151 factors was articulated in a recent petition for certiorari, in which the United States explained that "a decision to acquire land in trust under section 5 of the IRA is subject to judicial review under the APA, see 5 U.S.C. 706(2), taking into account the factors identified in the Secretary's regulations as relevant in making such decisions." Certiorari Petition in <u>United States Dep't of Interior v. South Dakota</u> p. 7 (attached as Ex. C to Pls.' Motion to Take Judicial Notice).<u>8/</u>  The Secretary's decision to acknowledge judicial review of § 465 determinations is hardly startling given the constitutional threat to the continued viability of § 465, nor, more importantly, does the acknowledgement of judicial review suggest that the Secretary's broad discretion has now been curtailed, as § 465 determinations were already subject to administrative review based on the § 151.10 factors. <u>City of Eagle Butte v. Aberdeen Area Director</u>, 17 I.B.I.A. 192, 197 n.3 (July 25, 1989).  In this case, an examination of the factors contained in § 151.10 demonstrates that the Department considered the factors relevant to its decision and that the denial of plaintiffs' application was well within the bounds of the Department's

---

<u>7/</u>(...continued)
<u>States</u>, 35 Fed. Cl. 358, 369 (Ct. Fed. Cl. 1996) (explaining that review of whether an agency properly exercised its discretion must take into account totality of decisional circumstances).

<u>8/</u>    It must also be noted that the certiorari petition was filed in an action where a party opposed an Interior decision to take property in trust.  <u>South Dakota v. Department of Interior</u>, 69 F.3d 878, 880 (8th Cir. 1995), <u>petition for cert. filed</u>, 64 U.S.L.W. 3823 (Jun. 3, 1996).  In situations where the Department is taking land into trust, then review of all the listed factors may be more critical when determining whether the decision comports with § 465.  <u>City of Eagle Butte v. Aberdeen Area Director</u>, 17 I.B.I.A. at 197 n.3.

discretion. <u>Diaz v. INS</u>, 648 F. Supp. 638, 648 (E.D. Cal. 1986) ("As a general matter, discretion in the administrative context provides the decision-maker with freedom to exercise his or her best judgment in reaching a decision.").

Section 151.10 lists seven factors to be considered when taking land into trust, one of which, § 151.10(d), applies only to acquisitions for individual Indians. Section 151.10(a) requires that the Department consider any statutory limitations on the exercise of its § 465 authority, which Secretary Anderson's discussion of § 2719(b)(a)(A) satisfied. Indeed, Secretary Anderson's analysis of this first factor weighed heavily against taking the land into trust. Section 151.10(b) provides that the Department consider the need of the applicant for the land, as the Department may only take land that is noncontiguous with a reservation into trust if the land is "necessary to facilitate tribal self-determination, economic development, or Indian housing," 25 C.F.R. § 151.3(a)(3). That the plaintiff Tribes met this threshold criteria was never in question, so Secretary Anderson had no need to discuss § 151.10(b). Section 151.10(c) requires the Department to consider the proposed use of the land, and Secretary Anderson's decision letter went into great detail discussing the problems created by the proposed use of St. Croix Meadows as a casino, which weighed heavily against acquisition. Finally, sections 151.10(e)-(g) were irrelevant to Secretary Anderson's decision to decline the Tribes' trust application, as these provisions require the Department to consider the effect of <u>taking</u> land into trust on tax rolls, on jurisdictional problems, and on the ability of the Bureau of Indian Affairs to discharge its attendant additional responsibilities. <u>See</u> <u>Miami Tribe of Oklahoma v.</u>

40

Muskogee Area Director, 28 I.B.I.A. at 56.

The cases cited by plaintiffs as supporting their argument are inapposite. In Mobil Oil Corp. v. Department of Energy, 610 F.2d 796 (Temp. Emer. Ct. App. 1979), the court remanded a decision by the Department of Energy because the agency failed to consider any of the factors it was required by statute to evaluate. Id. at 801 ("It is clear from the record that at no time prior to promulgating the April 30, 1974 amendment did the DOE even consider the relevant factors or objectives set out in [15 U.S.C.] § 753(b)(1)."). As detailed above, Secretary Anderson's decision letter complied with the relevant factors set forth in § 151.10 by thoroughly evaluating the applicable statute and proposed use of the property. Similarly, in Pennzoil Co. v. FPC, 534 F.2d 627 (5th Cir. 1976), which did not involve the application of statutory or regulatory factors, the court rejected an agency's disposition of a Freedom of Information Act request due to the agency's laconic analysis. Id. at 632 ("The Commission, however, felt that the 'public interest' outweighed such harm. We feel that this brief statement is inadequate as an articulation of a finding that disclosure of this information serves a legitimate regulatory function."). Again, Secretary Anderson discussed in detail the factors he considered in declining to exercise his discretion under § 465, citing substantial record opposition from local governments, state lawmakers, and nearby Indian tribes that was supported by the record.

Plaintiffs also complain that Secretary Anderson considered matters outside the factors listed in § 151.10. Although plaintiffs do not specify what these offensive matters were, it bears repeating that § 151.10 does not straightjacket the Department

from considering other relevant factors; it simply identifies certain factors that will often be relevant in a trust acquisition decision. Moreover, plaintiffs ignore the provision in 25 C.F.R. § 151.11 that empowers the Secretary to consider "any additional information he considers necessary to enable him to reach a decision." This authority extends down to Area Offices, which have been encouraged to provide the Central Office with "any additional findings independently made by the Area Director on issues or matters that will facilitate a decision." Checklist p. 1 (attached as Ex. B to Pls.' Complaint); see also Chase v. McMasters, 573 F.2d 1011, 1016 (8th Cir. 1978) (holding that the Secretary did not necessarily exceed his delegated authority when he took into consideration an individual Indian's desire to be relieved from the obligation of paying property taxes when deciding whether to take land into trust), cert. denied, 439 U.S. 965 (1978).

In the end, Secretary Anderson's decision was made with full record support after a thoughtful consideration of the relevant factors enumerated in 25 C.F.R. Part 151. The record shows that this was reasoned decisionmaking on a controversial and significant trust application, and plaintiffs have been unable to demonstrate that the Department engaged in an arbitrary action unbounded by intelligible principles. As such, their complaint seeking a remand of Secretary Anderson's decision should be dismissed.

## IV. CONCLUSION

For the reasons stated above, defendants ask the Court to deny plaintiffs'

appeal of the decision of Deputy Assistant Secretary Michael J. Anderson.

Dated this 23rd day of August, 1996.

Respectfully submitted,

PEGGY A. LAUTENSCHLAGER
United States Attorney

By:

MARK A. CAMELI
DAVID E. JONES
Assistant United States Attorneys
660 W. Washington Avenue
Madison, Wisconsin  53701-1585
(608) 264-5158

LOIS J. SCHIFFER
Assistant Attorney General
EDWARD J. PASSARELLI
MICHAEL K. MARTIN
U.S. Department of Justice
Environment and Natural ural Resources
 Division
P.O. Box 663
601 Pennsylvania Ave., N.W.
Washington, D.C.  20044-0663
(202) 272-6221

Attorneys for Defendant

Of Counsel:
TROY WOODWARD
SCOTT KEEP
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240

43

# EXHIBIT G



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

TAKE PRIDE
IN AMERICA

SEP 2 1 2007

Memorandum

To:        All Regional Directors

From:      Assistant Secretary – Indian Affairs

Subject:   September 2007 Checklist for Gaming Acquisitions,
           Gaming-related Acquisitions, and Two-Part Determinations
           Under Section 20(b)(1)(A) of the Indian Gaming Regulatory Act.

