## IN THE UNITED STATES THE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ST. CROIX CHIPPEWA INDIANS )
OF WISCONSIN )
)
      Plaintiff, )
)
v. )    Civ. No. 1:07-cv--02210-RJL
)
DIRK KEMPTHORNE, et al. )    Next Scheduled Court Deadline:
)    Oral Argument at 2:00 P.M. on
      Defendants. )    January 15, 2008
)

### THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN'S
### MEMORANDUM IN REPLY TO THE FEDERAL DEFENDANTS'
### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
### DEFENDANTS' MOTION TO DISMISS AND IN RESPONSE
### TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The St. Croix Chippewa Indians of Wisconsin (the "St. Croix Tribe" or the "Plaintiff"),

by and through counsel, hereby submits its Reply Memorandum to the Federal Defendants'

Memorandum of Points and Authorities in support of their Motion to Dismiss and in response to

the Plaintiff's Motion for Preliminary Injunction ("Defendants' Memorandum").

## I.    THE DEFENDANTS' MOTION TO DISMISS SHOULD PROPERLY BE
## DENIED

The Federal Defendants have moved for dismissal of the Complaint pursuant to Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Defendants' Memorandum at 6-7.  The Federal

Defendants assert three grounds as the basis for their Motion:  (1) the Plaintiff has not met its

burden of establishing the requisite waiver of sovereign immunity; (2) the Plaintiff lacks

standing to pursue its claims; and (3) the Plaintiff's claims are not ripe for review.  The Federal

Defendants' positions are without merit.

152241

A.     __The Plaintiff has Established the Requisite Waiver of Sovereign Immunity__.

The Federal Defendants make two arguments in support of their position that sovereign immunity has not been waived:  (1) none of the statutory provisions relied on by the Plaintiff provide for a waiver of sovereign immunity; and (2) the August 21, 2007 letter from George Skibine ("Skibine letter") does not constitute final agency action.  Defendants' Memorandum at 8-9.

The Federal Defendants tacitly acknowledge, as they must, that the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides for a waiver of sovereign immunity if the statutory requirements within the APA itself are met.  Defendants' Memorandum at 9.  As the Federal Defendants then proceed to correctly assert, that issue turns on whether or not the Skibine letter constitutes "final agency action" pursuant to 5 U.S.C. § 704.  Defendants' Memorandum at 10-11.  As the Federal Defendants acknowledge, the APA includes within the definition of "agency action" an "agency rule."  Defendants' Memorandum at 10 and 5 U.S.C. § 551(13).  The Federal Defendants do not take issue with the Plaintiff's position that the Skibine letter constitutes an "agency rule" under 5 U.S.C. § 551(4) in that it is an ". . .agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy or describing the. . .procedure or practice requirements of an agency. . . ." 5 U.S.C. § 551(4).  See Plaintiff's Memorandum in Support of its Motions for Temporary Restraining Order and a Preliminary Injunction ("Plaintiff's Memorandum") at 15, n.1.

Importantly, the Federal Defendants do not argue that the Skibine letter was some type of tentative or inconclusive statement of Interior's position.[1]  The Declaration of Mr. Skibine filed

---

[1] At the hearing held before this Court on December 12, 2007, counsel for the Government staked out the position that the Skibine letter did not constitute final agency action, suggesting as
(…Continued)

by the Federal Defendants fails to even mention the Skibine letter, or for that matter, the issue raised herein relating to Interior's decision to make the Part 151 determination prior to the two-part IGRA determination. The Skibine letter clearly meets the "consummation" of the agency decision making process standard set out by the Supreme Court in Bennett v. Spear, 520 U.S. 154, 177-178 (1997). It was sent by Mr. Skibine, in his capacity as Acting Deputy Assistant Secretary-Policy and Economic Development, in response to a letter sent by Mr. Adler to Assistant Secretary Artman. The statements made by Mr. Skibine, acting in his official capacity, were a finality. There was no speculation or prediction involved. It met the requirements of Bennett v. Spear, supra, as well as those set out by this District Court in Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan v. John Ashcroft, et al., 360 F. Supp.2d 64, 68 (D.D.C. 2004). Moreover, in Tarbell v. Department of Interior, 307 F. Supp.2d 409, 427 (N.D.N.Y. 2004), letters from Philip N. Hogen, Assistant Solicitor of the Division of Indian Affairs within the Interior Department ". . .articulating an official agency position" were found by the District Court to be a sufficient basis for review under the APA.

The Federal Defendants' position that the Skibine letter does not constitute final agency action is apparently based on the fact that the Interior Department has not yet issued a final decision regarding Plaintiff's application. Defendants' Memorandum at 11. Quite clearly, the Plaintiff's Complaint is based on Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Company, 463 U.S. 29 (1983) and the Interior Department's failure to comply with it and the subsequent case law following it. Indeed,

---

(Continued…)
a basis for this assertion, that the Interior Department was rethinking its position. See Transcript for the Hearing of December 12, 2007 at 14, lines 4-12, appended hereto as Exhibit A.

the Federal Defendants failed, in articulating their reasons that this action should be dismissed under Rule 12(b), to discuss, much less reconcile, State Farm (and circuit cases following it) with their arguments seeking dismissal of this action.[2]

The Second Circuit's decision in Yale-New Haven Hospital, et al. v. Michael O. Leavitt, 470 F.3d 71 (2nd Cir. 2006) vividly demonstrates why the Skibine letter is actionable under the APA as final agency action. In Yale-New Haven, a 1986 Manual position marked an evident change in course and "altered historical practice." Yale-New Haven, supra at 79-80. The 1986 Manual denied on a *per se* basis coverage for investigational medical devices whereas previously a 1977 letter provided some discretion in reimbursement. Yale-New Haven, supra at 74-75 and 80. Just as the Skibine letter did on its face, the Government contended in Yale-New Haven that the 1986 Manual "marked no change of position," but instead merely expressed the historical *de facto* practice. Yale-New Haven, supra at 81. However, the Second Circuit disagreed, finding that the 1986 Manual provision did in fact reverse historical practice and there was no contemporaneous explanation provided as to the reasons for the change in that practice. Yale-New Haven, supra at 79. This led the Second Circuit to conclude that the 1986 Manual provision was "invalid and unenforceable." Yale-New Haven, supra at 86.

In American Federation of Labor, et al. v. Michel Chertoff, et al., 2007 U.S. Dist. Lexis 75233 (N.D. Cal. Oct. 10, 2007), the issue presented was whether proposed 2007 no-match letters, which the Social Security Administration planned to send to thousands of employers, were actionable under the APA as arbitrary and capricious in that they neither stated that they represented a change in policy of the Department of Homeland Security nor articulated reasons

---

[2] The Federal Defendants only deal with State Farm and other cases following it in arguing that the Plaintiff has failed to meet the required standards for a Preliminary Injunction. See Defendants' Memorandum at 23 et seq.

for the policy change.  As held by the Court, the policy change set forth in the proposed

no-match letters was that an employer who received a no-match letter must follow the safe

harbor procedures or expose itself to criminal civil liability; whereas, previously, guidance from

Homeland Security and the INS recognized that the receipt of a no-match letter could not impact

criminal liability by itself.  American Federation of Labor, supra at *15.  This led the District

Court to issue a preliminary injunction prohibiting the dissemination of the proposed no-match

letters.  Following State Farm, the Court held that the agency had changed course and had failed

to set forth a reasoned analysis as to why it had changed course.  American Federation of Labor,

supra at 26-28.[3]

    The D.C. Circuit's decision in James V. Hurson Associates v. Dan Glickman, Secretary

of the United States Department of Agriculture, et al., 229 F.3d 277 (D.C. Cir. 2000) is directly

on point and is indeed controlling with respect to the issues raised by the Federal Defendants in

their Motion to Dismiss as well as with respect to their position, in opposition to the requested

injunctive relief, that the Plaintiff has not demonstrated that it is likely to succeed on the merits.

In Hurson, the Food Safety Inspection Service ("FSIS") of the United States Department of

Agriculture ("USDA") had responsibility with reviewing the labels affixed to certain commercial

food products to insure that they were truthful, not misleading and otherwise were in compliance

with relevant regulations.  Hurson, supra at 279.  Historically, a commercial food producer could

seek approval of a proposed label in several ways:  by mailing in an application, by personally

visiting the FSIS, or by hiring couriers/expediting firms whose employees would meet with FSIS

---

[3] The Defendants' Memorandum fails to even mention this decision even though it is obviously
significant in that the Court issued a preliminary injunction on the same theory which the
Plaintiff herein is asserting.  The decision was discussed in the Plaintiff's Memorandum at 21 as
having "real significance."

representatives during office hours. These meetings were called "face-to-face." Id. However, in 1998, the USDA announced its intention to eliminate the practice of allowing face-to-face meetings with courier/expediting firms. Hurson, supra at 279-280. The USDA cited at the time four separate reasons for its elimination of this particular face-to-face review process. Hurson, supra at 280. Hurson, a courier/expediting firm, whose livelihood was threatened by the USDA's new rule prohibiting face-to-face appointments, filed a lawsuit and also sought a temporary restraining order against the USDA. Hurson, supra at 280. Hurson alleged that the USDA had violated the APA by abolishing face-to-face appointments for courier/expediting firms without engaging in notice-and-comment rulemaking. Id. After the parties had fully briefed the notice-and-comment issue, but before the Court ruled on cross-motions for summary judgment, Hurson submitted an amended complaint (or, in the alternative, a motion seeking leave to amend its complaint). Hurson proposed to add new allegations that the USDA's elimination of face-to-face appointments was "arbitrary and capricious" in violation of the APA. The District Court denied Hurson's motion to amend as untimely. The Court further held that the agency's new rule was a procedural one and therefore exempt from the APA's notice-and-comment requirement. Id. On appeal, the D.C. Circuit found that the agency's abolition of face-to-face appointments did not alter the substantive criteria by which it would approve or deny proposed labels. Instead, it simply changed the procedures it would follow in applying those substantive standards. Hurson, supra at 281. Given that the substantive rules were not changed, the Court held that the APA's notice-and-comment requirement was not triggered. Id. However, with respect to Hurson's arbitrary and capricious claim, the Court held that it ". . .would survive a 12(b)(6) motion to dismiss." Hurson, supra at 284. The Court relied

on <u>State Farm</u> and the D.C. Circuit's later decision in <u>AT&T v. FCC</u>, 974 F.2d 1351, 1355 (D.C. Cir. 1992). <u>Id</u>.[4]

The Plaintiff submits that <u>Hurson</u> is controlling with respect to the disposition of the Federal Defendants' Motion to Dismiss. The Court explicitly recognized that Hurson could properly assert an arbitrary and capricious claim under the APA even though Hurson itself was not a commercial food producer and, therefore, had no direct interest in whether or not a proposed label was approved. Further, <u>Hurson</u> confirmed that an arbitrary and capricious claim can properly be asserted even though it is limited to a challenge to the agency's change in internal procedures by which it makes decisions -- as the Federal Defendants herein characterize it, a "departure from an internal process for review." Defendants' Memorandum at 25.

Just as in <u>Hurson</u>, the Complaint herein properly alleges the necessary elements to survive a motion to dismiss. For purposes of a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim, it is well-established that the complaint is to be construed liberally in the Plaintiff's favor and that the Plaintiff is to be granted the benefit of all inferences that can be derived from the alleged facts. <u>U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.</u>, 389 F.3d 1251, 1259-1260 (D.C. Cir. 2004). Dismissal is inappropriate unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of its claim which would entitle it to relief. <u>U.S. v. Martin-Baker Aircraft</u>, <u>supra</u> at 1260.

---

[4] While the USDA provided four separate reasons why it changed its procedure, Hurson argued that the stated reasons were pretextual, implausible and counter to the attendant facts. <u>Hurson</u>, <u>supra</u> at 284. Apparently dubious as to whether this challenge to the preferred reasons would succeed, the Court noted that it believed that Hurson's arbitrary and capricious claim was exceptionally weak and that it harbored grave doubts that it would be able to prevail on the merits on remand. <u>Hurson</u>, <u>supra</u> at 284.

The Plaintiff's Complaint alleges in its ¶¶ 8-9 that for more than a six-year period, continuing until the summer of 2007, Bureau of Indian Affairs ("BIA") officials represented to the Plaintiff and the Bad River Band that the two-part (IGRA) decision would be made first by the Central Office of the BIA and (if the Governor thereafter concurred) the BIA would then proceed to make the fee-to-trust determination under Part 151. This was consistent with the historical practice of the BIA. Complaint, ¶¶ 31-32. The Complaint further alleges that in August 2007 the Tribes were first notified by virtue of the Skibine letter that this process would be reversed and that the Part 151 decision would be made before the two-part determination required under IGRA. Complaint, ¶¶ 9 and 29. The Complaint further alleges that this represented a 100% reversal of the decision-making process during both the Clinton Administration and, thereafter, the Bush Administration. Complaint, ¶ 9. See also Complaint, ¶ 30. The Interior Department failed to offer an explanation supporting its change in procedure and practice. Complaint, ¶ 37.

The Federal Defendants, in their Memorandum and in the attached Declaration of George Skibine, do not take issue with the following facts in seeking a dismissal of the Complaint (nor could they) or in opposing the requested injunction: (1) prior to the summer of 2007, the Interior Department had an historical practice of making the two-part determination prior to the Part 151 determination with respect to off-reservation casino applications; (2) a decision was made during the summer of 2007 to reverse this decision making process; (3) no notification was sent to either the Plaintiff or other Indian tribes of this change in practice and procedure other than the Skibine letter itself (which claimed that this did not represent a policy change); and (4) no explanation was provided by the Interior Department to the Plaintiff or other Indian tribes for the reasons behind this change.

The Plaintiff has properly asserted a cause of action under the APA.

B.      **The Plaintiff Has Proper Standing.**

In their Memorandum at 12-14, the Federal Defendants assert that the Plaintiff lacks standing to pursue its claims.  The Federal Defendants assert, citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) contend that the Plaintiff lacks standing because its allegations of injuries are based upon speculation and conjecture "rather than a certainty" that a decision would be detrimental to the Plaintiff if the Part 151 determination were made prior to the two-part determination.  Defendants' Memorandum at 12.  This argument is misplaced in that the Plaintiff's arbitrary and capricious APA challenge is to the Interior Department's recent decision to make the Part 151 determination prior to the two-part determination.

In their discussion of Lujan (Defendants' Memorandum at 12), the Federal Defendants ignore the treatment of standing within Lujan itself where a plaintiff asserts procedural harm.  As Lujan held, 504 U.S. at 572, n.7:

> The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.

Lujan provided an example whereby one living adjacent to a site for the proposed construction of a federally-licensed dam had standing to challenge the agency's failure to prepare an environmental impact statement ("EIS") even though he cannot establish with a certainty that the EIS would cause the license to be withheld or altered or even though the dam will not be completed for many years.  Id.  Under the standards established by Lujan, a plaintiff, such as the Plaintiff herein, asserting procedural harm, need only show that the statutes in question were designed to protect some threatened concrete interests which are personal to the plaintiff.

Herein, the APA grants the Plaintiff a procedural right to protect its interest by challenging the Interior's final agency action.

The Defendants' Memorandum ignores the Supreme Court's decision during the past term in Massachusetts v. EPA, 127 S. Ct. 1438, 1453 (2007). The Supreme Court changed Lujan's redressability requirement in a manner which has direct applicability herein. Under Lujan, the standard was "likely" as opposed to merely "speculative." The new standard enunciated by the Supreme Court is that in cases of procedural injury, all that is required is "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Such a possibility certainly exists herein. Indeed, Government counsel stated at the Hearing held before this Court on December 12, 2007, that agency officials were already reconsidering their decision to make the Part 151 determination prior to the two-part decision. See Transcript of Hearing, page 14 (Exhibit A hereto).

Massachusetts v. EPA was followed by the D.C. Circuit in Wisconsin Public Power Inc. v. Federal Energy Regulatory Commission, 493 F.3d 239, 269 (D.C. Cir. 2007). Quoting from the Supreme Court's decision, the Court stated:

> [A petitioner] who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result.

The First Circuit also applied the modified standing requirements of Massachusetts in holding that individual tribal members had standing to bring an action for declaratory and injunctive relief alleging that the BIA failed to follow procedures required by law before approving a lease to construct a liquefied natural gas terminal on Indian lands. Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18 (1st Cir. 2007).

These decisions effectively dispose of the Federal Defendants' argument that the Plaintiff does not have standing because it cannot demonstrate that if the Federal Defendants made the two-part determination prior to the Part 151 determination, ". . .it would lead to a favorable decision on the Tribe's application."  Defendants' Memorandum at 14.

C.   **The Plaintiff's Claims are Ripe for Judicial Review.**

The Federal Defendants argue that the Plaintiff's suit is ". . .not ripe for review because the existence of the dispute itself hangs on future contingencies that may or may not occur." Defendants' Memorandum at 15.  Essentially, the Federal Defendants' position is that since the Plaintiff's application is still under review, this lawsuit is premature.

