IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 1:07-cv--02210-RJL |
| DIRK KEMPTHORNE, et al. | ) ) | Next Scheduled Court Deadline: Oral Argument at 2:00 P.M. on |
| Defendants. | ) ) ) | January 15, 2008 |

## NOTICE OF FILING

On January 3, 2008, Assistant Secretary Carl Artman issued to the Regional Directors of

the Bureau of Indian Affairs as well as to George Skibine of the Office of Indian Gaming a

"Guidance" Memorandum on taking off-reservation land into trust for gaming purposes.  A copy

is appended hereto as Attachment 1.  The Memorandum states, as its purpose, that it is a

clarification of how certain terms are interpreted and applied as they appear in Section 151.11 of

25 C.F.R. Part 151, particularly when considering the taking of off-reservation land into trust

status for gaming purposes.  The Memorandum further provides that if the initial review reveals

that the application either fails to address or does not adequately address the issues identified in

the Guidance Memorandum, then the application should be denied and the tribe promptly

informed.

On the following day, January 4, 2008, the Interior Department proceeded to deny eleven

applications filed by various tribes for off-reservation land to be taken into trust for gaming

purposes.  The Plaintiff filed as Exhibit C in its Reply Memorandum the letter sent to the

St. Regis Mohawk Tribe.  That tribe had already received a favorable two-part determination and

152266

the Governor had concurred.  Letters were issued on January 4, 2008 to ten other tribes.  They are appended hereto as Attachment 2.  On information and belief, two-part (IGRA) determinations had not been made on any of them.

Respectfully submitted,


_____/s/  Robert M. Adler_____
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1400

*Attorneys for the St. Croix Chippewa
Indians of Wisconsin*


Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893


Dated:  January 7, 2008

# ATTACHMENT 1

01-04-2008  08:18pm  From-                                    T-385  P.002/007  F-850



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



**Memorandum**

**To:**    Regional Directors, Bureau of Indian Affairs
           George Skibine, Office of Indian Gaming

**From:** Assistant Secretary Carl Artman

**Date:**  January 3, 2008

**Subject:** Guidance on taking off-reservation land into trust for gaming purposes

The Department currently has pending 30 applications from Indian tribes to take off-reservation land into trust for gaming purposes as part of the 25 U.S.C. § 2719(b)(1)(A) two-part determination. Many of the applications involve land that is a considerable distance from the reservation of the applicant tribe; for example, one involves land that is 1400 miles from the tribe's reservation. Processing these applications is time-consuming and resource-intensive in an area that is constrained by a large backlog and limited human resources.

The decision whether to take land into trust, either on-reservation or off-reservation, is discretionary with the Secretary. Section 151.11 of 25 C.F.R. Part 151 sets forth the factors the Department will consider when exercising this discretionary authority with respect to "tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation." Section 151.11(b) contains two provisions of particular relevance to applications that involve land that is a considerable distance from the reservation. It states that, as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give:

   1)    greater scrutiny to the tribe's justification of anticipated benefits from the acquisition; and

   2)    greater weight to concerns raised by state and local governments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

Part 151, however, does not further elaborate on how or why the Department is to give "greater scrutiny" and "greater weight" to these factors as the distance increases. The purpose of this guidance is to clarify how those terms are to be interpreted and applied,

1

particularly when considering the taking of off-reservation land into trust status for gaming purposes.

<u>Core Principles</u>

As background to the specific guidance that follows, it is important to restate the core principles that underlie the Part 151 regulations and that should inform the Department's interpretation of, and decisions under, those regulations.   The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465.  The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity.  To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations".  The IRA contains also provisions strengthening tribal governments and facilitating their operation.  The policy of the IRA, which was just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish.  Consistent with the policy, the Secretary has typically exercised discretion regarding trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing directly to do with Indian gaming.  The Indian Gaming Regulatory Act of 1988 (IGRA), 25 U.S.C. § 2701 et seq., adopted more than 50 years after the IRA, sets the parameters of Indian gaming.  One requirement is that if gaming is to occur on off-reservation lands those lands must be trust lands "over which an Indian tribe exercises governmental power."  The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA.  The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities far from existing reservations.  Whether land should be taken into trust far from existing reservations for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

<u>Implementation of Guidance</u>

This guidance should be implemented as follows:

1.  All pending applications or those received in the future should be initially reviewed in accordance with this guidance.  The initial review should precede any effort (if it is not already underway) to comply with the NEPA requirements of section 151.10(h).

2.  If the initial review reveals that the application fails to address, or does not adequately address, the issues identified in this guidance, the application should be denied and the tribe promptly informed. This denial does not preclude the tribe from applying for future off-reservation acquisitions for gaming or other purposes. However, those future applications will be subject to these same guidelines.

3.  A greater scrutiny of the justification of the anticipated benefits and the giving greater weight to the local concerns must still be given to all off-reservation land into trust applications, as required in 25 C.F.R. § 151.11(b). This memorandum does not diminish that responsibility, but only provides guidance for those applications that exceed a daily commutable distance from the reservation.

Greater Scrutiny of Anticipated Benefits

The guidance in this section applies to all applications, pending or yet to be received, that involve requests to take land into trust that is off-reservation. Reviewers must, in accordance with the regulations at 25 C.F.R. 151.11(b), "give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" as the distance between the acquisition and the tribe's reservation increases. The reviewer should apply this greater scrutiny as long as the requested acquisition is off-reservation regardless of the mileage between the tribe's reservation and proposed acquisition. If the proposed acquisition exceeds a commutable distance from the reservation the reviewer, at a minimum, should answer the questions listed below to help determine the benefits to the tribe. A commutable distance is considered to be the distance a reservation resident could reasonably commute on a regular basis to work at a tribal gaming facility located off-reservation

As noted above, section 151.11(b) requires the Secretary to "give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" of trust land "as the distance between the tribe's reservation and the land to be acquired increases." The reason for this requirement is that, as a general principle, the farther the economic enterprise - in this case, a gaming facility - is from the reservation, the greater the potential for significant negative consequences on reservation life.

