IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA | ) | |
| INDIANS OF WISCONSIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:07-cv--02210-RJL |
| | ) | |
| DIRK KEMPTHORNE, et al. | ) | Next Scheduled Court Deadline: |
| | ) | Oral Argument at 2:00 P.M. on |
| Defendants. | ) | January 15, 2008 |
| | ) | |

## FIRST AMENDED COMPLAINT

The St  Croix Chippewa Indians of Wisconsin ("the St. Croix Tribe" or "the Plaintiff")
files its First Amended Complaint against the Defendants, Secretary of the Interior Dirk
Kempthorne and Assistant Secretary – Indian Affairs, Carl J. Artman (collectively, the
"Defendants") and states and alleges as follows:

### INTRODUCTION

1.      This is an action brought by The St. Croix Tribe, a federally-recognized
Chippewa Tribe, located in remote areas of northern Wisconsin.  The St. Croix Tribe, together
with the Bad River Band of Lake Superior Chippewa Indians (collectively, the "Tribes) for the
past six years have diligently pursued the approval by the Bureau of Indian Affairs ("BIA") to
establish a casino in Beloit, Wisconsin.

2.      The St. Croix Tribe, whose reservation lands are located in remote areas of
Wisconsin, faces significant challenges to economic development and diversification.  It
currently has two casinos (located on Tribal lands).  They produce insufficient revenues to fund

152306

badly-needed tribal needs.  The St. Croix Tribe has significant unemployment and a substantial

percentage of its employed members earn wages which are below the poverty level.

3.	The St. Croix Tribe's ability to accumulate the resources to meet their substantial

unmet needs, to obtain the capital for further economic development, to increase employment for

tribal members, and to decrease its dependence on funding from the federal government, is

largely dependant on the approval of the Beloit Casino Project.  This would be a large

destination resort expected to attract several million visitors a year, principally from the densely

populated greater Chicagoland area.  In addition to its casino, the project will include a 500-room

hotel, several restaurants, a conference center, a theater and a water park.  The general region

anticipates that the casino will generate significant revenues for a wide variety of service

industries in the area.  The Beloit Casino Project will involve construction costs of at least $300

million.  Once built, it will provide some 3,000 full-time jobs.  This project dominates the local

scene in terms of its future economic planning and hopes for its economic revitalization.  Local

elected officials have repeatedly written BIA officials, as well as attending numerous meetings in

Washington, D.C. with BIA representatives, to express their strong and unequivocal support for

the project.

4.	The Beloit Casino Project was originally the idea of the City of Beloit itself as a

viable course by which it could restore the local economy which had seriously declined due to

the loss of thousands of jobs due to factory closings.  The Beloit Casino Project has been

supported unanimously for many years by resolutions of the Beloit City Council.  It has also

received favorable resolutions of support from Rock County (where Beloit is located) as well as

from other nearby townships.

5.      The Tribes have ancestral and historical ties to the Beloit region.  The Tribes'
ancestors resided in the Beloit area and were parties to peace treaties ceding lands in this area to
the United States.

6.      The Tribes jointly filed in July 2001 an application with the BIA Regional Office
to take 26 acres of land into trust for gaming purposes in Beloit, Wisconsin.  To date, the Tribes
have collectively spent in excess of $2 million in pursuit of the approval of this project, including
consultant costs, legal fees and option payments made to a local developer for the would-be trust
land and adjoining lands necessary for the casino project.  The St. Croix Tribe itself has, to date,
spent well in excess of $1 million on this project.

7.      Throughout the process of seeking approval from the BIA, the Tribes have
incurred significant expenses without the financial assistance of an outside developer/promoter.
The Tribes have taken inordinate measures to ensure that they were fully complying with all of
the BIA's exacting requirements for the approval of the Beloit Casino Project, including the
significant requirements imposed by the National Environmental Policy Act ("NEPA") and the
National Historic Preservation Act.  This included the substantial expenditure of time and
financial resources that went into the preparation of an Environmental Assessment ("EA").  After
the completion of the EA, the Tribes were informed by the Department of Justice that it would
require an Environmental Impact Statement ("EIS") to be prepared for all off-reservation casino
applications.  (Otherwise, the Department of Justice indicated it would not defend any lawsuit
brought to challenge a Finding of No Significant Impact ("FONSI") issued by the BIA based on
an EA.)  That, in turn, required the Tribes to start all over again (beginning with the scoping
process required for an EIS).  That took an additional three years of time, effort and expense.

Tribal representatives were recently informed that the draft filed by the EIS had been approved by the Solicitor's Office of the BIA.

8.      In order to be assured that the Tribes correctly understood the procedures which would be required in order to gain approval for their project, Tribal leaders, staff members and attorneys have had numerous meetings with representatives of the BIA in both its Regional Office located in St. Paul, Minnesota as well as with senior officials of the BIA in its Central Office in Washington, D.C.  During these meetings, numerous issues have been addressed and resolved.  During the six years of discussions with BIA representatives in the Regional Office, it was continuously represented by the BIA to Tribal representatives that the Section 20 ("IGRA") decision would be made <u>first</u> by the Central Office; and if the Governor concurred, the BIA would then proceed to make the fee-to-trust determination under 25 C.F.R. Part 151 ("Part 151").

9.      The Tribes' application was forwarded (with a favorable recommendation) by the Regional Office to the Central Office in January 2007.  From that moment until August 2007, Tribal leaders and their representatives were informed by BIA officials in meetings in the Central Office that the two-part determination would be made before the Part 151 determination -- as had been the practice followed by the BIA.  However, in August 2007, the Tribes were first notified that this process would be reversed and that the Part 151 decision would be made <u>before</u> the two-part determination required under IGRA.  This represented a 100% reversal of the decision-making process during both the Clinton Administration and, thereafter, the Bush Administration.

