## IN THE UNITED STATES THE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 1:07-cv--02210-RJL |
| DIRK KEMPTHORNE, et al. | ) ) | Next Scheduled Court Deadline: Oral Argument at 2:00 P.M. on |
| Defendants. | ) ) | January 15, 2008 |

## NOTICE OF THE FILING OF A SECOND MOTION
## FOR A TEMPORARY RESTRAINING ORDER
## AND A MOTION FOR A PRELIMINARY INJUNCTION

Please take notice that the St. Croix Chippewa Indians of Wisconsin, by and through counsel, in connection with the above styled case, has filed with this Court its Second Motion for a Temporary Restraining Order and Preliminary Injunction. A copy of the First Amended Complaint has previously been filed with this Court. The Plaintiff's Memorandum of Points and Authorities, in support of its Motion, the attached Affidavit of Robert M. Adler and a proposed Order have also been electronically filed with the Court. This constitutes all of the papers which

152365

will be presented to the Court at the time of any hearing on the Motion for a Temporary

Restraining Order.

Respectfully submitted,


    /s/ Robert M. Adler
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1400
Fax:  202-785-4047
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com

*Attorneys for the St. Croix Chippewa
Indians of Wisconsin*

Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893


Dated:  January 14, 2008

## IN THE UNITED STATES THE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA | ) | |
| INDIANS OF WISCONSIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:07-cv--02210-RJL |
| | ) | |
| DIRK KEMPTHORNE, et al. | ) | Next Scheduled Court Deadline: |
| | ) | Oral Argument at 2:00 P.M. on |
| Defendants. | ) | January 15, 2008 |
| | ) | |

## PLAINTIFF'S SECOND MOTION FOR
## A TEMPORARY RESTRAINING ORDER

The Plaintiff, the St. Croix Chippewa Indians of Wisconsin ("The St. Croix Tribe"), by and through counsel, hereby moves this Court, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and LCvR 65.1(a) for a Temporary Restraining Order.

The Court's attention is respectfully directed to the attached Memorandum of Points and Authorities filed in support hereof together with the Affidavit of Robert M. Adler with its attached exhibits.

A proposed Order is also appended to this Motion.

152366

WHEREFORE, for the premises considered, the Plaintiff respectfully submits that a

Temporary Restraining Order should be entered by this Court.


Respectfully submitted,


___/s/ Robert M. Adler_____
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1428
Fax:  (202) 785-4047
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com


*Attorneys for the St. Croix Chippewa*
*Indians of Wisconsin*


Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893


Dated:  January 14, 2008

## IN THE UNITED STATES THE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **THE ST. CROIX CHIPPEWA** | ) | |
| **INDIANS OF WISCONSIN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. No. 1:07-cv--02210-RJL** |
| | ) | |
| **DIRK KEMPTHORNE, et al.** | ) | **Next Scheduled Court Deadline:** |
| | ) | **Oral Argument at 2:00 P.M. on** |
| **Defendants.** | ) | **January 15, 2008** |
| | ) | |

## PLAINTIFF'S SECOND MOTION
## FOR A PRELIMINARY INJUNCTION

The Plaintiff, the St. Croix Chippewa Indians of Wisconsin ("The St. Croix Tribe"), by and through counsel, hereby moves this Court, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and LCvR 65.1(a) for a Preliminary Injunction.

The Court's attention is respectfully directed to the attached Memorandum of Points and Authorities filed in support hereof together with the Affidavit of Robert M. Adler with its attached exhibits.

A proposed Order is also appended to this Motion.

152366

WHEREFORE, for the premises considered, the Plaintiff respectfully submits that a
Preliminary Injunction should be entered by this Court.

Respectfully submitted,

_____/s/ Robert M. Adler_____
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1428
Fax:  (202) 785-4047
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com

*Attorneys for the St. Croix Chippewa*
*Indians of Wisconsin*

Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893

Dated:  January 14, 2008

IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ST. CROIX CHIPPEWA    )
INDIANS OF WISCONSIN      )
                          )
        Plaintiff,        )
                          )
v.                        )        Civ. No. 1:07-cv--02210-RJL
                          )
DIRK KEMPTHORNE, et al.   )        Next Scheduled Court Deadline:
                          )        Oral Argument at 2:00 P.M. on
        Defendants.       )        January 15, 2008
                          )

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS SECOND MOTION FOR A
TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

The St. Croix Chippewa Indians of Wisconsin (the "St. Croix Tribe" or the "Plaintiff"),

by and through counsel, hereby submits this Memorandum in support of the above-referenced

Motions.  The Affidavit of Robert M. Adler and its attached exhibits are submitted in support

hereof.  The Plaintiff also relies on the Declaration of its Tribal Chairperson, Hazel Hindsley,

submitted in support of the Plaintiff's earlier motion for injunctive relief.

### Factual Statement

The St. Croix Tribe has previously filed with this Court its Complaint asserting that the

Department of the Interior unlawfully decided to make the Part 151 determination prior to the

Section 20 (IGRA) determination with respect to the pending application submitted by the

Plaintiff (and the Bad River Band) to take land into trust in Beloit, Wisconsin, as well as for

similar applications submitted by other Indian tribes.  The Plaintiff filed a Motion for a

Temporary Restraining Order and a Preliminary Injunction.  The Federal Defendants have filed a

152366

Motion to Dismiss and an Opposition to the requested injunctive relief.  Argument on the

Plaintiff's requested Preliminary Injunction will be heard before this Court on January 15, 2008.

Since the filing of the Complaint herein, other significant and related events have taken

place.  On January 3, 2008, a memorandum was issued by Assistant Secretary Carl Artman to the

BIA Regional Directors as well as to George Skibine, Office of Indian Gaming (hereinafter,

"Guidance Memorandum").  A copy of the Guidance Memorandum is appended to the Affidavit

of Robert M. Adler ("Adler Aff.") as Exhibit A.  The subject matter of this memorandum is

"Guidance on taking off-reservation land into trust for gaming purposes."  This memorandum

was issued without prior consultation with either the Plaintiff or other Indian tribes.  The

Guidance Memorandum's stated purpose was to "clarify" provisions contained in 25 C.F.R.

Section 151.11(b) pertaining to the portion of that regulation which provided that as the distance

between the tribe's reservation and the land to be acquired in trust increased, the Secretary of the

Interior was to give "greater scrutiny" to the tribe's justification of anticipated benefits in the

acquisition and give "greater weight" to concerns raised by state and local governments as the

acquisition's potential impacts on regulatory jurisdiction, real property taxes and special

assessments.  Guidance Memorandum, pages 1-2.

The Guidance Memorandum made it clear, in repeated statements, that its provisions

were required to be followed by the Regional Directors and the Office of Indian Gaming (located

in the BIA's Central Office in Washington, D.C.).  To wit, a separate section of the Guidance

Memorandum provided for "Implementation of Guidance" (emphasis in original) (pages 2-3).  It

stated, in pertinent part, in its ¶ 1:  "All pending applications or those received in the future

should be initially reviewed in accordance with this guidance."  It further provided in its ¶ 2:

> If the initial review reveals that the application fails to address, or
> does not adequately address, the issues identified in this guidance,

the application should be denied and the tribe promptly informed.
This denial does not preclude the tribe from applying for future
off-reservation acquisitions for gaming or other purposes.
However, those future applications will be subject to the same
guidelines.  (emphasis supplied).

The Guidance Memorandum further provided (page 4):  ". . .some of the issues that need
to be addressed in the application if the land is to be taken into trust is off-reservation and for
economic development are. . . ."  (emphasis supplied).  Similar language later appears in the
Guidance Memorandum (page 5), stating ". . .these are important questions that must be
addressed."  (emphasis supplied).

The Guidance Memorandum (page 3), in reference to 25 C.F.R. § 151.11(b), stated that
the reason for the requirement that greater scrutiny be given to the tribe's justification of
anticipated benefits as the distance between the tribe's reservation and the land to be acquired
increases was ". . .as a general principle, the farther the economic enterprise - in this case, a
gaming facility - is from the reservation, the greater the potential for significant negative
consequences on reservation life."  It further stated (pages 3-4) that:  ". . .the location of the
gaming facility can have significant negative effects on reservation life that potentially worsen as
the distance increases."  The Guidance Memorandum then opined (page 4) that if a gaming
facility was not within a "commutable distance of the reservation,". . . the negative impacts on
reservation life could be considerable."

The Guidance Memorandum (page 4) postulates that if the casino is located more than a
"commutable distance" from the reservation, then Tribal members may ". . .be forced to move
away from the reservation to take advantage of the job opportunity."  It goes on to describe this
as a negative impact, stating:  ". . .[t]he departure of a significant number of reservation residents

and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community." Id.

The Plaintiff contends that the Guidance Memorandum was arbitrary and capricious in that when issuing it, the Interior Department had no evidence, studies or empirical data which supported the theories described. The Guidance Memorandum, on its face, did not refer to or rely on any such factual support. Indeed, on information and belief, the Interior Department had no evidence that a tribe's economic enterprise, whether a gaming facility or otherwise, located several hundred miles away from the reservation, would have a negative impact on reservation life.

The Guidance Memorandum describes (pages 5-6) the manner in which "greater weight" is to be given to the concerns of state and local governments as the distance from the reservation to the land to be acquired in trust (for gaming purposes) increases. The Memorandum states (page 5) that: (a) ". . .the farther from the reservation the proposed trust acquisition is, the more the transfer of Indian jurisdiction to that parcel of land is likely to disrupt established governmental patterns"; and (b) ". . .the farther from the reservation the land acquisition is, the more difficult it will be for the tribal government to efficiently project and exercise its governmental and regulatory powers." These theories, once again, represent sheer and unfounded speculation and are not supported by any evidence, studies or empirical data.

Importantly, the Guidance Memorandum imposed binding obligations on Tribal applicants to submit applications that conformed to it. In addition, the Guidance Memorandum did not leave either the Regional Directors or the Office of Indian Gaming free to exercise their own discretion in a manner which was inconsistent with the requirements of the Guidance

Memorandum.  On the very next day following its issuance, the Guidance Memorandum was applied by the Interior Department in a way that indicates that it was, in fact, binding.

On January 4, 2008, the Interior Department, following the dictates of the Guidance Memorandum, denied eleven pending fee-to-trust applications for off-reservation gaming.[1]  A copy of these denial letters is appended to the Affidavit of Robert M. Adler as Exhibit B.  The binding nature of the Guidance Memorandum on these decisions is apparent in that the denial letters followed the theories set forth in the Guidance Memorandum.  This was also confirmed by a Department of the Interior press release issued on January 4, 2008 describing its new Guidance Memorandum as well as the denial letters sent to numerous tribes.  A copy of the press release is appended to the Affidavit of Robert M. Adler as Exhibit C.  The press release stated, in pertinent part:  "Pursuant to the guidance, the Department of the Interior today issued letters to 22 separate tribes with pending applications to take land into trust."  (emphasis supplied).

The Plaintiff submits that, rather than unilaterally issuing the Guidance Memorandum, the Interior Department was required to first go through the APA's notice and comment rule making procedure.  It was also required to consult with Indian tribes before doing so.  Indeed, the Interior Department had publicly committed itself to follow both of these procedures before promulgating standards by which land was to be taken into trust.

This is demonstrated by the history leading up to the issuance of the Guidance Memorandum.  The Interior Department first issued Part 151 regulations on September 18, 1980.  Part 151 had not undergone substantial revision since their adoption until 1999.  64 Fed. Reg. 17574 (April 12, 1999).  In 1999, the Interior Department proposed to substantially revise

---

[1] It is self-evident that the tribes whose applications were summarily denied on January 4, 2008 were not provided any opportunity to provide information responsive to the new requirements imposed by the Guidance Memorandum.