Please find attached a September 2007 revision of the Checklist for Gaming Acquisitions.
This revision replaces the March 2005 Checklist. All pending and future acquisitions for
gaming, gaming-related purposes, and Section 20 two-part determinations should be
processed in accordance with the requirements of the September 2007 Checklist. The
authority to approve or disapprove requests for the acquisition of land into trust for
gaming and gaming-related purposes remains with the Assistant Secretary for Indian
Affairs in accordance with Secretarial policy issued on July 19, 1990, and our
memorandum of November 9, 2001.

The September 2007 Checklist differs from the previous checklist in only two respects.
First, Section D on the first page is modified to clarify that an application for a two-part
Secretarial determination pursuant to Section 20(b)(1)(A) of IGRA should not be
processed unless the land is already in trust or, if not yet in trust, until after the
publication of a notice to take the land in trust has been published pursuant to 25 CFR
151.12. Second, Section III of Part 2 is amended to clarify that the preparation of NEPA
documentation should not be undertaken before either a request has been submitted to
take land in trust under 25 CFR 151.9, or, if the land is already in trust, not before the
submission of an application for a two-part determination under Section 20(b)(1)(A) of
IGRA. The changes are redlined in the text of the Checklist for your convenience.

Attachment

# CHECKLIST
# FOR GAMING ACQUISITIONS
# GAMING-RELATED
# ACQUISITIONS and IGRA
# SECTION 20
# DETERMINATIONS

Office of Indian Gaming
1849 C Street NW, MS-3657 MIB
Washington, DC  20240
(202) 219-4066
(202) 273-3153 fax

September 2007

# Table of Contents

PART 1 - LAND ACQUISITION - 25 CFR PART 151

    I. 151.3 Land acquisition policy ............................................................. Page 2
    II. 151.4 Acquisitions in trust of lands owned in fee by an Indian ...................... Page 2
    III. 151.5 Trust acquisitions in Oklahoma under Section 5 of the IRA ................ Page 2
    IV. 151.6 Exchanges ....................................................................... Page 2
    V. 151.7 Acquisitions of fractional interests .............................................. Page 2
    VI. 151.8 Tribal consent for non-member acquisitions ................................. Page 2
    VII. 151.9 Request for approval of acquisitions ......................................... Page 3
    VIII. 151.10 On-reservation acquisitions ................................................ Page 3
        B. 151.10(a) ...................................................................... Page 3
        C. 151.10(b) ...................................................................... Page 3
        D. 151.10(c) ...................................................................... Page 3
        E. 151.10(d) ...................................................................... Page 4
        F. 151.10(e) ...................................................................... Page 4
        G. 151.10(f) ...................................................................... Page 4
        H. 151.10(g) ...................................................................... Page 4
        I. 151.10(h) ...................................................................... Page 4
    IX. 151.11 Off reservation acquisitions ................................................. Page 5
    X. 151.12 Action on requests ............................................................ Page 5
    XI. 151.13 Title Examination ............................................................. Page 5
    XII. 151.14 Formalization of acceptance ................................................ Page 5

PART 2 - INDIAN GAMING REGULATORY ACT - 25 U.S.C. § 2719, SECTION 20

    I. Section 20(a), 25 U.S.C. § 2719(a) .................................................... Page 6
        A. Section 20(a)(1) ............................................................... Page 6
        B. Section 20 (a)(2)(A) ........................................................... Page 6
        C. Section 20 (a)(2)(B) ........................................................... Page 6
    II. Section 20(b)(1), 25 U.S.C. § 2719(b)(1) ............................................ Page 7
        A. Section 20 (b)(1)(B) ........................................................... Page 7
        B. Section 20(b)(1)(A) ........................................................... Page 7
    III. Guidance for preparing NEPA documents ......................................... Page 9
        Checklist of Environmental Issues for NEPA Review ........................... Page 11
    IV. Preparation of Section 20 documentation by Region ............................ Page 12

## CHECKLIST FOR GAMING and GAMING-RELATED ACQUISITIONS

The Office of Indian Gaming (OIG) is responsible for Indian gaming functions and activities remaining with, or delegated to, the Secretary under the Indian Gaming Regulatory Act of 1988 (IGRA), 25 U.S.C. §§ 2701-2721. The OIG is also responsible for the review of recommendations from Regional Offices regarding requests for the acquisition of land into trust for gaming and gaming-related purposes. This function includes acquisitions either for a new gaming facility, for the expansion of a present gaming facility, or for projects that are essential to the operation of a gaming facility, such as parking lots or the construction of a waste water treatment facility serving the gaming establishment. The following criteria should be used to determine whether the acquisition is gaming-related: (1) If the land and the improvements on the land are going to be used exclusively to support the gaming facility, the acquisition is gaming-related; (2) if the land and the improvements on the land are not used exclusively to support the gaming facility but the gaming facility cannot operate without it, the acquisition is gaming-related; and (3) if the land and the improvements are not used exclusively for the gaming facility and are not essential to its operation, but the gaming facility is merely sharing in infrastructure improvements, the acquisition is not gaming-related.

In order to assist you in preparing a complete land acquisition package for review and final action, the OIG has prepared this checklist for your use. The checklist is designed to address the factors found in Title 25, Code of Federal Regulations (CFR), Part 151, the requirements of Section 20 of IGRA, and the environmental laws which most likely would be applicable. We also have included information on certain procedural steps that should be followed to assure that a complete file of the tribe's application, information, and supporting documentation is properly submitted to the Central Office. These procedural steps are:

A.   All requests for the acquisition of land for gaming must be transmitted to OIG regardless of whether the land is located on, contiguous to, or off the applicant's reservation. This directive applies to trust-to-trust, restricted-to- restricted/trust, and fee-to-trust land acquisitions. The authority to approve or disapprove land acquisitions for gaming and gaming-related purposes is vested with the Assistant Secretary - Indian Affairs (AS-IA); however, the authority to accept title in trust for BIA is vested with the Regional Director.

B.   The acquisition package submitted to OIG must contain a complete file of information and documents which clearly indicates compliance with 25 CFR Part 151, IGRA, the National Environmental Policy Act (NEPA) and other applicable Federal laws, regulations, and Executive Orders. The Regional Office's transmittal memorandum must contain Proposed Findings of Fact and Conclusions relative to 25 CFR Part 151, Section 20 of IGRA, and NEPA, and any other information deemed appropriate by the Regional Director. Further, it must contain the Regional Director's recommendations for approval or disapproval of the acquisition. For ease in cross-referencing to specific findings or conclusions, the acquisition package should be organized with an index, and all exhibits should be tabbed and numbered. The initial request or application received from the tribe should be kept intact and tabbed as one exhibit. For example, responses to the BIA's request for input/comments should be kept intact and tabbed as a single exhibit, e.g. the 30-day notices to states, county, city, etc. All of these documents can be under one tab with each full document manually numbered for ease in citation and location. No additions or deletions should be made to the tribe's application package. Any additional information obtained by BIA offices to supplement or clarify the tribe's application should be maintained separately and should be identified in a manner that will enable the reader to readily make a determination as to which office obtained or prepared the additional information.