In making this argument, the Federal Defendants ignore the body of law dealing with ripeness with respect to a claim of procedural injury.  As held by the Supreme Court in Ohio Forestry Association, Inc. v. Sierra Club, 523 U.S. 726, 737 (1998):

> [A] person with standing who is injured by a failure to comply
> with [statutory] procedure may complain of that failure at the
> time the failure takes place, for the claim can never get riper.

In Nulankeyutmonen Nkihtaqmikon, supra, the BIA made an argument similar to that made herein -- that the plaintiffs' claims were not ripe because it rested on future contingencies that had not yet occurred.  Nulankeyutmonen Nkihtaqmikon, supra at 32-33.  However, the First Circuit rejected that argument holding that it ". . .misses the mark."  Id.  According to the Court: "Plaintiffs' alleged injury is the BIA's failure to follow federal law before approving [a] lease."

## II.    THE PLAINTIFF HAS SATISFACTORILY MET THE STANDARDS FOR A PRELIMINARY INJUNCTION.

### A.    The Plaintiff is Likely to Succeed on the Merits of Its Claims.

The Federal Defendants contend that the Plaintiff is unlikely to succeed on the merits in that there is "no law to apply" and that, due to the administrative discretion imparted to the agency, any decision made by the Interior Department to make the Part 151 determination prior to the two-part determination is not reviewable by this Court.  Defendants' Memorandum at 16-23.

The Federal Defendants' assertions are without merit.  In the first place, even if, hypothetically, the Federal Defendants are correct that there is "no law to apply" and it has absolute discretion whether the Part 151 or the two-part determination should be made first, its change in historical practice is subject to the requirements of State Farm and the cases following it.  The Federal Defendants  place reliance on American Farm Lives v. Black Ball Freight Service, et al., 397 U.S. 532, 539 (1970).  Defendants' Memorandum at 18.  That decision, decided well before State Farm, did not purport to deal with any State Farm type arbitrary and capricious issue and the corollary issue presented herein as to whether the changed procedure was consistent with Congressional intent.  Second, the Plaintiff firmly believes that there is "law to apply" and that the Interior Department does not have discretion to make the Part 151 determination prior to the two-part (IGRA) determination.  As the Plaintiff originally set forth in its Memorandum at 22-23, n.3 filed in support of the requested Preliminary Injunction, even if the two relevant statutes (25 U.S.C. § 465 and 25 U.S.C. § 2719) are in conflict with each other, the later enacted statute (25 U.S.C. § 2719) prevails and trumps any conflict with the earlier statute.  See State of Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 704-05 (1st Cir. 1994), cert. denied, 513 U.S. 919 (1994).

The Interior Department itself has on at least two separate occasions confirmed to separate courts that its own view of the statutory scheme that the § 2719(b)(1)(A) two-part determination must be made in order for the Department to then exercise its authority under 25 U.S.C. § 465.  The earliest such statement presently known to the Plaintiff is the Government's brief (pages 2-3 and 22) filed in <u>Sokaogon Chippewa Community, et al. v. Bruce C. Babbitt</u> in the United States District Court for the Western District of Wisconsin (No. 95-659).[5]  In the Federal Defendants' discussion of this brief, they assert that the quote from page 22 ". . .says nothing about sequence. . . ."  Defendants' Memorandum at 21.  However, the Government's brief in <u>Sokaogon</u> at 22 does speak to sequence in that it clearly states that the Interior Department cannot exercise its authority under 25 U.S.C. § 465 to acquire land in trust unless an applicant can show that it will be in its best interest and that the proposed casino will not be detrimental to the surrounding community.  Those showings cannot possibly be made unless the two-part determination is made prior to the Part 151 determination.  Be that as it may, if there is any doubt about the Government's stated position as to the sequence of the determinations, the same brief succinctly stated at pages 2-3 that the "initial determination" is the two-part determination.

The second such statement by the Government was one made in March 2007 in its brief filed in the D.C. Circuit in <u>Citizens Exposing Truth About Casinos v. Dirk Kempthorne, et al.</u> (No. 06-5354).  A copy is appended hereto as Exhibit B.[6]  That appeal challenged the Interior

---

[5] A copy of this brief was appended to the Affidavit of Robert M. Adler (filed in support of the Plaintiff's Motion for a Preliminary Injunction) as Exhibit F.

[6] An attorney for the Solicitor's Office in the BIA appears on this brief together with Department of Justice attorneys.

Department's decision to acquire the so-called "Sackrider property" in trust for gaming purposes. Interior first concluded that the Sackrider property qualified under the "initial reservation exception in IGRA."[7] Citizens Exposing Truth About Casinos v. Dirk Kempthorne, 492 F.3d 460, 463-464 (D.C. Cir. 2007). In its brief on page 29, the Government stated: "What is more, Interior had to determine whether the Sackrider properly would qualify for gaming under 25 U.S.C. § 2719 in order to comply with the IRA [the Indian Reorganization Act, 25 U.S.C. § 465] and its implementing regulations."

The Government's statements in the Sokaogon and Citizens Exposing Truth About Casinos briefs are significant in that they not only document Interior's historical practice but they also articulate the Interior Department's interpretation of the statutory scheme. The Plaintiff submits that Interior's acknowledgements at the time correctly reflected Congressional intent. As the Second Circuit held in Yale-New Haven at 79, quoting from State Farm: "A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. . . ." The Court in Yale-New Haven, supra at 79 also found instructive the Second Circuit's earlier decision in Huntington Hospital v. Thompson, 319 F.3d 74, 79 (2nd Cir. 2002) which held: "While an agency is not locked into the first interpretation of a statute it embraces, it cannot simply adopt inconsistent positions without presenting some reasoned analysis." That is precisely what the Interior Department has not done herein. Although reversing the order of its decision making process, a position clearly inconsistent with its earlier-stated interpretations of the statutory construction, it has done so without even attempting to present a reasoned analysis of why it did so and making a

---

[7] The "initial reservation" exception is one of several exceptions to the statutory prohibition of gaming, in addition to a favorable finding under the two-part determination,.

presentation as to why its new procedure is nonetheless consistent with Congressional intent. That is unlawful and actionable.

Interior cannot now be allowed to ignore the proper statutory scheme for making these decisions by creating some artifice to deny pending off-reservation casino applications. The sequencing of the Part 151 and two-part determinations was not, and is not, a procedure which the Interior Department can decide to willy nilly change as it has done here. Instead, as the Interior Department clearly recognized in the statements made to two federal courts and in letters to the Governors of two states (Exhibits D and E to the Affidavit of Robert M. Adler ("Adler Aff.")) that Congress intended that the gaming related issues (other than for NEPA considerations) be determined under the two-part determination. That is, whether the proposed casino was in the best interest of the applicant tribe(s) and whether it would cause detriment to the surrounding casino. If those issues were decided favorably to the tribal applicant, then the tax and jurisdictional issues would later be decided under Part 151 if the Governor concurred in the favorable two-part determination. This construction of the regulatory scheme was detailed in the Adler Aff., ¶ 4. Notably, this has not been countered by Mr. Skibine in his Declaration.

The Plaintiff submits that even had the Interior Department provided reasons for its change in procedure in making the Part 151 determination first, or should it attempt to do so in the future, any such proffered explanation remains subject to legitimate challenge under the APA. State Farm made it abundantly clear that if an agency changes course, its new policy or procedure must nonetheless be based on factors which Congress has intended it to consider. Motor Vehicle Manufacturers Association in the United States, Inc. v. State Farm Mutual Automobile Insurance Company, 463 U.S. 29, 43 (1983). As the Second Circuit stated in

Yale-New Haven, supra at 80 quoting from its earlier decision in N.Y. Council, Ass'n of Civilian

Technicians v. Fed. Labor Relations Authority 757 F.2d 502, 508 (2nd Cir. 1985):

> When an agency reverses its course, a court must satisfy itself
> that the agency knows it is changing course, has given sound
> reasons for the change, and has shown that the rule is consistent
> with the law that gives the agency its authority to act. . . .
>
>          *       *       *
>
> Even in the absence of cumulative experience, changed
> circumstances or judicial criticism, an agency is free to change
> course after reweighing the competing statutory policies. But
> such a flip-flop must be accompanied by a reasoned explanation
> why the new rule effectuates the statute as well as or better than
> the old rule.

## B.    The Federal Defendants' Efforts to Limit State Farm and Cases Following It Effort Are Without Merit.

The Federal Defendants' analysis of State Farm and cases following that decision appears

for the first time in their Memorandum at 23-26.  They assert that the applicability of State Farm

in the present dispute is "limited."  Defendants' Memorandum at 24.  Essentially, their argument

is that State Farm  and cases following it establish a pattern where in the State Farm doctrine is

only applied ". . .at regulation or enforcement of an outside party."  Defendants' Memorandum

at 25.  The Federal Defendants proceed to contend that State Farm and its progeny do not apply

to ". . .an alleged departure from an internal process for review.  Id."  They further argue that any

decision to make the Part 151 determinations prior to the two-part determinations ". . .does not

impact the rights or obligations of any outside party.  The decision would merely involve

internal, ministerial management fully within the agency's discretionary powers to decide how to

best manage the programs Congress has asked it to implement."  Defendants' Memorandum

at 26.

These arguments are without merit.  In the first place, the issues presented herein squarely deal with Interior's regulatory procedures and how and when they are applied.  They accordingly fall within the zone of "regulation" which the Federal Defendants acknowledge is covered by State Farm.  Second, the priority of the determinations (Part 151 versus the two-part) does effect the Plaintiff's rights.  Congress, in passing IGRA in 1988, clearly intended to provide Indian tribes with the ability to establish that one or more of the exceptions to the prohibition of gaming properly applied to the casino proposal under consideration.  Accordingly, Interior's decision to make the Part 151 determination first is not simply an "internal, ministerial management. . ." decision.

Further, filed in support of the Plaintiff's Motion for a Preliminary Injunction is the Declaration of the St. Croix Tribe's Chairperson, Hazel Hindsley.  Chairperson Hindsley stated, in pertinent part in ¶ 10:  ". . .[A]s I view it, there is an apparent effort to find some pretext by which to deny the Tribes' pending fee-to-trust application for gaming in Beloit, Wisconsin.  The Department of the Interior put this into place by deciding to make the Part 151 determination before the two-part determination under IGRA."  This sworn statement has not been contradicted by the Federal Defendants in any affidavit filed with this Court.  Accordingly, the record, for purposes of the requested injunctive relief, is that the Interior Department's decision to make the Part 151 determination prior to the two-part determination was not simply an internal administrative decision but one aimed to provide a pretextual basis upon which to deny the Beloit and similar off-reservation gaming applications.

The Federal Defendants state that they have ". . .not found or been made aware of any Court decision requiring a reasoned explanation for an alleged departure from an internal process for review."  Defendants' Memorandum at 25.  The D.C. Circuit's decision in Hurson, supra is

just such a case.  It dealt with a change in an internal review process whereby the face to-face procedure was eliminated for courier services.  There was no change in any regulation. Moreover, <u>State Farm</u> and cases following it do not limit their holdings to only situations involving "regulation or enforcement of an outside third party."  Defendants' Memorandum at 25.  Instead, the <u>State Farm</u> doctrine generally applies whenever an agency has changed its policy or historical practice.  That was the case in <u>American Federation of Labor</u>, <u>supra</u> with respect to the proposed no-match letters.  And, that was also the case in <u>Yale-New Haven</u>, <u>supra</u> with respect to the policy statements made in the 1986 Manual provision.

Other case law supports the Plaintiff's position.  In <u>Owner-Operator Independent Drivers Associations Inc. v. Federal Motor Carrier Safety Administration</u>, 494 F.3d 188, 206 (D.C. Cir. 2007, rehearing <em>en banc</em> denied September 28, 2007), the Court held that the agency failed to satisfy the arbitrary and capricious standard under <u>State Farm</u> in that it failed to provide an explanation for critical elements of methodology adopted by it for a crash-risk model which changed models previously used by the agency.  In <u>Fox TV Stations, Inc., et al. v. Federal Communications Commission, et al.</u>, 2007 U.S. App. Lexis 12868 (2nd Cir. 2007), <u>petition for cert. filed</u> (U.S. Nov. 1, 2007) (No. 07-582), the FCC changed its standards relating to whether isolated and fleeting expletives ran afoul of its indecency regime.  The Court held that there was no question but that the FCC had changed its policy and that its action was arbitrary and capricious in that it failed to provide a reasoned explanation for the change.  <u>Fox TV</u>, <u>supra</u> at *31-32, *40-41.

III.   **THE INTERIOR DEPARTMENT'S PRONOUNCEMENT IN THE SKIBINE LETTER OF MAKING THE TWO-PART DETERMINATION FIRST, AND ITS DECISION TO DO SO IN CONFLICT WITH CONGRESSIONAL INTENT, AND CONSTITUTE VIOLATIONS OF 5 U.S.C.(2)(A), (C) AND (D).**

For reasons previously stated in this Reply Memorandum and in Plaintiff's Memorandum, the Interior Department's decision to make the Part 151 determination prior to the two-part determination is in conflict with Congressional intent in its passage of IGRA. Accordingly, it is "not in accordance with law" (5 U.S.C. § 706(2)(A) (Count I)). Further, for reasons previously set forth by the Plaintiff, the Interior Department's decision to make the Part 151 determination first is "in excess of its statutory authority or limitations and similarly "short of statutory right." (5 U.S.C. § 706(2)(Count III)). Finally, Interior's failure to comply with State Farm and in cases following it is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). (Count IV).

The Federal Defendants argue in their Memorandum that any Interior decision to make the Part 151 determination first would not violate due process and that no trust obligation exists in these circumstances and none was violated. Defendants' Memorandum at 27-30. The Plaintiff believes that these issues are best reserved for a full briefing and determination on the merits. It will therefore not rely on its due process or trust obligation claims for purposes of establishing that there is a substantial likelihood of success on the merits.

IV.   **THE PLAINTIFF WILL SUFFER IRREPARABLE INJURY IF THE REQUESTED INJUNCTION IS NOT GRANTED.**

Unless this Court issues a Preliminary Injunction, the present record is clear that the Interior Department will, in all likelihood, immediately proceed to send denial letters to the Plaintiff, the Bad River Band and other tribes having similar applications pending before the

152241                                    19

Central Office of the BIA.[8]  In fact, a denial letter, relying on Part 151, was sent today by Interior

to the St. Regis Mohawk Tribe.  A copy is appended hereto as Exhibit C.  On information and

belief, similar denial letters have also been sent today to other Indian tribes.

The Affidavit of Robert M. Adler detailed a meeting held with Assistant Secretary

Artman on November 29, 2007.  Adler Aff., ¶ 15.  During that meeting, Assistant Secretary

Artman confirmed that the Part 151 determination would be made for the Beloit application prior

to the two-part IGRA determination.  Assistant Secretary Artman made it quite clear that

decisions would be made within several weeks of that meeting on not only the Beloit application

but other similar applications.  From that meeting with Assistant Secretary Artman, and

Mr. Adler's earlier meetings with him, no doubt was left in Mr. Adler's mind that a letter would

be sent by the BIA before Christmas to the St. Croix Tribe and the Bad River Band denying,

under Part 151, their application.

In their response to the Plaintiff's Motion for a Preliminary Injunction, the Federal

Defendants do not take issue with Mr. Adler's statements that a denial letter (absent an

injunction) will be almost immediately sent to the St. Croix Tribe and the Bad River Band.

Indeed, the Declaration of George Skibine fails to deal with this issue.  Accordingly, the record

in this case is that absent injunctive relief, a denial letter based upon Part 151 will be sent in the

immediate future (perhaps within days) to the St. Croix Tribe and the Bad River Band.  That

denial letter under Part 151 would be legally flawed, and invalid, for the very reasons asserted by

the Plaintiff in this lawsuit.  While the Federal Defendants assert in their Memorandum at 31 that

the Plaintiff has failed to demonstrate that irreparable injury will occur without an injunction,

---

[8] A strong indication of this is Interior's steadfast refusal at the December 12, 2007 hearing to
include in the Stipulation the pending applications submitted by other tribes.

they have failed to proffer any evidence to this Court that absent an injunction they will not issue

a denial letter to the St. Croix Tribe and the Bad River Band based upon Part 151.  The Plaintiff

has satisfied its burden.

      The Federal Defendants place considerable weight on their argument that the Plaintiff has

unjustifiably delayed  in the filing of its request for injunctive relief.  Defendants' Memorandum

at 30-31.  However, the lawsuit itself was filed on December 7, 2007 -- 11 days after the

November 29, 2007 meeting with Assistant Secretary Artman.  The Motions for a Temporary

Restraining Order and Preliminary Injunction Relief were filed the next business day,

December 10, 2007.  The Plaintiff submits that this period of time was reasonable and not an

unnecessary delay.  The eleven-day interval provided time for extensive consultations with the

Tribal Council in Wisconsin, further research, and the preparation and drafting of the Complaint,

the Motions for a Temporary Restraining Order and a Preliminary Injunctions, the supporting

Memorandum and sworn statements submitted in support of the requested injunctive relief.

There was no lack of diligence.