Tribes typically view off-reservation gaming facilities as providing two economic benefits to the tribe. The first is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, and thus can have a positive effect on reservation life. Obviously, the income stream from a gaming facility is not likely to decrease as the distance from the reservation increases. In fact, off-reservation sites are often selected for gaming facilities because they provide better markets for gaming and potentially greater income streams than sites on or close to the reservation.

The second benefit of off-reservation gaming facilities is the opportunity for job training and employment of tribal members. With respect to this benefit, the location of the

gaming facility can have significant negative effects on reservation life that potentially worsen as the distance increases. If the gaming facility is not within a commutable distance of the reservation, tribal members who are residents of the reservation will either: a) not be able to take advantage of the job opportunities if they desire to remain on the reservation; or b) be forced to move away from the reservation to take advantage of the job opportunity.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. High on-reservation unemployment rates, with their attendant social ills, are already a serious problem on many reservations. A gaming operation on or close to the reservation allows the tribe to alleviate this situation by using their gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the existence of the off-reservation facility would require or encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the applicant tribe and may mitigate some potential negative impacts, no application to take land into trust beyond a commutable distance from the reservation should be granted unless it carefully and comprehensively analyzes the potential negative impacts on reservation life and clearly demonstrates why these are outweighed by the financial benefits of tribal ownership in a distant gaming facility.

As stated above, some of the issues that need to be addressed in the application if the land is to be taken into trust is off-reservation and for economic development are:

What is the unemployment rate on the reservation? How will it be affected by the operation of the gaming facility?

How many tribal members (with their dependents) are likely to leave the reservation to seek employment at the gaming facility? How will their departure affect the quality of reservation life?

How will the relocation of reservation residents affect their long-term identification with the tribe and the eligibility of their children and descendants for tribal membership?

What are the specifically identified on-reservation benefits from the proposed gaming facility? Will any of the revenue be used to create on-reservation job opportunities?

4

As long as it remains the policy of the Federal government to support and encourage growth of reservations governed by tribal governments, these are important questions that must be addressed before decisions about off-reservation trust land acquisitions are made. The Department should not use its IRA authority to acquire land in trust in such a way as to defeat or hinder the purpose of the IRA. It should be noted that tribes are free to pursue a wide variety of off-reservation business enterprises and initiatives without the approval or supervision of the Department. It is only when the enterprises involve the taking of land into trust, as is required for off-reservation Indian gaming facilities, that the Department must exercise its IRA authority.

## Greater Weight

Section 151.11(b) also requires the Secretary to give "greater weight" than he might otherwise to the concerns of state and local governments. Under the regulations, state and local governments are to be immediately notified of a tribe's application to take land into trust, and are to file their comments in writing no later than 30 days after receiving notice. The reviewer must give a greater weight to the concerns of the state and local governments no matter what the distance is between the tribe's reservation and the proposed off-reservation acquisition. This is the second part of the two part review required by section 151.11(b).

The regulations identify two sets of state and local concerns that need to be given "greater weight:" 1) jurisdictional problems and potential conflicts of land use; and 2) the removal of the land from the tax rolls. The reason for this requirement of giving "greater weight" is two-fold. First, the farther from the reservation the proposed trust acquisition is, the more the transfer of Indian jurisdiction to that parcel of land is likely to disrupt established governmental patterns. The Department has considerable experience with the problems posed by checkerboard patterns of jurisdiction. Distant local governments are less likely to have experience dealing with and accommodating tribal governments with their unique governmental and regulatory authorities. Second, the farther from the reservation the land acquisition is, the more difficult it will be for the tribal government to efficiently project and exercise its governmental and regulatory powers.

With respect to jurisdictional issues, the application should include copies of any intergovernmental agreements negotiated between the tribe and the state and local governments, or an explanation as to why no such agreements exist. Failure to achieve such agreements should weigh heavily against the approval of the application.

With respect to land use issues, the application should include a comprehensive analysis as to whether the proposed gaming facility is compatible with the current zoning and land use requirements of the state and local governments, and with the uses being made of adjacent or contiguous land, and whether such uses would be negatively impacted by the traffic, noise, and development associated with or generated by the proposed gaming facility. Incompatible uses might consist of adjacent or contiguous land zoned or used for: National Parks, National Monuments, Federally designated conservation areas,

National Fish and Wildlife Refuges, day care centers, schools, churches, or residential developments. If the application does not contain such an analysis, it should be denied.

<u>Conclusion</u>

The Office of Indian Gaming will review the current applications. If an application is denied subsequent to this review, the applicant tribe will be notified immediately. Tribes receiving a denial subsequent to this review may resubmit the application with information that will satisfy the regulations. Regional directors shall use this clarification to guide their recommendations or determinations on future applications to take off-reservation land into trust.

# ATTACHMENT 2

# (Part A)



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



TAKE PRIDE
IN AMERICA

JAN 0 4 2008

The Honorable Virgil Moorehead
Chairman, Big Lagoon Rancheria
P.O Drawer 3060
Trinidad, California 95570

Dear Chairman Moorehead:

On March 27, 2006, the Big Lagoon Rancheria (Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust a 23.1-acre parcel of land in Barstow, San Bernardino County, California (Barstow parcel). The Tribe proposes to develop a gaming facility and other uses incidental thereto on the land.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming

operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.     25 C.F.R. 151.3   Land acquisition policy.**

The regulations require the Department, in 25 C.F.R. 151.3(a)(3), to make a determination that the acquisition of the land is necessary to  facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application.  The proposed gaming site is approximately 550 miles from the Tribe's existing reservation.  The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations in Barstow that could then be used to satisfy tribal needs on the reservation.