10.     Despite all of this, it has recently become apparent that the efforts of the Tribes and elected officials in Beloit (and the surrounding region) to have the BIA approve this project will, in all probability, be a futility.  This is strictly due, on information and belief, to Secretary

Dirk Kempthorne's personal views opposing off-reservation gaming for reasons which do not find a basis in either the standards set out by IGRA or for taking fee land into trust pursuant to Part 151. Secretary Kempthorne's personal animus towards off-reservation gaming is set forth in a recent Complaint filed in this Court. See St. Regis Mohawk Tribe v. Dirk Kempthorne (Civil Action No. 07-CV-01958-RWR).

11.    On information and belief, Secretary Kempthorne's negative personal views toward off-reservation gaming have led the BIA to craft various artifices by which it can plausibly proceed to deny a number of pending off-reservation casino applications, including the Plaintiff's.

12.    The Department of the Interior ("DOI") is unlawfully attempting to carry this out by making the Part 151 determination first and thereafter relying on a new unlawful guidance memorandum to deny many pending applications. Upon information and belief, the DOI decided to make the Part 151 determination first in that it is fully aware that if the two-part determination of IGRA were made first, there would be no realistic way to deny the Beloit application (and a number of other similar pending applications) in that the tribes' applications fully met the requirements of IGRA's two-part determination. Further, on information and belief, senior officials of the DOI have concluded that once a favorable two-part determination is made (assuming concurrence by the Governor), this would leave no room for the BIA to deny the applications under Part 151 and have any realistic belief that this decision would be upheld by a Federal Court. For these reasons, on information and belief, the DOI decided to make the Part 151 determination first because it will leave it free to deny a fee-to-trust gaming application under a number of contrived theories, having no factual basis, as set forth in the guidance memorandum. As set forth below, by adopting this new procedure and thereafter issuing its

guidance memorandum, the DOI has completely ignored and violated the requirements of the Administrative Procedure Act ("APA"), Congressional intent as set out in IGRA, and controlling case law.

13.    The Plaintiff seeks Declaratory and Injunctive Relief from this Honorable Court in order to prevent the DOI from denying the Beloit fee-to-trust and similar applications by (a) using its newly adopted unlawful procedure to make the Part 151 decision prior to the two-part IGRA determinations; and (b) relying on and applying its new unlawful guidance memorandum. Unless Injunctive relief is entered, on information and belief, the DOI will immediately proceed to deny the Beloit application just as it has denied, in the last several days, a number of other similar pending off-reservation casino applications submitted by other Tribes.

## Jurisdiction and Venue

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1362 and 5 U.S.C. §§ 502, 553, 701-706.  This Court has authority to issue Declaratory and Injunctive Relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 555(b) and 701-706.

15.    Venue is proper in this District Court pursuant to 28 U.S.C. § 1391(e) because this is an action in which the Defendants are officers and employees of the United States acting in their official capacities, and a substantial part of the events or omissions giving rise to the claims herein have occurred or will occur in this judicial district.

## Parties

16.    The St. Croix Tribe is a federally recognized Indian tribe whose reservation is located in Burnett, Polk and Barron counties in northwestern Wisconsin.  The Tribe qualifies under IGRA, 25 U.S.C. § 2701 *et seq.* to operate class III gaming in the proposed Beloit Casino.

17.    Dirk Kempthorne is the Secretary of the Interior and is charged by law with carrying out the duties and responsibilities of the United States as a trustee for the Tribes.  In his official capacity, Secretary Kempthorne is authorized to make the required determinations under IGRA, § 2719(b)(1)(A), that the proposed Beloit Casino is in the best interest of the Tribes and is not detrimental to the surrounding community.  Thereafter, if the Governor concurs in a favorable determination, Secretary Kempthorne is authorized to acquire the proposed land in trust for the Beloit Casino Project in the name of the United States and to hold such land in trust for the Tribes, and to take all necessary action on the Tribes' request to acquire such lands.

18.    Carl J. Artman is the Assistant Secretary – Indian Affairs and is charged by law with carrying out the duties and responsibilities of the United States as a trustee for the Tribes. In his official capacity, Assistant Secretary Artman is authorized to make the required determinations under IGRA, § 2719(b)(1)(A), that the proposed Beloit Casino is in the best interests of the Tribes and is not detrimental to the surrounding community.  Thereafter, if the Governor concurs in this determination, Secretary Kempthorne is authorized to acquire the proposed land in trust for the Beloit Casino Project in the name of the United States and to hold such land in trust for the Tribes, and to take all necessary action on the Tribes' request to acquire such lands.

## BACKGROUND

### A.  Statutory and Regulatory Requirements

19.    Section 5 of the Indian Reorganization Act, 25 U.S.C. § 465, enacted in 1934, and its implementing regulations at 25 C.F.R. Part 151 (promulgated in 1980) authorize the Secretary of the Interior to acquire lands for Indian tribes in the name of the United States to hold such lands in trust for Indian tribes and to take action on a tribe's request to acquire such lands.  This

statute and the Part 151 regulations apply to all tribal requests to take land into trust for any

purpose.

20.     In 1988, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701

*et seq.* ("IGRA").  Congress intended IGRA "to provide a statutory basis for the operation of

gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency,

and strong tribal governments[,] … to ensure that the Indian tribe is the primary beneficiary of

the gaming operation, . . . and to protect such gaming as a means of generating tribal revenue."

25 U.S.C. § 2702.  The Senate Committee on Indian Affairs Report, in describing IGRA's

exceptions, made it clear that they were meant to set "forth policies with respect to lands

acquired in trust after [IGRA's] enactment."  S. Rep. No. 100-446, at 20 (1988), *reprinted in*

1988 U.S.C.C.A.N. 3071, 3090.  According to the National Indian Gaming Commission

established by Congress in 1988 under IGRA, Congress enacted IGRA in order to support the

policy of federally recognized sovereignty and to:

> . . .also address congressional concerns regarding the absence of
> clear Federal standards or regulations for the conduct of Indian
> gaming.  Congress enacted [IGRA] for three specified purposes:
>     (a)  To provide a statutory basis for the operation of gaming by
> Indian tribes as a means of promoting tribal economic
> development, self-sufficiency, and strong tribal government;. . .