Part 151 "to make clearer that [BIA] will follow a process that is somewhat different, and [BIA] will apply a standard which is somewhat more demanding when a land-into-trust application involves title to lands which are located outside the boundaries of a reservation ('off-reservation lands')." 64 Fed. Reg. at 17574. The effect of this proposal would have been to make the application information needed to acquire off-reservation land more demanding than acquiring on-reservation land. The proposed rules were issued as final rules in 2001. 66 Fed. Reg. 3452 (Jan. 16, 2001).

On August 13, 2001, the Interior Department proposed that the final rules ". . .should be withdrawn and a further rule proposed to better address the public's continued concerns regarding the Department's procedures for taking land into trust for federally-recognized Indian tribes." 66 Fed. Reg. 42474-75 (Aug. 13, 2001). The main concern expressed by the BIA, pertaining to off-reservation acquisitions, was the lack of standards contained in the revised rule. The *Federal Register* notice stated, in pertinent part:

> The Department is considering clarifying the standards that will be used by the Secretary to determine whether to approve an application and defining the burdens of proof that the applicant and those opposing a trust application have to the application….For off-reservation acquisitions, the Department is considering requiring that tribes show by substantial evidence that the acquisition is necessary to facilitate tribal self-determination, economic development, Indian housing, land consolidation, or natural resources protection, and the tribe be further required to show that no demonstrable harm to the local community is realized. The Department is considering requiring that opponents of off-reservation acquisitions show by clear evidence that the acquisition will result in significant harm to the local community or severe negative impacts to the environment. 66 Fed. Reg. at 42475.

Based on the comments received on the proposed withdrawal of the final revisions to Part 151, the Interior Department formally withdrew the final revisions to Part 151 in November

2001, stating that <u>it would engage in consultations</u> with Indian tribes <u>in a new rulemaking</u> to

address specific areas.  66 Fed. Reg. 56608 (November 9, 2001).  The *Federal Register* Notice

stated, in pertinent part:

> . . .the Department has decided to withdraw the final rule in
> whole to address these specific areas of concern in a <u>new</u> <u>rule</u>.
> (emphasis supplied.)

Included in the matters which would be the subject of a new rule, after tribal consultations had

taken place, were "the standards of review used in reaching a determination of whether to accept

land into trust…."  66 Fed. Reg. at 56609-10.  With respect to prior consultations, the Interior

Department made the commitment that the *Federal Register* notice stated, in pertinent part:

> Consistent with Departmental policy <u>to consult</u> with federally-
> recognized Indian tribes on proposed Federal actions that impact
> Indian tribes, the Department <u>will conduct consultation with</u>
> <u>Indian tribes</u> on the following areas in its efforts to promulgate a
> new rule:  …."  (emphasis supplied).  66 Fed. Reg. at 56609-10.

The Interior Department, in withdrawing the final revisions to Part 151, stated at the time

that it would "…allow the current 25 CRF Part 151 to remain in effect during the pendency of

the development of a new rulemaking addressing this matter."  66 Fed. Reg. at 56610.

Thereafter, the Interior Department has never attempted to promulgate revised Part 151

regulations through the notice and comment rule making process.

Prior consultations were also required by Executive Order No. 13175 November 9, 2000,

3 C.F.R. 304 (2001).  It provided, in pertinent part, in its Section 5:

> *Consultation.*  (a)  Each agency shall have an accountable process
> to ensure meaningful and timely input by tribal officials in the
> development of regulatory policies that have tribal implications.
>
> *            *            *
>
> (b)  To the extent practicable and permitted by law, no
> agency shall promulgate any regulation that has tribal

implications, that imposes substantial direct compliance costs on
Indian tribal governments, and that is not required by statute,
unless:

*    *    *

(2)  the agency, prior to the formal promulgation of the
regulation, (A) consulted with tribal officials early in the process
of developing the proposed regulation;

The Plaintiff moves this Court to enter a Temporary Restraining Order and a Preliminary

Injunction in order to prohibit the Interior Department from using the Guidance Memorandum in

making any decision under Part 151 with respect to the Plaintiff (and Bad River Band's) pending

fee-to-trust application as well as for similar pending applications submitted by other Indian

tribes.  The Guidance Memorandum is patently invalid.  Appropriate injunctive relief is required

in order to prevent its continued usage by the Interior Department to deny pending

off-reservation fee-to-trust applications.


**Argument**

Pursuant to the D.C. Circuit's decision in <u>Mova Pharmaceutical v. Shalala</u>, 140 F.3d

1060, 1066 (D.C. Cir. 1998), in order for a party to demonstrate entitlement to Preliminary

Injunction, it must show:  (1) a substantial likelihood of success on the merits; (2) that it would

suffer irreparable injury if the Injunction is not granted; (3) that an Injunction will not

substantially injure other interested parties; and (4) that the public interest will be furthered by

the Injunction.  <u>See</u> <u>also</u> <u>Omar, et al. v. Francis J. Harvey, Secretary of the Army, et al.</u>, 479 F.3d

1, 28 (D.C. Cir. 2007), <u>cert. granted</u>, 128 S. Ct. 741 (2007)(No. 07-394).  "The four factors are

balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by

making a very strong showing on another factor."  <u>Brian Hunter v. Federal Energy Regulatory</u>

Commission, 2007 U.S. Dist. Lexis 90475 at *9 (D.D.C. Dec. 10, 2007). The St. Croix Tribe respectfully submits that these requirements are satisfied herein.

A.      **There is a substantial likelihood of success on the merits.**

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides for a waiver of sovereign immunity if the statutory requirements within the APA itself are met. With respect to the issue presented herein, that issue turns on whether or not the Guidance Memorandum constituted "final agency action" pursuant to 5 U.S.C. § 704. Included within the definition of "agency action" is an "agency rule." 5 U.S.C. § 551(13). Without question, the Guidance Memorandum constitutes an "agency rule" under 5 U.S.C. § 551(4) in that it is an ". . .agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy or describing the. . .procedure or practice requirements of an agency. . . ." 5 U.S.C. § 551(4).

By its own terms, the Guidance Memorandum was not a tentative or inconclusive statement of the Interior Department's position. Rather, it was clearly a "consummation" of the agency's decision making process and therefore satisfied the standard set out by the Supreme Court in Bennett v. Spear, 520 U.S. 154, 177-178 (1997). See also Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan v. John Ashcroft, et al., 360 F. Supp.2d 64, 68 (D.D.C. 2004); Tarbell v. Department of Interior, 307 F. Supp.2d 409, 427 (N.D.N.Y. 2004) (letters from the Assistant Solicitor of the Division of Indian Affairs ". . .articulating an official agency position").

The Guidance Memorandum made it quite clear that its provisions were required to be followed. Agency officials were not free to disregard them in their review of applications. Pending applications or those received in the future which did not meet the standards imposed in

the new Guidance Memorandum were required to be denied.  Guidance Memorandum, page 2,

¶ 2.  Moreover, as described by its own press release, the Interior Department used this Guidance

Memorandum as a basis for its denial on the following day, January 4, 2008, of eleven

off-reservation fee-to-trust gaming applications submitted by various tribes.

General Electric Company v. Environmental Protection Agency, 290 F.3d 377 (D.C. Cir.

2002) is a leading case which presented the issue of whether a guidance document published by

the EPA was a "rule" pursuant to 5 U.S.C. § 551(4).  That, in turn, depended on whether the

guidance document would be considered a legislative rule rather than a statement of policy or an

interpretive rule.  According to the Court at 382:

> Our cases likewise make clear that an agency pronouncement will
> be considered binding as a practical matter if it either appears on
> its face to be binding, Appalachian Power, 208 F.3d at 1023
> ("The entire Guidance, from beginning to end. . .reads like a
> ukase.  It commands, it requires, it orders, it dictates."), or is
> applied by the agency in a way that indicates it is binding.

The Court continued its analysis at 383 by quoting, with approval, from Robert A.

Anthony, Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like -- Should

Federal Agencies Use Them to Bind the Public?, 41 Duke L.J. 1311, 1328-29 (1992):

> A document will have practical binding effect before it is actually
> applied if the affected private parties are reasonably led to believe
> that failure to conform will bring adverse consequences, such
> as … denial of an application.  If the document is couched in
> mandatory language, or in terms indicating that it will be
> regularly applied, a binding intent is strongly evidenced.  In some
> circumstances, if the language of the document is such that
> private parties can rely on it as a norm or safe harbor by which to
> shape their actions, it can be binding as a practical matter.

The Court held that the guidance document had the force of law in that, on its face, it

imposed binding obligations on applicants to submit applications which conformed to it.

General Electric Company, supra at 385.  This, according to the Court, was sufficient to render it

a legislative rule.  Id.  Further, according to the court, the EPA's application of the guidance

document did nothing to demonstrate that it had any lesser effect in practice.  Id.  Since the EPA

had failed to follow the required notice and comment rule making process pursuant to 5 U.S.C.

§ 553, it vacated the guidance document.  Id.

In Croplife America, et al. v. Environmental Protection Agency, et al., 329 F.3d 876

(D.C. Cir. 2003) the issue before the Court was whether an EPA directive (which banned agency

consideration of "third-party" human studies in evaluating the safety of pesticides) constituted a

binding regulation.  The EPA issued this directive in a press release, rather than pursuing the

notice and comment rule making process.  Croplife, supra at 881.  Following General Electric,

supra, the Court held that it was clear that the directive in the press release was one that could not

be ignored.  Croplife, supra at 883.  The Court found that the directive was one which did not

allow the agency decision makers to be free to exercise discretion, but instead bound both private

parties and the agency itself with the "force of law."  Croplife, supra at 883.  For these reasons, it

held that the directive was a substantive rule and that it therefore constituted a regulation rather

than a policy statement.  Id.  Since the required notice and comment procedures were not

followed, the Court vacated the APA's rule.  Croplife, supra at 885.

Quite recently, in Cement Kiln Recycling Coalition v. Environmental Protection Agency,

et al., 493 F.3d 207 (D.C. Cir. 2007), one of the issues presented was whether or not a guidance

document, not promulgated pursuant to the notice and comment procedures of the APA, was

valid.  Cement Kiln, supra at 215, 226.  The Court limited its decision to an analysis as to

whether the document, on its face, was binding in that the agency had not yet applied the

document to any specific decision.  Cement Kiln, supra at 227.  The Court held that nothing on

the face of the guidance document suggested that it was binding.  Id.  In so concluding, it

referred to pages within the document which were ". . .replete with words of suggestion. . . ."  Id.

According to the Court, its pronouncements were described as recommendations that permitting authorities were encouraged to consider but were, at the same time, allowed to ". . .use approaches on a case-by-case-basis that differ from those recommended in this guidance where appropriate." Id. For these reasons, the court held that the guidance document was not binding. That document was in stark contrast to the Guidance Document herein which commanded (page 3) that if the application failed to address, or did not adequately address, the issues identified in the Guidance Memorandum, then, ". . .the application should be denied. . . ."

A very recent decision which is on point is John Chiang v. Dirk Kempthorne, 503 F.Supp.2d 343 (D.D.C. 2007). The plaintiff therein challenged guidelines issued by the Interior Department's Mineral Management Service. The Interior Department argued that the guidelines were merely an explanatory policy statement and did not bind the Department in any way. Chiang, supra at 349. However, the Court found that the guidelines were both binding on their face and had been applied by the agency in a binding fashion. Chiang, supra at 350. According to the Court, the guidelines explicitly stated that agency "will not issue orders to pay or to perform" and "will grant appeals" that run afoul of its expanded statute of limitations. Id. In determining these "definitive pronouncements," the Court found that the language within the guidelines was mandatory. Further, the Court held that the agency was applying the guidelines in a binding fashion. Id.