C.   The Regional Director must independently analyze the factors, and make independent findings and recommendations even when the Tribe submitting the application has contracted the realty services program under Title I of the Indian Self-Determination and Education Assistance Act (ISDEA), or has entered into a self-governance compact pursuant to Title IV of the ISDEA.

D.   When the acquisition is subject to Section 20 (b)(1)(A) of IGRA, 25 U.S.C. Sec. 2719(b)(1)(A), which requires consultation, a two-part Secretarial determination, and the concurrence of the Governor of the State, the Regional Director must first receive notification of the publication in the Federal Register of the notice required under 25 CFR 151.12 before undertaking the preparation of a recommendation on whether a gaming establishment on newly acquired lands is in the best interest of the tribe and its members and is not detrimental to the surrounding community. The specific factors and consideration for the Section 20 analysis are identified in Part 2 of this Checklist.

E.  When the Regional Director believes that the acquisition satisfies one of the Section 20 exemptions other than (b)(1)(A), the transmittal memorandum from the Regional Director must so indicate and must include an analysis establishing that such an exemption exists, and include supporting documentation, i.e., an appropriate Solicitor's Office legal opinion, in the acquisition file.

F.  The completed acquisition package must be reviewed by the appropriate Regional or Field Solicitor to ensure that all legal requirements have been adequately addressed.

G.  The Regional Director's Memorandum must contain a statement certifying that the documents submitted for the acquisition are copies of the original documents.

## PART 1 - LAND ACQUISITION - 25 CFR PART 151

### I.  151.3 Land acquisition policy

☐  A.  The Regional Director's Proposed Findings of Fact and Conclusions must include a statement and statutory citation to the specific act(s) of Congress authorizing the trust acquisition, e.g., Section 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 465.

Additionally, the Regional Director's Proposed Findings of Fact and Conclusions must include a discussion of applicable provisions in the tribe's governing documents authorizing the tribe to take the requested action.

☐  B.  The Regional Director must include a statement that indicates which circumstances listed in 25 CFR § 151.3(a) support the request for the trust acquisition.

### II.  151.4 Acquisitions in trust of lands owned in fee by an Indian

☐  A.  The trust acquisition package must include a discussion of the ownership status of the property, a legal land survey or other document that provides an accurate description of the property to be acquired, and a plat or map to show the distance and/or proximity of the property to the reservation, the reservation boundaries, or to trust lands, whichever is applicable (see also Part 1, Section VII,

Paragraph A of this Checklist).

☐  B.  The acquisition package must include a copy of the resolution of the appropriate governing body of the tribe authorizing the trust acquisition request and must include a copy or excerpt of the tribe's governing document, if any, which identifies the scope of authority for the tribe's actions. The resolution should include a request to take the land into trust, the exact legal description of the property, the location, the intended purpose, and a citation to the applicable portion of the tribe's governing document which permits the governing body to make the request. The legal description of the property must be identical throughout the acquisition package. Any discrepancies in the legal description should be noted and fully explained.

☐  C.  The Regional Director must provide an assurance that the information provided pursuant to 25 CFR § 151.4 was reviewed and found to be sufficient. The Regional Director's assurance must include a brief summary of the tribe's history, organization, and governing practices to illustrate the tribe's operating standards. Legal issues must be reviewed by the appropriate Regional or Field Solicitor. A copy of the Solicitor's opinion or response must be included as part of the package.

### III.  151.5 Trust acquisitions in Oklahoma under Section 5 of the Indian Reorganization Act

☐  A.  When 25 CFR § 151.5 applies, the acquisition package must include all the information required under Part 1, Section II of this Checklist.

### IV.  151.6 Exchanges

☐  A.  When 25 CFR § 151.6 applies, the acquisition package must include all the information required under Part 1, Section II of this Checklist, in addition to information required in 25 CFR Part 152, if applicable.

### V.  151.7 Acquisitions of fractional interests

☐  A.  When 25 CFR § 151.7 applies, the acquisition package must include all the information required under Part 1, Section II of this Checklist.

## VI. 151.8 Tribal consent for non-member acquisitions

☐  A.  When 25 CFR § 151.8 applies, the acquisition package must include all the information required under Part 1, Section II of this Checklist.

☐  B.  A copy of any written documentation, such as a letter or resolution, executed by the tribe proposing to acquire land on a reservation other than its own, to the tribe having jurisdiction over such reservation must be included as part of the package. This documentation should identify the property proposed for trust acquisition and the parties involved in the transaction.

☐  C.  The acquisition package must also include a copy of the written consent of the tribe having jurisdiction over such reservation for the proposed acquisition. This documentation should also identify the property and the parties involved in the transaction.

## VII. 151.9 Request for approval of acquisitions

☐  A.  The information required under 25 CFR Part 151 should be organized to provide a complete picture of the tribe's request.  The Tribes should be encouraged to submit their requests in a manner which will facilitate the analysis of the request. At the onset of a request, the tribe should be instructed on the nature of the required submissions which support the request. Documents received from the tribe should be kept intact.  NO ADDITIONS OR DELETIONS SHOULD BE MADE TO THE TRIBE'S APPLICATION PACKAGE.  ANY ADDITIONAL INFORMATION OBTAINED BY BIA OFFICES TO SUPPLEMENT OR CLARIFY THE TRIBE'S APPLICATION SHOULD BE MAINTAINED SEPARATELY AND IDENTIFIED IN A MANNER THAT WILL ENABLE THE READER TO READILY MAKE A DETERMINATION AS TO WHICH OFFICE OBTAINED OR PREPARED THE ADDITIONAL INFORMATION. Although there is no particular application format required, the organization of information should follow the following logical sequence:  (1) The identification of the parties; (2) a citation of the statutory authority which authorizes the acquisition; (3) a statement justifying the need for the additional land [151.10(b)]; (4) a full and complete explanation of the intended purpose for the land [151.10(c)]; (5) a physical description of the location of the land; (6) present and past uses of the land; (7) proof of present ownership, or a description of those circumstances which will lead to tribal ownership; (8) a legal description supported by a survey or other document; (9) an indication of the location and proximity to the tribe's reservation, the reservation boundaries or to trust lands; (10) a plat/map indicating such location and proximity of the land to the reservation; and (11) the tribal resolution. The tribal resolution must include the information listed in Part 1, Section II, Paragraph B of this Checklist.

## VIII. 151.10 On-reservation acquisitions

☐  A.  The notification process will be conducted by letter inviting the state and local governments having regulatory jurisdiction over the land to be acquired to provide written comments on potential impacts (regulatory jurisdiction, real property taxes, and special assessments). The notification letters should include information on the location of the proposed gaming facility, the scope of gaming proposed, and other pertinent information which will assist the consulted officials should they wish to comment on the proposed acquisition.

☐  B.  151.10(a):   The Regional Director must determine that there is statutory authority for the acquisition.  A brief summary of the specific statute or act(s) of Congress should be provided along with an independent, factual analysis of the application of such statutory authority to the tribe's request. (See Part 1, Section I of this Checklist).