      The Federal Defendants refer this Court to two fairly recent decisions from this District

Court dealing with the issue of delay.  Defendants' Memorandum at 31.  In Sandoz, Inc. v. Food

and Drug Administration, 439 F. Supp.2d 26, 31 (D.D.C. 2006), aff'd., mot. dismissed, 2006

U.S. App. Lexis 22343 (D.C. Cir. Aug. 30, 2006), the Court found that Sandoz delayed pursuing

the action until the last minute.  It placed primary reliance on the Supreme Court's decision in

Hill v. McDonough, 547 U.S. 573, 126 S. Ct. 2096, 2104 (2006) for the proposition that there is

a strong equitable presumption against the grant of a stay where a claim could have been brought

at such a time as to allow consideration of the merits without requiring entry of a stay.  Id.  In the

case at bar, even had a lawsuit and a request for injunctive relief been filed on the date of the

Skibine letter, there is no practical way that the complicated legal issues raised by the Plaintiff's lawsuit could be resolved prior to the time that a denial letter would predictably be issued by the Interior Department to the Plaintiff and the Bad River Band.

In the second case, City of Tempe AZ v. F.A.A., 239 F. Supp.2d 55, 65, n.13 (D.D.C. 2003), the plaintiffs filed their complaint on October 16, 2002, but did not apply for a preliminary injunction until December 16, 2002, three weeks before the scheduled start of the runway closure. The Court's stated reason for its conclusion that there was unnecessary delay was the 44-day time period between the filing of the lawsuit and the application for a preliminary injunction. (". . .[plaintiffs] offer little excuse for the two-month lapse between the filing of the complaint and the filing of the application for extraordinary relief."). These cases do not suggest that there was unreasonable delay herein.

Finally, the Federal Defendants assert that the Plaintiff has not demonstrated irreparable injury because it has not demonstrated that it will actually suffer any economic harm. Defendants' Memorandum at 32. The Federal Defendants misperceive the requisite irreparable injury which is claimed for purposes of the Preliminary Injunction. As set forth in the Plaintiff's Memorandum at 25, the D.C. Circuit in National Wildlife Federation v. Burford, et al., 835 F.2d 305, 325 (D.C. Cir. 1987) made it imminently clear that when there is procedural harm claimed, as there is herein, then that is the irreparable injury which an injunction is designed to stay:

> A preliminary injunction is designed to prevent irreparable injury;
> its value would be totally eviscerated if the plaintiff had to show
> that the harm had already occurred before the court could issue
> the injunction." (emphasis in original).

## V.    AN INJUNCTION WILL SERVE THE PUBLIC INTEREST

In arguing that an injunction would not serve the public interest, the Federal Defendants incorrectly assert that the Plaintiff has failed to identify any final agency action taken by Defendant.  Defendants' Memorandum at 33.  For that reason, argue the Federal Defendants, an injunction would lead to pointless litigation and disrupt the processes established by the Defendant for review of applications to take land into trust for gaming.  To the contrary, the Plaintiff submits that unless and until the issues raised by the Plaintiff herein are resolved by this Court, it would make little sense for the Interior Department to proceed to make Part 151 decisions for the Beloit or other similar applications since by doing so it would be forced to rescind those decisions if the Federal Defendants do not prevail in this litigation.  In fact, at the Court's hearing on December 12, 2007, this point was raised by the Court with Government counsel.  See Hearing Transcript (Exhibit A hereto) at 13-14.  This colloquy led Government counsel to state that he understood Interior was reconsidering its position.  Transcript at 14.

Finally, the Federal Defendants assert that if a Preliminary Injunction is issued, it will negatively impact Indian tribes who are not party to this litigation.  Defendants' Memorandum at 33.  The Federal Defendants do not provide any explanation or support for this statement.  To the contrary, the Plaintiff believes that other Indian tribes, having similar applications pending before the Interior Department, will demonstrably benefit from the issuance of a Preliminary Injunction so that the issues raised by the Complaint can be resolved on the merits.

## **CONCLUSION**

For the reasons set forth herein and in the Plaintiff's Memorandum previously submitted to this Court, the Plaintiff submits that the Federal Defendants' Motion to Dismiss should be

denied and that a preliminary Injunction should be issued pending a decision by this Court on the merits.

Respectfully submitted,


_____/s/  Robert M. Adler_____
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1400

*Attorneys for the St. Croix Chippewa Indians of Wisconsin*


Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893


Dated:  January 4, 2008

# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA



| | | |
|---|---|---|
| ST. CROIX CHIPPEWA INDIANS OF | : | Docket No. CV07-2210 |
| WISCONSIN, | : | (RJL) |
| | : | |
| Plaintiff, | : | December 12, 2007 |
| | : | |
| | : | 2:30 p.m. |
| v. | : | |
| | : | |
| DIRK KEMPTHORNE, ET AL., | : | |
| | : | |
| Defendants. | | |

. . . . . . . . . . . . . .


TRANSCRIPT OF TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiff:          GERALD YAMADA, ESQ.
                            ROBERT ADLER, ESQ. (On telephone)
                            O'Connor & Hannan, LLP
                            1666 K Street, NW
                            Washington, DC 20006


For the Defendants:         KRISTOFOR R. SWANSON, ESQ.
                            SARA ELIZABETH CULLEY, ESQ.
                            U.S. Department of Justice
                            601 D Street, NW
                            Washington, DC 20004


ALSO PRESENT:               George T. Skibine

Page 2

```
       Court Reporter:                PATTY ARTRIP GELS, RMR

                                      Official Court Reporter

                                      Room 4700-A, U.S. Courthouse

                                      Washington, D.C. 20001

                                      (202) 962-0200




       Proceedings reported by machine shorthand, transcript produced

       by computer-aided transcription.
```

1                    P R O C E E D I N G S

2              COURTROOM DEPUTY:  Your Honor, this is the matter of

3    St. Croix Chippewa Indians of Wisconsin versus Dirk Kempthorne,

4    et al. Civil Action 07-2210.  The matter before the Court is a

5    Temporary Restraining Order.

6              Counsel come forth and state your appearances for the

7    record, please.  Mr. Adler.

8              MR. ADLER:  Yes, I am here.

9              THE COURT:  State your appearance for the record.

10             MR. ADLER:  Robert Adler, counsel for the St. Croix

11   Chippewa Indians of Wisconsin.

12             MR. YAMADA:  Gerald Yamada, law firm of O'Connor &

13   Hannan representing the St. Croix Chippewa Indians of Wisconsin.

14             THE COURT:  Welcome.

15             MR. SWANSON:  Christopher Swanson, Department of

16   Justice, Natural Resources Section representing the Defendants.

17             THE COURT:  Welcome.

18             MS. CULLEY:  Sara Culley also of the Department of

19   Justice here on behalf of the Defendants and with us at counsel

20   table is George Skibine, agency counsel.

21             THE COURT:  Welcome.  All right, counsel, first of all,

22   I wanted to note for the record, although I do not believe I

23   have a conflict of  interest, I wanted to note in an abundance

24   of caution that years ago, and I stress years, long before I was

25   on this bench so back in the 1999, 2000 time frame, I did in

Page 4

1   private practice have an occasion to represent an individual who

2   was a lobbyist in the field of Indian gaming; and it was in

3   connection with the Babbitt independent counsel inquiry.

4          He was one of the witnesses that was called in in his

5   capacity as a former Chief of Staff to the Indian Gaming

6   Commission, a Mr. Daisy.  I have only the faintest recollection

7   of what the facts were surrounding his testimony that I prepared

8   for, reviewed the documents that I received copies of from the

9   independent counsel's office, and represented him at the time.

10         It did have something, in vague terms, that's all I can

11  recall, to deal with Wisconsin and Indian gaming in Wisconsin.

12  I am not even sure if it was this particular matter here today

13  eight years later, nine years later; but in a hyperabundance of

14  caution I wanted to put it on the record and let the parties

15  know that I did have a vague recollection of that.

16         I didn't represent the tribe itself, of course, who is

17  a party in this case.  So I wanted to put that on the record and

18  give both sides an opportunity, not only to hear it, but to

19  raise any concern or objection they may have with my going

20  forward with the case in light of that prior involvement albeit

21  tangential and removed, but nevertheless, as I said, in an

22  abundance of caution.

23         So having brought that to your attention and given you

24  a chance to at least digest it, think about it, Mr. Yamada, does

25  the Plaintiffs have any issue or concern relating to the Court

Page 5

1    remaining involved in the case?

2            MR. YAMADA: As I understand it, the controversy

3    occurred prior to both Mr. Adler and I joining O'Connor &

4    Hannan. The St. Croix as many Indian tribes were involved in

5    the controversy as well as O'Connor & Hannan. We do not believe

6    that that controversy is related at all to the one before this

7    Court.

8            We have absolutely no objection to you continuing and

9    having you preside over this case. Thank you, your Honor.

10           THE COURT: All right. Thank you, Mr. Yamada. How

11   about for the Government, Mr. Swanson?

12           MR. SWANSON: We also have no objection, your Honor.

13           THE COURT: Very good. All right. Well, then based on

14   that and again my own conclusion independent actually of the

15   parties, I don't believe it poses any conflict so the Court will

16   stay with the case under the circumstances.

17           So, now, we are here today really it is kind of a

18   multi-purpose get-together. First of all, in this District it

19   is common that the pleadings and TROs and PIs Preliminary

20   Injunctions are styled sometimes in a way that it is not clear

21   whether the Plaintiffs actually needs a TRO now or is it the

22   Preliminary Injunction that they are seeking to achieve under

23   the circumstances.

24           So I usually hold this type of a hearing to hear from

25   both sides as to, first of all, as to whether this is a case

1    where a TRO is really apposite and, if not, to set a briefing

2    schedule so that each side can have a chance to, well,

3    particularly in the case of the Defendants, the Defendants

4    usually need an opportunity to respond in writing to the

5    pleadings that are filed by the Plaintiff under the

6    circumstances.

7            So I wanted to give each side a chance to be heard on

8    those issues and to discuss with you any anything relating to a

9    briefing schedule here so that we could give everyone a chance

10    to put their thoughts on paper and then I can read it and digest

11    before we have the oral argument on the Preliminary Injunction

12    case.

13            So, Mr. Yamada, let me start with you.  You are the

14    moving party after all.  Is this a case in your judgment that

15    really lends itself to the necessity of the extreme remedy of a

16    Temporary Restraining Order or is this more a PI kind of case

17    where we can have a briefing schedule, then have a hearing on

18    the PI.

19            MR. YAMADA:  Your Honor, we believe that an Temporary

20    Restraining Order is needed.  The reason for that is we

21    understand that the Interior Department is on the verge within

22    the next two weeks of issuing letters based upon the new policy

23    and that those letters in fact would be denials of the pending

24    applications.

25            THE COURT:  Okay.  And if you can say, is your basis

1    for believing that that will happen that imminently in the next

2    two weeks, is that based on public information; or is that based

3    on some non public information that you can't even really cite

4    to authoritatively?

5         MR. YAMADA:  The information comes with discussions

6    with the Interior Department officials.  Mr. Adler can speak

7    perhaps more clearly to those since he was involved in the

8    meetings, but again it is not published information in terms of

9    the time frame.

10        THE COURT:  So it is not something I could just go on

11   the web and get it?

12        MR. YAMADA:  That's correct.

13        THE COURT:  Okay.  Now, sometimes in situations of the

14   kind you are alluding to here, one way to alleviate the

15   necessity of a Temporary Restraining Order decision and argument

16   is to just simply inquire as to whether the particular agency is

17   in a position or not to forestall any decision pending the

18   arguments for the Preliminary Injunction and the decision on the

19   Preliminary Injunction.

20        I don't know if, Mr. Swanson, you would be in a

21   position today to make any representations along those lines,

22   but why don't we give you -- have a seat, Mr. Yamada, and then

23   we will see what Mr. Swanson has to say about whether or not the

24   agency is in a position to hold off on this decision that Mr.

25   Yamada believes is imminent until we have had a chance to have

1    the argument on the PI and the Court to rule on the PI because

2    the Court has to obviously rule expeditiously on the PI.

3            MR. SWANSON:  Actually I can speak directly to that.

4    In our discussions with the agency this morning in preparation

5    for this hearing, they actually assured us that there will not

6    be, and they would be willing to stipulate to this if necessary,

7    there will be no decision on St. Croix's part 151 determination

8    any sooner than January 31st of 2008 if that helps.

9            THE COURT:  All right.  Well, if that were the case,

10   then, Mr. Yamada, I mean I would be scheduling a hearing on the

11   PI in this case, well, certainly within the next few weeks.

12   That would get us to sometime at the very beginning of January

13   probably because of the holidays and everything in there and

14   that would give the Court a matter of certainly weeks to not

15   only issue a decision but get it out to the public domain.

16           Mr. Swanson, do you know if that could be, in order to

17   accommodate the Court, that could be pushed back a little more

18   than that so that I have a little extra time to digest

19   everything and issue --

20           MR. SWANSON:  After that January 31st date the agency

21   would be willing to agree to give Plaintiffs 21 days' notice of

22   any imminent decision on their part 151 application.

23           THE COURT:  Before they acted?

24           MR. SWANSON:  Before they act, correct.

25           THE COURT:  So the Court would obviously be privy to

Page 9

1    that notice as well, right?  You would inform the Court

2    immediately?

3              MR. SWANSON:  Correct.

4              THE COURT:  Well, certainly I think I can represent

5    very confidently that if they gave the notice on the first of

6    the month of February, certainly by the 21st of the month, the

7    Court would have ruled.  I mean that's a total of seven weeks.

8    There is no doubt in my mind that hearing the argument the

9    first, say, around the first week of the year that I would be

10   able to not only hear the arguments, but issue my opinion well

11   before, I would like to think, well before the earliest possible

12   date under that scenario which would be roughly the 21st of the

13   month.

14             MR. YAMADA:  Your Honor.

15             THE COURT:  Come on up, Mr. Yamada.

16             MR. YAMADA:  Your Honor, the stipulation that the

17   Government offered is specific to the St. Croix tribe.  It is

18   our understanding that there are at least two, perhaps three

19   other applications pending in the central office that are in the

20   same position as the St. Croix tribe.

21             I think the stipulation is acceptable if the Government

22   is willing to stipulate that no decisions on any of the pending

23   applications will be made using 151 first before the part two

24   determination.

25             THE COURT:  Well, I see your point.  In other words,

Page 10

 1    obviously if they limited their decision only to your

 2    application but then granted somebody else's application, that

 3    would effectively be a denial of your application, would it not,

 4    Mr. Yamada?

 5            So effectively they would have to agree that all

 6    pending applications for this issue would have to be on hold,

 7    wouldn't they, Mr. Swanson.

 8            MR. SWANSON:  I would respectfully disagree, your

 9    Honor.  My understanding of the process and, if you would like,

10    I can confer with my agency counsel, is that each of these

11    applications is reviewed independently.  So issuing one

12    determination on a tribe who is not here today obviously does

13    not necessarily impact how the determination would come out on

14    St. Croix's application.

15            Furthermore, this goes a little bit to --

16            THE COURT:  So St. Croix, in theory anyway, St. Croix's

17    application could be granted in their favor even if between now

18    and the granting in their favor somebody else's application

19    would also be granted?

20            MR. SWANSON:  Correct.

21            THE COURT:  Mr. Yamada, is that inconsistent with your

22    understanding of the regulations and the law?

23            MR. YAMADA:  Well, each application, of course, is

24    judged on its own merits, but what is at issue in this case and

25    the basis of our request for the TRO and the Preliminary

1    Injunction is the newly issued policy that was issued in August

2    of this year.   That policy is inconsistent or doesn't follow the

3    Administrative Procedures Act.

4            We think it is arbitrary and capricious so to have the

5    Interior Department go forward, implement that policy applying

6    it to other tribes and then at the time when it comes time to

7    consider our application, to use those as precedence I think

8    would put us in a very difficult position.

9            THE COURT:  All right.  Mr. Swanson, would it be

10    helpful to you to have a chance to take a recess for a few

11    minutes and talk to your agency counsel about this situation

12    that Mr. Yamada is concerned about to see if it may be mutually

13    resolvable I mean this afternoon, the next, say, half hour?

14            MR. SWANSON:  Yes, I would be happy to, your Honor.

15            THE COURT:  We don't need to reduce it at this point to

16    writing if there could be agreement in principle between the

17    parties that would essentially freeze the playing field until

18    the Court had a chance to rule on the PI, I think that would

19    essentially accomplish the objective that we are trying to get

20    here under these circumstances.

21            I mean obviously the Court can and will rule on a TRO

22    if it has to, but it tries its best to limit rulings of that

23    kind only when it is absolutely a necessity to do so.

24            So why don't we do this.  Why don't we take a brief

25    recess.  Let Mr. Burwell know when you think you are ready for

1    me to come back and have a chat with Mr. Yamada and see if this

2    is something that may be resolvable.

3              I certainly think I can reach and issue my ruling by

4    the 21st of the month of February at the earliest and that would

5    give the agency the time to, if it needed to, to move forward

6    expeditiously right after the 31st of January.  So we will take

7    a brief recess.

8              (Recess.)