**B.     25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations require the Department, in 25 C.F.R. 151.10(b), to evaluate the need of the Tribe for additional land. Although the Tribe owns only approximately 25 acres of trust lands, it only has approximately 18 members. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of 23.1 acres, located hundreds of miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.     25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used.  In this case, the land will be used for the development of a very large off-reservation class III gaming facility.

**D.     25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation. As the distance increases, the Secretary must give greater scrutiny to the

Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation and the proposed Barstow parcel are located in the State of California, approximately 550 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Barstow because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that, "the Tribe is currently unable to engage in any meaningful economic development on its existing reservation. The environmentally sensitive areas located on and off the reservation have prevented the development of almost all economic activities there – currently the only use of the reservation is for tribal housing." Therefore, the primary expected benefit is the income stream from the gaming facility, which can provide support for existing governmental services, including Two Feathers Native American Family Services, which provides various social services to tribal members and other Native Americans living in Humboldt County, and the Tribe's education, social services, roads, tribal government, fire, community services, and child welfare programs to its members. However, the general descriptions do not provide sufficient detail to allow a determination by the Secretary of the specific benefits expected from the use of net gaming revenues.

The second benefit of the proposed gaming facility is the opportunity for job training and employment of tribal members living on the reservation. We note that the Tribe has a Tribal Employment Rights Ordinance which was enacted to enhance tribal employment. However, no expected on-reservation employment benefits are described in the application, so it is not possible for the Secretary to make a determination of the employment benefits to tribal members living on the reservation. With respect to this benefit, the location of the proposed gaming facility can have significant negative effects on reservation life. Because the proposed gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of

the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Barstow parcel and has determined that it will not accept the land into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs



## United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



TAKE PRIDE
IN AMERICA

JAN 0 4 2008

The Honorable Charles F. Wood
Chairman, Chemehuevi Indian Tribe
P.O. Box 1976
Havasu Lake, California 92362

Dear Chairman Wood:

On February 16, 2006, the Chemehuevi Indian Tribe (Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust a 40-acre parcel of land in Barstow, California (Barstow parcel). The Tribe proposes to construct, develop, and manage a resort gaming facility, hotel, and other uses incidental thereto on the parcel.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming

operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.      25 C.F.R. 151.3 Land acquisition policy.**

The regulations require the Department, in 25 C.F.R. 151.3(a)(3), to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 135 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at Barstow that could then be used to satisfy tribal needs on the reservation.

**B.      25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations require the Department, in 25 C.F.R. 151.10(b), to evaluate the need of the Tribe for additional land. The Tribe owns approximately 30,600 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of approximately 40 acres, located 135 miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.      25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10 (c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its reservation.

**D.      25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's

2

reservation. As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation and the proposed Barstow parcel are located in the State of California, approximately 135 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Barstow because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state in Resolution No. 06-01-28-01 that, "[t]he Project will provide the revenues necessary to fund essential governmental services on the Reservation, allow the Tribe to finance and develop businesses on the reservation." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The general statements in the application on tribal programs and needs do not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues to either on-reservation employment of tribal members, or specific tribal programs and operations.

The second benefit of the proposed gaming facility is the opportunity for job training and employment of tribal members living on reservation. In your application you state in Resolution No. 06-01-28-01 that the Project will, "create jobs on the Reservation that will improve the standard of living for all persons who live and work on the reservation." Your application does not indicate, however, that the Tribe expects the off-reservation location to provide jobs directly to residents of the reservation. With respect to job training and employment, the location of the gaming facility can have other significant negative effects on reservation life. Because the proposed gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high on-reservation unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a

3

significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Barstow parcel and has determined that it will not accept the land into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

4



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



TAKE PRIDE
IN AMERICA

The Honorable Kenneth Meshigaud     JAN 0 4 2008
Chairperson, Hannahville Indian Community
N14911 Hannahville B1 Road
Wilson, Michigan 49896-9728

Dear Chairperson Meshigaud:

On February 16, 2006, the Hannahville Indian Community (Tribe) submitted to the
Bureau of Indian Affairs (BIA) an application to acquire in trust a 9.8-acre parcel of land
in Romulus, Wayne County, Michigan (Romulus parcel). The Tribe proposes to
construct, develop, and manage a gaming facility, hotel, and other uses incidental thereto
on the parcel.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to
begin by restating the core principles that underlie the land acquisitions regulations. The
Part 151 regulations implement the trust land acquisition authority given to the Secretary
by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was
primarily intended to redress the effects of the discredited policy of allotment, which had
sought to divide up the tribal land base among individual Indians and non-Indians, and to
destroy tribal governments and tribal identity. To assist in restoring the tribal land base,
the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining
surplus lands of any Indian reservation" that had been opened to sale or disposal under
the public land laws; 2) consolidate Indian ownership of land holdings within
reservations by acquiring and exchanging interests of both Indians and non-Indians; and
3) acquire, in his discretion, interests in lands "within or without existing reservations."
The IRA also contains provisions strengthening tribal governments and facilitating their
operation. The policy of the IRA, which is just the opposite of allotment, is to provide a
tribal land base on which tribal communities, governed by tribal governments, could exist
and flourish. Consistent with the policy, the Secretary has typically exercised his trust
land acquisition authority to take lands into trust that are within, or in close proximity to,
existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory
Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the
criteria under which gaming activities can occur on Indian lands. One requirement is that
if gaming is to occur on off-reservation lands, those lands must be trust lands "over which
an Indian tribe exercises governmental power." The authority to acquire trust lands,
however, is derived from the IRA; no trust land acquisition authority is granted to the
Secretary by IGRA. The Department has taken the position that although IGRA was

intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated January 17, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.      25 C.F.R. 151.3 Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 457 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at Romulus that could then be used to satisfy tribal needs on the reservation.