69 Fed. Reg. 16977 (March 31, 2004).

21.     Under Section 20 of IGRA, 25 U.S.C. § 2701, tribes are prohibited from engaging

in any gaming on land acquired after the date of IGRA's enactment, October 17, 1988, unless

certain exceptions are satisfied.  The exception, pertinent herein, is § 2719(b)(1)(A), which

provides that the prohibition of gaming on post-1988 land does not apply when:

> the Secretary, after consultation with the Indian tribe and
> appropriate State and local officials, including officials of other
> nearby Indian tribes, determines that a gaming establishment on

> newly acquired lands [1] would be in the best interest of the
> Indian Tribe and its members, and [2] would not be detrimental to
> the surrounding community, but only if the Governor of the State
> in which the gaming activity is to be conducted concurs in the
> Secretary's determination …

This exception is commonly referred to as the "two-part determination."

22.     Thus, Section 5 of the Indian Reorganization Act, 25 U.S.C. § 465 (and its

regulations falling under Part 151) and IGRA, § 2719 (b)(1)(A), both apply to the acquisition of

trust lands for gaming purposes.  Section 5 of the Indian Reorganization Act is very general in

nature in that it, together with the Part 151 regulations, apply to the determination as to whether

fee land will be taken into trust for any purpose, whether that be for grazing, Indian housing, a

grocery store or a casino.  They authorize the Secretary of the Interior to acquire lands that are

either "within or without existing reservations," for Indian tribes in the name of the United States

to hold those lands in trust for Indian tribes.  The criteria governing when land will be taken into

trust for an Indian tribe under this statute were promulgated by Interior in regulations at 25

C.F.R. Part 151.  The criteria relevant to this case appear at 25 C.F.R., §§ 151.3, 151.10 and

151.11.

23.     25 C.F.R., § 151.3, provides, in pertinent part, that:

> land not held in trust … may only be acquired for an individual
> Indian or a tribe in trust status when such acquisition is
> authorized by an act of Congress.  No acquisition of land in trust
> status … shall be valid unless the acquisition is approved by the
> Secretary.
>         (a)  Subject to the provisions contained in the acts of
> Congress which authorize land acquisitions, land may be acquired
> for a tribe in trust status:
>
>                       *        *        *
>
>         (3)  When the Secretary determines that the acquisition of
> the land is necessary to facilitate tribal self-determination,
> economic development, or Indian housing.

24.    25 C.F.R., § 151.10, provides that for on-reservation trust acquisitions:

> The Secretary will consider the following criteria in evaluating requests for the acquisition of land in trust status when the land is located within or contiguous to an Indian reservation, and the acquisition is not mandated:
>
> (a)  The existence of statutory authority for the acquisition and any limitations contained in such authority;
>
> (b)  The need of the individual Indian or the tribe for additional land;
>
> (c)  The purposes for which the land will be used;
>
> (d)  [*provision relating to acquisition for individual Indian, not applicable to tribal application*];
>
> (e)  If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;
>
> (f)  Jurisdictional problems and potential conflicts of land use which may arise; and
>
> (g)  If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.
>
> (h)  The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.

25.    25 C.F.R, § 151.11, which governs off-reservation trust acquisitions, provides, in

pertinent part, that:

> The Secretary shall consider the following requirements in evaluating tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation, and the acquisition is not mandated:
>
> (a)  The criteria listed in Sect. 151.10(a) through (c) and (e) through (h);
>
> (b)  The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation, shall be considered as follows: as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition.  The Secretary shall give greater

weight to the concerns raised pursuant to paragraph (d) of this section.

(c) Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed land.

(d) Contact with state and local governments pursuant to Sect. 151.10(e) and (f) shall be completed as follows: Upon receipt of a tribe's written request to have lands taken in trust, the Secretary shall notify the state and local governments having regulatory jurisdiction over the land to be acquired. The notice shall inform the state and local government that each will be given 30 days in which to provide written comment as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

**B.  The Department of the Interior's Unlawful Decision to Make the Part 151 Determination Prior to the Two-Part IGRA Determination**

26.    In July 2001, the Tribes submitted an application to the BIA's Regional Office in St. Paul, Minnesota for the Secretary of the Interior to acquire a 26-acre parcel in trust for gaming purposes in Beloit, Wisconsin.

27.    On January 8, 2007, Regional Director Terry Virden, wrote the Tribes' Chairmen, informing them that their application had been forwarded to the Central Office in Washington, D.C. with a favorable recommendation. Almost immediately thereafter, Tribal leaders and representatives, together with elected officials from the Beloit area, met in Washington, D.C. with George Skibine, Director of the BIA's Indian Gaming Management Staff. At that time, Mr. Skibine informed the numerous individuals present that the BIA would complete its staff review of the Tribes' application within sixty days. However, after that meeting, it became apparent that the review process (other than for the ongoing review of the draft EIS) had essentially become frozen in that it was clear that this application, and other similar applications, were not going to be favorably approved by virtue of Secretary Kempthorne's strong negative views towards off-reservation fee-to-trust gaming applications. It was also apparent to the Tribes

that Secretary Kempthorne's views found no basis in either IGRA or Part 151 and that he was nonetheless determined not to approve these applications, including Beloit, whether that meant making no decision at all during the remainder of his term as Secretary or crafting some artifice by which to deny the applications. This reality, on information and belief, led to an informal freeze within the BIA of taking various interim steps in the decision-making process for pending off-reservation casino applications such as failing to take the necessary steps to permit Notices of Availability to be published in the *Federal Register* for draft or final EIS's. This, in fact, was the subject of testimony and critical comments made by Senator Dorgan at a recent Oversight hearing of the Senate Indian Affairs Committee in which Assistant Secretary Artman appeared.

28.    After little or no progress was perceived by the Tribes and their representatives in the review of the Beloit application, the St. Croix Tribe's outside counsel, Robert M. Adler, wrote to Assistant Secretary Artman by letter dated July 13, 2007. In that letter, he: (a) requested (in view of the delay by the BIA in reviewing the application) that Assistant Secretary Artman inform him when the staff review of the application would be completed; and, (b) asked Assistant Secretary Artman to inform him whether rumors were accurate that the Part 151 determination would be made before the two-part IGRA determination. Mr. Adler also expressed serious concerns about the use of Part 151 as the appropriate standards to be applied in making decisions to approve (or deny) off-reservation casino applications. Mr. Adler pointed out that to do so would be contrary to Congressional intent.