The Court's analysis in Chiang demonstrates why both the Skibine letter and the Guidance Memorandum are final agency actions. The starting point was the Supreme Court's decision Bennett v. Spear, 520 U.S. 154, 177-78 (1997). Chiang, supra at 350. Under Bennett, in order for an agency action to be "final" there are two prongs which must be satisfied. The first is that it must mark the "consummation" of the agency's decision making process. Id. The

second is that rights or obligations have been determined <u>or</u> from which legal consequences will flow.  <u>Id</u>.  For both the Skibine letter and the Guidance Memorandum, the agency's decision making process had clearly been consummated.  Thus, the first prong was satisfied.  With regard to the second prong, the Court in <u>Chiang</u>, <u>supra</u> at 350, looked to the D.C. Circuit's decision in <u>General Electric Company v. EPA</u>, <u>supra</u> as well as to its decision in <u>National Association of Home Builders v. United States Army Corps of Engineers</u>, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (which discussed <u>Croplife</u> in conducting its finality analysis).  According to the Court in <u>Chiang</u>, judicial reviewability turns on the ultimate question of whether the agency action bound the private parties or the agency itself with the "force of law."  <u>Id</u>.  That, in turn, depended on whether the agency's action appeared on its face to be binding or is applied by the agency in a way that indicated it was binding.  <u>Id</u>.

The Guidance Memorandum, both on its face and in its actual application, reflected that it was binding.  Thus, the second prong has been satisfied.[2]

The Plaintiff has asserted in Count I of the First Amended Complaint that the Guidance Memorandum was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  The Court in <u>Chiang</u>, following <u>Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Company</u>, 463 U.S. 29 (1983), held that an agency's decision was arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is

---

[2] Similarly, the Skibine letter, both by its own terms and in its actual application, reflected that the agency considered it to be binding.  This is reflected by the agency proceeding to issue the Guidance Memorandum, making it quite clear that the first decision which would be made for pending off-reservation gaming applications was the Part 151 determination ; and, thereafter, proceeding to deny eleven separate applications under Part 151.

so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Chiang, supra at 352. The Court found, following State Farm, supra, that, in fact, the guidelines were in violation of 5 U.S.C. § 706(2)(A) for these reasons. The Court continued to hold that in promulgating the guidelines:  ". . .the agency did not consider many important aspects of the relevant problem, as the Guidelines are virtually bereft of any justification whatsoever"; the Guidelines ". . .failed to address several other obvious competing concerns. . ."; and, to the extent that the Guidelines' policy was based on the need to conserve agency resources, they ". . .failed to provide any discussion about the amount of resource savings that would result and how the new policy would improve the overall functioning of the agency." Chiang. supra at 352. For these reasons, following State Farm, the Court held that the guidelines were arbitrary and capricious. Chiang, supra at 353.

Similarly, the Guidance Memorandum herein was "bereft" of any justification for its stated theories and policies. This included the following:  (1) the further the gaming facility was away from the reservation, "the greater the potential for significant negative consequences on reservation life (page 3); (2) ". . .the location of the gaming facility can have significant negative effects on reservation life that potentially worsen as the distance increases." (pages 3-4); (3) negative impacts on reservation life "could be considerable" if tribal members who were residents of the reservation will not be able to take advantage of job opportunities if they desire to remain on the reservation or will be forced to move away from the reservation to take advantage of the job opportunity (page 4); (4) where residents of the reservation are not able to take advantage of the job opportunities if they desire to remain there, "the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation."; (5) "the departure of a significant number of reservation residents and their

families could have serious and far-reaching implications to the remaining tribal community and its continuity as a community." (page 4).

The Guidance Memorandum makes no reference to any evidence, studies or empirical data which supports any of its stated views. Moreover, on its face, its assumptions are clearly ill-founded. As is well known, most Indian reservations have high unemployment rates with many low-paying jobs for those who are able to find employment. Many enrolled members have left the reservations to find employment elsewhere. Accordingly, when good jobs become available at a tribe's enterprise located as much as several hundred miles away, how that can possibly have a negative effect on either the tribal members or the reservation itself is a mystery. Further, while the Guidance Memorandum recognizes that the income stream from an off-reservation gaming facility can be used to fund tribal services, develop tribal infrastructure and provide per capita payments to tribal members (page 3), it cannot possibly be claimed by the Interior Department with any degree of accuracy that an off-reservation casino will at the same time have a negative impact on reservation life. Similar to the Court's holding in <u>Chiang</u>, the Guidance Memorandum is arbitrary and capricious.[3]

Finally, the Plaintiff submits there were no consultations between the Interior Department and Indian tribes prior to the issuance on January 3, 2008 of the Guidance Memorandum. Amended Complaint, ¶ 41. Executive Order No. 13175 itself required prior consultations before any regulation was promulgated that had tribal implications. At the time the Interior Department formally withdrew its final revisions to Part 151 in November 2001, its *Federal Register* notice

---

[3] In contending that the Guidance Memorandum is arbitrary, capricious, an abuse of discretion and contrary to law, the Plaintiff also relies on the arguments made in its Memorandum of Points and Authorities (and the Exhibits attached thereto) filed in support of its Motion to Seal pending further Order of this Court.

(66 Fed. Reg. 56608 (November 9, 2001) stated that it would thereafter consult with federally

recognized Indian tribes on proposed Federal actions which impacted Indian tribes ". . .in its

efforts to promulgate a new rule. . . ."  Not only were consultations required under the referenced

Executive Order, but the Interior Department bound itself, prior to promulgating a regulation

which promulgated new standards for land to be  taken into trust pursuant to 25 C.F.R. Part 151

to consultations.  However, the Interior Department both failed to consult and to utilize the

notice and comment rule making provisions of the APA.  An agency is required to follow its own

procedures.  Morton v. Ruiz, 415 U.S. 199, 235 (1974).  The Interior Department failed to do so.

Accordingly, its Guidance Memorandum is invalid and unenforceable.

The Plaintiff's legal challenge to the Guidance Memorandum is clearly ripe for judicial

review.  As held by the Supreme Court in Ohio Forestry Association, Inc. v. Sierra Club, 523

U.S. 726, 737 (1998):

> [A] person with standing who is injured by a failure to comply
> with [statutory] procedure may complain of that failure at the
> time the failure takes place, for the claim can never get riper.

In their Opposition to the Plaintiff's Motion for Injunctive Relief relating to the decision

to make the Part 151 determination prior to the two-part determination, the Federal Defendants

asserted that the  issue was not ripe for review in that no decision had been made on the

fee-to-trust application itself.  The D.C. Circuit's decision in General Electric Company v.

Environmental Protection Agency, supra at 380-381, disposed of that argument.  The Court held

that the challenge to the guidance document therein was "fully fit for review."  General Electric,

supra at 380,  The Court's reasoning was that whether or not the guidance document was a

legislative rule was ". . .largely a legal, not a factual question, turning as it does in this case

primarily upon the text of the Document."  Id.  The Court came to the same conclusion in

Cement Kiln Recycling Coalition v. Environmental Protection Agency, et al., supra at 216.  The

Court also held out that if the agency's practical application is important in determining whether

or not the guidance document or other statement was a legislative rule, then fitness for review

may wait until it can be determined how the agency actually applied the document.  Id.  In the

case at bar, however, the Interior Department has already applied the Guidance Memorandum in

denying eleven fee-to-trust applications.  Accordingly, even if the Government argues that the

actual application of the Guidance Memorandum is important in determining whether it is or is

not a legislative rule, we are past that point in view of the eleven denial letters issued on

January 4, 2008.

In Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18 (1st Cir. 2007), the Interior

Department contended that the Plaintiff's claims were not ripe because it rested on future

contingencies that had not yet occurred.  Nulankeyutmonen Nkihtaqmikon, supra at 32-33.

However, the First Circuit rejected that argument, holding that it ". . .misses the mark."  Id.

According to the Court:  "Plaintiffs' alleged injury is the BIA's failure to follow federal law

before approving [a] lease."

**B.    The Plaintiff Would Suffer Irreparable Injury if the Requested Injunction is Not Granted.**

Should this Court deny the Plaintiff's pending Motion for injunctive relief prohibiting the

Interior Department from utilizing its new procedure to make the Part 151 determination first

with respect to its pending off-reservation casino application, it is patently obvious that the

Interior Department will proceed, as it did with the pending fee-to-trust applications of eleven

other tribes, to deny the Beloit off-reservation casino application.  It is quite clear from the

Interior Department's acknowledged use of the Guidance Memorandum in issuing the eleven

denial letters, it will continue to rely on the Guidance Memorandum.  The Plaintiff submits that

injunctive relief is required in order to prohibit the use by the Interior Department of the legally

flawed Guidance Memorandum -- whether for the Plaintiff's application or for similar

applications submitted by other Indian tribes which have not, as of this date, been denied.  As

previously set forth in the Declaration of Hazel Hindsley filed in support of the Plaintiff's

original Motion for Temporary Restraining Order and Injunctive Relief, incorporated herein by

reference, the St. Croix Tribe itself has to date spent well in excess of $1 million on this project.

Hindsley Declaration, ¶ 6,  Further, the St. Croix Tribe's ability to accumulate the resources

needed to meet its substantial unmet needs, to obtain the capital for further economic

development, to increase employment for tribal members, to decrease its dependence on funding,

is largely dependent on the approval of the Beloit Casino Project.   Hindsley Declaration, ¶4.

See also Hindsley Declaration, ¶ 11.

    The D.C. Circuit in National Wildlife Federation v. Burford, et al., 835 F.2d 305, 325

(D.C. Cir. 1987) made it imminently clear that when there is procedural harm claimed, as there is

herein, then that is the irreparable injury which an injunction is designed to stay:

> A preliminary injunction is designed to prevent irreparable injury;
> its value would be totally eviscerated if the plaintiff had to show
> that the harm had already occurred before the court could issue
> the injunction."  (emphasis in original).

            \*      \*      \*

> . . .Mountain States appears to misunderstand the purpose of the
> preliminary injunction; it is designed precisely to prevent the
> Secretary from exercising his discretion in circumstances in
> which it likely would lead to irreparable injury.

**C.** **The Issuance of a Preliminary Injunction Will Not Cause Substantial Harm to the Department of the Interior.**

The Plaintiff seeks issuance of a Preliminary Injunction so that the status quo can be maintained until there is a full hearing and decision on the merits. This should not cause any substantial harm to the Interior Department. There can be no justifiable reason why a delay in issuing any further determinations will cause "substantial harm."

**D.** **The Public Interest Will Be Served by the Issuance of a Preliminary Injunction.**

The public interest weighs strongly in favor of the issuance of a Preliminary Injunction so that time is allowed for a thorough judicial review and decision by this Court on the merits of the issues raised herein. National Treasury Employees Union v. U.S. Department of Treasury, 838 F.Supp. 631, 640 (D.D.C. 1993) ("The preservation of. . .the legality of the process by which government agencies function certainly weighs heavily in the public interest.")l Clarke v. Ofc. of Fed. Housing Enterp. Oversight, 355 F.Supp.2d 56, 66 (D.D.C. 2004) ("There is a substantial public interest in ensuring that [the agency] acts within the limits of its authority.")

The Plaintiff submits that unless and until the issues raised by the Plaintiff herein are resolved by this Court, it would make little sense for the Interior Department to proceed to make Part 151 decisions for the Beloit or other similar applications, since by doing so, it would be forced to rescind those decisions if the Federal Defendants do not prevail in this litigation. In fact, at the Court's hearing on December 12, 2007, this point was raised by the Court with Government counsel. See Hearing Transcript (appended as Exhibit A to the Plaintiff's Memorandum in reply to the Federal Defendants' Memorandum of Points and Authorities in

Support of Defendants' Motion to Dismiss and in Response to Plaintiff's Motion for a Preliminary Injunction) at 13-14.