☐  C.  151.10(b):  The Regional Director must conclude that the tribe has sufficiently justified the need for the additional land. The Regional Director's conclusion should be based on a factual finding which may be supported by independent information, or by information and evidence provided by the tribe. The tribe may justify its request by establishing that existing tribal land is inadequate for gaming because of size, location, and market conditions. In support of this contention the tribe may have developed feasibility or market study, or a business plan which the Regional Director should independently review to determine whether it supports the tribe's assertions.

☐ D. 151.10(c): The Regional Director must conclude that the tribe has adequately described the intended purposes for the land.

E. 151.10(d) NOT APPLICABLE

☐ F. 151.10(e): The Regional Director must make a conclusive statement regarding the impact on the State and any political subdivisions expected to result from removing the land from the tax rolls. The Regional Director will come to a conclusion on the basis of information received from the state and local governments having regulatory jurisdiction over the land to be acquired, and other independent information. At the expiration of the required 30-day comment period for State and local governments, the appropriate BIA official will prepare a record that indicates the contacts made and the responses received, and that includes any other additional comments or information. The record will also include any objections made by the contacted governmental entities. The Regional Director must consider any and all objections, and must provide an analysis of the merits of specific objections. The Regional Director will include any information on the outcome of any objection referred to the tribe. Copies of the record on the 30-day notification process shall be included in the submission to the Central Office.

☐ G. 151.10(f): The Regional Director must include, in the same manner as described in Part 1, Section VIII, paragraph F of this Checklist, a conclusion regarding any jurisdictional problems and potential land use conflicts. The Regional Director's conclusion should be based on information received as a result of the BIA notification, on information obtained independently, or on information known about the jurisdictional issues inherent in the status of Indian lands. If jurisdictional problems or conflicts in land use have been identified, existing agreements between the tribe and local jurisdictions resolving these issues should be included in the acquisition package.

☐ H. 151.10(g): The Regional Director must include an independent assessment of the impact on the BIA should the land be acquired in trust. The Regional Director should consider the type of services required for the land, if any; the availability of staff to carry out the additional responsibilities; and such other considerations which may be relevant in making this assessment. In the assessment of the impact, an analysis is required of the intended and future uses of the property, and a statement should be written based on the analysis indicating the extent to which the BIA Agency and Regional offices will be impacted by the proposed trust acquisition. A fully documented assessment is needed to assess how the added responsibilities (i.e. leases, rentals, easements, emergencies, environmental concerns, roads, traffic, etc.) will affect the present BIA staff. To state merely that the BIA's only duty to the property will be routine or administrative is insufficient. If the applicant tribe has contracted the realty services program under Title I of the ISDEA, or has entered into a self-governance compact under Title IV of the ISDEA, the Regional Office should provide an analysis of the tribe's role in the supervision/administration of the land.

☐ I. 151.10(g): The acquisition package must include a pre-acquisition environmental site assessment, no matter whether the proposed acquisition is discretionary or non-discretionary, as required by 602 DM 2. This Department Manual release requires the assessments to be conducted or supervised by qualified individuals, as determined by the Bureau, and provides that assessments will generally be considered adequate for one year prior to the date of acquisition, with documented exceptions for real property located in adverse climatic or geographical areas.

With respect to discretionary acquisitions, the Regional Director must also comply with the requirements of NEPA and its implementing regulations. NEPA is codified at 42 U.S.C. §§ 4321-4347. The NEPA regulations promulgated by the Council on Environmental Quality (CEQ) are published at 40 CFR Parts 1500-1508. In addition, the Regional Director must comply with Departmental NEPA requirements in 516 DM 1-6, as well as the BIA-specific NEPA requirements in 516 DM 6, Appendix 4. The Bureau's NEPA Handbook is published in 30 BIAM Supplement 1. The *Checklist of Environmental Issues for NEPA Review of Proposed Gaming-Related Actions* reproduced in Part 2 of this Checklist must be included with NEPA documents which are being submitted to the AS-IA for review. A more detailed description of the pertinent

NEPA requirements is provided in Part 2, Section III of this Checklist.

## IX. 151.11 Off reservation acquisitions

☐  A.  When 25 CFR 151.11 applies, the acquisition package must include all the information required under Part I, Section VIII, of this Checklist.

☐  B.  The greater the distance the acquired land is from the tribe's reservation will require that the Regional Director's analysis more fully justify the anticipated benefits to the tribe. The information obtained under Part 2, Section II(B) (best interests factors) of this Checklist may be considered, if the application requires submission of this information pursuant to Section 20 of the IGRA, in analyzing the tribe's application to determine if the acquisition sufficiently satisfies the anticipated benefit to the tribe. As the distance from the reservation increases, the greater the justification will have to be to support the additional benefits to the tribe.

☐  C.  The Regional Director must review the tribe's comprehensive economic development plan required under 25 CFR § 151.11(c), which specifies the anticipated financial benefits associated with the acquisition.

## X. 151.12 Action on requests

☐  A.  The AS-IA will use the information provided by the tribe, Superintendent, and Regional Director to make a decision on the request. Therefore, the Regional Director must ensure that the acquisition package is complete in all respects to allow for a timely and informed decision. The package must include all documents, exhibits, and information relied on or provided in support of the proposed acquisition. Should the AS-IA decide to approve the tribe's application to acquire the land in trust for gaming, the Central Office will publish the required *Federal Register* notice.

## XI. 151.13 Title Examination

☐  A.  The acquisition package must include an *Abstract of Title* or *Commitment for Title Insurance Policy* covering the property to be acquired. The title evidence must be examined by the appropriate Regional or Field Solicitor who must prepare a preliminary title opinion to identify any liens, encumbrances or other legal infirmities which may exist. The accuracy of all legal descriptions must be verified and must match the legal descriptions of the property contained in other documents within the acquisition package prior to submission to the appropriate Regional or Field Solicitor. Copies of correspondence or documented contacts between the Regional Office and the Solicitor's Office must be included as part of the acquisition package. A draft of the instrument of conveyance must be prepared and provided to the Solicitor to ensure compliance with all legal requirements.

After an Abstract of Title has been submitted by the tribe for the title evidence, an appraisal of the property by the BIA is required. The appraisal is used to alert the appropriate Regional or Field Solicitor of the value of the property in the event that office does not have authority to examine title evidence on property exceeding the value of $100,000. The Department of Justice is authorized to examine an Abstract of Title on the property valued at $100,000 or more.

## XII. 151.14 Formalization of acceptance

☐  A.  The Regional Director will be notified in writing of the AS-IA's approval of the acquisition request and authorized to proceed with the formal acceptance of the land in trust subject to satisfactory completion of all title requirements, and following expiration of the 30-day period after publication of the *Federal Register* notice required under 25 CFR § 151.12. A copy of the final title opinion by the appropriate Regional or Field Solicitor, and a copy of the approved and recorded conveyance instrument must be provided to OIGM for inclusion as part of the file.

☐  B.  The appropriate Regional or Field Solicitor's approval of the draft conveyance document must be obtained before a final instrument of conveyance is prepared and signed. A copy of the draft conveyance instrument should be included as part of the acquisition package.

☐  C.  The approved instrument of conveyance must be recorded in the appropriate BIA title office. When fee property is approved for trust, the approved instrument of conveyance to trust should also be recorded in the appropriate county office.