9              THE COURT:  All right.  Counsel, you have had a chance

10   to discuss this.  Mr. Swanson, why don't you give me a little

11   update on where things stand at the moment anyway.

12             MR. SWANSON:  Yes, your Honor.  When we recessed, we

13   were talking about the potential of stipulating not to make

14   decisions on 151 applications pending from other tribes outside

15   of St. Croix, and the agency is uncomfortable with that

16   stipulation for a few reasons.

17             First of which being simply the fact that that involves

18   parties that aren't here today and the breadth of it I guess is

19   the issue which is paralleled in the Plaintiff's proposed --

20             THE COURT:  How could it hurt the St. Croix tribe from

21   your vantage point?

22             MR. SWANSON:  How could it hurt the --

23             THE COURT:  Yes.

24             MR. SWANSON:  We are not sure that it could.  I think

25   the logic gap in there is that, if the tribe is claiming that

Page 13

1    this change in process is invalid under the APA, that argument

2    is still in place even if these other decisions have been made.

3            THE COURT:  I mean frankly if the Court were to rule in

4    their favor, wouldn't that put the agency in the unenviable

5    position of having to redo what it had already done during this

6    interregna?

7            MR. SWANSON:  I am sorry, I couldn't hear you.  Redoing

8    what?

9            THE COURT:  Wouldn't this put the burden on the agency

10    to redo what they had already done as it relates to applications

11    during this interregna?

12            MR. SWANSON:  Yes, it would somewhat restructure the

13    process.  I should say that of the pending applications now, no

14    determination has been made whether 151 or the two-step is going

15    to be made first. The guidelines and things out to the region

16    are prospective and not retrospective.

17            THE COURT:  One would think it would be in the agency's

18    interest to wait as well.

19            MR. SWANSON: The agency's what?

20            THE COURT:  It would be in the agency's interest to

21    wait to act on any application until it got some signal from

22    this Court as to whether or not the current system does or

23    doesn't withstand judicial review because, if they go forward

24    under the current system between now and the ruling on the St.

25    Croix case and it should come to pass that the system is somehow

Page 14

1   legally defective, they would have to go and redo consistent

2   with those defects the applications they acted on between now

3   and the time of St. Croix, wouldn't they?

4         MR. SWANSON:  That is correct, your Honor, but I think

5   that, again, that assumes there has been some final agency

6   action in this change of process. We are starting to creep a

7   little bit into the likelihood of success here, but our position

8   is that this August 21st letter the Plaintiffs rely on as the

9   final agency action is not an agency action.

10        And that was very evident this morning in talking on

11  the phone with the agency that this by to means has been settled

12  one way or the other.

13        THE COURT:  Okay.  So at this point it is willing to

14  suspend on the St. Croix application until the end of January

15  and give it a three-week notice thereafter --

16        MR. SWANSON:  Correct.

17        THE COURT:  -- prior to any action on its application?

18        MR. SWANSON:  Correct.

19        THE COURT:  Okay.

20        MR. SWANSON:  Thank you.

21        THE COURT:  Very good.  Mr. Yamada.

22        MR. YAMADA:  Your Honor, in terms of the St. Croix

23  position, our position is basically -- is that the August 21st

24  letter is in fact final agency action, and it is fatally flawed

25  because it is inconsistent with Congressional intent.  Now,

Page 15

1    that's issues for the PI and subsequent hearings.

2            In terms of the current issue before us in terms of the

3    scope of the stipulation, our primary concern is that the agency

4    goes forward, denies applications using 151 first, and then

5    using that as precedence to justify their policy in this

6    litigation.

7            THE COURT:  But they wouldn't be able to do that as a

8    practical matter because if the Court, in theory, if the Court

9    were to rule in your favor between now and say February 21st,

10   then they couldn't use it for any precedential value against you

11   because what the Court would be doing is ordering them to

12   reevaluate and restructure their current system.

13           So there would be no precedential value against your

14   client for any application acted on in the interim.  And, of

15   course, as to your client, of course, there wouldn't be any

16   action until the Court had ruled anyway.

17           MR. YAMADA:  Right.  In terms of the scope of the

18   stipulation, we think it protects our client's interests.  We do

19   not represent the other tribes so --

20           THE COURT:  Right.

21           MR. YAMADA:  -- under these circumstances the

22   stipulation is acceptable to us.

23           THE COURT:  All right.  Very good.  So what we will do

24   is we will just focus on setting a schedule for the briefing and

25   the hearing on the PI today, and the Court will proceed on the

Page 16

1    assumption that you will finalize in writing and hand it in to

2    the Court, Mr. Swanson, with your pleading or sooner.  I mean as

3    soon as you can really that -- but the representation has been

4    made on the record and the Court accepts it for what it is

5    worth.

6         .        So, you know, the Court expects conduct consistent

7    therewith, and I have no reason to question that that would be

8    the case. So it is an oral stipulation accepted at this point,

9    but put it in writing just for the sake of everyone's protection

10   and make sure Mr. Yamada sees it before it is finalized.  That

11   would be a good thing lest there be any issues of that kind.

12             Now, the Court is mindful it is the holiday season.

13   How much time would the Government like to respond to the

14   pleadings of the Plaintiff? Is two weeks sufficient under the

15   circumstances?

16             MR. SWANSON:  Yes, your Honor. It is.

17             THE COURT:  Very good.  That gets us to -- let's see,

18   you got these yesterday I assume? Is that a fair statement or

19   maybe Monday?

20             MR. SWANSON:  Yes, I believe the complaint was filed on

21   the 7th, and we came into the office on Monday and it was there.

22             THE COURT:  All right. So we will say you were on

23   notice as of the 24th and then for your reply there, Mr. Yamada,

24   again I have to take into consideration the Christmas holiday

25   season there, but would it be acceptable by the fourth? Would

1    that be enough time for you to get your reply in by?

2              MR. YAMADA:  That will be fine, your Honor.

3              THE COURT:  Taking off those couple days for Christmas

4    and New Year's.  If you need more time, you are always ask for

5    an extension for a few days or whatever, and that applies to the

6    Government too.  If the Government turns out to need for

7    whatever reason a few extra days, work it out with the other

8    side, but generally the Court especially if it is mutually

9    agreed to, extensions for a few days, that's not a problem.

10             So the pleadings should all be in by the fourth of

11   January. Why don't we set the argument.  I will need a few days

12   to digest it obviously so why don't we set the argument for the

13   following week.  Is counsel available on the 9th?

14             MR. YAMADA:  That's fine.

15             MR. SWANSON:  Yes, that's fine here as well.

16             THE COURT:  Okay.  So actually the 10th.  I take that

17   back, counsel.  Check the 10th because I just remembered

18   something for the 9th.  Is the 10th equally acceptable in the

19   afternoon?

20             MR. YAMADA:  Yes, it is.

21             MR. SWANSON:  Your Honor, Miss Culley tells me that she

22   is going to be on travel on the 10th.  I don't mind doing it if

23   there is no other options, but maybe the 9th or the 11th would

24   be -- maybe I will let Miss Culley speak.

25

Page 18

1          MS. CULLEY:   Thanks, your Honor. I have a long planned

2    mediation in San Jose on the 11th so if we could do the 9th or

3    perhaps move to the next week.

4          THE COURT:  Well, how long are you going to be out

5    there?

6          MR. SWANSON:  Hopefully just traveling on the 10th and

7    coming home on the 12th.

8          THE COURT:  All right.  Why don't we -- I have the 15th

9    wide open so you will be safely back here by the 15th, right?

10         MR. SWANSON:  I would hope.

11         THE COURT:  I would too.  All right.  2 o'clock on the

12   15th.  Mr. Yamada, does that work on your calendar?

13         MR. YAMADA:  That's fine.

14         MS. CULLEY:  Thank you.

15         THE COURT:  Very good. I will set it down now for an

16   hour and a half total.  We might not need all of that time, but

17   I said 2 o'clock, right?

18         COURTROOM DEPUTY:  Yes.

19         THE COURT:  Yes, 2 o'clock for the argument that day.

20   Very good.  Any other questions or issues we need to address at

21   this time, Mr. Yamada?

22         MR. YAMADA:  No, your Honor.

23         THE COURT:  Very good.  Mr. Swanson.

24         MR. SWANSON:  None here also, your Honor.

25         THE COURT:  Okay.  Good.  Thank you, counsel.  I

Page 19

1    appreciate your efforts, and just submit that to the Court with

2    a copy to Mr. Yamada after you have had a chance to review it

3    with him and at least it will be part of the record in the case.

4         Check with Mr. Burwell if you have any questions about

5    the -- we are on the ECF system, as you probably know so, you

6    know, file it under the ECF system once it is ready and it will

7    be part of the record in the case.  Thank you, counsel.

8         (Whereupon, at 5:00 p.m., the proceedings were

9    concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 20

1                           CERTIFICATE OF REPORTER

2

3          I, Patty A. Gels, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B
# (Part 1)

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FEB 26 2007

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

No. 06-5354

**STIPULATED TO STAND BY POOL FOR ORAL ARGUMENT**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITIZENS EXPOSING TRUTH ABOUT CASINOS, a Michigan
non-profit corporation,

Plaintiff-Appellant,

-v.-

DIRK KEMPTHORNE, in his official capacity as Secretary of the
United States Department of the Interior; JAMES CASON, in his
official capacity as Associate Deputy Secretary of the United States
Department of the Interior,

Defendants-Appellees.

NOTTAWASEPPI HURON BAND OF POTAWATOMI INDIANS,

Intervenor-Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**ANSWERING BRIEF OF DEFENDANTS-APPELLEES**

MATTHEW J. McKEOWN
Acting Assistant Attorney General

PATRICIA MILLER
TODD S. AAGAARD
AARON P. AVILA
Attorneys, U.S. Dept. of Justice
Env't & Natural Res. Div.
P.O. Box 23795 (L'Enfant)
Washington, D.C. 20026
(202) 514-...

OF COUNSEL:

MARIA WISEMAN
U.S. Dep't of the Interior
Office of the Solicitor

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A) Parties and Amici:  Plaintiff-Appellant is Citizens Exposing

Truth About Casinos.  Defendants-Appellees are Dirk Kempthorne, in

his official capacity as Secretary of the United States Department of

the Interior and James Cason, in his official capacity as Associate

Deputy Secretary of the United States Department of the Interior.

Intervenor Defendant-Appellee is Nottawaseppi Huron Band of

Potawatomi Indians.  In the district court, John Engler, Governor, the

State of Michigan, and Calhoun County Community Development were

amici curiae.

(B) Rulings Under Review:  This is an appeal of the April 23,

2004, Memorandum and Order and the October 16, 2006, Order

Dismissing the Case entered by the United States District Court for the

District of Columbia, *Citizens Exposing Truth About Casinos v.*

*Kempthorne*, No. 1:02CV0174.

(C) Related Cases:  This case has not been before this Court

previously.  *Michigan Gambling Opposition v. Norton*, D.D.C. No.

05-01181(JGP), presents, in part, issues similar to those raised in this

appeal.  The district court decided that case on February 23, 2007.

Aaron P. Avila
U.S. Dep't of Justice
Env't & Natural Res. Div.
P.O. Box 23795 (L'Enfant Station)
Washington, DC  20026
(202) 514-1307

26 February 2007

# TABLE OF CONTENTS

PAGE

CERTIFICATE AS TO PARTIES, RULINGS,
    AND RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATUTES AND REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    THE INDIAN REORGANIZATION ACT . . . . . . . . . . . . . . . 4

        A.    Acquiring Land in Trust . . . . . . . . . . . . . . . . . . . . . . . 4

        B.    Proclamation of Trust Land as a Reservation . . . . . . 6

    II.    THE INDIAN GAMING REGULATORY ACT . . . . . . . . . . 7

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.    FEDERAL RECOGNITION OF THE HURON BAND . . . 10

    II.    THE PINE CREEK PROPERTY . . . . . . . . . . . . . . . . . . . . 12

    III.    THE SACKRIDER PROPERTY . . . . . . . . . . . . . . . . . . . . 14

    IV.    THE CHALLENGED DECISION . . . . . . . . . . . . . . . . . . . 16

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I.    CETAC'S COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                                                                          PAGE

II.    THE DISTRICT COURT'S APRIL 23, 2004,
       MEMORANDUM AND ORDER . . . . . . . . . . . . . . . . . . . . . . 21

III.   THE DISTRICT COURT'S ORDER DISMISSING
       THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

       INTERIOR PROPERLY DETERMINED THAT
       THE SACKRIDER PROPERTY WOULD QUALIFY AS
       THE HURON BAND'S "INITIAL RESERVATION" . . . . . . . . . . 27

              A.    Interior's Interpretation and Decision are
                    Entitled to Deference . . . . . . . . . . . . . . . . . . . . . . . . 28

              B.    Interior's Interpretation Comports with
                    the Language, Structure, and Purpose of IGRA . . . . 34

              C.    CETAC's Arguments Lack Merit . . . . . . . . . . . . . . . . 36

                    i.    A "reservation" is not limited to land
                          used as a tribal residence . . . . . . . . . . . . . . . . 37

                    ii.   The Pine Creek property is not the Band's
                          "initial reservation" . . . . . . . . . . . . . . . . . . . . 50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

PAGE

CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME
LIMITATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

ADDENDUM

CERTIFICATE OF SERVICE

TABLE OF AUTHORITIES

PAGE

**FEDERAL CASES**

*Adams Fruit Company v. Barrett*, 494 U.S. 638 (1990) . . . . . . . . . . . 32

✗*Ariz. Pub. Serv. Co. v. Envtl. Prot. Agency*,
     211 F.3d 1280 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . 38, 39, 46

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*,
     467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Christensen v. Harris County*, 529 U.S. 576 (2000) . . . . . . . . 31-33, 38

*Citizens Against Casino Gambling Erie County v. Kempthorne*,
     2007 WL 108466 (W.D.N.Y. Jan 12, 2007) . . . . . . . . . . . . . . . 30

✗ *City of Roseville v. Norton*,
     348 F.3d 1020 (D.C. Cir. 2003) . . . . . . . . . 31,35-38, 42, 45, 47, 54

*Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A.*,
     377 F.3d 1164 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 42

*Gonzalez v. Reno*, 215 F.3d 1243 (11th Cir. 2000) . . . . . . . . . . . . . . 33

*Okla. Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe of
     Okla.*, 498 U.S. 505 (1991). . . . . . . . . . . . . . . . . . . . . . . . . 6

*Mail Order Ass'n of Am. v. U.S. Postal Serv.*,
     986 F.2d 509 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 42

*Michigan Gambling Opposition v. Norton*,
     D.D.C. No. 05-01181 (JGP) (Feb. 23, 2007) . . . . . . . . . . . . . 37, 53

*NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*,
     513 U.S. 251, (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

vi

\*Authorities upon which we chiefly rely
are marked with asterisks.