**B.      25 C.F.R. 151.10(b). The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 5,800 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of less than 9.8 acres, located 457 miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.      25 C.F.R. 151.10(c). The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10 (c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its reservation.

**D.      25 C.F.R. 151.11(b). The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's

reservation. As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation and the proposed Romulus property are located in the State of Michigan, approximately 457 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Romulus because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that the off-reservation project is proposed because the Tribe's current casino on its Reservation on the Upper Peninsula of Michigan "due to its remote location, cannot generate sufficient income to provide the essential governmental services that are needed for the Tribe's members." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The general statements in the application on tribal programs and needs do not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues to either on-reservation employment of tribal members, or specific tribal programs and operations.

The other benefit of a gaming facility is the opportunity for job training and employment of tribal members living on reservation. We note that the Tribe has a Tribal Employment Rights Ordinance which was enacted to enhance tribal employment. However, no expected on-reservation employment benefits are described in the application, so it is not possible for the Secretary to make a determination of the employment benefits to tribal members living on the reservation. The location of the gaming facility can have other significant negative effects on reservation life that can worsen as the distance increases. If the gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using their gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In this case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of

3

the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Romulus property, concludes the Tribe's need for additional land is not justified in this situation, and has determined that it will not accept the property into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

cc:    Regional Director, Midwest Region



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



JAN 0 4 2008

The Honorable Raymond Gachupin
Governor, Pueblo of Jemez
P.O. Box 100
Jemez Pueblo, New Mexico 87024

Dear Governor Gachupin:

On December 23, 2004, the Pueblo of Jemez (Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust a 78.43-acre parcel of land in Anthony, Dona Ana County, New Mexico (Anthony property). The Tribe proposes to develop and operate a major resort, and casino facility, and other uses incidental thereto on the parcel.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming

operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3 Land acquisition policy.**

The regulations require the Department, in 25 C.F.R. 151.3(a)(3), to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 293 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Anthony property gaming facility that could then be used to satisfy tribal needs on the reservation.

**B.    25 C.F.R. 151.10(b). The need of the Tribe for additional land.**

The regulations require the Department, in 25 C.F.R. 151.10(b), to evaluate the need of the Tribe for additional land. The Tribe owns approximately 89,600 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of less than 79 acres, located 293 of miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.    25 C.F.R. 151.10(c). The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility.

**D.    25 C.F.R. 151.11(b). The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's

reservation. As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation and the proposed Anthony property are located in the State of New Mexico, approximately 293 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment on the Anthony property because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that, "an off reservation gaming operation in Anthony, NM, is preferred because the Pueblo's current location of its existing reservation is too remote from major population centers and the competition from neighboring Indian tribes who have established gaming casinos is too great." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, all anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The application describes the existing conditions of government operations on the reservation, including the unmet needs. However, the general descriptions do not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues.

The second benefit of the proposed gaming facility is the opportunity for job training and employment of tribal members living on reservation. Your application says, "there is serious unemployment among tribal members," and, "the Tribe's unemployment rate is thought to be in excess of 50%, and is possibly 66%, and there are few employment opportunities on the Reservation." Further, the application states, "[T]he Pueblo intends to hire Dona Ana County residents for the casino." These statements indicate that the Tribe does not expect the off-reservation location to provide jobs directly to residents of the reservation. The location of the gaming facility can have significant negative effects on reservation life. Because the proposed gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Anthony property and has determined that it will not accept the land into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

4



# United States Department of the Interior

## OFFICE OF THE SECRETARY
### WASHINGTON, D.C. 20240



JAN 0 4 2008

The Honorable Victoria A. Doud
Tribal President, Lac du Flambeau Band of
   Lake Superior Chippewa Indians of Wisconsin
P.O. Box 67
Lac du Flambeau, Wisconsin 54538

Dear Tribal President Doud:

On September 27, 2001, the Lac du Flambeau Band of Lake Superior Chippewa Indians
(Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust
a 20-acre parcel of land in Shullsburg, Lafayette County, Wisconsin (Shullsburg parcel).
The Tribe proposes to construct, develop, and manage a destination gaming resort
complex and other uses incidental thereto on the parcel.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to
begin by restating the core principles that underlie the land acquisitions regulations. The
Part 151 regulations implement the trust land acquisition authority given to the Secretary
by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was
primarily intended to redress the effects of the discredited policy of allotment, which had
sought to divide up the tribal land base among individual Indians and non-Indians, and to
destroy tribal governments and tribal identity. To assist in restoring the tribal land base,
the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining
surplus lands of any Indian reservation" that had been opened to sale or disposal under
the public land laws; 2) consolidate Indian ownership of land holdings within
reservations by acquiring and exchanging interests of both Indians and non-Indians; and
3) acquire, in his discretion, interests in lands "within or without existing reservations."
The IRA also contains provisions strengthening tribal governments and facilitating their
operation. The policy of the IRA, which is just the opposite of allotment, is to provide a
tribal land base on which tribal communities, governed by tribal governments, could exist
and flourish. Consistent with the policy, the Secretary has typically exercised his trust
land acquisition authority to take lands into trust that are within, or in close proximity to,
existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory
Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the
criteria under which gaming activities can occur on Indian lands. One requirement is that
if gaming is to occur on off-reservation lands, those lands must be trust lands "over which
an Indian tribe exercises governmental power." The authority to acquire trust lands,
however, is derived from the IRA; no trust land acquisition authority is granted to the

Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

A.      **25 C.F.R. 151.3  Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 304 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Shullsburg gaming facility that could then be used to satisfy Tribal needs on the reservation.