29.    By letter dated August 21, 2007, a response was sent to Mr. Adler by George Skibine, Acting Deputy Assistant Secretary-Policy and Economic Development. Mr. Skibine indicated that he had been asked to respond to Mr. Adler's letter of July 13, 2007. This letter proceeded to state, in pertinent part:

> We will make a determination on whether to take land into trust
> pursuant to Part 151 <u>prior</u> to making the two-part secretarial
> determination under IGRA.  We believe that it is the appropriate
> and logical sequence for the decision-making process.  We do not
> believe that this represents a policy change since the Department
> has never before specified a particular sequence from making the
> two decisions involved in this process.  (emphasis supplied).

30.    On information and belief, the DOI has not informed other Indian tribes or the public at large (whether through publication in the *Federal Register* or otherwise) that for fee-to-trust off-reservation gaming applications, a decision had been made that the DOI would no longer follow its historical practice of making the two-part IGRA determination prior to the Part 151 determination.  Moreover, the DOI did not provide an explanation to the Plaintiff, the Bad River Band or, on information and belief, any other Indian tribe of the reasons for the change in its historical practice and procedure.

31.    Despite the representation in Mr. Skibine's letter of August 21, 2007 that "the Department has never before specified a particular sequence from making the two decisions," this has not actually been the case.  As set forth below in ¶¶ 32-35, during the Clinton Administration and later during the Bush Administration, it was made quite clear to the public that the two-part determination would be made first.  And, in point of fact, during the past six years, the two-part determination has been made prior to the Part 151 decision on at least two instances.

32.    In a letter dated December 21, 2006 from James E. Cason, the Associate Deputy Secretary of the Department of the Interior, to the then-Governor of New York, George Pataki, Mr. Cason wrote that he was providing him with an opportunity to concur in the two-part determination which had been made on the St. Regis Mohawk application for an off-reservation casino.  (A favorable decision under the two-part IGRA determination had previously been made.)  Mr. Cason stated, in pertinent part:

13

> Your affirmative written concurrence is required before the
> Department will proceed with the consideration of the St. Regis
> Mohawk Tribe's application to take a portion of the Monticello
> Raceway in trust pursuant to the Department's land acquisition
> regulations in 25 U.S.C. Part 151. Please be mindful that your
> concurrence and its two-part determination under Section
> 20(b)(1)(A) of IGRA should not be construed as a future
> commitment from the Department to take the land into trust.
> That decision has yet to be made and will be made only after
> consideration of all of the regulatory requirements contained in
> 25 C.F.R. Part 151. (emphasis supplied).

33.    A similar letter was sent on February 20, 2001 to Wisconsin Governor Scott

McCallum by James H. McDivitt, Deputy Assistant Secretary-Indian Affairs (Management).

This letter pertained to the pending application of three Wisconsin Tribes to take land into trust

in Hudson, Wisconsin for the purpose of operating an off-reservation casino. Deputy Assistant

Secretary McDivitt made it crystal clear that the two-part determination preceded the Part 151

determination which would be made if the Governor concurred in the IGRA decision. Deputy

Assistant Secretary McDivitt wrote, in pertinent part:

> Pursuant to Section 20(b)(1)(A) of the IGRA, before the
> Hudson parcel can be acquired in trust for gaming purposes,
> I must determine that a gaming facility on the land would
> be in the best interests of the Tribes and their members and
> not detrimental to the surrounding community and then you
> must concur in that determination. If you concur in this
> determination, the land can be acquired by the United States
> in trust for the Tribes for gaming purposes, provided all the
> requirements of the Bureau of Indian Affairs' land
> acquisition regulations found in 25 CFR Part 151 are met.
> (emphasis supplied).

Deputy Assistant Secretary McDivitt then stated:

> The Department has completed its review of the Tribes'
> application for the two-part determination. Based on this
> application and its supporting documentation, including
> the comments received from the State and local
> government officials, and officials of nearby Indian tribes,

the Department has made findings of fact supporting the
two-part determination.

Mr. McDivitt proceeded to inform Governor McCallum that this letter was
being sent to him in order to seek his concurrence on the BIA's favorable two-part
determination.

34.    In March 2007, in its brief filed in the D.C. Circuit in <u>Citizens Exposing Truth
About Casinos v. Dirk Kempthorne, et al.</u> (No. 06-5354), the Government stated:  "What is
more, Interior had to determine whether the Sackrider properly would qualify for gaming under
25 U.S.C. § 2719 in order to comply with the IRA [the Indian Reorganization Act, 25 U.S.C.
§ 465] and its implementing regulations."

35.    An action had been filed in 2000 by the three tribes which had submitted a
fee-to-trust application for a casino in Hudson, Wisconsin.  <u>Sokaogon Chippewa Community, et
al. v. Bruce C. Babbitt, Secretary</u>, No. 00-1137 (W.D. Wis.).  Significantly, in a brief filed on
March 9, 2000 by the Department of Justice, in which attorneys in the Solicitor's Office of the
Department of the Interior appeared "Of Counsel," the Government stated, in pertinent part
at 2-3:

> Pursuant to guidelines issued on September 28, 1994, by the
> Acting Deputy Commission of the Indian Affairs, area offices
> of the Bureau of Indian Affairs must make the <u>initial</u> determination
> of whether an applicant tribe has satisfied their requirements of
> § 2719(b)(1)(A) (emphasis supplied).

The Government's brief further stated at 22:

> As explained above (p. 5), the Department may not exercise its
> authority under 25 U.S.C. Section 465 to acquire land in trust if it
> will be used for gaming purposes unless an applicant tribe can
> show that a proposed gaming operation will be in its best interest
> and that the operation will not be detrimental to the surrounding
> community.  25 U.S.C. § 2719(b)(1)(A).