If the requested injunctive relief is issued, it will not negatively impact Indian tribes who are not party to this litigation.  An injunction would prohibit the Interior Department from unlawfully proceeding to deny the Plaintiff's pending off-reservation fee-to-trust gaming application, as well as similar applications submitted by other tribes, where the distance between the established reservation and the proposed casino is more than "commutable."  These tribes' interests certainly cannot be said to be harmed by enjoining the Interior Department from making decisions on their applications until the legal issues have first been resolved by this Court.

## Conclusion

For the reasons set forth herein, the Plaintiff submits that its requested Temporary Restraining Order and Preliminary Injunction should be issued by this Court pending a decision on the merits.

Respectfully submitted,

        /s/ Robert M. Adler
Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1428
Fax:  (202) 785-4047
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com

*Attorneys for the St. Croix Chippewa*
*Indians of Wisconsin*

152366                                          20

Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893

Dated:  January 14, 2008

## IN THE UNITED STATES THE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA<br>INDIANS OF WISCONSIN | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:07-cv--02210-RJL |
| | ) | |
| DIRK KEMPTHORNE, et al. | ) | **Next Scheduled Court Deadline:** |
| | ) | **Oral Argument at 2:00 P.M. on** |
| Defendants. | ) | **January 15, 2008** |
| | ) | |

## AFFIDAVIT OF ROBERT M. ADLER

ROBERT M. ADLER, being duly sworn, deposes and sayeth that:

1.    I am the lead counsel for the Plaintiff in this matter.

2.    Appended hereto as Exhibit A is a true and accurate copy of a Memorandum dated January 3, 2008 sent by Assistant Secretary Artman to the Regional Directors of the Bureau of Indian Affairs as well as to George Skibine, Office of Indian Gaming. The subject matter of that memorandum was "Guidance on taking off-reservation land into trust for gaming purposes."

3.    Appended hereto as Exhibit B are true and accurate copies of eleven letters sent by the Department of the Interior on January 4, 2008 to the identified Indian tribes. In each of these letters, the Department of the Interior declined to take the designated land into trust for gaming purposes.

4.    Appended hereto as Exhibit C is a true and accurate copy of a press release issued by the Department of the Interior on January 4, 2008 relating to the Guidance memorandum

152397

(Exhibit A hereto) dated January 3, 2008 and the denial letters to eleven tribes issued pursuant to the Guidance memorandum (Exhibit B hereto).

      FURTHER, AFFIANT SAYETH NOT.

Dated:  January 14, 2008

_____
      ROBERT M. ADLER

| District of Columbia | ) | |
|---|---|---|
| | ) | ss: |
| City of Washington | ) | |

    Subscribed and sworn to before me this _14th_ day of _January_, 2008.

_____   My commission expires:
Notary Public

**Joanne K. Comisiak**
**Notary Public, District of Columbia**
**My Commission Expires 09-30-2008**

# EXHIBIT A

01-04-2008  08:18pm  From-                                    T-385  P.002/007  F-850



# United States Department of the Interior

## OFFICE OF THE SECRETARY
### WASHINGTON, D.C. 20240



**Memorandum**

**To:**     Regional Directors, Bureau of Indian Affairs
           George Skibine, Office of Indian Gaming

**From:**  Assistant Secretary Carl Artman

**Date:**  January 3, 2008

**Subject:** Guidance on taking off-reservation land into trust for gaming purposes

The Department currently has pending 30 applications from Indian tribes to take off-reservation land into trust for gaming purposes as part of the 25 U.S.C. § 2719(b)(1)(A) two-part determination. Many of the applications involve land that is a considerable distance from the reservation of the applicant tribe; for example, one involves land that is 1400 miles from the tribe's reservation. Processing these applications is time-consuming and resource-intensive in an area that is constrained by a large backlog and limited human resources.

The decision whether to take land into trust, either on-reservation or off-reservation, is discretionary with the Secretary. Section 151.11 of 25 C.F.R. Part 151 sets forth the factors the Department will consider when exercising this discretionary authority with respect to "tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation." Section 151.11(b) contains two provisions of particular relevance to applications that involve land that is a considerable distance from the reservation. It states that, as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give:

1)     greater scrutiny to the tribe's justification of anticipated benefits from the acquisition; and

2)     greater weight to concerns raised by state and local governments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

Part 151, however, does not further elaborate on how or why the Department is to give "greater scrutiny" and "greater weight" to these factors as the distance increases. The purpose of this guidance is to clarify how those terms are to be interpreted and applied,

1

particularly when considering the taking of off-reservation land into trust status for gaming purposes.

## Core Principles

As background to the specific guidance that follows, it is important to restate the core principles that underlie the Part 151 regulations and that should inform the Department's interpretation of, and decisions under, those regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations". The IRA contains also provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which was just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised discretion regarding trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing directly to do with Indian gaming. The Indian Gaming Regulatory Act of 1988 (IGRA), 25 U.S.C. § 2701 et seq., adopted more than 50 years after the IRA, sets the parameters of Indian gaming. One requirement is that if gaming is to occur on off-reservation lands those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities far from existing reservations. Whether land should be taken into trust far from existing reservations for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

## Implementation of Guidance

This guidance should be implemented as follows:

1. All pending applications or those received in the future should be initially reviewed in accordance with this guidance. The initial review should precede any effort (if it is not already underway) to comply with the NEPA requirements of section 151.10(h).

2. If the initial review reveals that the application fails to address, or does not adequately address, the issues identified in this guidance, the application should be denied and the tribe promptly informed. This denial does not preclude the tribe from applying for future off-reservation acquisitions for gaming or other purposes. However, those future applications will be subject to these same guidelines.

3. A greater scrutiny of the justification of the anticipated benefits and the giving greater weight to the local concerns must still be given to all off-reservation land into trust applications, as required in 25 C.F.R. § 151.11(b). This memorandum does not diminish that responsibility, but only provides guidance for those applications that exceed a daily commutable distance from the reservation.

### Greater Scrutiny of Anticipated Benefits

The guidance in this section applies to all applications, pending or yet to be received, that involve requests to take land into trust that is off-reservation. Reviewers must, in accordance with the regulations at 25 C.F.R. 151.11(b), "give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" as the distance between the acquisition and the tribe's reservation increases. The reviewer should apply this greater scrutiny as long as the requested acquisition is off-reservation regardless of the mileage between the tribe's reservation and proposed acquisition. If the proposed acquisition exceeds a commutable distance from the reservation the reviewer, at a minimum, should answer the questions listed below to help determine the benefits to the tribe. A commutable distance is considered to be the distance a reservation resident could reasonably commute on a regular basis to work at a tribal gaming facility located off-reservation

As noted above, section 151.11(b) requires the Secretary to "give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" of trust land "as the distance between the tribe's reservation and the land to be acquired increases." The reason for this requirement is that, as a general principle, the farther the economic enterprise - in this case, a gaming facility - is from the reservation, the greater the potential for significant negative consequences on reservation life.

Tribes typically view off-reservation gaming facilities as providing two economic benefits to the tribe. The first is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, and thus can have a positive effect on reservation life. Obviously, the income stream from a gaming facility is not likely to decrease as the distance from the reservation increases. In fact, off-reservation sites are often selected for gaming facilities because they provide better markets for gaming and potentially greater income streams than sites on or close to the reservation.

The second benefit of off-reservation gaming facilities is the opportunity for job training and employment of tribal members. With respect to this benefit, the location of the

gaming facility can have significant negative effects on reservation life that potentially worsen as the distance increases. If the gaming facility is not within a commutable distance of the reservation, tribal members who are residents of the reservation will either: a) not be able to take advantage of the job opportunities if they desire to remain on the reservation; or b) be forced to move away from the reservation to take advantage of the job opportunity.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. High on-reservation unemployment rates, with their attendant social ills, are already a serious problem on many reservations. A gaming operation on or close to the reservation allows the tribe to alleviate this situation by using their gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the existence of the off-reservation facility would require or encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the applicant tribe and may mitigate some potential negative impacts, no application to take land into trust beyond a commutable distance from the reservation should be granted unless it carefully and comprehensively analyzes the potential negative impacts on reservation life and clearly demonstrates why these are outweighed by the financial benefits of tribal ownership in a distant gaming facility.

As stated above, some of the issues that need to be addressed in the application if the land is to be taken into trust is off-reservation and for economic development are:

What is the unemployment rate on the reservation? How will it be affected by the operation of the gaming facility?

How many tribal members (with their dependents) are likely to leave the reservation to seek employment at the gaming facility? How will their departure affect the quality of reservation life?

How will the relocation of reservation residents affect their long-term identification with the tribe and the eligibility of their children and descendants for tribal membership?

What are the specifically identified on-reservation benefits from the proposed gaming facility? Will any of the revenue be used to create on-reservation job opportunities?

As long as it remains the policy of the Federal government to support and encourage growth of reservations governed by tribal governments, these are important questions that must be addressed before decisions about off-reservation trust land acquisitions are made. The Department should not use its IRA authority to acquire land in trust in such a way as to defeat or hinder the purpose of the IRA. It should be noted that tribes are free to pursue a wide variety of off-reservation business enterprises and initiatives without the approval or supervision of the Department. It is only when the enterprises involve the taking of land into trust, as is required for off-reservation Indian gaming facilities, that the Department must exercise its IRA authority.

<u>Greater Weight</u>

Section 151.11(b) also requires the Secretary to give "greater weight" than he might otherwise to the concerns of state and local governments. Under the regulations, state and local governments are to be immediately notified of a tribe's application to take land into trust, and are to file their comments in writing no later than 30 days after receiving notice. The reviewer must give a greater weight to the concerns of the state and local governments no matter what the distance is between the tribe's reservation and the proposed off-reservation acquisition. This is the second part of the two part review required by section 151.11(b).

The regulations identify two sets of state and local concerns that need to be given "greater weight:" 1) jurisdictional problems and potential conflicts of land use; and 2) the removal of the land from the tax rolls. The reason for this requirement of giving "greater weight" is two-fold. First, the farther from the reservation the proposed trust acquisition is, the more the transfer of Indian jurisdiction to that parcel of land is likely to disrupt established governmental patterns. The Department has considerable experience with the problems posed by checkerboard patterns of jurisdiction. Distant local governments are less likely to have experience dealing with and accommodating tribal governments with their unique governmental and regulatory authorities. Second, the farther from the reservation the land acquisition is, the more difficult it will be for the tribal government to efficiently project and exercise its governmental and regulatory powers.

With respect to jurisdictional issues, the application should include copies of any intergovernmental agreements negotiated between the tribe and the state and local governments, or an explanation as to why no such agreements exist. Failure to achieve such agreements should weigh heavily against the approval of the application.

With respect to land use issues, the application should include a comprehensive analysis as to whether the proposed gaming facility is compatible with the current zoning and land use requirements of the state and local governments, and with the uses being made of adjacent or contiguous land, and whether such uses would be negatively impacted by the traffic, noise, and development associated with or generated by the proposed gaming facility. Incompatible uses might consist of adjacent or contiguous land zoned or used for: National Parks, National Monuments, Federally designated conservation areas,

National Fish and Wildlife Refuges, day care centers, schools, churches, or residential developments. If the application does not contain such an analysis, it should be denied.

Conclusion

The Office of Indian Gaming will review the current applications. If an application is denied subsequent to this review, the applicant tribe will be notified immediately. Tribes receiving a denial subsequent to this review may resubmit the application with information that will satisfy the regulations. Regional directors shall use this clarification to guide their recommendations or determinations on future applications to take off-reservation land into trust.