## PART 2 - INDIAN GAMING REGULATORY ACT - 25 U.S.C. § 2719, SECTION 20

Section 20 of IGRA, 25 U.S.C. § 2719, governs the use of land acquired in trust when the intended use of the land is for gaming. Section 20 of IGRA prohibits gaming on lands acquired in trust after October 17, 1988, with certain exceptions.

The first section of this Part describes the exceptions to the gaming prohibition on lands acquired in trust after October 17, 1988. The second section of this Part describes the instances when the general prohibition on gaming on newly acquired lands will not apply to lands acquired in trust after October 17, 1988. The third section of this Part describes the responsibility of the BIA Regional Office regarding compliance with the requirements of NEPA. The fourth section of this part describes the preparation of the Section 20 documentation by the Regional Office for transmittal to Central Office.

All applications for the trust acquisition of land intended for gaming must be processed with Section 20 considerations in mind. Typically, the acquisition will be for the construction and operation of a gaming facility. There will be projects however, which on first impression may not readily appear to be intended for gaming. For instance, if a tribe intends to expand an existing gaming facility through the addition of a hotel with additional gaming space thereon, the acquisition should be deemed to be for gaming. However, if a tribe intends to expand parking facilities for an existing gaming establishment, the acquisition should not be deemed to be for gaming because there is no gaming conducted in the parking lot. Although an acquisition for the expansion of parking facilities would not be subject to the two-part determination in 25 U.S.C. § 2719(b)(1)(A), the acquisition is still subject to approval by the AS-IA, as stated in PART ONE, above because it is gaming-related. A tribe's contention that gaming on newly acquired lands is not prohibited because one or more exceptions apply will require a conclusive factual and legal finding that the particular exception does apply to the trust acquisition.

## I. Section 20(a), 25 U.S.C. § 2719(a)

This section of IGRA prohibits gaming on land acquired by the Secretary in trust for an Indian tribe after October 17, 1988, UNLESS one of the following exceptions apply:

☐   A.  **Section 20(a)(1): The land to be acquired**

qualifies as <u>either:</u>

☐   land that is located within the boundaries of the tribe's reservation as the reservation existed on October 17, 1988, <u>OR</u>

☐   land that is contiguous to the boundaries of the tribe's reservation as the reservation existed on October 17, 1988. Include documentation establishing that the land is contiguous and the appropriate Field or Regional Solicitor's concurrence with this determination.

☐   B.  **Section 20 (a)(2)(A): The tribe had no reservation on October 17, 1988, AND the land is located in Oklahoma, AND:**

☐   the land to be acquired is within the boundaries of the Indian tribe's former reservation as defined by the Secretary, (2)(A)(i). Include an Office of the Solicitor's opinion that the land is within the tribe's former reservation, <u>OR</u>

☐   the land to be acquired is contiguous to other land held in trust or restricted status by the United States for the Indian tribe in Oklahoma, (2)(A)(ii). Include documentation establishing that the land is contiguous and the appropriate Field or Regional Solicitor's concurrence with this determination.

When the application indicates that the proposed acquisition of land in Oklahoma is located in the Indian tribe's "former reservation," the Regional Director must provide a legal opinion from the Office of the Solicitor that the land qualifies as "former reservation lands" and should be treated as such for the purposes of IGRA.

When the application indicates that the proposed acquisition is contiguous to other trust land, or to land held in restricted status by the United States for the Oklahoma tribe, the acquisition package must include documentation of the trust or restricted status of the land which is contiguous to the proposed acquisition. A plat or map showing the contiguous status of the respective parcels of land should be included in the acquisition package. The Regional Director's findings should include all legal descriptions of the lands (lengthy descriptions can be noted as attachments, exhibits, etc.), references to significant dates such as the acquisition date and approval date of trust status. Any and all facts, historical and present, which will establish the finding that the proposed acquisition is contiguous should be discussed and included in the Regional Director's findings. The appropriate Regional or Field Solicitor's concurrence that the land is contiguous must be included.

☐ **C. Section 20 (a)(2)(B): The tribe had no reservation on October 17, 1988, AND the land is located in a State other than Oklahoma AND:**

    ☐ such land is within the Indian tribe's last recognized reservation within the State or States within which such Indian tribe is presently located.

When the application indicates that the proposed acquisition is located within the Indian tribe's "last recognized reservation," the Regional Director must provide documentation that the proposed acquisition is in the tribe's last recognized reservation. The Regional Director's analysis of this issue must include documented information relating the history of the tribe to show that the tribe is presently located in the state in which the land proposed for trust acquisition is located. A legal opinion from the Office of the Solicitor addressing this issue must be included.

**II. Section 20(b)(1), 25 U.S.C. § 2719(b)(1)**

This section provides that the general prohibition on gaming on newly acquired lands will not apply under several circumstances. Because the circumstances numbered (b)(1)(B) are not frequently presented, they are discussed before (b)(1)(A).

☐ **A. Section 20 (b)(1)(B): Gaming can be conducted on newly acquired land if the land(s) are taken in trust as part of:**

    ☐ a settlement of a land claim, (b)(1)(B)(i); OR

    ☐ the initial reservation of a newly acknowledged Indian tribe given Federal recognition under the Federal acknowledgment process, (b)(1)(B)(ii); OR

    ☐ the restoration of lands for an Indian tribe restored to Federal recognition, (b)(1)(B)(iii).

When the application indicates that the proposed acquisition falls within one of these exceptions, the Regional Director must provide documentation that the particular exception is applicable to the case. Copies of the enabling acts or legislation such as the settlement act, the restoration act, the reservation plan, the final determination of federal recognition and other documentary evidence relating to the tribe's history and existence must be included as part of the acquisition package. A legal opinion from the Office of the Solicitor concluding that the proposed acquisition comes within one of the above exceptions must be included.

☐ **B. Section 20(b)(1)(A): Gaming can be conducted on newly acquired land if the Secretary:**

    ☐ consults with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, **and**

    ☐ issues a two-part determination: that the gaming establishment on newly acquired lands (1) will be in the best interest of the Indian tribe and its members, and, (2) will not be detrimental to the surrounding community, **and**

    ☐ obtains the concurrence of the Governor of the State in which the gaming activity is to be conducted in the Secretary's two-part determination.

The BIA has been delegated responsibility to conduct the consultation on behalf of the Secretary. The consultation process must be completed by the Regional Director at the Regional Office level. Consultation will be conducted by letter inviting the applicant tribe and appropriate state (including the Governor), local and other nearby tribal officials to comment on the proposed acquisition by addressing questions/issues relating to the two-part determination. The consultation letter should include pertinent information regarding the proposed trust acquisition for gaming including information on the location of the proposed gaming facility, the scope of gaming proposed and other information which will assist the consulted officials to comment on the proposed acquisition. A consultation letter should always be sent to the Governor of the State in which the gaming activity is to be located.

☐ Appropriate state and local officials include the governor of the state in which the land is located and state and appropriate officials of units of local governments located within ten (10) miles of the site of the proposed gaming establishment.

☐ Nearby tribal officials include the tribal governing bodies of all tribes with Indian lands located within 50 miles of the site of the proposed trust acquisition.