PAGE

**FEDERAL CASES (cont.)**

*Pension Benefit Guaranty Corp. v. LTV Corp.,*
    496 U.S. 633 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Sac & Fox Nation of Missouri v. Norton,*
    240 F.3d 1250 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 30, 43

*Sturdza v. United Arab Emirates,*
    281 F.3d 1287 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 24

✳*TOMAC v. Norton,* 433 F.3d 852 (D.C. Cir. 2005) . . . . . . . . 7, 35, 45, 47

*United States v. Mead Corp.,* 533 U.S. 218 (2001). . . . . . . . . . . . . . 38

*United States v. Whren,* 111 F.3d 956, 958 (D.C. Cir. 1997) . . . . . . . . 42

*Wilson v. Pena,* 79 F.3d 154 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . 24

**FEDERAL STATUTES**

5 U.S.C. §§ 701-706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7 U.S.C. § 1926(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

7 U.S.C. § 2662(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

18 U.S.C. § 1151(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

✳25 U.S.C. § 465 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6, 20, 22, 24

✳25 U.S.C. § 467 . . . . . . . . . . . . . . . . . . . . . . . 6, 26, 35, 38, 44, 51

25 U.S.C. § 476 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

PAGE

**FEDERAL STATUTES (cont.)**

25 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

25 U.S.C. § 706(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

25 U.S.C. § 2702(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 45

25 U.S.C. § 2702(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

25 U.S.C. § 2703 (4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

25 U.S.C. § 2703(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

25 U.S.C. § 2703(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 U.S.C. § 2710(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

25 U.S.C. § 2710(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 U.S.C. § 2710(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

25 U.S.C. § 2710(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

25 U.S.C. §§ 2710(b)-(d)(9); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

25 U.S.C. § 2711(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

✳25 U.S.C. § 2719 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-11, 29

25 U.S.C. § 2719(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 53

25 U.S.C. § 2719(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

25 U.S.C. § 2719(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

25 U.S.C. § 2719(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 34, 47

PAGE

## FEDERAL STATUTES (cont.)

*25 U.S.C. § 2719(b)(1)(B)(ii) . . . . . . . . . . . . . . . . . . . . . 1, 6, 22, 27, 34, 53

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. § 741(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 2991b(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Pub. L. No. 107-63 § 134 (2001) . . . . . . . . . . . . . . . . . 9, 10, 29-31, 42

## FEDERAL REGULATIONS

25 C.F.R. § 83.10(l)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

25 C.F.R. Part 151 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17, 50

25 C.F.R. § 151.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25 C.F.R. § 151.10(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

25 C.F.R. § 151.10(e) . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

25 C.F.R. § 151.10(f) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

25 C.F.R. § 151.10(g) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

25 C.F.R. § 151.2(d) . . . . . . . . . . . . . . . . . . . . . . . . . . 48

25 C.F.R. § 151.2(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

25 C.F.R. § 151.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

PAGE

**FEDERAL REGULATIONS (cont.)**

25 C.F.R. § 151.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

60 Fed. Reg. 28,426 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

60 Fed. Reg. 66,315 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11

*67 Fed. Reg. 51,867 (2002) . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 15, 20, 34

**RULES**

Fed. R. App. P. 28(a)(9)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**OTHER**

Felix S. Cohen's *Handbook of Federal Indian Law* (1982 ed.) . . . . 39-41

## GLOSSARY

| | |
|---|---|
| Add. | Addendum |
| APA | Administrative Procedure Act |
| Br. | Corrected Brief of Plaintiff-Appellant |
| CETAC | Plaintiff-Appellant Citizens Exposing Truth About Casinos |
| FLSA | Fair Labor Standards Act |
| FONSI | Finding of No Significant Impact |
| Huron Band or the Band | Intervenor Defendant-Appellee Nottawaseppi Huron Band of Potawatomi Indians |
| Interior | Department of the Interior, and, collectively, Defendants-Appellees Secretary of the United States Department of the Interior and the Assistant Secretary of the United States Department of the Interior |
| IGRA | Indian Gaming Regulatory Act |
| IRA | Indian Reorganization Act |
| NEPA | National Environmental Policy Act |
| NIGC | National Indian Gaming Commission |
| Secretary | Secretary of the Interior |

STIPULATED TO STAND BY POOL FOR ORAL ARGUMENT

## STATEMENT OF JURISDICTION

Plaintiff-Appellant Citizens Exposing Truth About Casinos ("CETAC") properly invoked the jurisdiction of the district court pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  CETAC's complaint alleged four counts and named as defendants the Secretary of the United States Department of the Interior and the Assistant Secretary of the United States Department of the Interior (collectively, "Interior").  JA16.  In an April 23, 2004, Memorandum and Order, the district court dismissed Counts II-IV of the complaint.  On Count I, the district court remanded to Interior and issued an injunction.  After Interior completed the proceedings on remand and the parties entered into a stipulation, the district court entered a final order on October 16, 2006, that dissolved the injunction and dismissed all remaining claims.  *See* JA14 (docket entry 77).

CETAC timely filed a notice of appeal on October 26, 2006.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

1

## STATEMENT OF THE ISSUES

CETAC challenges Interior's decision to acquire the so-called
"Sackrider property" in trust for Intervenor Defendant-Appellee
Nottawaseppi Huron Band of Potawatomi Indians (the "Huron Band")
pursuant to the Indian Reorganization Act ("IRA").  In that decision,
Interior also found that, "if the Sackrider property were included in the
initial proclamation of reservation, it would meet the requirements of
the 'initial reservation' exception of [the Indian Gaming Regulatory
Act], 25 U.S.C. 2719(b)(1)(B)(ii), excepting it from the general
prohibition on gaming on trust land acquired after October 17, 1988,
contained in 25 U.S.C. 2719(a)."  67 Fed. Reg. 51,867, 51,867 (2002).
On appeal, CETAC challenges only Interior's conclusion that the
Sackrider property would qualify under the "initial reservation"
exception of the Indian Gaming Regulatory Act.  The issues raised by
CETAC's appeal are:

I. Whether, in order to be a reservation under the Indian Gaming
Regulatory Act ("IGRA"), the Sackrider property must be used for tribal
housing.

II.  Whether the Sackrider property cannot be the Huron Band's

"initial reservation," even though it will be the Band's first federal

reservation after its recognition as a federal Indian tribe.

## STATUTES AND REGULATIONS

The relevant statutory and regulatory provisions are set forth in

the Addendum.

## STATEMENT OF THE CASE

In 1995, Interior acknowledged the Huron Band as a federally

recognized tribe pursuant to the IRA.  60 Fed. Reg. 66,315 (1995); *see*

*also* JA952-54 (reproducing Federal Register).  On December 11, 1999,

the Huron Band submitted an application for the United States to

acquire several parcels of land into trust on behalf of the Band under

the IRA.  JA359; JA926-65.  The property relevant here is an

approximately 79-acre parcel in Michigan (the "Sackrider property").

JA379.  By notice published in the Federal Register, Interior

announced its final determination of intent to acquire the Sackrider

property in trust for the Huron Band.  67 Fed. Reg. at 51,867.  CETAC

filed its complaint challenging Interior's decision, seeking declaratory

and injunctive relief.  JA15-67.  Among other things, CETAC sought an

injunction preventing Interior from taking the Sackrider property into trust and a declaratory judgment that "[t]he Huron Band does not qualify for any of the exceptions to IGRA's general ban on gambling on newly acquired Indian lands, including the exception that permits gambling on a tribe's 'initial reservation.'" JA66.

## LEGAL BACKGROUND

## I.    THE INDIAN REORGANIZATION ACT

### A.    Acquiring Land in Trust

Section 5 of the IRA authorizes the Secretary of the Interior ("Secretary") to acquire lands for the purpose of providing land for Indians. 25 U.S.C. § 465. Title to any lands acquired pursuant to that section are "taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired." *Id.*

Interior has promulgated regulations implementing Section 5 of the IRA. *See* 25 C.F.R. Part 151. Those regulations "set forth the authorities, policy, and procedures governing the acquisition of land by the United States in trust status for individual Indians and tribes." 25 C.F.R. § 151.1. Under the regulations, the Secretary can acquire land for a tribe in trust status "[w]hen the Secretary determines that the

acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." *Id.*
§ 151.3(a)(3). When a written request is made to Interior for the United States to take land in trust and acquisition is not mandated by a statute other than 25 U.S.C. § 465, the Secretary notifies the state and local governments having regulatory jurisdiction over the land to be acquired that they have 30 days to provide written comments regarding the potential impacts on "regulatory jurisdiction, real property taxes and special assessments." 25 C.F.R. §§ 151.10; 151.11(d). In deciding whether to acquire the land in trust for a tribe, the Secretary must consider: the tribe's need for additional land; the purposes for which the land will be used; jurisdictional problems and potential land-use conflicts that may arise; the extent the applicant has provided the Secretary sufficient information to comply with various requirements, such as the National Environmental Policy Act; if the land to be acquired is in unrestricted fee status, the impact from the removal of the land from the tax rolls; and whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities

resulting from the acquisition of the land in trust status. *Id.* §§ 151.10 (b)-(c), (e)-(h); 151.11(a).

## B.  Proclamation of Trust Land as a Reservation

In addition to providing authority to the Secretary to acquire land into trust, the IRA authorizes the Secretary to designate such lands as part of a tribe's reservation. *See* 25 U.S.C. § 467. Specifically, the Secretary can "proclaim new Indian reservations on lands acquired" pursuant to the Secretary's authority under, among other provisions, 25 U.S.C. § 465, or "to add such lands to existing reservations." *Id.* § 467.

The Secretary has issued guidelines for proclaiming a reservation pursuant to the IRA. JA970-72. Under those guidelines, a "reservation" for the purposes of issuing a reservation proclamation pursuant to the IRA is "that area of land over which a tribe is recognized by the United States as having governmental jurisdiction."[1/]

---

[1/] This case deals with whether Interior properly determined that the Sackrider property would qualify as the Band's "initial reservation" under IGRA, 25 U.S.C. § 2719(b)(1)(B)(ii). As recognized by the Supreme Court, a reservation proclamation pursuant to the IRA generally is not necessary for a tribe to assert jurisdiction over tribal trust land. *See Okla. Tax Comm'n v. Citizen Band of Potawatomi*

(continued...)

6

JA970.  (The IRA's implementing regulations identically define an "Indian reservation" as "that area of land over which the tribe is recognized by the United States as having governmental jurisdiction." 25 C.F.R. § 151.2(f).)  Before a reservation proclamation can be made, the land must have been granted trust status.  JA970 (Par. 2).  The guidelines explain that a reservation proclamation is "an administrative function which is required before the tribe may take advantage of special federal assistance . . . [and] clarifies tribal jurisdiction over the trust property."  JA970-71 (Par. 4).

## II.    THE INDIAN GAMING REGULATORY ACT

Congress enacted IGRA in large part "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal government" and "to ensure that the Indian tribe is the primary beneficiary of the gaming operation."  25 U.S.C. § 2702(1)-(2); *see TOMAC v. Norton*, 433 F.3d 852, 865 (D.C. Cir. 2005).  A tribe may conduct gaming under IGRA only on "Indian lands" within its

---

[1]/(...continued)
*Indian Tribe of Okla.*, 498 U.S. 505, 511 (1991).

jurisdiction. *See* 25 U.S.C. §§ 2710(b)(1) (Class II) & 2710(d)(3) (Class

III).[2] IGRA defines "Indian lands" as "(A) all lands within the limits of

any Indian reservation; and (B) any lands title to which is either held

in trust by the United States for the benefit of any Indian tribe or

individual or held by any Indian tribe or individual subject to

restriction by the United States against alienation and over which an

Indian tribe exercises governmental power." *Id.* § 2703(4).

Section 20 of IGRA, 25 U.S.C. § 2719, provides that gaming

regulated under IGRA shall not be conducted on lands acquired by the

Secretary in trust for the benefit of an Indian tribe after October 17,

1988, unless a statutory exception applies. *Id.* § 2719(a). There are

several statutory exceptions. One is when the Secretary, after

---

[2] IGRA classifies gaming into three classes. Class I gaming means
social games for minimal value prizes or traditional forms of Indian
gaming engaged in as part of tribal ceremonies or celebrations. 25
U.S.C. § 2703(6). Class I gaming is within the exclusive jurisdiction of
the Indian tribes and is not subject to regulation under IGRA. *Id.*
§ 2710(a)(1). Class II gaming is the game of chance called bingo
(including pull-tabs, lotto, punch boards, tip jars, instant bingo, and
other games similar to bingo) and card games (excluding "banking card
games" such as baccarat, chemin de fer, and blackjack (21)). *Id.*
§ 2703(7). Class III gaming is all forms of gaming that are not Class I
or Class II gaming (such as banked card games and slot machines). *Id.*
§ 2703(8). Class II and Class III gaming are subject to regulation
under IGRA. *Id.* § 2710(a)(2)-(b) & (d).

consultation with the appropriate state and local officials, determines

that "a gaming establishment on newly acquired lands would be in the

best interest of the Indian tribe and its members, and would not be

detrimental to the surrounding community" and the Governor of the

state in which the gaming activity is to be conducted concurs in the

Secretary's determination. *Id.* § 2719(b)(1)(A). Another exception, and

the one at issue here, applies when "lands are taken into trust as part

of . . . the initial reservation of an Indian tribe acknowledged by the

Secretary under the Federal acknowledgment process." *Id.*

§ 2719(b)(1)(B)(ii).

In 2001, Congress clarified that IGRA had provided the Secretary

of the Interior the authority to determine whether a specific area of

land is a reservation for purposes of IGRA, including IGRA Section 20,

25 U.S.C. § 2719. Department of the Interior and Related Agencies

Appropriations Act, 2002, Pub. L. No. 107-63, § 134 (2001).[3] Consistent

---

[3] The Appropriations Act states:

> CLARIFICATION OF THE SECRETARY OF
> THE INTERIOR'S AUTHORITY UNDER
> SECTIONS 2701-2721 OF TITLE 25, UNITED
> STATES CODE. The authority to determine
> whether a specific area of land is a "reservation"

(continued...)

with that understanding, Interior and the National Indian Gaming

Commission ("NIGC") have entered into a Memorandum of Agreement

under which "[t]he NIGC agrees that whether a tribe meets one of the

exceptions in 25 U.S.C. § 2719 (i.e. settlement of a land claim, restored

lands for a restored tribe, or an initial reservation of a tribe

acknowledged through the Part 83 process) is a decision made by the

Secretary when he or she decides to take land into trust for gaming."[4]

## FACTUAL BACKGROUND

## I.     FEDERAL RECOGNITION OF THE HURON BAND

The Huron Band is a descendant of the Potawatomi Tribe of

Michigan. JA379. Its members are descendants of the Potawatomi of

Huron, a band which signed treaties with the United States from 1795

through 1833. *Id.* After the War of 1812, the group moved from the

Detroit area to a reserve in southwestern Michigan. *Id.* In 1840, the

---

[3](...continued)
        for purposes of sections 2701-2721 of title 25,
        United States Code, was delegated to the
        Secretary of the Interior on October 17, 1988 . . . .
Pub. L. No. 107-63, § 134, 115 Stat. 414, 442-43 (2001).

[4]  The Memorandum of Agreement is available at:
www.nigc.gov/ReadingRoom/memorandumof%20agreements/tabid/126/
Default.aspx.

ancestors of the Huron Band either avoided the federal government's attempt to remove the Potawatomi or returned to Michigan within a few years after removal. *Id.* The community reestablished by 1842. *Id.* In 1845, the Band purchased an area known as the Pine Creek land and then moved from the reserve to Pine Creek (the Pine Creek property is discussed in more detail below). JA379, JA527-28. In 1934, the Huron Band petitioned the federal government for permission to organize under the IRA and to receive federal services. JA428, JA465. That request was refused in 1939. *Id.* In the 1970s, the Band resumed its efforts and began actively pursuing Federal acknowledgment. JA465.

In 1995, Interior published its proposed findings in support of acknowledgment of the Huron Band. *See* 60 Fed. Reg. 28,426 (1995). On December 21, 1995, Interior published its final determination to acknowledge the Band. 60 Fed. Reg. 66,315 (1995); *see also* JA952-54 (reproducing Federal Register). The recognition became effective ninety days later. *Id.*; *see also* 25 C.F.R. § 83.10(*l*)(4).

## II.    THE PINE CREEK PROPERTY

The Pine Creek property is approximately 120 acres located in Athens Township, Calhoun County, Michigan, about 12.5 miles southwest of the Sackrider property.  JA379; JA938.  The area is sometimes referred to as the Pine Creek Indian Reservation.  In the 1840s, tribal ancestors relocated to the Pine Creek area from a reserve in nearby St. Joseph County, Michigan, after resisting the federal government's forced relocation policy of removing all Potawatomi to what was later to become the State of Kansas.  *See* JA938; 60 Fed. Reg. 28,426-27.  The Band acquired the Pine Creek property with annuity monies from an 1807 treaty.  *See* 60 Fed. Reg. at 28,426-27; JA378; JA482, JA527, JA938.  From 1845, the Governor of Michigan has held title to the Pine Creek property on behalf of the Band although the State claims it does not have authority to hold land in trust as a reservation for an Indian tribe.  JA378.  Thus, as discussed below, the status of the Pine Creek property is the subject of much dispute.  *See infra* at 13-14.

Pine Creek served as the home to many of the Band's members until the Great Depression.  JA938.  With the Great Depression and

# EXHIBIT B
# (Part 2)

World War II, many of the Huron Band's members moved to more urban areas in search of employment and housing. *Id.* Few members -- approximately 15 as of 1995 -- reside on the Pine Creek property. JA803. An additional 183 members reside within a 20-mile radius of the Pine Creek property. *Id.* There are no paved roads or business on the property. *Id.*; JA938.

Although the land is frequently referred to as the "Pine Creek Indian Reservation," the United States does not hold the land in trust for the Huron Band and does not recognize the land as an Indian reservation under federal law. Even the State of Michigan does not consider the land to be held in trust as a reservation. JA600-07. In 1964, the Bureau of Indian Affairs noted that it had not recognized the Pine Creek property as Indian land and that Michigan did not have a record of the Huron Band or any tax exemption for the Pine Creek property. JA599-600. It is reported that the Michigan Attorney General prepared a title opinion in 1970 verifying the State's trusteeship over the land, but that opinion has never been located. JA600. In 1979, however, the State Attorney General disavowed the trust status, reasoning that there was no statutory authority for the

Governor to accept the land in trust. JA602. In 1985, the State

Attorney General's Office identified legal issues which could affect the

validity of the State's trust over the Pine Creek property. JA604.

Indeed, in its district court amicus brief, Michigan stated that "the Pine

Creek property does not possess any special reservation or trust status

under Michigan law." "Memorandum of Points and Authorities of

Amici Curiae State of Michigan and Michigan Governor John Engler in

Support of the United States' Motion to Dismiss or, in the Alternative,

for Summary Judgment," District Court Docket Entry No. 26, at 4.

The Huron Band does not exercise governmental jurisdiction over

Pine Creek property, such as authority over land use, law enforcement,

building codes, zoning, education, fire service, and judiciary. JA136-37.

Only the State exercises that jurisdiction.