B.      **25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 45,000 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of 20 acres, located 304 miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

C.      **25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its reservation.

**D.    25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation.  As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments.  The Tribe's reservation and the proposed Shullsburg parcel are located in the State of Wisconsin, approximately 304 miles apart.  The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Shullburg because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that, "[b]y capitalizing on the expanded market area available to a facility situated in Shullsburg, Wisconsin, the Tribe will generate much needed revenue back to the Tribal government to fund its growing infrastructure and service programs." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, all anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The application describes the existing conditions of government operations on the reservation, including the unmet needs. However, the general descriptions do not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues.

The second benefit of the proposed gaming facility is the opportunity for job training and employment of tribal members living on reservation. Your application says, "[t]he effect of labor demands, combined with the extra revenues available for local spending will serve as a pressure to generally increase earnings in an area where wages are among the lowest of any area in the State. . . .The proposed Project will advance the County's economic goals." Further, your application's feasibility study states "the State has made LaFayette County a special development zone for a reason. This project addresses that reason." These statements indicate that the Tribe expects employment opportunities to increase for local residents but not to provide jobs directly to residents of the reservation. The location of the proposed gaming facility can have significant negative effects on reservation life.  Because the proposed gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable.  In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation.  A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation.  A gaming operation on or

3

close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Shullsburg parcel and has determined that it will not accept the property into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

4

# ATTACHMENT 2

# (Part B)



# United States Department of the Interior

### OFFICE OF THE SECRETARY
### WASHINGTON, D.C. 20240



TAKE PRIDE
IN AMERICA

JAN 0 4 2008

The Honorable Catherine Saubel
Chairwoman, Los Coyotes Band
    of Cahuilla & Cupeno Indians
P.O. Box 189
Warner Springs, California 92086

Dear Chairwoman Saubel:

On March 29, 2006, the Los Coyotes Band of Cahuilla and Cupeno Indians (Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust approximately 20-acres of land in Barstow, San Bernardino County, California (Barstow parcel). The Tribe proposes to develop a gaming facility and other uses incidental thereto on the land.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which

an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3  Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 115 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations in Barstow that could then be used to satisfy Tribal needs on the reservation.

**B.    25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 25,000 acres of trust land and has approximately 288 members. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of 20 acres, located 115 miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.    25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10 (c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility.

**D.    25 C.F.R. 151.11(b). The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation. As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation and the proposed Barstow parcel are located in the State of California, approximately 115 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Barstow because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that the project is proposed because "the Tribe has no realistic environmental or economic alternative but to obtain off-reservation land on which it can develop a gaming facility consistent with those operated by other tribes in the State of California." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The statement, "[R]eceipts from the Tribe's gaming facility will be used to fund governmental and health services on the reservation, as well as to fund housing there," does not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues to either on-reservation employment of tribal members, or specific tribal programs and operations.

The second benefit of the proposed gaming facility is the opportunity for job training and employment of tribal members living on reservation. No expected on-reservation employment benefits are described in the application, so it is not possible for the Secretary to make a determination on the employment benefit to tribal members living on the reservation. With respect to this benefit, the location of the gaming facility can have significant negative effects on reservation life. Because the proposed gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high on-reservation unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes

3

. a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Barstow parcel and has determined that it will not accept the land into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



JAN 0 4 2008

The Honorable Beasley Denson
Chief, Mississippi Band of Choctaw Indians
P.O. Box 6010 Choctaw Branch
Philadelphia, Mississippi 39350

Dear Chief Denson:

On November 21, 2005, the Mississippi Band of Choctaw Indians (Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust 4 tracts of land totaling approximately 61-acres of land in Jackson County, Mississippi (Jackson County parcels). The Tribe proposes to develop and operate a major resort, casino facility, and other uses incidental thereto on the parcels.

**Background**

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was

intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated May 18, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. 151.3, 151.10(b), §§ 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3 Land acquisition policy.**

The regulations require the Department, in 25 C.F.R. 151.3(a)(3), to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 175 miles from the Tribe's principal reservation, where most of the Tribe's population resides. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Jackson County gaming facility that could then be used to satisfy tribal needs on the reservation.

**B.    25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations require the Department, in 25 C.F.R. 151.10(b), to evaluate the need of the Tribe for additional land. The Tribe owns approximately 28,500 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of 61 acres, located 175 miles away from the principal reservation, which has been selected due, principally, to its proximity to the major interstate highway connecting the urban centers of the region.

**C.    25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10 (c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its principal reservation.

2

**D.     25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation.  As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments.  The Tribe's principal reservation and the proposed Jackson County parcels are located in the State of Mississippi, approximately 175 miles apart.  The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Jackson County because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's principal reservation.

In your application you state that the project "will provide significant revenues to support tribal government services and community needs for the existing and future on-reservation communities." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The application describes the existing conditions of government operations on the reservation. The statement, "Because Project revenues will be used for on-Reservation programs, businesses, and infrastructure, the Project will also create many jobs on the Reservation," does not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues to either on-reservation employment of tribal members, or specific tribal programs and operations.