36.     The Government's statements in the Sokaogon and Citizens Exposing Truth About Casinos briefs, as well as in its letters to the Governors of Wisconsin and New York, document DOI's historical practice as well as the Interior Department's interpretation of the statutory scheme and Congressional intent:  the two-part determination was required to be made prior to the Part 151 determination.

37.     The D.C. Circuit's decision in Exposing Truth About Casinos v. Kempthorne, 492 F.3d 460, 466 (D.C. Cir. 2007) addressed a situation which is analogous to the issues presented herein.  At issue was the authority of Secretary Kempthorne to designate land for the benefit of an Indian tribe which fell within the "initial reservation" exemption of Section 20.  In finding that the Secretary had such authority, the court stated that:

> The Secretary's determination that the "initial reservation"
> exception applied to the Sackrider property was intended to have
> the force of law, as it formed the basis for the Secretary's
> decision under the IRA to acquire the property in trust for the
> Band.

38.     The District Court in the Sokaogon litigation also issued a decision which clearly recognized that the two-part determination was made by the BIA prior to the Part 151 decision. Sokaogon Chippewa Community, et al. v. Bruce C. Babbitt, Secretary, et al., 929 F.Supp. 1165, 1169-1170 (W.D. Wis. 1996).  The Court stated:

> A request to establish an off-reservation gaming facility must be
> approved by the Secretary of the Interior in accordance with the
> Indian Gaming Regulatory Act, which provided at 25 U.S.C.
> § 2719(b)(1)(A) that off-reservation is permitted only if [the
> two-part determination is favorably decided by the Secretary].
> Even if the secretary finds that the proposed off-reservation
> gaming establishment is in the best interest of the applicant tribes
> and would not be detrimental to the surrounding community and
> the governor concurs in that determination, the secretary must
> decide whether to exercise his discretion to acquire the land in
> trust pursuant to the Indian Reorganization Act, 25 U.S.C. § 465.

39.    On September 21, 2007, Assistant Secretary Artman issued a memorandum to all of the BIA Regional Directors.  In it, he explained an attached September 2007 revision of the "checklist for gaming acquisitions."  Assistant Secretary Artman stated that the newly revised checklist differed from the earlier (March 2005) checklist in only two respects.  The first, which is pertinent herein, was that the first page of the checklist contained a modification "… to clarify that an application for two-part secretarial determination pursuant to § 20(b)(1)(A) of IGRA should not be processed unless the land is already in trust or, if not yet in trust, until after the publication of a notice to take the land in trust has been published pursuant to 25 C.F.R. 151.12." (emphasis supplied).  Despite Assistant Secretary Artman's representation that this was a clarification, this was, in fact, a complete reversal of the historical practice followed by the BIA for many years.

### C.    The Department of the Interior's Unlawful Guidance Memorandum of January 3, 2008

40.    On January 3, 2008, Assistant Secretary Carl Artman issued a memorandum to Regional Directors of the Bureau of Indian Affairs as well as to George Skibine, Office of Indian Gaming.  The subject of this memorandum was "Guidance on taking off-reservation land into trust for gaming purposes."  This memorandum is hereinafter referred to as the Guidance Memorandum.

41.    The Guidance Memorandum was issued without prior consultations between the Interior Department and Indian tribes.  Instead, it was issued without forewarning.  On November 28, 2007, a memorandum from the Plaintiff's attorneys was e-mailed to Assistant Secretary Artman.  It asked whether they would have an opportunity to consult with him prior to the Guidelines being finalized.  It then stated:  "If not, why not?"  At a meeting with Assistant Secretary Artman on November 29, 2007, he specifically declined to provide a copy of the

requested guidelines (which at that time were reportedly still under internal review) to attorneys

for the Plaintiff, so that there could be consultations with respect to them, prior to the time that a

decision was made on the Plaintiff and Bad River Band's fee-to-trust application.

42.     The Guidance Memorandum's purported purpose was to "clarify" provisions

contained in 25 C.F.R. Section 151.11(b) pertaining to the portion of that regulation which

provided that as the distance between the tribe's reservation and the land to be acquired in trust

increased, the Secretary of the Interior was to give "greater scrutiny" to the tribe's justification of

anticipated benefits in the acquisition and give "greater weight" to concerns raised by state and

local governments as the acquisition's potential impacts on regulatory jurisdiction, real property

taxes and special assessments.  Guidance Memorandum, pages 1-2.

43.     The Guidance Memorandum acknowledged (page 2) that the Indian

Reorganization Act of 1934, 25 U.S.C. § 465 ". . .has nothing directly to do with Indian

gaming."  Instead, the Guidance Memorandum stated:  "The Indian Gaming Regulatory Act of

1988 (IGRA), 25 U.S.C. § 2701 et seq., adopted more than 50 years after [25 U.S.C. § 465] sets

the parameters of Indian gaming."  Id.

44.     The Guidance Memorandum made it clear, in repeated statements, that its

provisions were required to be followed by the Regional Directors and the Office of Indian

Gaming (located in the BIA's Central Office in Washington, D.C.).  To wit, a separate section of

the Guidance Memorandum provided for "Implementation of Guidance" (emphasis in original)

(pages 2-3).  It stated, in pertinent part, in its ¶ 1:  "All pending applications or those received in

the future should be initially reviewed in accordance with this guidance."  It further provided in

its ¶ 2:

> If the initial review reveals that the application fails to address, or
> does not adequately address, the issues identified in this guidance,

the application <u>should</u> <u>be</u> <u>denied</u> and the tribe promptly informed.
This denial does not preclude the tribe from applying for future
off-reservation acquisitions for gaming or other purposes.
However, those future applications will be subject to the same
guidelines.  (emphasis supplied).

The Guidance Memorandum further provided (page 4):  ". . .some of the issues that <u>need
to be addressed</u> in the application if the land is to be taken into trust is off-reservation and for
economic development are. . . ."  (emphasis supplied).  Similar language later appears in the
Guidance Memorandum (page 5), stating ". . .these are important questions that <u>must be
addressed</u>."  (emphasis supplied).