# EXHIBIT B
# (Part 1)



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



TAKE PRIDE
IN AMERICA

JAN 0 4 2008

The Honorable Virgil Moorehead
Chairman, Big Lagoon Rancheria
P.O Drawer 3060
Trinidad, California 95570

Dear Chairman Moorehead:

On March 27, 2006, the Big Lagoon Rancheria (Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust a 23.1-acre parcel of land in Barstow, San Bernardino County, California (Barstow parcel). The Tribe proposes to develop a gaming facility and other uses incidental thereto on the land.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming

operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.     25 C.F.R. 151.3  Land acquisition policy.**

The regulations require the Department, in 25 C.F.R. 151.3(a)(3), to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 550 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations in Barstow that could then be used to satisfy tribal needs on the reservation.

**B.     25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations require the Department, in 25 C.F.R. 151.10(b), to evaluate the need of the Tribe for additional land. Although the Tribe owns only approximately 25 acres of trust lands, it only has approximately 18 members. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of 23.1 acres, located hundreds of miles from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.     25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility.

**D.     25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation. As the distance increases, the Secretary must give greater scrutiny to the

2

Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation and the proposed Barstow parcel are located in the State of California, approximately 550 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Barstow because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that, "the Tribe is currently unable to engage in any meaningful economic development on its existing reservation. The environmentally sensitive areas located on and off the reservation have prevented the development of almost all economic activities there – currently the only use of the reservation is for tribal housing." Therefore, the primary expected benefit is the income stream from the gaming facility, which can provide support for existing governmental services, including Two Feathers Native American Family Services, which provides various social services to tribal members and other Native Americans living in Humboldt County, and the Tribe's education, social services, roads, tribal government, fire, community services, and child welfare programs to its members. However, the general descriptions do not provide sufficient detail to allow a determination by the Secretary of the specific benefits expected from the use of net gaming revenues.

The second benefit of the proposed gaming facility is the opportunity for job training and employment of tribal members living on the reservation. We note that the Tribe has a Tribal Employment Rights Ordinance which was enacted to enhance tribal employment. However, no expected on-reservation employment benefits are described in the application, so it is not possible for the Secretary to make a determination of the employment benefits to tribal members living on the reservation. With respect to this benefit, the location of the proposed gaming facility can have significant negative effects on reservation life. Because the proposed gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of

the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Barstow parcel and has determined that it will not accept the land into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

4



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



JAN 0 4 2008

The Honorable Charles F. Wood
Chairman, Chemehuevi Indian Tribe
P.O. Box 1976
Havasu Lake, California 92362

Dear Chairman Wood:

On February 16, 2006, the Chemehuevi Indian Tribe (Tribe) submitted to the Bureau of
Indian Affairs (BIA) an application to acquire in trust a 40-acre parcel of land in Barstow,
California (Barstow parcel). The Tribe proposes to construct, develop, and manage a
resort gaming facility, hotel, and other uses incidental thereto on the parcel.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to
begin by restating the core principles that underlie the land acquisitions regulations. The
Part 151 regulations implement the trust land acquisition authority given to the Secretary
by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was
primarily intended to redress the effects of the discredited policy of allotment, which had
sought to divide up the tribal land base among individual Indians and non-Indians, and to
destroy tribal governments and tribal identity. To assist in restoring the tribal land base,
the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining
surplus lands of any Indian reservation" that had been opened to sale or disposal under
the public land laws; 2) consolidate Indian ownership of land holdings within
reservations by acquiring and exchanging interests of both Indians and non-Indians; and
3) acquire, in his discretion, interests in lands "within or without existing reservations."
The IRA also contains provisions strengthening tribal governments and facilitating their
operation. The policy of the IRA, which is just the opposite of allotment, is to provide a
tribal land base on which tribal communities, governed by tribal governments, could exist
and flourish. Consistent with the policy, the Secretary has typically exercised his trust
land acquisition authority to take lands into trust that are within, or in close proximity to,
existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory
Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the
criteria under which gaming activities can occur on Indian lands. One requirement is that
if gaming is to occur on off-reservation lands, those lands must be trust lands "over which
an Indian tribe exercises governmental power." The authority to acquire trust lands,
however, is derived from the IRA; no trust land acquisition authority is granted to the
Secretary by IGRA. The Department has taken the position that although IGRA was
intended to promote the economic development of tribes by facilitating Indian gaming

operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3 Land acquisition policy.**

The regulations require the Department, in 25 C.F.R. 151.3(a)(3), to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 135 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at Barstow that could then be used to satisfy tribal needs on the reservation.

**B.    25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations require the Department, in 25 C.F.R. 151.10(b), to evaluate the need of the Tribe for additional land. The Tribe owns approximately 30,600 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of approximately 40 acres, located 135 miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.    25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10 (c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its reservation.

**D.    25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's

2

reservation. As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation and the proposed Barstow parcel are located in the State of California, approximately 135 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Barstow because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state in Resolution No. 06-01-28-01 that, "[t]he Project will provide the revenues necessary to fund essential governmental services on the Reservation, allow the Tribe to finance and develop businesses on the reservation." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The general statements in the application on tribal programs and needs do not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues to either on-reservation employment of tribal members, or specific tribal programs and operations.

The second benefit of the proposed gaming facility is the opportunity for job training and employment of tribal members living on reservation. In your application you state in Resolution No. 06-01-28-01 that the Project will, "create jobs on the Reservation that will improve the standard of living for all persons who live and work on the reservation." Your application does not indicate, however, that the Tribe expects the off-reservation location to provide jobs directly to residents of the reservation. With respect to job training and employment, the location of the gaming facility can have other significant negative effects on reservation life. Because the proposed gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high on-reservation unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a

3

significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Barstow parcel and has determined that it will not accept the land into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

TAKE PRIDE
IN AMERICA

The Honorable Kenneth Meshigaud    JAN 0 4 2008
Chairperson, Hannahville Indian Community
N14911 Hannahville B1 Road
Wilson, Michigan 49896-9728

Dear Chairperson Meshigaud:

On February 16, 2006, the Hannahville Indian Community (Tribe) submitted to the
Bureau of Indian Affairs (BIA) an application to acquire in trust a 9.8-acre parcel of land
in Romulus, Wayne County, Michigan (Romulus parcel). The Tribe proposes to
construct, develop, and manage a gaming facility, hotel, and other uses incidental thereto
on the parcel.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to
begin by restating the core principles that underlie the land acquisitions regulations. The
Part 151 regulations implement the trust land acquisition authority given to the Secretary
by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was
primarily intended to redress the effects of the discredited policy of allotment, which had
sought to divide up the tribal land base among individual Indians and non-Indians, and to
destroy tribal governments and tribal identity. To assist in restoring the tribal land base,
the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining
surplus lands of any Indian reservation" that had been opened to sale or disposal under
the public land laws; 2) consolidate Indian ownership of land holdings within
reservations by acquiring and exchanging interests of both Indians and non-Indians; and
3) acquire, in his discretion, interests in lands "within or without existing reservations."
The IRA also contains provisions strengthening tribal governments and facilitating their
operation. The policy of the IRA, which is just the opposite of allotment, is to provide a
tribal land base on which tribal communities, governed by tribal governments, could exist
and flourish. Consistent with the policy, the Secretary has typically exercised his trust
land acquisition authority to take lands into trust that are within, or in close proximity to,
existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory
Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the
criteria under which gaming activities can occur on Indian lands. One requirement is that
if gaming is to occur on off-reservation lands, those lands must be trust lands "over which
an Indian tribe exercises governmental power." The authority to acquire trust lands,
however, is derived from the IRA; no trust land acquisition authority is granted to the
Secretary by IGRA. The Department has taken the position that although IGRA was

intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated January 17, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3 Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 457 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at Romulus that could then be used to satisfy tribal needs on the reservation.

**B.    25 C.F.R. 151.10(b). The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 5,800 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of less than 9.8 acres, located 457 miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.    25 C.F.R. 151.10(c). The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10 (c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its reservation.

**D.    25 C.F.R. 151.11(b). The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's

reservation. As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation and the proposed Romulus property are located in the State of Michigan, approximately 457 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Romulus because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that the off-reservation project is proposed because the Tribe's current casino on its Reservation on the Upper Peninsula of Michigan "due to its remote location, cannot generate sufficient income to provide the essential governmental services that are needed for the Tribe's members." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The general statements in the application on tribal programs and needs do not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues to either on-reservation employment of tribal members, or specific tribal programs and operations.

The other benefit of a gaming facility is the opportunity for job training and employment of tribal members living on reservation. We note that the Tribe has a Tribal Employment Rights Ordinance which was enacted to enhance tribal employment. However, no expected on-reservation employment benefits are described in the application, so it is not possible for the Secretary to make a determination of the employment benefits to tribal members living on the reservation. The location of the gaming facility can have other significant negative effects on reservation life that can worsen as the distance increases. If the gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using their gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In this case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of

3

the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Romulus property, concludes the Tribe's need for additional land is not justified in this situation, and has determined that it will not accept the property into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

cc:    Regional Director, Midwest Region

4



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



§                    JAN 0 4 2008

The Honorable Raymond Gachupin
Governor, Pueblo of Jemez
P.O. Box 100
Jemez Pueblo, New Mexico 87024

Dear Governor Gachupin:

On December 23, 2004, the Pueblo of Jemez (Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust a 78.43-acre parcel of land in Anthony, Dona Ana County, New Mexico (Anthony property). The Tribe proposes to develop and operate a major resort, and casino facility, and other uses incidental thereto on the parcel.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming

operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3  Land acquisition policy.**

The regulations require the Department, in 25 C.F.R. 151.3(a)(3), to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 293 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Anthony property gaming facility that could then be used to satisfy tribal needs on the reservation.

**B.    25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations require the Department, in 25 C.F.R. 151.10(b), to evaluate the need of the Tribe for additional land. The Tribe owns approximately 89,600 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of less than 79 acres, located 293 of miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.    25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility.

**D.    25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's

2

reservation. As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation and the proposed Anthony property are located in the State of New Mexico, approximately 293 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment on the Anthony property because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that, "an off reservation gaming operation in Anthony, NM, is preferred because the Pueblo's current location of its existing reservation is too remote from major population centers and the competition from neighboring Indian tribes who have established gaming casinos is too great." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, all anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The application describes the existing conditions of government operations on the reservation, including the unmet needs. However, the general descriptions do not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues.

The second benefit of the proposed gaming facility is the opportunity for job training and employment of tribal members living on reservation. Your application says, "there is serious unemployment among tribal members," and, "the Tribe's unemployment rate is thought to be in excess of 50%, and is possibly 66%, and there are few employment opportunities on the Reservation." Further, the application states, "[T]he Pueblo intends to hire Dona Ana County residents for the casino." These statements indicate that the Tribe does not expect the off-reservation location to provide jobs directly to residents of the reservation. The location of the gaming facility can have significant negative effects on reservation life. Because the proposed gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

3

In the second case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Anthony property and has determined that it will not accept the land into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

4



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



JAN 0 4 2008

The Honorable Victoria A. Doud
Tribal President, Lac du Flambeau Band of
    Lake Superior Chippewa Indians of Wisconsin
P.O. Box 67
Lac du Flambeau, Wisconsin 54538

Dear Tribal President Doud:

On September 27, 2001, the Lac du Flambeau Band of Lake Superior Chippewa Indians
(Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust
a 20-acre parcel of land in Shullsburg, Lafayette County, Wisconsin (Shullsburg parcel).
The Tribe proposes to construct, develop, and manage a destination gaming resort
complex and other uses incidental thereto on the parcel.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to
begin by restating the core principles that underlie the land acquisitions regulations. The
Part 151 regulations implement the trust land acquisition authority given to the Secretary
by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was
primarily intended to redress the effects of the discredited policy of allotment, which had
sought to divide up the tribal land base among individual Indians and non-Indians, and to
destroy tribal governments and tribal identity. To assist in restoring the tribal land base,
the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining
surplus lands of any Indian reservation" that had been opened to sale or disposal under
the public land laws; 2) consolidate Indian ownership of land holdings within
reservations by acquiring and exchanging interests of both Indians and non-Indians; and
3) acquire, in his discretion, interests in lands "within or without existing reservations."
The IRA also contains provisions strengthening tribal governments and facilitating their
operation. The policy of the IRA, which is just the opposite of allotment, is to provide a
tribal land base on which tribal communities, governed by tribal governments, could exist
and flourish. Consistent with the policy, the Secretary has typically exercised his trust
land acquisition authority to take lands into trust that are within, or in close proximity to,
existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory
Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the
criteria under which gaming activities can occur on Indian lands. One requirement is that
if gaming is to occur on off-reservation lands, those lands must be trust lands "over which
an Indian tribe exercises governmental power." The authority to acquire trust lands,
however, is derived from the IRA; no trust land acquisition authority is granted to the

Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

## Compliance with 25 C.F.R. Part 151

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.     25 C.F.R. 151.3  Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 304 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Shullsburg gaming facility that could then be used to satisfy Tribal needs on the reservation.