The Regional Director may decide that broader consultation is required, or that another method of consultation is necessary in addition to the consultation conducted by letter. When an additional method is used, the Regional Director must fully describe the process and the outcome or results, and provide verification of the use of the process. For example, if

public hearings or meetings were held copies of the hearing transcripts, minutes or videotapes must be provided as part of the file. Newspaper articles or other written verification of the public's response to the proposed acquisition should also be included to illustrate public sentiment. Sample letters are attached for your information. Note that two letters are used - one for the applicant tribe (13 factors); and one for the appropriate State, and local officials, including officials of other nearby Indian tribes (6 factors). It is recommended that the letters be adjusted to reflect the facts of the transaction being processed. Also, it is very important that this process be differentiated from the Part 151 notification process which requires the 30-day notice for determination of taxation, special assessments, services, zoning, etc. (151.10(e)).

The Regional Director should provide a minimum of 30 days for the consulted officials to comment and respond to the consultation letter. In determining the proper length of the consultation period, the Regional Director should take into consideration the number of parties contacted, the scope and magnitude of the proposed gaming project, the preliminary indications of public sentiment, support, opposition, the potential impact on other gaming operations and such other factors which likely will be issues of concern to the consulted parties. Additional time may be granted upon written request; however, the request should provide a good reason for the additional time.

☐   The consultation letters to the applicant tribe and to the appropriate state, local and nearby tribal officials must request specific information useful in making the two-part determination. The responses provided, whether they oppose or support the proposed acquisition, should be supported by factual data and documentary information justifying the position taken. To assist the Secretary in determining whether the gaming establishment on newly acquired land will be in the best interest of the tribe and its members, the applicant tribe should be requested to address items such as the following:

1.   Projections of income statements, balance sheets, fixed assets accounting, and cash flow statements for the gaming entity and the tribe prepared in accordance with Generally Accepted Accounting Principles and National Indian Gaming Commission standards. There should be sufficient detail in expenses and assumptions to allow evaluation of the accuracy and reasonableness of the projections. Projections should cover at least the term of any financing or management agreement, but not less than three years.

2.   Projected tribal employment, job training, and career development, including the basis for projecting an increase in tribal employment considering the off-reservation location of the facility, and the impact on the tribe if tribal members leave to take jobs off-reservation.

3.   Projected benefits to the tribe from tourism and basis for the projection.

4.   Projected benefits to the tribe and its members from the proposed uses of the increased tribal income.

5.   Projected benefits to the relationship between the tribe and the surrounding community.

6.   Possible adverse impacts on the tribe and plans for dealing with those impacts.

7.   Any other information which may provide a basis for a Secretarial determination that the gaming establishment is in the best interest of the tribe and its members, including copies of any consulting agreements, financial agreements, and other agreements relative to the purchase, acquisition, construction, or financing of the proposed gaming facility, or the acquisition of the land where the facility will be located.

☐   To assist the Secretary in determining whether the gaming establishment on newly acquired land will not be detrimental to the surrounding community, the officials consulted and the applicant tribe should be requested to address items such as the following:

1.   Evidence of environmental impacts and plans for mitigating adverse impacts.

2.   Reasonably anticipated impact on the social structure, infrastructure, services, housing, community character, and land use patterns of the surrounding community.

3.   Impact on the economic development, income, and employment of the surrounding community.

4.   Costs of impacts to the surrounding community and sources of revenue to accommodate them.

5.   Proposed programs, if any, for compulsive

gamblers and the source of funding.

6. Any other information which may provide a basis for a Secretarial determination that the gaming establishment is not detrimental to the surrounding community.

Consulted officials should be advised that the fact that an official does not have extensive information or documented proof on the items listed above should not prevent the consulted official from addressing the items to the extent possible.

Because the impacts of a gaming facility established on newly acquired land will be difficult to quantify in concrete or tangible terms, the officials consulted should also be invited to address such additional concerns or factors which they believe more fully demonstrate the actual or potential impact of the proposed gaming facility. The consulted officials should not be limited to the listed items.

III.  Guidance for preparing NEPA documents for proposed gaming-related actions

The following information provides general guidelines for compliance with NEPA in cases involving gaming-related Federal actions. The Regional Director must comply with the requirements of NEPA when making recommendations pursuant to the two-part determination in Section 20(b)(1)(A) of IGRA, even when this determination is made for lands already held in trust for an Indian tribe.  The NEPA process should not be initiated before the tribe has filed with the BIA either a request to take land into trust pursuant to 25 CFR 151.9, or, if the land is already into trust, an application for a two-part determination pursuant to Section 20(b)(1)(A) of IGRA.

NEPA is codified in 42 U.S.C. §§ 4321-4347. Section 102 of NEPA, 42 U.S.C. § 4332, requires all Federal Agencies to include in every recommendation or report on proposals for major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on: (1) the environmental impact of the proposed action, (2) any adverse environmental effects which cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

In 1978, the Council on Environmental Quality (CEQ) promulgated regulations implementing NEPA in 40 CFR

Parts 1500-1508. These regulations, which are binding on all Federal agencies, address the procedural requirements of NEPA and the proper methods for the administration of the NEPA process. Further guidance on NEPA compliance can be found in Department of the Interior Manual, Part 516. Departmental Manual 516 DM 6, Appendix 4 (augmented by a *Federal Register* Notice of July 7, 1995) addresses BIA's NEPA policy and procedures. The BIA's NEPA Handbook is published in 30 BIAM Supplement 1.

The law and regulations defining the parameters of NEPA are well-defined and explicit. The implementing regulations for NEPA require the use of an interdisciplinary approach, consultation with all interested parties, and a speedy commencement of the process (40 CFR § 1501.2). The NEPA regulations also require that the paperwork be concisely written (40 CFR § 1500.4), that the entire process be completed without delay (40 CFR § 1500.5), and that consideration of NEPA occur early in the planning process (40 CFR §§ 1501.1 and 1501.2). NEPA documents must be supported by evidence which is adequate to show that the agency in question has made sufficient environmental analyses (40 CFR § 1500.2(b)). The lead agency may, if it wishes, set specified page limits and time limits for NEPA documents (40 CFR § 1501.8); the BIA has so far not chosen to set such limits.

Under the NEPA process there are several levels of analysis that may be applied to a particular Federal action. The level which will eventually be chosen for the analysis is generally dependent upon whether or not an undertaking could significantly affect the environment. The basic levels are: a categorical exclusion determination (CX), an environmental assessment (EA), and an environmental impact statement (EIS).

☐  A Federal action may be categorically excluded from a detailed environmental analysis if it meets certain criteria, criteria which a Federal agency has previously determined would have no significant environmental impact. A number of agencies, including the BIA, have developed lists of actions which are normally categorically excluded from environmental evaluation under the NEPA regulations. See 516 DM 6 Appendix 4.

☐  The next level of analysis, the EA, is used to determine whether or not a Federal action would significantly affect the environment (for the definition of "significantly" see 40 CFR § 1508.27). If it would not, the agency can then issue a Finding of No Significant Impact (FONSI). The EA is described in 40 CFR § 1508.9. An EA usually contains the following information: the need for the proposed action; the alternatives to the proposed

action (always including the no-action alternative); the environmental impacts of the proposed action and the alternatives; and a listing of the agencies and persons consulted.