## III.  THE SACKRIDER PROPERTY

At issue in this case is the Sackrider property and Interior's

determination that the property would be the Band's "initial

reservation" and therefore not subject to IGRA's gaming prohibition on

after-acquired lands.[5]  The 79-acre property is located in Emmett

Township, Calhoun County, Michigan.  JA359, JA361.  Surrounding

land use varies and includes a mix of farmlands, commercial, and

residential.  *See* JA379-81.  Although the property is zoned

agricultural, Emmett Township has designated it as an area planned

for commercial development under the Township's Master Land Use

Plan.  JA387.  There will be no conflict of land use.  *Id.*

On December 11, 1999, the Huron Band submitted an application

for the United States to acquire several parcels in trust on its behalf

under the IRA.  JA359; JA926-65.  At this time, the Band has

proceeded on its application with respect to only one of those parcels,

the 79-acre Sackrider property.  *See* JA379 (noting that Sackrider

property would be the gaming parcel and other parcels would be

handled separately); *see also* JA360.  The purpose of the trust

acquisition is to promote the Band's economic development.  JA939.

The 1999 Bureau of Indian Affairs' Indian Labor Force Report

identified a 41% unemployment rate for the Huron Band, and 29% of

---

[5]  A legal description of the Sackrider property can be found in the
Federal Register, 67 Fed. Reg. at 51,867.

the employed Band members were found to have incomes below the poverty level. JA385. The Band's unemployment rate was more than five times greater than the average for Calhoun County (8.9%) and seven times higher than the average for Michigan (5.9%). JA939.

In its application, the Huron Band asked that the land be acquired in trust for the Band and "request[ed] a formal opinion from the Associate Solicitor that the Sackrider Property qualifies for exemption from Section 20 of IGRA as it is the Tribe's desire that the Sackrider Property be taken into trust as part of 'the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process' under IGRA." JA931.

## IV. THE CHALLENGED DECISION

Interior notified the State and local governments with regulatory jurisdiction over the land of the proposed trust acquisition and received comments. *See* JA366. Interior (through the Office of Indian Gaming Management and the Regional Director of the Bureau of Indian Affairs) made a determination of "Compliance with the Indian Gaming Regulatory Act." JA361. Interior concluded that the Sackrider property would qualify as the Band's "initial reservation" when the

16

Band obtained a reservation proclamation under 25 U.S.C. § 476

because it would be the Band's first reservation under federal law after

the Band's federal recognition.  JA361; JA915-18.  As a result, gaming

would be permitted on the land because it would meet the

requirements of IGRA's "initial reservation" exception, exempting the

land from IGRA's general ban on gaming on trust lands acquired after

October 17, 1988.  JA361; JA915-18.[9]

Interior then turned to the 25 C.F.R. Part 151 factors for

acquiring land in trust.  JA362-74; JA383-395.  The following discusses

some of the relevant Part 151 findings.  Pursuant to 25 C.F.R. § 151.3,

Interior found that the acquisition of the Sackrider property in trust for

the Huron Band was needed to facilitate economic development.

JA362.  Interior reached that conclusion because the Band recently was

---

[9] Before gaming can occur under IGRA, a tribe must also obtain NIGC
approval of its gaming ordinance or resolution and any management
contract; in addition, to conduct Class III gaming there must be a
Secretary approved gaming compact between the tribe and state.  *See*
25 U.S.C. §§ 2710(b)-(d)(9); 2711(a).  The Band also must have a
reservation proclamation.  The Huron Band is going through the
process to obtain the required approvals.  In addition, the Band
stipulated in the district court that no Class II or Class III gaming
would be conducted on the Sackrider property until the later of 18
months after the district court entered final judgment or a decision by
this Court.  *See infra* at 24.

restored to federal recognition and has no land base. *Id.* In addition, gaming on the land would "result in substantial financial benefits to the Tribe, and help stimulate economic development by providing capital to enable the Tribe to diversify its economic ventures." *Id.* The economic development, in turn, "will enable the Tribe to generate resources that will enable the Tribe to make its own decisions regarding its future, thus enjoying the benefits of tribal self-determination." *Id.* Interior found that it had statutory authority under the IRA to acquire the land as required by 25 C.F.R. § 151.10(a). JA363.

Per 25 C.F.R. § 151.10(e), Interior analyzed the impact of the trust acquisition on the State and local political subdivisions. JA363-64. Interior concluded that although Calhoun County will lose approximately $3,500 in taxes per year and Emmett Township will lose approximately $1,200 in taxes per year, the local governments also will benefit from the trust status for several reasons. *Id.* Under the Class III gaming compact negotiated with the State, the local governments will receive a percentage of the net casino revenues which will be significantly higher than the tax assessments. *Id.* The Huron Band

18

has also entered into agreements for public safety services, water/sewer services, and for traffic improvements for which the Band will pay and from which the entire community will benefit. *Id.*

Interior also found under 25 C.F.R. § 151.10(f) that any jurisdictional problems involving the property have been resolved by agreements between the Huron Band and the local governments for such matters as law enforcement, first response medical services, and fire suppression. JA364-65.

Interior finally determined, according to 25 C.F.R. § 151.10(g), that the Bureau of Indians Affairs would be equipped to discharge any additional responsibilities. JA365.

As part of the trust acquisition process, Interior also conducted a review pursuant to the National Environmental Policy Act ("NEPA"). In its final Environmental Assessment, Interior found that the trust acquisition for the Huron Band would not have a significant impact on the quality of the environment and accordingly issued a Finding of No Significant Impact ("FONSI"). Addendum ("Add.") at 9-10.

Exercising his delegated authority, the Assistant Secretary, adopting the recommendations from the Office of Indian Gaming

19

Management and Midwest Regional Office of the Bureau of Indian Affairs, decided to acquire the land in trust and concluded that the acquisition complied with the IRA and its implementing regulations as well as IGRA.  JA 376-377.  Interior published notice of the decision to acquire the Sackrider property in trust for the Huron Band in the Federal Register.  67 Fed. Reg. at 51,867.

## PROCEDURAL BACKGROUND

### I.    CETAC'S COMPLAINT

On August 30, 2002, CETAC filed a four-count complaint.  JA15-67.  Count I alleged that Interior violated NEPA by preparing an Environmental Assessment and issuing a FONSI and not preparing an Environmental Impact Statement.  JA32-59.  Count II alleged that Interior erred by deciding to acquire the Sackrider property in trust despite the absence of a valid compact between the Band and the State.  JA59-61.  Count III claimed that 25 U.S.C. § 465, the statutory authority for Interior to acquire the land in trust for the Band, violates the "nondelegation doctrine."  JA61-63.  Finally, Count IV alleged that the Sackrider property does not qualify for any of the exceptions to IGRA's general prohibition on gaming on trust lands acquired after

20

October 17, 1988. JA63-65. The complaint alleged that "[i]n the absence of such an exception, the Huron Band cannot legally operate a casino on the proposed site. Under the APA, Defendants have therefore acted 'without observance of procedure required by law' or otherwise 'not in accordance with the law.' *See* 5 U.S.C. § 706(2)(A) and (D)." JA65.

CETAC sought a temporary restraining order and injunctive relief preventing Interior from taking the Sackrider property into trust for operation of a casino. JA 65-67. CETAC also sought declaratory relief, including a declaratory judgment that "[t]he Huron Band does not qualify for any of the exceptions to IGRA's general ban on gambling on newly acquired Indian lands, including the exception that permits gambling on a tribe's 'initial reservation.'" JA66.

## II. THE DISTRICT COURT'S APRIL 23, 2004, MEMORANDUM AND ORDER

Interior moved to dismiss CETAC's complaint or, in the alternative, for summary judgment. Intervenor Defendant-Appellee Nattawawaseppi Huron Band of Potawatomi Indians filed a similar

21

motion.  CETAC opposed.  On April 23, 2004, the district court granted

the motions in part and denied them in part.

With respect to Count II of the complaint, the court found that

"federal law does not require that a valid tribal-state gaming compact

be in place <u>before</u> the Secretary can take land into trust for the tribe."

Add. at 4.

With respect to Count III, the court joined other courts by

rejecting CETAC's contention that Section 5 of the IRA, 25 U.S.C.

§ 465, is an unconstitutional delegation of legislative power.  Add. at 5-

6 (citing cases).

With respect to Count IV, the court found that Interior properly

determined that the Sackrider property would qualify as the Band's

initial reservation under 25 U.S.C. § 2719(b)(1)(B)(ii).  The court

rejected CETAC's argument that the Sackrider property could not be

the Band's initial reservation because it already has a state reservation

(i.e., the Pine Creek property).  The court noted that the state-

reservation status of the Pine Creek property "is a matter of some

disagreement."  Add. at 7.  The court also found that it was undisputed

that the property is not a reservation under federal law and "therefore

does not fall under the purview of IGRA, § 2719(b)(1)(B)." *Id.* The court next rejected CETAC's contention that the Sackrider property could not be a "reservation" because it was not going to provide housing for Indians. Add. at 8. The court found no statutory or regulatory requirement that the land must contain housing before it can be a reservation. *Id.* Finally, the court found that Interior's interpretation that the Sackrider property would be the Band's "initial reservation" was reasonable and entitled to deference. Add. at 8-9.

The court, however, ruled for CETAC on Count I of its complaint, the NEPA claim. The court found that the Environmental Assessment "fail[ed] to support the Secretary's conclusion that the project entails no significant environment impact in several respects." Add. at 11.

The district court therefore dismissed Counts II-IV of the complaint, but denied the motion as to Count I. The court enjoined Interior from taking the Sackrider property into trust and remanded to the agency. Add. at 17-18.

## III.  THE DISTRICT COURT'S ORDER DISMISSING THE CASE

In compliance with the district court's April 23, 2004, order, Interior completed an Environmental Impact Statement and Record of

Decision regarding the decision to take the Sackrider property into trust. Interior thereafter moved to dismiss Count I of CETAC's complaint. JA13-14 (docket entry 75). The parties then entered into a stipulation dismissing the remaining counts in the complaint, lifting the injunction prohibiting Interior from acquiring the Sackrider property into trust, and agreeing that no Class II or Class III gaming would be conducted on the Sackrider property until the later of 18 months after the district court entered final judgment or a decision by this Court. JA14 (docket entry 76). On October 16, 2006, the district court entered a corresponding order dismissing the case. *Id.* (docket entry 77).[7]

## STANDARD OF REVIEW

The district court granted Interior's motion to dismiss or, in the alternative, for summary judgment, and dismissed CETAC's complaint. This Court's review is *de novo*. *See Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1293 (D.C. Cir. 2002); *Wilson v. Pena*, 79 F.3d 154, 160 n.1 (D.C. Cir. 1996).

---

[7] The United States acquired the Sackrider property in trust for the Huron Band on December 12, 2006.

24

# SUMMARY OF ARGUMENT

Interior properly determined that the Sackrider property -- the first land that the federal government would hold in trust for the Huron Band after the Band's federal recognition, that the Band would exercise jurisdiction over, and that Interior would proclaim a reservation pursuant to its authority under the IRA -- would fall within IGRA's "initial reservation" exception to the ban on gaming on federal trust lands acquired after October 17, 1988.  CETAC's arguments to the contrary lack merit.

Initially, CETAC's argument that the Secretary's interpretation is not entitled to *Chevron* deference is wrong.  This Court has held that the statutory term "reservation" is ambiguous.  Thus, under *Chevron*, this Court defers to the Secretary's permissible construction of the statute.  Contrary to CETAC's contentions, Congress did delegate authority to Interior to interpret IGRA as relevant here and therefore *Chevron* deference is appropriate.  CETAC's assertion that *Chevron* deference is only appropriate where an agency interpretation is intended to carry the force of law also fails.  First, Interior's interpretation here does carry the force of law.  Second, irrespective of

whether it carries the force of law, *Chevron* deference is appropriate in cases, like this, involving suits for judicial review of agency actions that constitute the official and deliberate determination of the agency.

With respect to CETAC's challenge to Interior's determination that the Sackrider property would fall within IGRA's "initial reservation" exception to the ban on gaming on after-acquired lands, CETAC maintains that, in order for trust land to be a "reservation" under the Indian Gaming Regulatory Act, the land must be used for tribal housing. That argument lacks support in the statutory text as well as the structure and purpose of IGRA. A "reservation" under the Indian Gaming Regulatory Act includes trust lands held by the federal government which Interior has proclaimed a reservation pursuant to its authority under 25 U.S.C. § 467. There is no additional requirement that the lands be used as housing.

CETAC's next argument is that the Pine Creek property constitutes the Band's "initial reservation" under IGRA, even though (i) the State, not the tribe, exercises governmental jurisdiction over the land; (ii) it is disputed whether the State holds the land in trust for the Band; and (iii) it has never been proclaimed a reservation by Interior.

Interior properly concluded that, for a newly recognized tribe such as the Huron Band, a tribe's "initial reservation" under IGRA, must meet three conditions: be the first land that is held in trust by the federal government; be proclaimed a reservation by Interior; and be land over which the Band exercises governmental jurisdiction. To hold that property such as the Pine Creek land is a tribe's "initial reservation" would be contrary to and disrupt IGRA's regulatory scheme.

## ARGUMENT

## INTERIOR PROPERLY DETERMINED THAT THE SACKRIDER PROPERTY WOULD QUALIFY AS THE HURON BAND'S "INITIAL RESERVATION"

On appeal, CETAC challenges only Interior's determination that the Sackrider property would qualify as land taken into trust as part of "the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process," 25 U.S.C. § 2719(b)(1)(B)(ii), and therefore would be exempt from IGRA's prohibition on gaming on trust lands acquired after October 17, 1988. As set forth below, when examined against the plain meaning of the statute and the relevant canons of statutory construction, CETAC's argument fails.

27

A.    Interior's Interpretation and Decision are Entitled to
      Deference

At issue in this appeal is Interior's official interpretation of the

term "initial reservation" in IGRA.  CETAC essentially argues that

"initial reservation" *could* be read to be limited to land used for the

residence of a tribe and *could* be read to include state reservations.  But

the statute clearly does not compel such an interpretation and

therefore this Court should defer to Interior's determination.

Where a statute is ambiguous, courts defer to an agency's

permissible construction of the statute.  *Chevron, U.S.A., Inc. v.*

*Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984).  Interior's trust

acquisition decision under the IRA, which included a legal

determination that the lands would constitute the Huron Band's

"initial reservation" for purposes of IGRA, is entitled to deference under

*Chevron.*

CETAC suggests that deference is not appropriate here because

the NIGC, not the Secretary, is charged with administering IGRA.

Corrected Brief of Plaintiff-Appellant ("Br.") at 38-40.  CETAC ignores,

however, the substantial role that the Secretary has in administering

28

IGRA in this and other regards. For example, the Secretary approves per capita revenue allocation plans, approves Tribal-State Class III gaming compacts, and prescribes procedures to negotiate a compact in the event of an impasse between a tribe and state. *See* 25 U.S.C. § 2710(b)(3)(B), (d)(8)(A)-(D), (d)(7)(B)(vii). What is more, Interior had to determine whether the Sackrider properly would qualify for gaming under 25 U.S.C. § 2719 in order to comply with the IRA and its implementing regulations.

If there were any doubt as to Congress's delegation of authority to Interior to interpret IGRA as relevant here, Congress put it to rest in 2001. As discussed above, *supra* at 9-10, in that year Congress enacted legislation making clear that on October 17, 1988, (the date of IGRA's enactment) the Secretary had been delegated the authority to determine "whether a specific area of land is a 'reservation'" under IGRA. Pub. L. No. 107-63, § 134. Consistent with that, a Memorandum of Agreement between Interior and the NIGC provides that whether trust lands meet one of the exceptions to IGRA's ban on gaming on after-acquired lands, such as the "initial reservation"

exception, is a decision for the Secretary to make when he decides to take land into trust for gaming-related purposes. *See supra* at 9-10.

CETAC's reliance (Br. at 39-40) on the Tenth Circuit's decision in *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250 (10th Cir. 2001), and a decision of the District Court for the Western District of New York, *Citizens Against Casino Gambling in Erie County v. Kempthorne*, 2007 WL 108466 (W.D.N.Y. Jan. 12, 2007), is misplaced. First, *Sac & Fox* was decided before Congress enacted Pub. L. No. 107-63, § 134. *Sac & Fox* concluded that the Secretary's interpretation of the term "reservation" in 25 U.S.C. § 2719(a)(1) did not deserve *Chevron* deference because, according to the Tenth Circuit, Congress delegated authority to the NIGC, not the Secretary, in IGRA. In passing Pub. L. No. 107-63, § 134, Congress overruled the legal premise of the Tenth Circuit's decision in *Sac & Fox*. The *Sac & Fox* decision thus is of no help to CETAC. Although the district court's decision in *Citizens Against Casino Gambling in Erie County* came after Pub. L. No. 107-63, it relies heavily on the discredited *Sac & Fox* and makes no mention whatsoever of Pub. L. No. 107-63. In addition, this Court has held that "[t]he approach of the Tenth Circuit in *Sac and Fox Nation* is not

30

persuasive" because "Congress rebuked the decision almost

immediately" by enacting Pub. L. No. 107-63, § 134. *City of Roseville v.*

*Norton*, 348 F.3d 1020, 1029 (D.C. Cir. 2003). Thus, those two decisions

do not support CETAC's argument that *Chevron* deference is not owed

here.