The other benefit of a gaming facility is the opportunity for job training and employment of tribal members living on reservation. The expected employment benefits described in the application do not evaluate the employment expected for tribal members living on the reservation, indicating that the Tribe does not expect the off-reservation location to provide jobs directly to residents of the reservation. The application says, "because of the small number of tribal members who live in Jackson County, it is anticipated that the work force for the resort and casino project will mostly consist of non-Indians." The location of the gaming facility can have significant negative effects on reservation life that can worsen as the distance increases. If the gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable.  In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the principal reservation.  A gaming operation on or close to the reservation would allow the Tribe to use its gaming facility as a conduit for job training and employment programs for tribal members.  Provision of employment

3

opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In this case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Jackson County parcels and has determined that it will not accept the land into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs



THE ASSOCIATE DEPUTY SECRETARY OF THE INTERIOR

WASHINGTON

JAN 0 4 2008

The Honorable Robert Chicks
President, Stockbridge Munsee
  Community of Wisconsin
N8476 Mo He Con Nuck Road
Bowler, Wisconsin 54416

Dear President Chicks:

On February 11, 2002, the Stockbridge Munsee Community of Wisconsin (Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust a 333-acre parcel of land in the Town of Thompson, Sullivan County, New York (Thompson parcel). The Tribe proposes to construct, develop, and manage a gaming facility, hotel, and other uses incidental thereto on the parcel.

**Background**

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the

Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust far from existing reservations for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3  Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 1,045 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Thompson parcel that could then be used to satisfy tribal needs on the reservation.

**B.    25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 16,400 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure or to resolve local land management conflicts. Rather, the application seeks a particular site of 333 acres, located over 1,000 miles away from the reservation, which has been selected due, principally, to its proximity to the primary highway connecting the New York City urban area to the Catskill's resort area.

**C.    25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its reservation.

2

**D.     25 C.F.R. 151.11(b).  The location of the land relative to State boundaries,
and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location
of the land relative to State boundaries and its distance from the boundaries of the Tribe's
reservation.  As the distance increases, the Secretary must give greater scrutiny to the
Tribe's justification of anticipated benefits from the acquisition, and greater weight to the
concerns of local governments.  The Tribe's reservation is located in the State of
Wisconsin, and the proposed Thompson parcel is located in the State of New York, and
are approximately 1,035 miles apart.  The Department is concerned that approval of this
application would not support the option for tribal members to live on their existing
reservation and to have meaningful employment opportunities at the proposed gaming
establishment in the Town of Thompson because the proposed gaming establishment will
not be located within a reasonable commuting distance from the Tribe's reservation.

The Tribe has stated that the proposed gaming facilities will provide two economic
benefits to the Tribe.  The first is the income stream from the gaming facility, which can
be used to fund tribal services, develop tribal infrastructure, and provide per capita
payments to tribal members, and thus can have a positive effect on reservation life.  This
projected income stream will not be affected by the remote location of the proposed
casino from the Tribe's reservation.

The second benefit of the proposed off-reservation gaming facility is the opportunity for
job training and employment of tribal members.  With respect to this benefit, the remote
location of the proposed gaming facility can have significant negative effects on
reservation life.  Because the proposed gaming facility is not within a commutable
distance of the reservation, tribal members who are residents of the reservation will
either: a) not be able to take advantage of the job opportunities if they desire to remain on
the reservation; or b) be forced to move away from the reservation to take advantage of
the job opportunities.

In either case, the negative impacts on reservation life could be considerable.  In the first
case, the operation of the gaming facility would not directly improve the employment rate
of tribal members living on the reservation.  A high unemployment rate, with its attendant
social ills, is already a problem on the Tribe's reservation.  A gaming operation on or
close to the reservation allows the Tribe to alleviate this situation by using its gaming
facility as a conduit for job training and employment programs for tribal members.
Provision of employment opportunities to reservation residents promotes a strong tribal
government and tribal community.  Employment of tribal members is an important
benefit of tribal economic enterprises.

In this case, the remote location of the proposed gaming facility may encourage
reservation residents to leave the reservation for an extended period to take advantage of
the job opportunities created by the tribal gaming facility.  The potential departure of a
significant number of reservation residents and their families could have serious and far-
reaching implications for the remaining tribal community and its continuity as a

3

community.  While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary.  The Department has completed an evaluation of the Tribe's fee-to-trust application for the Thompson parcel and has determined that it will not accept the property into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust.  This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA.  It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

James E. Cason



THE ASSOCIATE DEPUTY SECRETARY OF THE INTERIOR
WASHINGTON. DC 20240

JAN 0 4 2008

The Honorable Paul Spicer
Chief, Seneca-Cayuga Tribe of Oklahoma
P.O. Box 1283
Miami, Oklahoma 74355

Dear Chief Spicer:

On April 13, 2006, the Seneca-Cayuga Tribe of Oklahoma (Tribe) submitted to the
Bureau of Indian Affairs (BIA) an application to acquire in trust a 230-acre parcel of land
in Montezuma, Cayuga County, New York (Montezuma parcel). The Tribe proposes to
construct, develop, and manage a gaming facility, hotel, and other uses incidental thereto
on the parcel.