45.    The Guidance Memorandum, in reference to 25 C.F.R. § 151.11(b), stated
(page 3) that the reason for the requirement that greater scrutiny be given to the tribe's
justification of anticipated benefits as the distance between the tribe's reservation and the land to
be acquired increases was ". . .as a general principle, the farther the economic enterprise - in this
case, a gaming facility - is from the reservation, the greater the potential for significant negative
consequences on reservation life."  It further stated (pages 3-4) that:  ". . .the location of the
gaming facility can have significant negative effects on reservation life that potentially worsen as
the distance increases."  The Guidance Memorandum then opined (page 4) that if a gaming
facility was not within a "commutable distance of the reservation,". . . the negative impacts on
reservation life could be considerable."

46.    The Guidance Memorandum (page 4) postulates that if the casino is located more
than a "commutable distance" from the reservation, then Tribal members may ". . .be forced to
move away from the reservation to take advantage of the job opportunity."  The Guidance
Memorandum goes on to describe this as a negative impact, stating:  ". . .[t]he departure of a

significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community." Id.

47.    On information and belief, when issuing the Guidance Memorandum, the Interior Department had no evidence, studies or empirical data which supported the theories described in ¶¶ 45-46 above.  The Guidance Memorandum, on its face, did not refer to or rely on any such factual support.  Indeed, on information and belief, there is no evidence that a tribe's economic enterprise, whether a gaming facility or otherwise, located several hundred miles away from the reservation, has a negative impact on reservation life.

48.    The Guidance Memorandum's theory that an off-reservation  casino would have a negative impact on reservation life amount to sheer and unfounded speculation.  It is also wrong. It is well known and accepted in Indian country, and others familiar with economic issues involving Indians and Indian tribes, that:  (a) the additional revenue stream going to an established tribal reservation from an off-reservation casino will, without doubt, improve "reservation life" in that it will provide for additional tribal programs, additional services, additional jobs and better wages; and (b) additional jobs and tribal programs on the reservation will provide a significant inducement for tribal members who have previously left the reservation to find jobs elsewhere to return to their "home" on the reservation.

49.    The Guidance Memorandum describes (pages 5-6) the manner in which "greater weight" is to be given to the concerns of state and local governments as the distance from the reservation to the land to be acquired in trust (for gaming purposes) increases.  The Memorandum states (page 5) that:  (a) ". . .the farther from the reservation the proposed trust acquisition is, the more the transfer of Indian jurisdiction to that parcel of land is likely to disrupt established governmental patterns"; and (b) ". . .the farther from the reservation the land

acquisition is, the more difficult it will be for the tribal government to efficiently project and exercise its governmental and regulatory powers." These theories, once again, represent sheer and unfounded speculation and are not supported by any evidence, studies or empirical data.

50.    The "guidance" provided by the Guidance Memorandum with respect to the "greater scrutiny" and the "greater weight" to be given in the review of off-reservation casino applications under Part 151 is a contrivance created in order to craft some appearance of authority and justification to deny pending off-reservation casino applications.

51.    The Guidance Memorandum imposed binding obligations on Tribal applicants to submit applications that conformed to it. In addition, the Guidance Memorandum did not permit either the Regional Directors or the Office of Indian Gaming free to exercise their own discretion in a manner which was inconsistent with the requirements of the Guidance Memorandum. Instead, the Guidance Memorandum was binding on its face for both the Regional Directors and the Office of Indian Gaming. Further, the Guidance Memorandum was applied by the Interior Department in a way that indicates that it was, in fact, binding. On the following day, January 4, 2008, the Interior Department, following the dictates of the Guidance Memorandum, denied eleven pending fee-to-trust applications for off-reservation gaming. The binding nature of the Guidance Memorandum on these decisions is apparent on the face of the denial letters and was confirmed by a Department of the Interior press release issued on January 4, 2008 describing its new Guidance Memorandum as well as its denial letters sent to numerous tribes. The press release stated, in pertinent part: "Pursuant to the guidance, the Department of the Interior today issued letters to 22 separate tribes with pending applications to take land into trust." (emphasis supplied). On information and belief, the tribes whose applications were summarily denied on January 4, 2008 were not provided any opportunity to provide information responsive to the new

requirements imposed by the Guidance Memorandum.  One tribe, the Lac du Flambeau Band,

located in Wisconsin, had its application denied by Assistant Secretary Artman even though it

was still in the review process at the Regional Office.

52.    A convoluted history preceded the issuance of the Guidance Memorandum.  The

Interior Department first issued Part 151 regulations on September 18, 1980.  Part 151 had not

undergone substantial revision since their adoption until 1999.  64 Fed. Reg. 17574 (April 12,

1999).  In 1999, the Interior Department proposed to substantially revise Part 151 "to make

clearer that [BIA] will follow a process that is somewhat different, and [BIA] will apply a

standard which is somewhat more demanding when a land-into-trust application involves title to

lands which are located outside the boundaries of a reservation ('off-reservation lands')."  64

Fed. Reg. at 17574.  The effect of this proposal would have been to make the application

information needed to acquire off-reservation land more demanding than acquiring

on-reservation land.  The proposed rules were issued as final rules in 2001.  66 Fed. Reg. 3452

(Jan. 16, 2001).

53.    On August 13, 2001, the Interior Department proposed that the final rules

". . .should be withdrawn and a further rule proposed to better address the public's continued

concerns regarding the Department's procedures for taking land into trust for

federally-recognized Indian tribes."  66 Fed. Reg. 42474-75 (Aug. 13, 2001).  The main concern

expressed by the BIA pertaining to off-reservation acquisitions, was the lack of standards

contained in the revised rule.  The *Federal Register* notice stated, in pertinent part:

> The Department is considering clarifying the standards that will
> be used by the Secretary to determine whether to approve an
> application and defining the burdens of proof that the applicant
> and those opposing a trust application have to the
> application….For off-reservation acquisitions, the Department is
> considering requiring that tribes show by substantial evidence

> that the acquisition is necessary to facilitate tribal self-
> determination, economic development, Indian housing, land
> consolidation, or natural resources protection, and the tribe be
> further required to show that no demonstrable harm to the local
> community is realized. The Department is considering requiring
> that opponents of off-reservation acquisitions show by clear
> evidence that the acquisition will result in significant harm to the
> local community or severe negative impacts to the environment.
> 66 Fed. Reg. at 42475.