**B.     25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 45,000 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of 20 acres, located 304 miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.     25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its reservation.

2

**D.    25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation.  As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments.  The Tribe's reservation and the proposed Shullsburg parcel are located in the State of Wisconsin, approximately 304 miles apart.  The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Shullburg because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that, "[b]y capitalizing on the expanded market area available to a facility situated in Shullsburg, Wisconsin, the Tribe will generate much needed revenue back to the Tribal government to fund its growing infrastructure and service programs." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, all anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The application describes the existing conditions of government operations on the reservation, including the unmet needs. However, the general descriptions do not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues.

The second benefit of the proposed gaming facility is the opportunity for job training and employment of tribal members living on reservation. Your application says, "[t]he effect of labor demands, combined with the extra revenues available for local spending will serve as a pressure to generally increase earnings in an area where wages are among the lowest of any area in the State. . . .The proposed Project will advance the County's economic goals." Further, your application's feasibility study states "the State has made LaFayette County a special development zone for a reason. This project addresses that reason." These statements indicate that the Tribe expects employment opportunities to increase for local residents but not to provide jobs directly to residents of the reservation. The location of the proposed gaming facility can have significant negative effects on reservation life.  Because the proposed gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable.  In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation.  A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation.  A gaming operation on or

3

close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Shullsburg parcel and has determined that it will not accept the property into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

4

# EXHIBIT B
# (Part 2)



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



TAKE PRIDE
IN AMERICA

JAN 0 4 2008

The Honorable Catherine Saubel
Chairwoman, Los Coyotes Band
  of Cahuilla & Cupeno Indians
P.O. Box 189
Warner Springs, California 92086

Dear Chairwoman Saubel:

On March 29, 2006, the Los Coyotes Band of Cahuilla and Cupeno Indians (Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust approximately 20-acres of land in Barstow, San Bernardino County, California (Barstow parcel). The Tribe proposes to develop a gaming facility and other uses incidental thereto on the land.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which

an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3  Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 115 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations in Barstow that could then be used to satisfy Tribal needs on the reservation.

**B.    25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 25,000 acres of trust land and has approximately 288 members. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of 20 acres, located 115 miles away from the reservation, which has been selected due, principally, to its proximity to urban markets.

**C.    25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10 (c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility.

2

**D.   25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation.  As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments.  The Tribe's reservation and the proposed Barstow parcel are located in the State of California, approximately 115 miles apart.  The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Barstow because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that the project is proposed because "the Tribe has no realistic environmental or economic alternative but to obtain off-reservation land on which it can develop a gaming facility consistent with those operated by other tribes in the State of California." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The statement, "[R]eceipts from the Tribe's gaming facility will be used to fund governmental and health services on the reservation, as well as to fund housing there," does not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues to either on-reservation employment of tribal members, or specific tribal programs and operations.

The second benefit of the proposed gaming facility is the opportunity for job training and employment of tribal members living on reservation. No expected on-reservation employment benefits are described in the application, so it is not possible for the Secretary to make a determination on the employment benefit to tribal members living on the reservation. With respect to this benefit, the location of the gaming facility can have significant negative effects on reservation life.  Because the proposed gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable.  In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation.  A high on-reservation unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation.  A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members.  Provision of employment opportunities to reservation residents promotes

3

a strong tribal government and tribal community.  Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility.  The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community.  While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary.  The Department has completed an evaluation of the Tribe's fee-to-trust application for the Barstow parcel and has determined that it will not accept the land into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust.  This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA.  It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

4



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240



JAN 0 4 2008

The Honorable Beasley Denson
Chief, Mississippi Band of Choctaw Indians
P.O. Box 6010 Choctaw Branch
Philadelphia, Mississippi 39350

Dear Chief Denson:

On November 21, 2005, the Mississippi Band of Choctaw Indians (Tribe) submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust 4 tracts of land totaling approximately 61-acres of land in Jackson County, Mississippi (Jackson County parcels). The Tribe proposes to develop and operate a major resort, casino facility, and other uses incidental thereto on the parcels.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was

intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated May 18, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. 151.3, 151.10(b), §§ 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3  Land acquisition policy.**

The regulations require the Department, in 25 C.F.R. 151.3(a)(3), to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 175 miles from the Tribe's principal reservation, where most of the Tribe's population resides. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Jackson County gaming facility that could then be used to satisfy tribal needs on the reservation.

**B.    25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations require the Department, in 25 C.F.R. 151.10(b), to evaluate the need of the Tribe for additional land. The Tribe owns approximately 28,500 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of 61 acres, located 175 miles away from the principal reservation, which has been selected due, principally, to its proximity to the major interstate highway connecting the urban centers of the region.

**C.    25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10 (c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its principal reservation.

2

**D.     25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation.  As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments.  The Tribe's principal reservation and the proposed Jackson County parcels are located in the State of Mississippi, approximately 175 miles apart.  The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Jackson County because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's principal reservation.

In your application you state that the project "will provide significant revenues to support tribal government services and community needs for the existing and future on-reservation communities." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The application describes the existing conditions of government operations on the reservation. The statement, "Because Project revenues will be used for on-Reservation programs, businesses, and infrastructure, the Project will also create many jobs on the Reservation," does not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues to either on-reservation employment of tribal members, or specific tribal programs and operations.

The other benefit of a gaming facility is the opportunity for job training and employment of tribal members living on reservation. The expected employment benefits described in the application do not evaluate the employment expected for tribal members living on the reservation, indicating that the Tribe does not expect the off-reservation location to provide jobs directly to residents of the reservation. The application says, "because of the small number of tribal members who live in Jackson County, it is anticipated that the work force for the resort and casino project will mostly consist of non-Indians." The location of the gaming facility can have significant negative effects on reservation life that can worsen as the distance increases. If the gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable.  In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the principal reservation.  A gaming operation on or close to the reservation would allow the Tribe to use its gaming facility as a conduit for job training and employment programs for tribal members.  Provision of employment

3

opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In this case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Jackson County parcels and has determined that it will not accept the land into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary – Indian Affairs

4



THE ASSOCIATE DEPUTY SECRETARY OF THE INTERIOR

WASHINGTON

JAN 0 4 2008

The Honorable Robert Chicks
President, Stockbridge Munsee
  Community of Wisconsin
N8476 Mo He Con Nuck Road
Bowler, Wisconsin 54416

Dear President Chicks:

On February 11, 2002, the Stockbridge Munsee Community of Wisconsin (Tribe)
submitted to the Bureau of Indian Affairs (BIA) an application to acquire in trust a 333-
acre parcel of land in the Town of Thompson, Sullivan County, New York (Thompson
parcel). The Tribe proposes to construct, develop, and manage a gaming facility, hotel,
and other uses incidental thereto on the parcel.

**Background**

In explaining the Department of the Interior's (Department) decision, it is important to
begin by restating the core principles that underlie the land acquisitions regulations. The
Part 151 regulations implement the trust land acquisition authority given to the Secretary
by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was
primarily intended to redress the effects of the discredited policy of allotment, which had
sought to divide up the tribal land base among individual Indians and non-Indians, and to
destroy tribal governments and tribal identity. To assist in restoring the tribal land base,
the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining
surplus lands of any Indian reservation" that had been opened to sale or disposal under
the public land laws; 2) consolidate Indian ownership of land holdings within
reservations by acquiring and exchanging interests of both Indians and non-Indians; and
3) acquire, in his discretion, interests in lands "within or without existing reservations."
The IRA also contains provisions strengthening tribal governments and facilitating their
operation. The policy of the IRA, which is just the opposite of allotment, is to provide a
tribal land base on which tribal communities, governed by tribal governments, could exist
and flourish. Consistent with the policy, the Secretary has typically exercised his trust
land acquisition authority to take lands into trust that are within, or in close proximity to,
existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory
Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the
criteria under which gaming activities can occur on Indian lands. One requirement is that
if gaming is to occur on off-reservation lands, those lands must be trust lands "over which
an Indian tribe exercises governmental power." The authority to acquire trust lands,
however, is derived from the IRA; no trust land acquisition authority is granted to the

Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust far from existing reservations for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.      25 C.F.R. 151.3  Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 1,045 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Thompson parcel that could then be used to satisfy tribal needs on the reservation.

**B.      25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 16,400 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure or to resolve local land management conflicts. Rather, the application seeks a particular site of 333 acres, located over 1,000 miles away from the reservation, which has been selected due, principally, to its proximity to the primary highway connecting the New York City urban area to the Catskill's resort area.

**C.      25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its reservation.

**D.    25 C.F.R. 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation.  As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments.  The Tribe's reservation is located in the State of Wisconsin, and the proposed Thompson parcel is located in the State of New York, and are approximately 1,035 miles apart.  The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in the Town of Thompson because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

The Tribe has stated that the proposed gaming facilities will provide two economic benefits to the Tribe.  The first is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, and thus can have a positive effect on reservation life.  This projected income stream will not be affected by the remote location of the proposed casino from the Tribe's reservation.

The second benefit of the proposed off-reservation gaming facility is the opportunity for job training and employment of tribal members.  With respect to this benefit, the remote location of the proposed gaming facility can have significant negative effects on reservation life.  Because the proposed gaming facility is not within a commutable distance of the reservation, tribal members who are residents of the reservation will either: a) not be able to take advantage of the job opportunities if they desire to remain on the reservation; or b) be forced to move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable.  In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation.  A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation.  A gaming operation on or close to the reservation allows the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members.  Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community.  Employment of tribal members is an important benefit of tribal economic enterprises.

In this case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a

3

community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Thompson parcel and has determined that it will not accept the property into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

*James E. Cason*

James E. Cason

4



THE ASSOCIATE DEPUTY SECRETARY OF THE INTERIOR
WASHINGTON. DC 20240

JAN 0 4 2008

The Honorable Paul Spicer
Chief, Seneca-Cayuga Tribe of Oklahoma
P.O. Box 1283
Miami, Oklahoma 74355

Dear Chief Spicer:

On April 13, 2006, the Seneca-Cayuga Tribe of Oklahoma (Tribe) submitted to the
Bureau of Indian Affairs (BIA) an application to acquire in trust a 230-acre parcel of land
in Montezuma, Cayuga County, New York (Montezuma parcel). The Tribe proposes to
construct, develop, and manage a gaming facility, hotel, and other uses incidental thereto
on the parcel.