☐   If the EA determines that the environmental consequences of a proposed Federal undertaking may be significant, an EIS is prepared. The EIS, the most comprehensive level of analysis, is described in 40 CFR § 1502. Proposals for large, and/or potentially controversial gaming establishments should normally require the preparation of an EIS, especially if mitigation measures are required to reduce significant impacts. The EIS should discuss the purpose of, and need for, the action; the alternatives; the affected environment; the environmental consequences of the proposed action; mitigation measures; lists of preparers, agencies, organizations and persons to whom the statement is sent; an index; and an appendix (if any). It is also a good practice to include in a NEPA document a large-scale map with a legend, showing the proposed site in detail. A smaller-scale map with a legend, showing the site in relation to the surrounding features and areas is also a desirable feature of a NEPA document.

Following is a *Checklist of Environmental Issues for NEPA Review of Proposed Gaming-related Actions.* The Regional Director must include this *Checklist* with NEPA documents which are being submitted to the AS-IA for review. Diskette copies of the *Checklist* are available from the OIGM upon request.

## OFFICE OF INDIAN GAMING MANAGEMENT
*Checklist of Environmental Issues for NEPA Review of Proposed Gaming-related Actions*

Title of NEPA Document:_____ Regional Office:_____

NEPA Document Number:_____ Case File Number:_____ Date:_____

Print Name & Title of Lead Area Preparer/Reviewer:

| Common Environmental Issues | Addressed in Document? | | Significant Impact?♣ | | Signature of BIA Field Specialist | Date |
|---|---|---|---|---|---|---|
| | Page(s) | No | Yes | No | | |
| Air Quality (40 CFR 50-85, 29 CFR 1910.134(d), etc.) ♥ | | | | | | |
| Archaeological, Historical & Cultural (36 CFR 800) ♥ | | | | | | |
| Biota & Threatened & Endangered Species (50 CFR) ♥ | | | | | | |
| Coastal Zone Issues (15 CFR 930)   (♥ if applicable) | | | | | | |
| Construction, Demolition, Landscaping & Reclamation | | | | | | |
| Crime Potential, Protection and Prevention | | | | | | |
| Current, Past and Future Cumulative Impacts ♣ ♥ | | | | | | |
| Demographic Trends (♥ if alterations will be notable) | | | | | | |
| Energy (electrical, fuel, etc.) Resource Use & Changes ♥ | | | | | | |
| Fire Potential, Protection and Prevention | | | | | | |
| Floodplain, River, Lake, Wetland & Riparian Areas ♥ | | | | | | |
| Forests, Forestry Resources and Logging | | | | | | |
| Geology, Seismic and Mining (♥ if a hazard is present) | | | | | | |
| Hazardous Substances and Wastes (40 CFR 260-373) ♥ | | | | | | |
| Health and Safety: OSHA (29 CFR 1900-1999), etc. | | | | | | |
| Indian Religious Issues (AIRFA: 25 CFR 211.7, etc.) ♥ | | | | | | |
| Land-use Plans (40 CFR 1508.18(b) and 25 CFR 151) | | | | | | |
| Noise (29 CFR 1910.95 & 1926.52, 40 CFR 205, etc.) | | | | | | |
| Non-hazardous Wastes (solid, liquid or confined gas) ♥ | | | | | | |
| Paleontological Resources | | | | | | |
| Prime and Unique Farm Lands (7 CFR 658.3-5) ♥ | | | | | | |
| Protected, Sensitive and Special-management Areas ♥ | | | | | | |
| Rangelands, Range Resources and Range Activities | | | | | | |
| Recreational/Subsistence Hunting, Fishing & Gathering | | | | | | |
| Releases (40 CFR 112-117, 40 CFR 300-373, etc.) ♥ | | | | | | |
| Socioeconomic Issues (tribe & other affected parties) ♥ | | | | | | |
| Stormwater Discharges (40 CFR 122.26) ♥ | | | | | | |
| Utilities Issues and Changes | | | | | | |
| Vehicular and Pedestrian Traffic Issues and Changes ♥ | | | | | | |
| Visual Resources (light pollution, views, aesthetics, etc.) ♥ | | | | | | |
| Wastewater Treatment & Disposal (40 CFR 122-129) ♥ | | | | | | |
| Water Quality (surface, ground and drinking water) ♥ | | | | | | |
| Water Quantities Needed and/or Affected ♥ | | | | | | |
| Other (specify) | | | | | | |
| Other (specify) | | | | | | |

♥  Indicates those issues, at a minimum, which must be addressed in all EAs and EISes. Other issues must be addressed if they would be affected.
♣  "Significance" is defined in 40 CFR 1508.27.  An EA or an EIS must show an assessment of the degree of significance of any expected impact -- individual, cumulative, direct, indirect, beneficial, adverse, present, reasonably-foreseeable-future, residual and/or synergistic -- of the proposed action. See 42 USC 7609; 40 CFR 1501.2(n and b), 1502.16, and 1508.8; and 516 DM 5.3(B).  "Cumulative impact" is defined in 40 CFR 1508.7.

### IV. Preparation of Section 20 documentation by Region

**This section describes the duties of the BIA Region Office after completion of the Section 20 requirements for the proposed acquisition:**

☐ Upon completion of the consultation process, (i.e. receipt of responses, expiration of allowed response time), the Regional Director will review and prepare a summary of the comments and responses r eceived f rom t he c onsulted o fficials. When a response raises an issue with actual or potential negative implications which may affect a favorable two-part determination, the Regional Director will analyze the issue and determine what action may be appropriate. The Regional Director should request the applicant tribe to make an effort to resolve the issue. The tribe should be given 30 days to resolve the issue. Additional time may be granted upon written request; however, the requester must justify the need for the additional time. The Regional Director should also advise the tribe that failure or reluctance to respond will result in the Regional Director making conclusive findings on the issue without input from the tribe.

☐ Upon completion of all actions or activities relating to the proposed two-part determination, including an independent analysis of all the information and factual evidence provided by the tribe and the parties consulted, the Regional Director must prepare Proposed Findings of Fact addressing the two-part determination and the items of information relating to such a determination. The proposed findings made and conclusions reached must be supported by the facts, supporting exhibits or other documentation.

The Regional Director's Proposed Findings of Fact should include an analysis by program officers (i.e. social services, law enforcement, finance, environmental and tribal operations), to ensure that aspects of those program areas have been adequately addressed by the tribe's application. For example, suppose that the tribe had indicated that in furtherance of its relationship with the surrounding community, the tribe and the local governments will enter into mutual-aid or crossdeputization agreements to facilitate better police services. Clearly, the law enforcement staff would provide a valuable analysis of the agreements and the merits of the proposal.

The Regional Director's Proposed Findings of Fact should also include an analysis of all agreements relied on to arrive at conclusions on the two part determination. For example, if the management agreement is the document used to figure projections of income to the tribe, the Regional Director's Proposed Findings of Fact must include an analysis and conclusion regarding the validity of the finding.

To assure that all important documents and issues are received and adequately reviewed and considered, the acquisition package should be organized in such a manner to allow easy access for review. The information and exhibits should be tabbed and indexed for e asy reference. For purposes of organization, the Regional Director's factual findings relative to the two-part determination should be placed under the topical heading identified for each of the two-parts. For example, the "Best Interest of the Tribe" category should serve as a topical heading, and be followed by facts, findings and conclusions on each factor listed under that category.

IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-02210 RWR |
| | ) | |
| DIRK KEMPTHORNE in his official capacity as SECRETARY OF INTERIOR | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| CARL J. ARTMAN in his official capacity as ASSISTANT SECRETARY – INDIAN AFFAIRS | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**[PROPOSED] ORDER FOR A TEMPORARY RESTRAINING ORDER**

Upon consideration of the Plaintiff's Motion for a Temporary Restraining Order, the

supporting Memorandum filed therewith, the Declaration of Tribal chairperson Hazel Hindsley

and the Affidavit of Robert M. Adler with its attached exhibits filed in support, and any

opposition thereto, it is this _____ day of _____, 2007

HEREBY ORDERED that the Plaintiff's Motion for a Temporary Restraining Order be

and is hereby GRANTED.  This Court finds that the decision by the Department of the Interior

that for the Plaintiff and the Bad River Band of Lake Superior Chippewa Indians' ("Bad River

Band") pending fee-to-trust application for gaming in Beloit, Wisconsin (as well as for other

pending off-reservation fee applications for gaming submitted by other tribes), the determination

under 25 C.F.R. Part 151 will be made prior to the determinations under 25 U.S.C.

§ 2719(b)(1)(A):

151939

(a)      was made in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(a) in that the Department of the Interior, in making the determination to make the Part 151 determination prior to the IGRA determination (under 25 U.S.C. § 2719(b)(1)(A)) failed to properly notify interested Indian tribes of the change in practice and procedure which had been in place at the Department of the Interior for many years.  Further, the Department of the Interior failed to offer a reasoned explanation to the Plaintiff and to other interested Indian tribes as to the reason or reasons for its change in procedure and practice.  Moreover, the Department of the Interior failed to offer any explanation to the Plaintiff or other interested Indian tribes as to how this new practice and procedure was consistent with Congressional intent;

(b)      constituted *ultra vires* actions, pursuant to 5 U.S.C. § 706(2)(C), in that they are in conflict with IGRA (25 U.S.C. § 2719(b)(1)(A)) as enacted by Congress and are, therefore, unlawful pursuant to 5 U.S.C. § 706(2)(C).  It is this Court's view that Congress intended for issues relating to the gaming considerations for an Indian tribe's application for land to be taken into trust are to be determined under 25 U.S.C. § 2719(b)(1)(A) and not pursuant to Part 151 of the regulations as the Secretary of the Interior has erroneously decided will take place in its new procedure; and

(c)      the Defendants herein have violated their trust responsibilities to the Plaintiff and other Indian tribes which have submitted off-reservation fee-to-trust applications for gaming purposes.

For the above reasons, Secretary of the Interior Dirk Kempthorne and Assistant Secretary-Indian Affairs Carl J. Artman, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, be and are hereby temporarily restrained, until further Order, of this Court from:

(a)      implementing or otherwise carrying out the Department of Interior's recently announced policy and procedure that it will make the Part 151 determination prior to the two-part determination under IGRA (25 U.S.C. § 2719(b)(1)(A)) with respect to Plaintiff and the Bad River Band's pending off-reservation fee-to-trust application for gaming purposes in Beloit, Wisconsin, as well as with respect to pending off-reservation fee-to-trust applications for gaming purposes submitted by other Indian tribes; and

(b)      making any decision or determination with respect to the Plaintiff and the Bad River Band's pending application to take land into trust for gaming purposes in Beloit, Wisconsin (as well as from making any decisions or determinations with respect to similar off-reservation applications filed by other Indian tribes to take land into trust for gaming purposes) unless it first makes the required two-part determinations appearing in 25 U.S.C. § 2719(b)(1)(A).

_____

UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 07-CV-02210 RWR |
| DIRK KEMPTHORNE in his official capacity as SECRETARY OF INTERIOR | ) ) ) ) | |
| and | ) ) | |
| CARL J. ARTMAN in his official capacity as ASSISTANT SECRETARY – INDIAN AFFAIRS | ) ) ) ) | |
| Defendants. | ) ) | |

**[PROPOSED] ORDER FOR A PRELIMINARY INJUNCTION**

Upon consideration of the Plaintiff's Motion for a Preliminary Injunction, the supporting

Memorandum filed therewith, the Declaration of Tribal chairperson Hazel Hindsley and the

Affidavit of Robert M. Adler with its attached exhibits filed in support, and any opposition

thereto, it is this _____ day of _____, 2007

HEREBY ORDERED that the Plaintiff's Motion for a Preliminary Injunction be

and is hereby GRANTED.  This Court finds that the decision by the Department of the Interior

that for the Plaintiff and the Bad River Band of Lake Superior Chippewa Indians' ("Bad River

Band") pending fee-to-trust application for gaming in Beloit, Wisconsin (as well as for other

pending off-reservation fee applications for gaming submitted by other tribes), to make the

determination under 25 C.F.R. Part 151 prior to the determinations under 25 U.S.C.

§ 2719(b)(1)(A):

151941

(a)      was made in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(a) in that the Department of the Interior, in making the determination to make the Part 151 determination prior to the IGRA determination (under 25 U.S.C. § 2719(b)(1)(A)) failed to properly notify interested Indian tribes of the change in practice and procedure which had been in place at the Department of the Interior for many years.  Further, the Department of the Interior failed to offer a reasoned explanation to the Plaintiff and to other interested Indian tribes as to the reason or reasons for its change in procedure and practice.  Moreover, the Department of the Interior failed to offer any explanation to the Plaintiff or other interested Indian tribes as to how this new practice and procedure was consistent with Congressional intent;

(b)      constituted *ultra vires* actions, pursuant to 5 U.S.C. § 706(2)(C), in that they are in conflict with IGRA (25 U.S.C. § 2719(b)(1)(A)) as enacted by Congress and are, therefore, unlawful pursuant to 5 U.S.C. § 706(2)(C).  It is this Court's view that Congress intended for issues relating to the gaming considerations for an Indian tribe's application for land to be taken into trust are to be determined under 25 U.S.C. § 2719(b)(1)(A) and not pursuant to Part 151 of the regulations as the Secretary of the Interior has erroneously decided will take place in its new procedure; and

(c)      the Defendants herein have violated their trust responsibilities to the Plaintiff and other Indian tribes which have submitted off-reservation fee-to-trust applications for gaming purposes.

For the above reasons, Secretary of the Interior Dirk Kempthorne and Assistant Secretary-Indian Affairs Carl J. Artman, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, be and are hereby enjoined until further Order of this Court from:

(a)    implementing or otherwise carrying out the Department of Interior's recently announced policy and procedure that it will make the Part 151 determination prior to the two-part determination under IGRA (25 U.S.C. § 2719(b)(1)(A)) with respect to Plaintiff and the Bad River Band's pending off-reservation fee-to-trust application for gaming purposes in Beloit, Wisconsin, as well as with respect to pending off-reservation fee-to-trust applications for gaming purposes submitted by other Indian tribes; and

(b)    making any decision or determination with respect to the Plaintiff and the Bad River Band's pending application to take land into trust for gaming purposes in Beloit, Wisconsin (as well as from making any decisions or determinations with respect to similar off-reservation applications filed by other Indian tribes to take land into trust for gaming purposes) unless it first makes the required two-part determinations appearing in 25 U.S.C. § 2719(b)(1)(A).

_____

UNITED STATES DISTRICT JUDGE