Relying on *Christensen v. Harris County*, 529 U.S. 576, 586-86

(2000), CETAC argues that deference is only appropriate where an

agency interpretation is intended to carry the force of law. Br. at 37-38.

Initially, Interior's interpretation does "carry the force of law." The

agency's interpretation formed the basis of its decision to acquire the

Sackrider property in trust for the Huron Band. Also, the NIGC has

agreed that it is the Secretary's decision, when he acquires land in

trust for a tribe, that determines whether the trust lands meet one of

IGRA's exceptions to the gaming ban.

CETAC's argument based on *Christensen* is also incorrect because

*Chevron* deference is appropriate in cases, like this, involving suits for

judicial review of agency actions that constitute the official and

deliberate determination of the agency. *Christensen* was not a suit for

judicial review of agency action, as this case is. Rather, it was a private

31

lawsuit against an employer alleging violations of provisions of the Fair Labor Standards Act ("FLSA") governing compensatory time for public employees. In that lawsuit, the employees sought to rely on an opinion letter written by the Acting Administrator of the Wage and Hour Division of the Department of Labor to the employer, to the effect that the FLSA prohibited employers from requiring employees to use accrued compensatory time, absent an agreement with the employees. *Christensen*, 529 U.S. at 580-81. That opinion letter was not issued in any kind of enforcement action taken by the Department of Labor against any particular employer. The letter therefore did not constitute the official exercise of delegated authority to enforce the FLSA against a particular employer.

This case, by contrast, involves a suit for judicial review of a decision that was unquestionably the exercise of Interior's express authority under the IRA and IGRA. Congress specifically delegated to the Secretary the authority to determine what constitutes a reservation under IGRA as well as the authority to acquire land in trust and proclaim reservations. *See Adams Fruit Company v. Barrett*, 494 U.S.

32

638, 649 (1990) (explaining that *Chevron* deference applies where there has been congressional delegation of administrative authority).

The Supreme Court in *Christensen* observed that it "confront[ed] an interpretation contained in an opinion letter, not one arrived at after, *for example*, a formal adjudication or notice-and-comment rulemaking." 529 U.S. at 587 (emphasis added). But *Christensen* did not limit *Chevron* deference to formal adjudications and rulemakings, nor did it preclude applying *Chevron* deference in situations that do involve the application of an agency's delegated authority to a particular set of facts, such as occurred here. Indeed, the Supreme Court has frequently applied *Chevron* in such contexts. *See NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257-61 (1995); *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 647, 655 (1990); *see also Gonzalez v. Reno*, 215 F.3d 1243, 1245 (11th Cir. 2000) (finding *Chevron* deference appropriate, and declining to apply *Christensen*, where agency action under review constituted "the deliberate and official" position of agency, notwithstanding that the agency action at issue was neither a "rule" nor the product of a formal adjudication).

33

**B.    Interior's Interpretation Comports with the Language, Structure, and Purpose of IGRA**

In deciding to acquire the Sackrider property in trust for the Huron Band, Interior determined that the Sackrider property would qualify as lands taken into trust as part of "the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process." 25 U.S.C. § 2719(b)(1)(B)(ii). In determining the land would qualify under the "initial reservation" exception, Interior relied on a memorandum in the administrative record from the Acting Associate Solicitor for the Division of Indian Affairs. *See* 67 Fed. Reg. at 51,867 (citing Dec. 13, 2000 memorandum). That memorandum explained:

> The first time a reservation is proclaimed for the Band, it constitutes the 'initial reservation' under 25 U.S.C. 2719(b)(1)(B), and the Band may avoid the ban on gaming on newly acquired land for any lands taken into trust as part of the initial reservation -- those placed in trust before or at the time of the initial proclamation. Land acquired after the initial proclamation of the reservation will not fall within the exception. If the Band[] wishes, just the Sackrider parcel may be acquired in trust before the proclamation, but

34

# EXHIBIT B (Part 3)

the Band may only request an "initial
reservation" once.

JA918. The memorandum concluded that, if Interior proclaims the

Sackrider to be part of the Band's reservation in the initial

proclamation of the Band's reservation (which can only occur after the

parcel is accepted into trust), "it would be within the 'initial

reservation' exception to the prohibition against gaming." JA917; *see*

*also* JA918. As the memorandum explains, this puts a newly

recognized tribe in a position similar to tribes that had land in trust

before October 17, 1988, by providing an initial opportunity to have

trust lands on which gaming may occur. JA917-18.

Interior's analysis rests upon a natural and plain reading of the

phrase "initial reservation" as meaning the first land taken into trust

for a tribe under federal law and proclaimed a reservation under 25

U.S.C. § 467. Interior's reading is also consistent with the basic

purposes of IGRA as well as its "initial reservation" exception from the

prohibition on gaming on after-acquired lands. *See TOMAC*, 433 F.3d

at 865-66 (looking to IGRA's purpose when determining whether tribe

was a "restored" tribe under IGRA Section 20); *City of Roseville*, 348

35

F.3d at 1028, 1030, 1032 (recognizing that IGRA's exceptions "ensur[e] that tribes lacking reservations when IGRA was enacted are not disadvantaged relative to more established ones"); *see infra* at 45-46.

Interior's interpretation is particularly appropriate in light of the so-called Indian canon of construction. Under that canon, ambiguous statutory provisions that are enacted for the benefit of Indians are to be construed liberally in favor of Indians. *City of Roseville*, 348 F.3d at 1032. The IRA and IGRA were enacted for the benefit of Indian tribes and therefore the Indian canon of construction applies. *See id.* (finding that "IGRA is designed to promote the economic viability of Indian Tribes" and applying Indian canon of construction).

## C.   CETAC's Arguments Lack Merit

CETAC raises two arguments as to why the "initial reservation" exception should not apply. First, CETAC maintains that the Pine Creek property is the Band's "initial reservation" and thus the Sackrider property "is at best the Huron Band's 'second' reservation." Br. at 16-23. Second, CETAC claims that the Sackrider property does not qualify as a reservation at all because a "reservation" is only "land used for residence of tribal members" and the Band intends to use the

36

property for gaming  Br. at 24-43.  We address CETAC's arguments in the reverse order because understanding why the Sackrider property is a "reservation" helps explain why the Pine Creek property is not the Band's "initial reservation."

### 1.    A "reservation" is not limited to land used as a tribal residence

CETAC argues that the Sackrider property cannot be a "reservation" because the "established meaning . . . for at least 120 years" of the word "reservation" is "land used for the residence of tribal members" and the Band "has no intention of using the site as a tribal residence."  Br. at 24.  CETAC therefore concludes that "the site is not eligible for gambling as the Huron Band's 'initial reservation.'"  *Id.*  A similar argument has been rejected previously by this Court.  *See City of Roseville*, 348 F.3d at 1028.[8]

IGRA does not define the term reservation; nor do the regulations implementing IGRA.  This Court has found the statutory term

--------

[8] Recently, in *Michigan Gambling Opposition v. Norton*, D.D.C. No. 05-01181(JGP), slip op. at 7-11 (Feb. 23, 2007), the D.C. District Court upheld the Secretary's interpretation that the term "reservation" in IGRA does not include a housing requirement, applying the Indian canon of construction as well as *Chevron*.  Add. at 25-29 (reproducing slip op.).

37

"reservation" to be ambiguous and to have no rigid meaning in the United States Code. *Ariz. Pub. Serv. Co. v. Envtl. Prot. Agency*, 211 F.3d 1280, 1293 (D.C. Cir. 2000) (construing term "reservation" in Clean Air Act). Thus, as set forth above, this Court should defer to Interior's permissible and reasonable interpretation.[9] Here, Interior reached the reasonable conclusion that the Sackrider property would constitute a reservation under IGRA when Interior proclaims the property a "reservation" pursuant to its authority under the IRA, 25 U.S.C. § 467. An argument very similar to CETAC's has already been rejected as "nonsensical" by this Court in *City of Roseville,* where this Court observed that "it would make no sense if a tribe's use of land for gaming could defeat the land's eligibility for gaming." 348 F.3d at 1028 (rejecting argument that "restored lands" under IGRA required land to be used for residential purposes).

CETAC's alternative interpretation of "reservation" would have this Court engraft an additional requirement -- that the property be

---

[9] Even if this Court were to conclude that Interior's interpretation is not entitled to *Chevron* deference, it would still be entitled to substantial deference. *See Christensen*, 529 U.S. at 587; *United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001).

used for housing.  Of course, there is no such requirement in the

statutory text.  Instead, CETAC argues that the "established meaning"

of the term "reservation" is "land set aside for the residence of tribe

members" and is conclusive.  Br. at 25; *see also id.* at 28.  That

argument, however, is directly contrary to this Court's holding that the

statutory term "reservation" is ambiguous.  *Ariz. Pub. Serv. Co.*, 211

F.3d at 1293.

CETAC's argument is also based on selective citation and mis-

characterization of Felix S. Cohen's *Handbook of Federal Indian Law*

(1982 ed.).  CETAC claims that the Handbook is "'the official

government treatise' on American Indian law," that it "was 'published

under the auspices of the Department of the Interior,'" and thus should

be controlling.  Br. at 26 (*quoting* Handbook Introduction).  But,

CETAC quotes those phrases out of context -- they are referring to the

*original* 1942 Handbook, not the 1982 edition.  As the Introduction

explains, the original 1942 Handbook was prepared by Felix S. Cohen

as Special Assistant to the Attorney General and was published under

the auspices of the Department of the Interior.  Handbook of Federal

Indian Law (1982 ed.), at vii-viii.  Cohen then left the government in

39

1948 and died in 1953. *Id.* at vii. In 1958, Interior published a revised Handbook that "did not reflect Felix Cohen's work." *Id.* at ix. In 1968, Congress directed Interior to publish a new revised version. *Id.* Interior ultimately contracted the function to the University of New Mexico School of Law which used faculty from several schools with private funding and federal grants. *Id.* at ix-x, xiii. The resulting work is privately copyrighted and does not reflect the official positions of the United States or the Department of the Interior.[10]

What is more, the Handbook does not support the argument that the term reservation has an established meaning of land used for tribal residence. CETAC relies (Br. at 25-26) on a single sentence in the Handbook that says that in the 1850s "the modern meaning of Indian reservation emerged, referring to land set aside under federal protection for the residence of tribal Indians, regardless of origin." Handbook, at 34. But that sentence is part of a historical discussion about the genesis of the term "Indian country" as used in the Indian Country Statute, 18 U.S.C. § 1151(a), which governs criminal

---

[10] In addition, although the 1942 and 1958 editions of the Handbook were published by Interior, they were never adopted in whole or in part as the official position of the United States.

jurisdiction and in no way limits reservations to land with houses. As the Handbook explains, the term originally meant land a tribe "reserved" to itself under a treaty. Handbook, at 34-35; *id.* at n.66. The term then broadened to include lands set aside by the United States from public lands that were not originally owned by the tribes, but who would use and occupy the reservation. *Id.* This resulted in the *expansion* of the term to include "land set aside under federal protection for the residence of tribal Indians." *Id.*

Also, contrary to CETAC's argument, the Handbook notes that the "use of the term 'reservation' from public land law soon merged with the treaty use of the word to form a single definition describing federally-protected Indian tribal lands without any particular dependence on source. This definition of the term 'reservation' has since been generally used and accepted." Handbook, at 34-35 n.66. There is no reference to a requirement that the land be used as housing in order to qualify as a reservation.

The only other authority for CETAC's argument is the discredited Tenth Circuit *Sac & Fox* decision. As discussed above, *supra* at 30-31, *Sac & Fox* is based on the erroneous premise that no deference was

41

owed to the Secretary's interpretation of the term reservation. By enacting Pub. L. No. 107-63, § 134 Congress made clear the *Sac & Fox* court erred. *See also City of Roseville*, 348 F.3d at 1029-30. CETAC seems to argue that this Court should not give effect to Pub. L. No. 107-63, § 134 because "no later Congress can change the enactments of an earlier Congress without actually changing the language of the statute." Br. at 29 n.10.[11] But it remains the case that Section 134 is the law of the land; this is not subsequent legislative history that is trying to explain an earlier Congress's intent. Section 134 is a free-standing statute that is to be given effect. *See Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509, 515 (D.C. Cir. 1993).

Moreover, the *Sac & Fox* decision is narrowly tailored to its unique factual situation and therefore CETAC overstates its importance here. After erroneously embarking on its own

---

[11] In fact, CETAC has waived this point because CETAC only cites its district court summary judgment briefing in a footnote. *See* Fed. R. App. P. 28(a)(9)(A); *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1167 n. 4 (11th Cir. 2004) (holding that party had waived arguments when it attempted to present the arguments on appeal by incorporating by reference arguments made in district court); *United States v. Whren*, 111 F.3d 956, 958 (D.C. Cir. 1997) (absent extraordinary circumstances, this Court does not consider cursory arguments made only in a footnote).

42

interpretative endeavor, the *Sac & Fox* court stated its conclusion,

"Applying what we believe to be the proper definition of the term

'reservation' for purpose of IGRA *to the facts of this case*, it is apparent

that the Huron Cemetery does not fall within that definition."  240 F.3d

at 1267 (emphasis added).  It is clear that a number of factors underlie

that conclusion -- that the parcel was "permanently reserved" for the

purpose of a "burying-ground," *id.* at 1254, that the parcel had always

maintained its character as a burial ground, *id.* at 1267, that the parcel

was in a different state than the tribe's main location, *id.*, and that the

tribe had not exercised governmental jurisdiction over the parcel, *id.* at

1265.  *Sac & Fox* also was not dealing with the "initial reservation"

exception of IGRA.  Thus, CETAC over reads *Sac & Fox* as mandating

that the term reservation is always limited to land used for tribal

residence.

In addition, Interior has explained elsewhere that the term

"reservation" in IGRA means reservations established by recognized

methods.  *See* Feb. 14, 2006, Letter from Interior to NIGC, at 5; Dec. 8,

2006, Letter from Interior.[12] Thus, Interior interprets the term "as encompassing land within the existing boundaries of a reservation set aside by treaty, Executive Order, or statute; land Congress expressly legislates to be a reservation, and land proclaimed by the Secretary pursuant to 25 U.S.C. § 467 as a reservation under the IRA." *Id.* It can also include land granted reservation status through court order where the United States is a party and land considered a reservation within the meaning of 18 U.S.C. § 1151(a) when declared or proclaimed reservation. *See id.* at 5, 8. That definition clearly does not include a requirement that the land be used as housing and is consistent with Interior's conclusion that the Sackrider property would be the Band's "initial reservation" for IGRA purposes.

CETAC also asserts that its supposed "established meaning" of "reservation" is consistent with Congress's intent in enacting IGRA. Br. at 31-33. According to CETAC, Congress's purpose in enacting IGRA was to help minimize the "ill-effects of gambling," protect

---

[12] Those letters are available at:
http://www.nigc.gov/LinkClick.aspx?link=NIGC+Uploads%2findianlands%2fsaultstemariereservationopinion.pdf&tabid=120&mid=957 and
http://www.nigc.gov/LinkClick.aspx?link=NIGC+Uploads%2findianlands%2f61_Sault+Ste+Marie+Dec+letter.pdf&tabid=120&mid=957

surrounding communities from gaming on Indian lands, and prohibit

gaming on after-acquired lands "unless" Interior and the state

Governor determine gaming will not have a detrimental effect on the

"surrounding host community." Br. at 4, 7, 31-32. CETAC's argument

is an overstatement. While the two-part procedure to obtain an

exemption from IGRA's ban on gaming, 25 U.S.C. § 2719(b)(1)(A),

shows Congress had some intent to protect surrounding communities,

CETAC overemphasizes that one provision in the overall structure of

IGRA. CETAC also fails to acknowledge that one of IGRA's basic

purposes is "to provide a statutory basis for the operation of gaming by

Indian tribes as a means of promoting tribal economic development,

self-sufficiency, and strong tribal government" and to do so "to ensure

that the Indian tribe is the primary beneficiary of the gaming

operation." 25 U.S.C. § 2702(1)-(2); see TOMAC, 433 F.3d at 865.

Moreover, IGRA includes a number of exceptions to its prohibition on

gaming on after acquired lands, not just 25 U.S.C. § 2719(b)(1)(A).

Those exceptions are designed to allow newly acknowledged or restored

tribes to engage in gaming on par with other tribes. See City of

Roseville, 348 F.3d at 1030 (recognizing that IGRA's exceptions

"ensur[e] that tribes lacking reservations when IGRA was enacted are not disadvantaged relative to more established ones"). CETAC inappropriately argues that the sole purpose of IGRA was to protect surrounding communities from gaming on Indian lands. Simply put, CETAC's characterization of IGRA's purpose cannot justify engrafting a housing requirement on the term "reservation" in IGRA.[19] As discussed above, *supra* at 37-38, this Court has held that there is no "established" meaning of reservation as CETAC claims. *See Ariz. Pub. Serv. Co.*, 211 F.3d at 1293.