**Background**

In explaining the Department of the Interior's (Department) decision, it is important to
begin by restating the core principles that underlie the land acquisitions regulations. The
Part 151 regulations implement the trust land acquisition authority given to the Secretary
by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was
primarily intended to redress the effects of the discredited policy of allotment, which had
sought to divide up the tribal land base among individual Indians and non-Indians, and to
destroy tribal governments and tribal identity. To assist in restoring the tribal land base,
the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining
surplus lands of any Indian reservation" that had been opened to sale or disposal under
the public land laws; 2) consolidate Indian ownership of land holdings within
reservations by acquiring and exchanging interests of both Indians and non-Indians; and
3) acquire, in his discretion, interests in lands "within or without existing reservations."
The IRA also contains provisions strengthening tribal governments and facilitating their
operation. The policy of the IRA, which is just the opposite of allotment, is to provide a
tribal land base on which tribal communities, governed by tribal governments, could exist
and flourish. Consistent with the policy, the Secretary has typically exercised his trust
land acquisition authority to take lands into trust that are within, or in close proximity to,
existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory
Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the
criteria under which gaming activities can occur on Indian lands. One requirement is that
if gaming is to occur on off-reservation lands, those lands must be trust lands "over which
an Indian tribe exercises governmental power." The authority to acquire trust lands,
however, is derived from the IRA; no trust land acquisition authority is granted to the
Secretary by IGRA. The Department has taken the position that although IGRA was

intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.      25 C.F.R. 151.3 Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 1,500 miles from the Tribe's existing reservation.  The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Montezuma parcel that could then be used to satisfy tribal needs on the reservation.

**B.      25 C.F.R. 151.10(b). The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land.  The Tribe owns approximately 1,200 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of 230 acres, located 1,500 miles away from the reservation, which has been selected due, principally, to its proximity to the connector highways to the urban areas of Rochester and Syracuse, New York.

**C.      25 C.F.R. 151.10(c). The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has a class III gaming facility located on its reservation.

**D.      25 C.F.R. 151.11(b). The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation. As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation is located in the State of Oklahoma, and the proposed Montezuma parcel is located in the State of New York, and they are 1,500 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Montezuma because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that, "While the Grand Lake Casino in Grove, Oklahoma generates much needed revenue for the Tribe, its size and location render it insufficient to meet all of the economic development needs of the Tribe." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The application does not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues to either on-reservation employment of tribal members, or specific tribal programs and operations.

The other benefit of a gaming facility is the opportunity for job training and employment of tribal members living on reservation. The expected employment benefits are not described or evaluated in the application for the employment expected for Tribal members living on the reservation. The location of the gaming facility can have other significant negative effects on reservation life that can worsen as the distance increases. If the gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on-reservation. A high on-reservation unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation allows the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

3

In this case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Montezuma parcel and has determined that it will not accept the property into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

*James E. Cason*

James E. Cason



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



JAN 0 4 2008

The Honorable George Wickliffe
Chief, United Keetoowah Band of
    Cherokee Indians
P.O. Box 746
Tahlequah, Oklahoma  74465

Dear Chief Wickliffe:

By memorandum dated July 11, 2007, the Director, Eastern Oklahoma Regional Office (EORO) transmitted to the Assistant Secretary of Indian Affairs (ASIA), her recommendation, along with supporting documentation, that a ten-acre parcel of land in Sebastian County, Arkansas, known as the "Fort Smith Property" not be acquired in trust for the benefit of the United Keetoowah Band of Cherokee Indians of Oklahoma (Tribe).  The Tribe proposes to use the property for development of a hotel, resort, and casino.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations.  The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465.  The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity.  To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations."  The IRA also contains provisions strengthening tribal governments and facilitating their operation.  The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish.  Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming.  The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands.  One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which an Indian tribe exercises governmental power."  The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA.  The

Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

## FINDINGS OF FACT

### I. AUTHORITY

Section 5 of the IRA authorizes the Secretary, in his discretion, to acquire any interest in land, within or without Indian reservations, for the purpose of providing land for Indians. Section 203 of the Indian Land Consolidation Act (ILCA), (96 Stat. 2517; P.L. 97-459) makes Section 5 of the "Act of June 18, 1934, applicable to all tribes.

On May 8, 1950, the Assistant Secretary of the Interior submitted the Constitution and Bylaws of the United Keetoowah Band of Cherokee Indians for ratification to the members of the United Keetoowah Band of Cherokee Indians in Oklahoma. The Constitution and Bylaws were ratified on October 3, 1950.

Pursuant to Article V, Section 1 of the Constitution and Bylaws, Tribal Resolution No. 06-UKB-32 dated March 18, 2006, requests the Bureau of Indian Affairs (BIA) to acquire in trust the ten-acre parcel for the purpose of economic development, and more specifically for the development of a hotel, resort, and casino. The resolution was adopted by an affirmative vote of 12 members; 0 against; and 0 abstentions.

### II. DESCRIPTION OF THE PROPERTY

A part of the Northeast Quarter (NE¼) of Section 8, Township 8 North, Range 32 West, Fort Smith, Sebastian County, Arkansas. More particularly described as follows:

Commencing at the Northeast (NE) corner of said Section 8; thence North 86°00'00" W, 65.00 feet along the north land of said Section 8; thence S 00°25'41" W, 305.10 feet; thence N 85°57'19" W, 762.10 feet to a point on the centerline of Clayton Expressway; thence N 70°38'17" W, 114.0 feet to a point on the westerly right of way of Clayton Expressway; thence S 13°55'41" W, 55.78 feet along said westerly right of way; thence S 26°03'10" W, 411.78 feet along said right of way; thence S 23°31'32" W, 105.12 feet along said right of way; thence S 17°13'07" W, 54.93 feet along said right of way to ½" iron pin set for the Point of Beginning; thence S 17°13'07" W, 270.68 feet along said right of way to a ½"iron pin set; thence S 22°28'33" W, 209.85 feet along said right of way to an ½" iron pin set; thence S 33°19'46" W, 153.30 feet along said right of way to a ½" iron pin set; thence S 34°21'39" W, 4.82 feet along said right of way to a ½" iron pin set at the northerly line of a tract described in Sebastian County Document number 7082031 dated 9/11/2002; thence along said northerly line N 63°56'43" W, 658.72 feet to a ½" iron pin set on the lower right bank of the Arkansas River; thence N 24°26'37" E, 123.44 feet along said right bank to a ½" iron pin set; thence N 23°47'56" E, 258.86 feet along said right bank to a ½" iron pin set; thence North 21°47'52" E, 229.11 feet

2

along said right bank to a ½" iron pin set; thence South 65°53'43" E, 682.21 feet to the Point of Beginning. Containing 435,603 square feet or 10.00 acres, more or less. And being subject to an unrecorded OG&E easement with OG&E work order #7208071.