54.    Based on the comments received on the proposed withdrawal of the final

revisions to Part 151, the Interior Department formally withdrew the final revisions to Part 151 in

November 2001, stating that it would engage in consultations with Indian tribes in a new

rulemaking to address specific areas. 66 Fed. Reg. 56608 (November 9, 2001). The *Federal*

*Register* Notice stated, in pertinent part:

> . . .the Department has decided to withdraw the final rule in
> whole to address these specific areas of concern in a <u>new</u> <u>rule</u>.
> (emphasis supplied.)

Included were "the standards of review used in reaching a determination of whether to accept

land into trust…." 66 Fed. Reg. at 56609-10. In addition, the DOI made the commitment that

prior consultations would take place with Indian tribes. The *Federal Register* notice stated, in

pertinent part:

> Consistent with Departmental policy <u>to consult</u> with federally-
> recognized Indian tribes on proposed Federal actions that impact
> Indian tribes, the Department <u>will conduct consultation with</u>
> <u>Indian tribes</u> on the following areas in its efforts to promulgate a
> new rule: …." (emphasis supplied). 66 Fed. Reg. at 56609-10.

The Interior Department, in withdrawing the final revisions to Part 151 stated at the time

that it would "…allow the current 25 CRF Part 151 to remain in effect during the pendency of

the development of a new rulemaking addressing this matter." 66 Fed. Reg. at 56610.

152306                                              23

Thereafter, the Interior Department never attempted to promulgate revised Part 151 regulations through the notice and comment rule making process.

55.     Accordingly, in promulgating new standards for land to be taken into trust pursuant to 25 C.F.R. Part 151, the Interior Department committed itself to not do so unless and until it had:  (a) conducted prior consultations with Indian tribes; and (2) complied with the APA's formal notice and comment rule making process.  The Interior Department did not honor either of those commitments prior to issuing its Guidance Memorandum.

56.     Furthermore, Executive Order No. 13175 November 9, 2000, 3 C.F.R. 304 (2001) provided, in pertinent part, in its Section 5:

> *Consultation.*  (a)  Each agency shall have an accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications.
>
> *        *        *
>
> (b)  To the extent practicable and permitted by law, no agency shall promulgate any regulation that has tribal implications, that imposes substantial direct compliance costs on Indian tribal governments, and that is not required by statute, unless:
>
> *        *        *
>
> (2)  the agency, prior to the formal promulgation of the regulation, (A) consulted with tribal officials early in the process of developing the proposed regulation;

## Count I
## Violations of 5 U.S.C. § 706(2)(A)

57.     The Plaintiff incorporates by reference Paragraphs 1 through 56 as if more fully set forth herein.

58.     The actions by the Defendants, both taken to date and likely to occur in the near future, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

In violation of 5 U.S.C. § 706(2)(A), the Defendants, in their respective positions, have unlawfully caused the DOI to depart from its established practice of making the two-part determination prior to the Part 151 determination without the requisite notice to Indian Tribes or the public at large that the DOI had changed its practice and procedure. The DOI likewise failed to offer a reasoned explanation supporting its change in historical practice and procedure. Finally, in deciding to make the Part 151 determination prior to the two-part determination, the DOI has acted contrary to Congressional intent expressed in IGRA (and its legislative history) and has failed to publicly articulate its reasoning as to why its new practice and procedure remain consistent with Congressional intent.

59. The DOI issued the Guidance Memorandum without factual support, whether by way of empirical data, evidence studies or otherwise. Further, the DOI did not consider all important aspects of the issue and otherwise relied on factors which Congress did not intend for it to consider. Accordingly, the Guidance Memorandum is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

**Count II**
**Violations of 5 U.S.C. § 706 (2)(B)**

60. The Plaintiff incorporates by reference Paragraphs 1 through 59 as if more fully set forth herein.

61. The Defendants' actions, both taken to date and likely to occur in the near future, in deciding to make the Part 151 determination prior to the two-part determination, and thereafter planning to deny the Tribes' off-reservation gaming application; (and actually denying similar applications submitted by other Indian Tribes) constitute *ultra vires* actions which violate the Due Process clause of the United States Constitution; and, therefore, are contrary to The

St. Croix Tribe's Constitutional rights, power or privilege and are therefore unlawful to 5 U.S.C. § 706(2)(B).

## Count III
### Violations of 5 U.S.C. § 706(2)(C)

62.     The Plaintiff incorporates by reference Paragraphs 1 through 61 as if more fully set forth herein.

63.     The Defendants' actions, both taken to date and likely to occur in the near future, in deciding to make the Part 151 determination prior to the two-part determination, and thereafter planning to deny the Tribes' off-reservation gaming application (and actually denying similar applications submitted by other Indian Tribes) constitute *ultra vires* actions which are in excess of the Interior Department's statutory jurisdiction, authority or limitations, or short of statutory right and are therefore unlawful pursuant to 5 U.S.C. § 706(2)(C).

64.     The Defendants' actions, in issuing or causing to be issued, the Guidance Memorandum constitute an *ultra vires* action which is in excess of the Interior Department's statutory jurisdiction, authority or limitations, or short of statutory right and is therefore unlawful pursuant to 5 U.S.C. § 706(2)(C).

## Count IV
### Violation of 5 U.S.C. § 706(2)(D)

65.     The Plaintiff incorporates by reference Paragraphs 1 through 64 as if more fully set forth herein.

66.     The Defendants' actions, in deciding to make the Part 151 determination prior to the two-part determination, and thereafter planning to deny the Tribes' off-reservation gaming application (and actually denying similar applications submitted by other Indian Tribes)

constitute *ultra vires* actions which are without observance of procedure required by law and are therefore unlawful pursuant to 5 U.S.C. § 706(2)(D).