## Background

In explaining the Department of the Interior's (Department) decision, it is important to
begin by restating the core principles that underlie the land acquisitions regulations. The
Part 151 regulations implement the trust land acquisition authority given to the Secretary
by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was
primarily intended to redress the effects of the discredited policy of allotment, which had
sought to divide up the tribal land base among individual Indians and non-Indians, and to
destroy tribal governments and tribal identity. To assist in restoring the tribal land base,
the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining
surplus lands of any Indian reservation" that had been opened to sale or disposal under
the public land laws; 2) consolidate Indian ownership of land holdings within
reservations by acquiring and exchanging interests of both Indians and non-Indians; and
3) acquire, in his discretion, interests in lands "within or without existing reservations."
The IRA also contains provisions strengthening tribal governments and facilitating their
operation. The policy of the IRA, which is just the opposite of allotment, is to provide a
tribal land base on which tribal communities, governed by tribal governments, could exist
and flourish. Consistent with the policy, the Secretary has typically exercised his trust
land acquisition authority to take lands into trust that are within, or in close proximity to,
existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory
Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the
criteria under which gaming activities can occur on Indian lands. One requirement is that
if gaming is to occur on off-reservation lands, those lands must be trust lands "over which
an Indian tribe exercises governmental power." The authority to acquire trust lands,
however, is derived from the IRA; no trust land acquisition authority is granted to the
Secretary by IGRA. The Department has taken the position that although IGRA was

intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3 Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 1,500 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Montezuma parcel that could then be used to satisfy tribal needs on the reservation.

**B.    25 C.F.R. 151.10(b). The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 1,200 acres of trust land. This application does not address a need for more land to support tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of 230 acres, located 1,500 miles away from the reservation, which has been selected due, principally, to its proximity to the connector highways to the urban areas of Rochester and Syracuse, New York.

**C.    25 C.F.R. 151.10(c). The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has a class III gaming facility located on its reservation.

2

**D.    25 C.F.R. 151.11(b). The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation. As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation is located in the State of Oklahoma, and the proposed Montezuma parcel is located in the State of New York, and they are 1,500 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Montezuma because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

In your application you state that, "While the Grand Lake Casino in Grove, Oklahoma generates much needed revenue for the Tribe, its size and location render it insufficient to meet all of the economic development needs of the Tribe." Therefore, the primary expected benefit is the income stream from the gaming facility, which can be used to fund tribal services anticipated to provide a positive effect on reservation life regardless of the distance of the gaming facility from the reservation. The application does not provide sufficient detail to allow a determination by the Secretary on the specific benefits expected from the use of net gaming revenues to either on-reservation employment of tribal members, or specific tribal programs and operations.

The other benefit of a gaming facility is the opportunity for job training and employment of tribal members living on reservation. The expected employment benefits are not described or evaluated in the application for the employment expected for Tribal members living on the reservation. The location of the gaming facility can have other significant negative effects on reservation life that can worsen as the distance increases. If the gaming facility is not within a commutable distance of the reservation, resident tribal members will either: a) decline the job opportunity if they desire to remain on the reservation; or b) move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high on-reservation unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation allows the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In this case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The potential departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Montezuma parcel and has determined that it will not accept the property into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

*James E. Cason*

James E. Cason

4



# United States Department of the Interior

## OFFICE OF THE SECRETARY
### WASHINGTON, D.C. 20240



JAN 0 4 2008

The Honorable George Wickliffe
Chief, United Keetoowah Band of
    Cherokee Indians
P.O. Box 746
Tahlequah, Oklahoma 74465

Dear Chief Wickliffe:

By memorandum dated July 11, 2007, the Director, Eastern Oklahoma Regional Office (EORO) transmitted to the Assistant Secretary of Indian Affairs (ASIA), her recommendation, along with supporting documentation, that a ten-acre parcel of land in Sebastian County, Arkansas, known as the "Fort Smith Property" not be acquired in trust for the benefit of the United Keetoowah Band of Cherokee Indians of Oklahoma (Tribe). The Tribe proposes to use the property for development of a hotel, resort, and casino.

### Background

In explaining the Department of the Interior's (Department) decision, it is important to begin by restating the core principles that underlie the land acquisitions regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations." The IRA also contains provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which is just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised his trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the criteria under which gaming activities can occur on Indian lands. One requirement is that if gaming is to occur on off-reservation lands, those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The

1

Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation land. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

## FINDINGS OF FACT

## I. AUTHORITY

Section 5 of the IRA authorizes the Secretary, in his discretion, to acquire any interest in land, within or without Indian reservations, for the purpose of providing land for Indians. Section 203 of the Indian Land Consolidation Act (ILCA), (96 Stat. 2517; P.L. 97-459) makes Section 5 of the "Act of June 18, 1934, applicable to all tribes.

On May 8, 1950, the Assistant Secretary of the Interior submitted the Constitution and Bylaws of the United Keetoowah Band of Cherokee Indians for ratification to the members of the United Keetoowah Band of Cherokee Indians in Oklahoma. The Constitution and Bylaws were ratified on October 3, 1950.

Pursuant to Article V, Section 1 of the Constitution and Bylaws, Tribal Resolution No. 06-UKB-32 dated March 18, 2006, requests the Bureau of Indian Affairs (BIA) to acquire in trust the ten-acre parcel for the purpose of economic development, and more specifically for the development of a hotel, resort, and casino. The resolution was adopted by an affirmative vote of 12 members; 0 against; and 0 abstentions.

## II. DESCRIPTION OF THE PROPERTY

A part of the Northeast Quarter (NE¼) of Section 8, Township 8 North, Range 32 West, Fort Smith, Sebastian County, Arkansas. More particularly described as follows:

Commencing at the Northeast (NE) corner of said Section 8; thence North 86°00'00" W, 65.00 feet along the north land of said Section 8; thence S 00°25'41" W, 305.10 feet; thence N 85°57'19" W, 762.10 feet to a point on the centerline of Clayton Expressway; thence N 70°38'17" W, 114.0 feet to a point on the westerly right of way of Clayton Expressway; thence S 13°55'41" W, 55.78 feet along said westerly right of way; thence S 26°03'10" W, 411.78 feet along said right of way; thence S 23°31'32" W, 105.12 feet along said right of way; thence S 17°13'07" W, 54.93 feet along said right of way to ½" iron pin set for the Point of Beginning; thence S 17°13'07" W, 270.68 feet along said right of way to a ½"iron pin set; thence S 22°28'33" W, 209.85 feet along said right of way to an ½" iron pin set; thence S 33°19'46" W, 153.30 feet along said right of way to a ½" iron pin set; thence S 34°21'39" W, 4.82 feet along said right of way to a ½" iron pin set at the northerly line of a tract described in Sebastian County Document number 7082031 dated 9/11/2002; thence along said northerly line N 63°56'43" W, 658.72 feet to a ½" iron pin set on the lower right bank of the Arkansas River; thence N 24°26'37" E, 123.44 feet along said right bank to a ½" iron pin set; thence N 23°47'56" E, 258.86 feet along said right bank to a ½" iron pin set; thence North 21°47'52" E, 229.11 feet

2

along said right bank to a ½" iron pin set; thence South 65°53'43" E, 682.21 feet to the Point of Beginning. Containing 435,603 square feet or 10.00 acres, more or less. And being subject to an unrecorded OG&E easement with OG&E work order #7208071.

### III. TITLE TO THE PROPERTY

The Commitment for Title Insurance Policy No. S0009438 dated February 7, 2006, and legal description prepared by Chicago Title Insurance Company, reflect the title to be vested in United Keetoowah Band of Cherokee Indians.

### IV. COMPLIANCE WITH IGRA

The Tribe's gaming ordinance was approved by the National Indian Gaming Commission (NIGC) on March 22, 1995. The Tribe does not have a class III gaming compact with the State of Arkansas.

### V. COMPLIANCE WITH 25 C.F.R. PART 151

In a letter dated February 13, 2007, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. These regulations provide the basis upon which we exercise the Secretary's discretionary authority.

**A.      25 C.F.R. 151.3.  Land acquisition policy.**

The regulations, in 25 C.F.R. 151(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The application suggests that the economic benefit to the Tribe would be projected cash flow from casino operations in Fort Smith that could then be used to satisfy the needs of Tribal members in Oklahoma.

**B.      25 C.F.R. 151.10(a).  The existence of statutory authority for the acquisition and any limitations contained in such authority.**

The Department finds that Section 5 of the IRA is the requisite statutory authority to consider and act upon the Tribe's application.

**C.      25 C.F.R. 151.10(b).  The need of the individual Indian or tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The United Keetoowah Band of Cherokee Indians has no trust land. This application does not address a need for land to support tribal housing or government infrastructure or to resolve local land management conflicts. Rather, the application seeks a particular site of approximately ten acres, located seventy (70) miles away from the Tribe's

3

headquarters, which has been selected due, principally, to its proximity to the nearest urban area to the east of Oklahoma outside the Cherokee Nation.

**D.     25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used.  In this case, the land will be used for the development of a large off-reservation Class III gaming facility.

**E.     25 C.F.R. 151.10(e).  If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of land from the tax rolls.**

The regulations, in 25 C.F.R. 151.10(e), require the Department to consider the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls.  The removal of the parcel from the tax rolls would result in minimal impact to the State of Arkansas, Sebastian County, and the City of Fort Smith.

**F.     25 C.F.R. 151.10(f).  Jurisdictional problems and potential conflicts of land use which may arise.**

The regulations, in 25 C.F.R. 151.10(f), require the Department to consider potential jurisdictional problems and conflicts of land use which may arise in light of the comments of the State and its political subdivisions.  The Governor of Arkansas and his immediate predecessor are strongly opposed to the Tribe's proposed acquisition for gaming.  In addition, local officials have submitted comments in opposition to the proposed gaming facility.  Further, the Regional Director noted the City of Ft. Smith provides police, fire, water, and sanitation services.  The Tribe's application anticipated a Memorandum of Understanding (MOU) with the City to provide these services, but was not received.  I find that significant jurisdictional problems and potential land use issues exist for the property.

**G.     25 C.F.R. 151.10(g).  If the land to be acquired is in fee status whether the Bureau of Indian Affairs (BIA) is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.**

The regulations, in 25 C.F.R. 151.10(g), require the Department to evaluate whether the BIA is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.  The Tribe indicates that the BIA will be responsible for law enforcement, but believes that any additional responsibility of the BIA will be minimal.  A finding on this issue is not necessary to my decision on the application.

**H.     25 C.F.R. 151.10(h).  The extent of information to allow the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.**

The regulations, in 25 C.F.R. 151.10(h), require the Department to consider the extent to which the applicant has provided sufficient information to allow compliance with 516 DM 6, Appendix 4, National Environmental Policy Act Revised Implements Procedures and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.  An Environmental Assessment (EA) was prepared by the Tribe.  A finding on the sufficiency of the EA is not necessary to my decision on the Tribe's application.

**I.     25 C.F.R. § 151.11(b).  The location of the land relative to State boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's headquarters. The Tribe's headquarters are located in the State of Oklahoma approximately 70 miles away from the proposed site.  As the distance between the Tribe's headquarters and the land to be acquired increases, the Department shall give greater weight to the concerns raised by the State and its political subdivisions.  As outlined above there is significant local opposition to this acquisition.

**J.     25 C.F.R. § 151.11(c).  Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed use.**

The regulations, in 25 C.F.R. 151.11(c), require the Department to consider the Tribe's plan describing the anticipated economic benefits associated with the use of the proposed site.  The Regional Director's recommendation does not address this requirement, but the application contains a November 2005 Feasibility Study from Old Fort Entertainment, LLC by the Innovation Group that satisfies this criterion.