Finally, CETAC argues that Interior's definition of "reservation" is "untenable" and inconsistent with IGRA. Br. at 33-35. In a similar vein, CETAC maintains that Interior seeks improperly to "incorporat[e] regulations" promulgated under the IRA into IGRA. Br. at 41-42. Those arguments fail. Initially, in the IRA, Congress gave Interior the authority to proclaim a reservation for a tribe on lands acquired pursuant to the IRA. Congress enacted IGRA against that backdrop. It is therefore entirely consistent with IGRA for Interior to look to the

---

[19] Even accepting CETAC's characterization of Congress's purpose, it is not at all clear that CETAC's argument, which limits a reservation to land used as housing, would necessarily further that purpose.

IRA and its implementing regulations and conclude that a federally proclaimed reservation under the IRA would be a reservation for purposes of IGRA's "initial reservation" exception. Counterintuitively, CETAC invites a regime where a federally proclaimed reservation is *not* a reservation under the Indian Gaming Regulatory Act's "initial reservation" provision unless it is used for tribal housing. IGRA does not mandate such an odd result.

Moreover, IGRA's "initial reservation" exception applies only to lands that are "taken into trust" by the United States. 25 U.S.C. § 2719(b)(1)(B). Accordingly, in interpreting the term "reservation" in IGRA's "initial reservation" exception, Interior reasonably looked to the definition of "reservation" in the IRA, the statute pursuant to which the United States takes land into trust for Indian tribes. *Cf. City of Roseville*, 348 F.3d at 1031 (court looked to tribe's restoration act and the restoration act's purpose when determining what lands qualified as "restored lands" under IGRA); *TOMAC*, 433 F.3d at 864-65 (concluding that language and history of restoration act clearly demonstrated that tribe was "restored tribe" within meaning of IGRA).

47

CETAC contends, however, that applying the IRA's definition of reservation[14] is inconsistent with IGRA's definition of "Indian lands."[15] CETAC argues that IGRA's definition of Indian lands demonstrates that "Congress obviously intended that a 'reservation' and trust lands under a tribe's governmental power would be two different things." Br. at 34. But Interior does not treat the concepts of reservations and trust lands interchangeably. *Compare* 25 C.F.R. § 151.2(d) (defining trust land) *with id.* § 151.2(f) (defining Indian reservation). Indeed, the Sackrider property would not qualify as a reservation until the Band applied for and obtained a reservation proclamation under 25 U.S.C. § 467. Acquiring the Sackrider property in trust thus is a necessary

---

[14]  That is, land held in trust by the United States for a tribe over which the tribe is recognized by the United States as having governmental jurisdiction.

[15]  IGRA defines "Indian lands" as "(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."  25 U.S.C. § 2703(4).

48

but not sufficient condition for it to be the Band's "initial reservation"; the Band must have a reservation proclamation.[16]

In a last attempt to disrupt Interior's determination, CETAC contends that Interior "upset[s] the careful parity intended by IGRA" because "a newly acknowledged tribe would be in a far better position than an existing tribe from the standpoint of selecting a casino site." Br. at 35. That argument misconstrues the purpose of IGRA's "initial reservation" exception from the prohibition against gaming on after-acquired lands. The exception's purpose is not to create parity in "selecting a casino site"; rather, the intent of the exception is "to 'grandfather' certain lands acquired after IGRA by treating them similarly to lands held by tribes already recognized at the time IGRA was adopted." JA917. The "initial reservation" exception is designed so that tribes that do not gain federal recognition until after IGRA's enactment (or tribes federally acknowledged before IGRA's enactment but that lacked a reservation at the time of IGRA's enactment) are not precluded from gaming. Also, CETAC exaggerates when its says "a

---

[16] To be sure, under Interior's reasonable approach, a reservation does include some of the attributes of the second part of the "Indian lands" definition, 25 U.S.C. § 2703(4)(B), but the two are distinct.

newly acknowledged tribe could select literally any piece of land for its casino site." Br. at 35-36. The land still must be acquired into trust by Interior, which decides whether to take land into trust based on a number of factors. *See* 25 C.F.R. Part 151.

\* \* \*

To summarize, the statutory term "reservation" in IGRA is ambiguous; it does not have an established meaning, let alone the one that CETAC asserts, which would limit reservations to lands used for tribal housing. Interior reasonably and permissibly determined that a reservation for purposes of the "initial reservation" exception includes land acquired into trust by the United States for a tribe and proclaimed a reservation by Interior pursuant to its authority under the IRA. There is no further requirement that the land be used as housing for a tribe.

### 2. *The Pine Creek property is not the Band's "initial reservation"*

It is undisputed that the United States does not hold the Pine Creek property in trust, that the Pine Creek property is not a federal Indian reservation, that the Band does not exercise governmental

50

authority over the Pine Creek property, and that the Pine Creek property has not been proclaimed a reservation pursuant to 25 U.S.C. § 467. Once the Sackrider property is proclaimed a reservation by Interior pursuant to 25 U.S.C. § 467, it will be the first land acquired by the United States in trust for the Huron Band and proclaimed a reservation by the federal government. Interior accordingly concluded that the property would fit within IGRA's "initial reservation" exception. Indeed, as discussed above, *supra* at 43-44, Interior has interpreted the term "reservation" as meaning reservations established by recognized methods, all of which include federal action, i.e., proclamation, treaty, or congressional action. Nonetheless, CETAC maintains that the Pine Creek property is treated as a state reservation and therefore is the Band's "initial reservation." That argument lacks merit.

Initially, and as the district court properly noted, the trust status of the Pine Creek property is, and has been for many years, the subject of much debate, undermining any claim that Pine Creek is the Band's "initial reservation." CETAC asserts that Interior considers the Pine Creek property to be an official state reservation. *See* Br. at 16-19.

51

CETAC goes so far as to claim that "[t]he district court erred in allowing Defendants to disregard both their own official findings that Pine Creek is a current state reservation, and the Huron Band's own view of the matter." Br. at 19. Interior, however, was not making an "official finding[]" as to the state trust status of Pine Creek; indeed, that is a matter of state law.[17] CETAC also fails to acknowledge the portions of the administrative record that clearly demonstrate the long-standing controversy over the land's status. *See supra* at 13-14. In short, Pine Creek's status as being held in trust by the State or as a state reservation is far from clear.

But, even if the Pine Creek property is properly considered to be held in trust by the State, CETAC's argument still fails. At the outset, CETAC provides no authority for the proposition that there is such a thing as a "state reservation" under the law of Michigan.

There is also good reason to believe that, when Congress used the word "reservation" in IGRA's "initial reservation" exception, it did not mean a state reservation over which the tribe does not exercise

---

[17] The "Huron Band's own view" of the status of the Pine Creek property, Br. at 19, is plainly irrelevant to whether or not Pine Creek is the Band's "initial reservation" under IGRA.

governmental jurisdiction, such as Pine Creek.[18] The structure of
IGRA's prohibition on gaming on after-acquired lands and the
exceptions thereto shows that what is meant by "reservation" is a
*federal* reservation.  The gaming prohibition in 25 U.S.C. § 2719(a)
applies to "lands acquired by the Secretary in trust for the benefit of an
Indian tribe after October 17, 1988."  The next subsection of IGRA then
provides that "[s]ubsection (a) of this section will not apply when
. . . lands are taken into trust as part of . . . the initial reservation of an
Indian tribe acknowledged by the Secretary under the Federal
acknowledgment process."  25 U.S.C. § 2719(b)(1)(B)(ii).  That is,
subsection (a) creates a general prohibition on gaming on lands
acquired in trust by the *federal* government after IGRA's enactment,
but then subsection (b) provides the circumstances when *those federal
trust lands* will not in fact be subject to subsection (a)'s prohibition.

---

[18] In *Michigan Gambling Opposition v. Norton*, D.D.C. No.
05-01181(JGP), the court found that the land that was the subject of
that litigation was properly determined to be the tribe's initial
reservation, rejecting an argument that an earlier parcel of land was
the tribe's "initial reservation" under IGRA.  The court reasoned that
the earlier parcel was not the tribe's "initial reservation" because the
tribe had "only gained official governmental recognition on August 23,
1999 and has thus never exercised jurisdiction over any land."  Slip op.
at 12 (Add. at 30).

Those subsections are clearly focused only on federal trust lands and when those federal trust lands will be exempt from IGRA's bar. Thus, CETAC's argument that Congress intended the "initial reservation" exception to include state reservations is incompatible with the structure of this section of IGRA, which deals with federal trust lands and when they will be exempt from IGRA's gaming bar on after-acquired lands. This also shows that CETAC's argument would seem to render the Band without an "initial reservation" on which it could game under IGRA, clearly contrary to the purpose of the exception. Because IGRA's ban on gaming on after-acquired lands and the "initial reservation" exception apply to lands acquired by the Secretary in trust, they would not apply to the Pine Creek property, which is arguably held in trust by the State.[19]

And if the Pine Creek property were a "state reservation," and did fall within IGRA's "initial reservation" exception, land that the State

---

[19] In fact, with respect to IGRA's exceptions to the bar on gaming on after-acquired lands, this Court has stated that the "initial reservation" exception is similar to the "restored lands" exception in that they both are "lands *the Secretary takes into trust* to re-establish the tribe's economic viability." *City of Roseville*, 348 F.3d at 1031 (emphasis added).

holds title to and over which the State exercises jurisdiction would be subject to IGRA, which is a remarkable proposition. Indeed, where Congress has intended statutes to apply to both federal and state reservations it has said so explicitly in the statutory text. *See, e.g.,* 7 U.S.C. § 1926(a)(1) ("Indian tribes on Federal and State reservations"); 7 U.S.C. § 2662(a) ("Indian tribes on Federal or State reservations"); 29 U.S.C. § 741(a) ("Indian tribes located on Federal and State reservations"); 42 U.S.C. § 2991b(a) ("Indian tribes on Federal and State reservations").

CETAC asserts that when Congress intends for a statute to apply only to federal reservations it makes that "plain in the statute." Br. at 21. CETAC's only support, however, is a handful of statutes that refer to "federal Indian reservations" or "Indian reservations under the jurisdiction of the United States Government." *Id.* Tellingly, however, CETAC points to no example of a federal statute that uses simply the term "reservation" and has been applied to both federal reservations *and* state reservations. Thus, the more logical conclusion is that, when Congress intends a statute to apply to a state reservation, it says so as in the examples cited in the paragraph above. At the very least, this

discussion demonstrates ambiguity in Congress's use of the term

"reservation," requiring deference under *Chevron* and the application of

the Indian canon of construction.

Further undermining CETAC's claim that the Pine Creek

property constitutes the Band's "initial reservation" is the fact that

IGRA's provisions govern gaming on land within a tribe's jurisdiction.

*See* 25 U.S.C. § 2710(a)(2) (regulation of Class II gaming continues to

be within jurisdiction of tribe); *id.* § 2710(b)(1) (tribe may engage in

Class II gaming on Indian lands "within such tribe's jurisdiction"); *id.*

§ 2710(b)(2), (d)(1) (NIGC can approve Class II and III gaming

ordinance concerning gaming "on the Indian lands within the tribe's

jurisdiction"); *id.* § 2710(d)(1) (tribe may engage in Class III gaming

"having jurisdiction over such lands"); *id.* § 2710(d)(3) (tribe "having

jurisdiction over Indian lands" may request to negotiate with the state

a Class III Tribal-State gaming compact).  But here, it is undisputed

that the Band does not exercise governmental authority over the Pine

Creek property and the land is not under the Band's jurisdiction.  *See*

*supra* at 14.  Thus, it was reasonable for Interior to conclude that

Congress did not have property such as the Pine Creek land in mind

when it enacted IGRA's "initial reservation" exception. *See also supra* note 18.

CETAC's argument leads to another anomalous result. Under CETAC's argument that a state reservation could be a newly recognized tribe's "initial reservation," a state, not Interior, could end up creating a tribe's "initial reservation" for IGRA. Such a result would be at odds with the "independent *Federal* regulatory authority for gaming on Indian lands" Congress created in IGRA. 25 U.S.C. § 2702(3) (emphasis added).

In short, there is no basis for this Court to reject Interior's determination that the Sackrider property is the Huron Band's "initial reservation" for purposes of IGRA because it will be the Band's first federal reservation after its recognition as a federal Indian tribe.

# CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

MATTHEW J. McKEOWN
<u>Acting Assistant Attorney General</u>

PATRICIA MILLER
TODD S. AAGAARD
AARON P. AVILA
<u>Attorneys, U.S. Dep't of Justice</u>
<u>Env't & Natural Res. Div.</u>
<u>P.O. Box 23795 (L'Enfant Station)</u>
<u>Washington, DC 20026</u>
<u>(202) 514-1307</u>

OF COUNSEL:

MARIA WISEMAN
<u>U.S. Dep't of the Interior</u>
<u>Office of the Solicitor</u>

90-6-24-00903
26 February 2007

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION

I certify that this brief complies with the type volume limitation

set forth in Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure

and D.C. Circuit Rule 32(a).  The brief contains 11,168 words.

Aaron P. Avila
U.S. Dep't of Justice
Env't & Natural Res. Div.
P.O. Box 23795 (L'Enfant Station)
Washington, DC  20026
(202) 514-1307

# EXHIBIT C



THE ASSOCIATE DEPUTY SECRETARY OF THE INTERIOR
WASHINGTON

JAN 0 4 2008

The Honorable Chiefs Lorraine White,
   Barbara A. Lazore, and James W. Ransom
St. Regis Mohawk Tribe
412 State Route 37
Akwesasne, New York 13655

Dear Chiefs:

On December 9, 1998, the St. Regis Mohawk Tribe (Tribe) submitted to the Bureau of
Indian Affairs (BIA) an application to acquire in trust a 29.32-acre parcel of land in
Monticello, Sullivan County, New York (Monticello parcel). The Tribe proposes to
construct, develop, and manage a gaming facility, hotel, and other uses incidental thereto
on the parcel.

**Background**

In explaining the Department of the Interior's (Department) decision, it is important to
begin by restating the core principles that underlie the land acquisitions regulations. The
Part 151 regulations implement the trust land acquisition authority given to the Secretary
by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was
primarily intended to redress the effects of the discredited policy of allotment, which had
sought to divide up the tribal land base among individual Indians and non-Indians, and to
destroy tribal governments and tribal identity. To assist in restoring the tribal land base,
the IRA gave the Secretary the authority to: 1) return "to tribal ownership the remaining
surplus lands of any Indian reservation" that had been opened to sale or disposal under
the public land laws; 2) consolidate Indian ownership of land holdings within
reservations by acquiring and exchanging interests of both Indians and non-Indians; and
3) acquire, in his discretion, interests in lands "within or without existing reservations."
The IRA also contains provisions strengthening tribal governments and facilitating their
operation. The policy of the IRA, which was just the opposite of allotment, is to provide
a tribal land base on which tribal communities, governed by tribal governments, could
exist and flourish. Consistent with the policy, the Secretary has typically exercised his
trust land acquisition authority to take lands into trust that are within, or in close
proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory
Act (IGRA) 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the
criteria under which gaming activities can occur on Indian lands. One requirement is that
if gaming is to occur on off-reservation lands, those lands must be trust lands "over which
an Indian tribe exercises governmental power." The authority to acquire trust lands,
however, is derived from the IRA; no trust land acquisition authority is granted to the

Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation lands. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated December 21, 2006, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.     25 C.F.R. 151.3  Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3),  require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 350 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Monticello gaming facility that could then be used to satisfy tribal needs on the reservation and an estimated 260 jobs for tribal members at the casino, with associated job training.

**B.     25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 15,000 acres of restricted fee land, which is home to approximately 3,000 tribal members. This application does not address a need for more land to support Tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of approximately 29.32 acres, located 350 miles away from the reservation, which has been selected due, principally, to its proximity to the primary highway connecting the New York City urban area to the Catskill's resort area.

**C.     25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its reservation.

2

01/04/2008 15:52 FAX  202 273 3153          OIGM                                    ☒003/004

**D.    25 C.F.R. 151.11(b).  The location of the land relative to state boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation.  As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments.  The Tribe's reservation and the proposed Monticello parcel are located in the State of New York, approximately 350 miles apart.  The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Monticello because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

The Tribe has stated that the proposed off-reservation gaming facility will provide two economic benefits to the Tribe.  The first is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, and thus can have a positive effect on reservation life.  This projected income stream will not be affected by the remote location of the proposed casino from the Tribe's reservation.

The second benefit of the proposed off-reservation gaming facility is the opportunity for job training and employment of tribal members.  With respect to this benefit, the remote location of the proposed gaming facility can have significant negative effects on reservation life.  Because the proposed gaming facility is not within a commutable distance of the reservation, tribal members who are residents of the reservation will either: a) not be able to take advantage of the job opportunities if they desire to remain on the reservation; or b) be forced to move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable.  In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation.  A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation.  A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members.  Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community.  Employment of tribal members is an important benefit of tribal economic enterprises.

In this case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility.  The departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community.

3

While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

## Decision

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Monticello parcel and has determined that it will not accept the property into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

James E. Cason

cc:     Regional Director, Eastern Region

4