## III. TITLE TO THE PROPERTY

The Commitment for Title Insurance Policy No. S0009438 dated February 7, 2006, and legal description prepared by Chicago Title Insurance Company, reflect the title to be vested in United Keetoowah Band of Cherokee Indians.

## IV. COMPLIANCE WITH IGRA

The Tribe's gaming ordinance was approved by the National Indian Gaming Commission (NIGC) on March 22, 1995. The Tribe does not have a class III gaming compact with the State of Arkansas.

## V. COMPLIANCE WITH 25 C.F.R. PART 151

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. These regulations provide the basis upon which we exercise the Secretary's discretionary authority.

**A.    25 C.F.R. 151.3.  Land acquisition policy.**

The regulations, in 25 C.F.R. 151(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The application suggests that the economic benefit to the Tribe would be projected cash flow from casino operations in Fort Smith that could then be used to satisfy the needs of Tribal members in Oklahoma.

**B.    25 C.F.R. 151.10(a). The existence of statutory authority for the acquisition and any limitations contained in such authority.**

The Department finds that Section 5 of the IRA is the requisite statutory authority to consider and act upon the Tribe's application.

**C.    25 C.F.R. 151.10(b).  The need of the individual Indian or tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The United Keetoowah Band of Cherokee Indians has no trust land. This application does not address a need for land to support tribal housing or government infrastructure or to resolve local land management conflicts. Rather, the application seeks a particular site of approximately ten acres, located seventy (70) miles away from the Tribe's

3

headquarters, which has been selected due, principally, to its proximity to the nearest urban area to the east of Oklahoma outside the Cherokee Nation.

**D.    25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used.  In this case, the land will be used for the development of a large off-reservation Class III gaming facility.

**E.    25 C.F.R. 151.10(e).  If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of land from the tax rolls.**

The regulations, in 25 C.F.R. 151.10(e), require the Department to consider the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls.  The removal of the parcel from the tax rolls would result in minimal impact to the State of Arkansas, Sebastian County, and the City of Fort Smith.

**F.    25 C.F.R. 151.10(f).  Jurisdictional problems and potential conflicts of land use which may arise.**

The regulations, in 25 C.F.R. 151.10(f), require the Department to consider potential jurisdictional problems and conflicts of land use which may arise in light of the comments of the State and its political subdivisions.  The Governor of Arkansas and his immediate predecessor are strongly opposed to the Tribe's proposed acquisition for gaming.  In addition, local officials have submitted comments in opposition to the proposed gaming facility.  Further, the Regional Director noted the City of Ft. Smith provides police, fire, water, and sanitation services.  The Tribe's application anticipated a Memorandum of Understanding (MOU) with the City to provide these services, but was not received.  I find that significant jurisdictional problems and potential land use issues exist for the property.

**G.    25 C.F.R. 151.10(g).  If the land to be acquired is in fee status whether the Bureau of Indian Affairs (BIA) is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.**

The regulations, in 25 C.F.R. 151.10(g), require the Department to evaluate whether the BIA is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.  The Tribe indicates that the BIA will be responsible for law enforcement, but believes that any additional responsibility of the BIA will be minimal.  A finding on this issue is not necessary to my decision on the application.

4

H.    **25 C.F.R. 151.10(h). The extent of information to allow the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.**

The regulations, in 25 C.F.R. 151.10(h), require the Department to consider the extent to which the applicant has provided sufficient information to allow compliance with 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implements Procedures and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations. An Environmental Assessment (EA) was prepared by the Tribe. A finding on the sufficiency of the EA is not necessary to my decision on the Tribe's application.

I.    **25 C.F.R. § 151.11(b). The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's headquarters. The Tribe's headquarters are located in the State of Oklahoma approximately 70 miles away from the proposed site. As the distance between the Tribe's headquarters and the land to be acquired increases, the Department shall give greater weight to the concerns raised by the State and its political subdivisions. As outlined above there is significant local opposition to this acquisition.

J.    **25 C.F.R. § 151.11(c). Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed use.**

The regulations, in 25 C.F.R. 151.11(c), require the Department to consider the Tribe's plan describing the anticipated economic benefits associated with the use of the proposed site. The Regional Director's recommendation does not address this requirement, but the application contains a November 2005 Feasibility Study from Old Fort Entertainment, LLC by the Innovation Group that satisfies this criterion.

K.    **25 C.F.R. 151.11(d). Consultation with State and local governments with regulatory jurisdiction over the land pursuant to § 151.10(e) and (f).**

The Regional Director consulted with appropriate State and local governments. The Governor, State of Arkansas responded to the consultation letter expressing opposition to the acquisition. The City of Fort Smith and Sebastian County also have expressed opposition to the proposed acquisition.

## Decision

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed its evaluation of the Tribe's fee-to-trust application for the "Fort Smith Property" and has determined that it will not accept the property into trust.

The Department's evaluation of this land-into-trust application has identified several concerns, as outlined above, with criteria in 25 §§ C.F.R. 151.10(b), 151.10(c), 151.10(g), 151.11(b), and 151.11(d) that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. I concur with the Regional Director's recommendation. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary - Indian Affairs