## Count V
## Violation of Trust Responsibilities

67.    The Plaintiff incorporates by reference Paragraphs 1 through 65 as if more fully set forth herein.

68.    The Defendants' actions, both taken to date and likely to occur in the near future, in deciding to make the Part 151 determination prior to the two-part determination, and thereafter planning to deny the Tribes' off-reservation gaming application (and actually denying similar applications submitted by other Indian Tribes) are violations of the trust responsibilities owed by the Defendants to Indian tribes.

69.    The Defendants' actions, in issuing or causing to be issued, the Guidance Memorandum is a violation of trust responsibilities owed by the Defendants to Indian tribes, including the Plaintiff.

## Count VI
## Violation of 5 U.S.C. §§ 553(b)(c) and 706(2)(D)

70.    The Plaintiff incorporates by reference Paragraphs 1 through 69 as if more fully set forth herein.

71.    The Guidance Memorandum promulgated a substantive or legislative rule (as defined in 5 U.S.C. § 551(4)) as opposed to either an interpretive rule or a general statement of policy.  Nonetheless, the DOI did not follow the APA's notice and comment rule making requirements.  The Guidance Memorandum was therefore issued in violation of the notice and

comment rule making requirements of 5 U.S.C. § 553(b)(c).  The Guidance Memorandum is

invalid, unlawful and unenforceable.

### Count VII
### Failure of the DOI to Follow Its Own Procedures
### (5 U.S.C. § 706(2)(A) and (D)

72.     The Plaintiff incorporates by reference Paragraphs 1 through 71 as if more fully

set forth herein.

73.     As set forth in 66 Fed. Reg. 56608 (November 9, 2001), the DOI committed itself

to conduct prior consultations with Indian tribes in its efforts to "promulgate a new rule" relating

to the proposed standards of review used in reaching a determination as to whether to accept land

into trust.  The DOI similarly committed itself to promulgate any such new standards of review

through the notice and comment rule making process of the APA rather than unilaterally issuing

these standards in a document such as the Guidance Memorandum.  Given that there were no

prior consultations with Indian tribes with respect to the new standards of review to be used in

determining whether to accept land into trust for gaming purpose and, the DOI did not follow the

required APA notice and comment rule making process, the DOI has unlawfully failed to follow

its own prescribed procedures.  This is the case even if, hypothetically, the DOI was not

otherwise required to consult with Indian tribes prior to issuing its Guidance Memorandum  or

was not otherwise required to use the notice and comment rule making procedure of the APA.

Morton v. Ruiz, 415 U.S. 199, 235 (1974).  For these reasons, the Guidance Memorandum is

invalid, unlawful and unenforceable pursuant to 5 U.S.C. § 706(2)(A) and (D) in that it was not

in accordance with law and without observance of the procedure required by law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that this Honorable Court:

1.     Enter a Temporary Restraining Order and a Preliminary Injunction, pending a decision on the merits, that enjoins the Defendants, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise from:

(a)     implementing, enforcing or otherwise carrying out the Department of Interior's recently announced policy and procedure that it will make the Part 151 determination prior to the two-part determination under IGRA (25 U.S.C. § 2719(b)(1)(A)) with respect to Plaintiff and the Bad River Band's pending off-reservation fee-to-trust application for gaming purposes in Beloit, Wisconsin, as well as with respect to pending off-reservation fee-to-trust applications for gaming purposes submitted by other Indian tribes;

(b)     making any decision or determination with respect to the Plaintiff and the Bad River Band's pending application to take land into trust for gaming purposes in Beloit, Wisconsin (as well as from making any decisions or determinations with respect to similar off-reservation applications filed by other Indian tribes to take land into trust for gaming purposes) unless it first makes the required two-part determinations appearing in 25 U.S.C. § 2719(b)(1)(A); and

(c)     implementing, applying or otherwise carrying out the Department of the Interior's Guidance Memorandum with respect to the Plaintiff and the Bad River Band's pending off-reservation fee-to-trust application for gaming purposes in Beloit, Wisconsin as well as with respect to pending off-reservation fee-to-trust applications for gaming purposes submitted by other Indian tribes.

Case 1:07-cv-02210-RJL    Document 18    Filed 01/10/2008    Page 30 of 31

2.      Upon hearing the merits, enter a Declaratory Judgment that:

(a)      the Department of the Interior's decision to make the Part 151 determination prior to the two-part determination under IGRA is invalid, unlawful and unenforceable; and

(b)      the Department of the Interior's Guidance Memorandum is invalid, unlawful and unenforceable;

(c)      in the event that the Plaintiff and the Bad River Band's off-reservation fee-to-trust application is denied, the Department of the Interior's determination is invalid, unlawful and unenforceable if a procedure was utilized by which the Part 151 determination was made prior to the two-part (IGRA) determination and/or the Guidance Memorandum, or any portion thereof, was used as a basis for the denial decision; and

(d)      the Department of the Interior's denials of other Indian tribes' fee-to-trust applications for gaming purposes are invalid, unlawful and unenforceable if the Department of the Interior has utilized the procedure by which the Part 151 determination was made prior to the two-part (IGRA) determination and/or the Guidance Memorandum, or any portion thereof, was used as a basis for the denial decision(s).

3.      Enter an Order providing that, with respect to the Tribes' application to take land into trust for gaming purposes in Beloit, Wisconsin, the Department of the Interior is to make the two-part determination under IGRA prior to the time that it makes a determination under Part 151; and, further providing that in making its Part 151 determination, the Department of the Interior cannot utilize, in any respect, the Guidance Memorandum.

4.      Award the Plaintiff its cost and expenses, including reasonable attorney's fees; and

152306                                      30

5.  Award such other and further relief as is just and proper.

Respectfully submitted,

_____/s/  Robert M. Adler_____

Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1400
Fax:  202-785-4047
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com

*Attorneys for the St. Croix Chippewa*
*Indians of Wisconsin*

Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893

Dated:  January 10, 2008