**K.     25 C.F.R. 151.11(d).  Consultation with State and local governments with regulatory jurisdiction over the land pursuant to § 151.10(e) and (f).**

The Regional Director consulted with appropriate State and local governments.  The Governor, State of Arkansas responded to the consultation letter expressing opposition to the acquisition. The City of Fort Smith and Sebastian County also have expressed opposition to the proposed acquisition.

## Decision

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed its evaluation of the Tribe's fee-to-trust application for the "Fort Smith Property" and has determined that it will not accept the property into trust.

The Department's evaluation of this land-into-trust application has identified several concerns, as outlined above, with criteria in 25 §§ C.F.R. 151.10(b), 151.10(c), 151.10(g), 151.11(b), and 151.11(d) that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. I concur with the Regional Director's recommendation. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

Carl J. Artman
Assistant Secretary - Indian Affairs

# EXHIBIT C

# DEPARTMENT OF INTERIOR
# PRESS RELEASE

January 4, 2008
Contact: Shane Wolfe (202) 208-6416

## Department of the Interior Issues Off-Reservation Gaming Guidance and Sends Letters to Tribes
### Department of the Interior Guidance Issued by Assistant Secretary

Assistant Secretary of the Interior for Indian Affairs Carl Artman today issued guidance to Bureau of Indian Affairs (BIA) regional directors and the director of the Office of Indian Gaming to be used in the determination of whether or not to take off-reservation land into trust pursuant to the Indian Reorganization Act of 1934 (IRA) for gaming purposes pursuant to the Indian Gaming Regulatory Act of 1988 (IGRA).

### Indian Gaming Regulatory Act of 1988 and Indian Reorganization Act of 1934
• IGRA specifies the criteria that must exist for off-reservation gaming to occur on Indian lands. Indian lands must be trust lands "over which an Indian tribe exercises governmental power." A separate act, the Indian Reorganization Act of 1934 (IRA), enacted to provide a tribal land base on which tribal communities can flourish, gives the Secretary of the Interior discretionary authority to take off-reservation Indian land into trust. Section 151.11 of 25 C.F.R. Part 151 (Part 151) sets forth the factors the Department will consider when exercising the authority.

### "Part 151"
• Part 151 contains two provisions of particular relevance to applications that involve land that is a considerable distance from the reservation. It states that, as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give:

o 1) greater scrutiny to the tribes justification of anticipated benefits from the acquisition; and
o 2) greater weight to concerns raised by state and local governments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

• Part 151 does not elaborate further on how or why the Department is to give "greater scrutiny" or "greater weight" to the above factors as the distance increases.

### Purpose of Guidance
• The guidance clarifies how to interpret and apply the Part 151 terms 'greater scrutiny' and 'greater weight' when considering the taking of off-reservation land into trust status for gaming purposes.

o The guidance directs that a reviewer ask specific questions for those applications with lands that exceed a "commutable distance" from the reservation because of the impact that such a distant acquisition may or may not have on life on the reservation.

o The guidance emphasizes that as the distance from the reservation increases, greater weight should be given to state and local concerns, including jurisdictional problems and potential conflicts of land use and the removal of the land from the tax rolls.

**Letters to 22 Tribes**
• Pursuant to the guidance, the Department of the Interior today issued letters to 22 separate tribes with pending applications to take land into trust.

o 11 tribes were informed that the Department of the Interior will not exercise its discretionary authority to take respective properties into trust.

o 11 other tribes were informed that their applications lacked complete information and cannot be acted upon by the Office of Indian Gaming.

**Off-Reservation Lands**
• 14 of the 22 tribes to receive letters had submitted applications to take land into trust that is situated more than 100 miles from the reservations on which tribal members reside, with some more than 1000 miles from the reservation.

**Resubmission**
• Any application that is denied pursuant to the guidance may be resubmitted with information that may satisfy Part 151.

## IN THE UNITED STATES THE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 1:07-cv--02210-RJL |
| DIRK KEMPTHORNE, et al. | ) ) | Next Scheduled Court Deadline: Oral Argument at 2:00 P.M. on |
| Defendants. | ) ) ) | January 15, 2008 |

### [PROPOSED] ORDER FOR A TEMPORARY RESTRAINING ORDER

Upon consideration of the Plaintiff's Second Motion for a Temporary Restraining Order, the supporting Memorandum filed therewith and the Affidavit of Robert M. Adler with its attached exhibits filed in support, and any opposition thereto, it is this _____ day of _____, 2008

HEREBY ORDERED that the Plaintiff's Second Motion for a Temporary Restraining Order be and is hereby GRANTED.  This Court finds that the Guidance Memorandum dated January 3, 2008, as issued to the BIA's Regional Offices and the Office of Indian Gaming by Assistant Secretary Carl Artman:

A.    Was made in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) in that it was issued without factual support, including in its repeated statements that:

(1)    an off-reservation gaming facility can or will have negative effects on reservation life, including the employment of tribal members;

(2)    the further from the reservation the proposed acquisition is, the more the transfer of Indian jurisdiction to that parcel of land is likely to disrupt established governmental patterns;

152371

(3)     distant local governments are less likely to have experience dealing with and accommodating tribal governments with their unique governmental and regulatory authorities; and

(4)     the further from the reservation the land acquisition is , the more difficult it will be for the tribal government to efficiently project and exercise its governmental and regulatory powers.

The Court further finds that, in preparing and issuing the Guidance Memorandum, the Department of the Interior (DOI) did not consider all important aspects of the issues described therein and otherwise relied on factors which Congress did not intend for it to consider.

Accordingly, the Guidance Memorandum is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

B.     The Guidance Memorandum promulgated a substantive or legislative rule (as defined in 5 U.S.C. § 551(4)) as opposed to either an interpretive rule or a general statement of policy.  Nonetheless, the DOI did not follow the APA's notice and comment rule making requirements of 5 U.S.C. § 553(b)(c).  The Guidance Memorandum was therefore issued without observance of procedure required by law and is therefore unlawful pursuant to 5 U.S.C. § 706(2)(D).

C.     Executive Order 13175 requires the Interior Department to conduct consultations, to the extent practicable and permitted by law, with tribal officials early in the process of developing a proposed regulation which has "tribal implications."  As set forth in 66 Fed. Reg. 56608 (November 9, 2001), the DOI committed itself to conduct prior consultations with Indian tribes in its efforts to "promulgate a new rule" relating to the proposed standards of review used in reaching a determination as to whether to accept land into trust.  The DOI similarly committed

itself to promulgate any such new standards of review through the notice and comment rule making process of the APA rather than unilaterally issuing these standards in a document such as the Guidance Memorandum.  Given that there were no prior consultations with Indian tribes with respect to the new standards of review to be used in determining whether to accept land into trust for gaming purpose and, the DOI did not follow the required APA notice and comment rule making process, the DOI has unlawfully failed to follow its own prescribed procedures.  This is the case even if, hypothetically, the DOI was not otherwise required to consult with Indian tribes prior to issuing its Guidance Memorandum  or was not otherwise required to use the notice and comment rule making procedure of the APA.  For these reasons, the Guidance Memorandum is invalid, unlawful and unenforceable pursuant to 5 U.S.C. § 706(2)(A) and (D) in that it was not in accordance with law and without observance of the procedure required by law.

For the above reasons, Secretary of the Interior Dirk Kempthorne and Assistant Secretary-Indian Affairs Carl J. Artman, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, be and are hereby temporarily restrained, until further Order, of this Court from implementing, applying or otherwise carrying out the Department of the Interior's Guidance Memorandum with respect to the Plaintiff and the Bad River Band's pending off-reservation fee-to-trust application for gaming purposes in Beloit, Wisconsin as well as with respect to pending off-reservation fee-to-trust applications for gaming purposes submitted by other Indian tribes.

_____
Richard J. Leon
United States District Judge

**IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **THE ST. CROIX CHIPPEWA** | ) | |
| **INDIANS OF WISCONSIN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. No. 1:07-cv--02210-RJL** |
| | ) | |
| **DIRK KEMPTHORNE, et al.** | ) | **Next Scheduled Court Deadline:** |
| | ) | **Oral Argument at 2:00 P.M. on** |
| **Defendants.** | ) | **January 15, 2008** |
| | ) | |

**[PROPOSED] ORDER FOR A PRELIMINARY INJUNCTION**

Upon consideration of the Plaintiff's Second Motion for a Preliminary Injunction, the supporting Memorandum filed therewith and the Affidavit of Robert M. Adler with its attached exhibits filed in support, and any opposition thereto, it is this _____ day of _____, 2008

HEREBY ORDERED that the Plaintiff's Second Motion for a Preliminary Injunction be and is hereby GRANTED.  This Court finds that the Guidance Memorandum dated January 3, 2008, as issued to the BIA's Regional Offices and the Office of Indian Gaming by Assistant Secretary Carl Artman:

A.    Was made in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) in that it was issued without factual support, including in its repeated statements that:

(1)    an off-reservation gaming facility can or will have negative effects on reservation life, including the employment of tribal members;

(2)    the further from the reservation the proposed acquisition is, the more the transfer of Indian jurisdiction to that parcel of land is likely to disrupt established governmental patterns;

152381

(3)     distant local governments are less likely to have experience dealing with and accommodating tribal governments with their unique governmental and regulatory authorities; and

(4)     the further from the reservation the land acquisition is , the more difficult it will be for the tribal government to efficiently project and exercise its governmental and regulatory powers.

The Court further finds that, in preparing and issuing the Guidance Memorandum, the Department of the Interior (DOI) did not consider all important aspects of the issues described therein and otherwise relied on factors which Congress did not intend for it to consider.

Accordingly, the Guidance Memorandum is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

B.     The Guidance Memorandum promulgated a substantive or legislative rule (as defined in 5 U.S.C. § 551(4)) as opposed to either an interpretive rule or a general statement of policy.  Nonetheless, the DOI did not follow the APA's notice and comment rule making requirements of 5 U.S.C. § 553(b)(c).  The Guidance Memorandum was therefore issued without observance of procedure required by law and is therefore unlawful pursuant to 5 U.S.C. § 706(2)(D).

C.     Executive Order 13175 requires the Interior Department to conduct consultations, to the extent practicable and permitted by law, with tribal officials early in the process of developing a proposed regulation which has "tribal implications."  As set forth in 66 Fed. Reg. 56608 (November 9, 2001), the DOI committed itself to conduct prior consultations with Indian tribes in its efforts to "promulgate a new rule" relating to the proposed standards of review used in reaching a determination as to whether to accept land into trust.  The DOI similarly committed

itself to promulgate any such new standards of review through the notice and comment rule making process of the APA rather than unilaterally issuing these standards in a document such as the Guidance Memorandum.  Given that there were no prior consultations with Indian tribes with respect to the new standards of review to be used in determining whether to accept land into trust for gaming purpose and, the DOI did not follow the required APA notice and comment rule making process, the DOI has unlawfully failed to follow its own prescribed procedures.  This is the case even if, hypothetically, the DOI was not otherwise required to consult with Indian tribes prior to issuing its Guidance Memorandum  or was not otherwise required to use the notice and comment rule making procedure of the APA.  For these reasons, the Guidance Memorandum is invalid, unlawful and unenforceable pursuant to 5 U.S.C. § 706(2)(A) and (D) in that it was not in accordance with law and without observance of the procedure required by law.

For the above reasons, Secretary of the Interior Dirk Kempthorne and Assistant Secretary-Indian Affairs Carl J. Artman, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, be and are hereby temporarily restrained, until further Order, of this Court from implementing, applying or otherwise carrying out the Department of the Interior's Guidance Memorandum with respect to the Plaintiff and the Bad River Band's pending off-reservation fee-to-trust application for gaming purposes in Beloit, Wisconsin as well as with respect to pending off-reservation fee-to-trust applications for gaming purposes submitted by other Indian tribes.

Richard J. Leon
United States District Judge