IN THE UNITED STATES THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ST. CROIX CHIPPEWA INDIANS ) <br> OF WISCONSIN ) <br> ) <br>     **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> DIRK KEMPTHORNE, et al. ) <br> ) <br>     **Defendants.** ) <br>                                    ) | Civ. No. 1:07-cv--02210-RJL <br><br> Next Scheduled Court Deadline: <br> None |

## NOTICE OF FILING

The Plaintiff, by and through counsel, hereby files with this Court the decision granting the plaintiff's motion for a temporary restraining order and a preliminary injunction in <u>Tafas v. Dudas</u>, 511 F. Supp.2d 652 (E.D. Va. 2007). This decision was filed on October 31, 2007.

At the hearing held before this Court on January 15, 2008, in response to queries from the Court, the Plaintiff's counsel stated that he was unaware of any decision wherein an injunction had been granted where an application was pending. Further research was conducted after the conclusion of the hearing. It produced the <u>Tafas</u> decision which is appended hereto as Attachment 1. In it, the plaintiff had applications pending before the United States Patent and Trademark Office and sought injunctive relief with respect to Final Rules which were set to take effect on November 1, 2007. The failure to comply with <u>State Farm</u> was asserted as one of the grounds for which there was a likelihood of success. <u>Tafas</u>, <u>supra</u> at 665. The Court found that based on the difficult legal questions presented by the case, in sum, the likelihood of success on the merits factor weighed in favor of the plaintiffs. <u>Tafas</u>, <u>supra</u> at 667. The Court also found that there would be irreparable harm to the plaintiffs if the injunction was not granted. <u>Tafas</u>,

152534

supra at 668-669. In so doing, it accepted the plaintiffs' arguments that under its pending applications its "rights. . .would be changed under the new rules." Tafas, supra at 668. Similarly, the Plaintiff herein submits that Congress did not intend for the gaming-related issues with respect to its proposed casino, particularly the distance from it to its established reservation, to be considered under Part 151 as the Interior Department has decided to do. Accordingly, the Plaintiff asserts that its own protected rights would be negatively impacted if the Interior Department made its Part 151 determination first, in that the distance issue will be used as the standard for approval or denial under the new Guidance Memorandum of January 3, 2008.

        Respectfully submitted,

        __/s/ Robert M. Adler_____
        Robert M. Adler, Bar #62950
        Gerald H. Yamada, Bar #194092
        O'CONNOR & HANNAN, L.L.P.
        1666 K Street, N.W., Suite 500
        Washington, D.C. 20006-2803
        (202) 887-1400

        *Attorneys for the St. Croix Chippewa*
        *Indians of Wisconsin*

        Of Counsel:
        Andrew Adams, III
        St. Croix Chippewa Indians of Wisconsin
        24663 Angeline Avenue
        Webster, WI 54893

Dated: January 17, 2008

# ATTACHMENT 1

511 F. Supp. 2d 652, *; 2007 U.S. Dist. LEXIS 80474, **

TRIANTAFYLLOS TAFAS, Plaintiff, v. JON W. DUDAS, et al., Defendants. CONSOLIDATED WITH SMITHKLINE BEECHAM CORPORATION, et al., Plaintiffs v. JON W. DUDAS, et al., Defendants.

1:07cv846 (JCC) CONSOLIDATED WITH 1:07cv1008 (JCC)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

511 F. Supp. 2d 652; 2007 U.S. Dist. LEXIS 80474

October 31, 2007, Decided
October 31, 2007, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** This matter was before the court on, inter alia, plaintiff pharmaceutical company's motion for a temporary restraining order and a preliminary injunction preventing defendant United States Patent and Trademark Office (PTO) from implementing Final Rules. The PTO also moved to strike the declaration of an expert, an exhibit of the Memorandum in Support of plaintiff's motion. Numerous entities' also moved for leave to file amicus curiae briefs.

**OVERVIEW:** The PTO proposed a number of changes to its rules, herein called the Final Rules, which would limit the number of continuing applications that a patent applicant could make. The instant motions followed. The court first granted the filing of the amicus curiae motions, which the PTO opposed, because the briefs were timely and there was no need to disqualify the briefs simply because they sought to put forth an opinion. The court further denied the PTO's motion to strike the expert's declaration as an exhibit, pursuant to Fed. R. Evid. 702. At this preliminary injunction stage, given that the subject matter was difficult, and there were unique patent terms used, the explanatory material relied upon in the declaration was proper to provide background information. Finally, the court granted plaintiff's motion for a TRO and preliminary injunction. There was a likelihood that plaintiff would succeed on the merits of its claim, as plaintiff raised serious concerns as to whether a reasonably prudent person would be able to comply with examination support document requirements. Further, there would be irreparable harm and hardship suffered by plaintiff if the injunction was not granted.

**OUTCOME:** The court granted plaintiff's motion, denied the PTO's motion, and granted the motions for leave to file as amici.

**CORE TERMS:** patent, Final Rules, preliminary injunction, declaration, invention, continuing applications, amicus, continuation, irreparable harm, amicus curiae briefs, administrative record, curiae, likelihood of success, pharmaceutical, hardship, property rights, citations omitted, trade secrets, injunction, divisional, rulemaking, deference, amici, examiner, patent law, leave to file, public interest, expert testimony, implementing, inventor

**LEXISNEXIS(R) HEADNOTES**
Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview
Patent Law > Remedies > Equitable Relief > Injunctions
HN1 ⤓ The Federal Circuit has generally treated the grant or denial of a preliminary injunction as a procedural matter and thus has applied the procedural law of the regional circuit in which the

case was brought. However, where the issue pertains to or is unique to patent law, the Federal Circuit has applied its own law to both substantive and procedural issues intimately involved in the substance of enforcement of the patent right. The Federal Circuit has given dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues. Federal Circuit law applies to a preliminary injunction motion involving the enforcement of patent rights. Federal Circuit law applies to a preliminary injunction motion involving substantive issues in an area of law within the unique jurisdiction of the Federal Circuit.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
HN2± The four factors relevant to a district court's decision to grant or deny a preliminary injunction are: (1) the likelihood of a plaintiff's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest. These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested.

Civil Procedure > Judicial Officers > Judges > Discretion
Civil Procedure > Appeals > Amici Curiae
HN3± A district court has broad discretion in deciding whether to allow a non-party to participate as an amicus curiae. Such non-party participants have been allowed at the trial level where they provide helpful analysis of the law, they have a special interest in the subject matter of the suit, or existing counsel is in need of assistance. However, a motion for leave to file an amicus curiae brief should not be granted unless the court deems the proffered information timely and useful.

Civil Procedure > Judicial Officers > Judges > Discretion
Evidence > Testimony > Experts > General Overview
Evidence > Testimony > Experts > Daubert Standard
HN4± The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. A district court's decision with respect to the admissibility of expert scientific testimony is always a flexible one, and the district court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability. Trial judges must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. Great deference is given to a trial court's Daubert ruling.

Civil Procedure > Appeals > Amici Curiae
HN5± To the extent that the amicus raises issues or make arguments that exceed those properly raised by the parties, a Court] may not consider such issues. However, the mere fact that a non-party seeks to put forth an opinion in the case does not disqualify it as an amicus. Although an amicus is not a party to the litigation and participates only to assist the court, nevertheless, by the nature of things an amicus is not normally impartial and there is no rule that amici must be totally disinterested.

Patent Law > Infringement Actions > Claim Interpretation > Scope
HN6± The Federal Circuit, which regularly hears questions of patent law, has on numerous occasions noted the impropriety of patent lawyers testifying as expert witnesses and giving their opinion regarding the proper interpretation of a claim as a matter of law, the ultimate issue for the court to decide. However, patent lawyers frequently testify as expert witnesses as to matters of patent and Trademark Office practice and procedure and to explain the complexities of patent

prosecution, and a judge can even advert to the testimony of patent law experts -- that is, patent lawyers -- for advice on the interpretation of claims. There is an importance of expert witnesses in the field of patents to reveal how others use and understand technical terms that may appear ambiguous or opaque to the judge, who rarely has the knowledge of those skilled in the field of the patent.

Administrative Law > Judicial Review > Administrative Record > Disclosure & Discovery
HN7± Even in Administrative Procedure Act record review cases, circumstances may justify expanding the record or permitting discovery, including such a failure in the record to explain administrative action as to frustrate judicial review, the agency's reliance on materials or documents not included in the administrative record, or the need to supplement the record to explain or clarify technical terms or other difficult subject matter included in the record. There may be circumstances to justify expanding the record or permitting discovery, including ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds for decision, situations when it appears the agency has relied on documents or materials not included in the record, and other circumstances as necessary to permit explanation or clarification of technical terms or subject matter involved in the agency action under review as background information.

Administrative Law > Judicial Review > Administrative Record > Disclosure & Discovery
HN8± Not only are there situations in which external information can be helpful to a court, but the D.C. Circuit has pointed out that it can be reversible error for a district court to avoid going outside the administrative record in some situations. Extra-record evidence can be important in scenarios when a case is so complex that a court needs more evidence to enable it to understand the issues clearly and in cases where relief is at issue, especially at the preliminary injunction stage, among others.

Civil Procedure > Pleading & Practice > Pleadings > General Overview
HN9± It is not inappropriate for a party to include exhibits or declarations in addition to its briefs.

Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview
HN10± 35 U.S.C.S. § 2(b)(2) empowers the Patent and Trademark Office (PTO) to establish regulations, not inconsistent with law, for several enumerated purposes, the most relevant of which include regulations to govern the conduct of proceedings in the (PTO), 35 U.S.C.S. § 2(b)(2)(A), and to facilitate and expedite the processing of patent applications. 35 U.S.C. § 2(b)(2)(C). The PTO thus has the power to set reasonable deadlines and requirements for the prosecution of applications. Section 2(b)(2) does not, however, vest the PTO with any general substantive rulemaking power.

Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Priority
HN11± 35 U.S.C.S. § 120 states that later-filed applications shall have the same effect as pending previously-filed applications, thus allowing the former to take the priority date of the latter. 35 U.S.C.S. § 120. Under § 120 there is no statutory basis for fixing an arbitrary limit to the number of prior applications through which a chain of copendency may be traced to obtain the benefit of the filing date of the earliest of a chain of copending applications.

Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Priority
HN12± Prosecution laches permits the denial of an application where the applicant delays too long in filing a continuing application.

Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Priority
HN13± 35 U.S.C.S. § 120 did not abrogate the doctrine of prosecution laches.

Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Priority

> HN14 A decision by the Patent and Trademark Office to limit the number of continuing applications would run contrary to the mandate of 35 U.S.C.S. § 120.

Patent Law > U.S. Patent & Trademark Office Proceedings > Examinations > General Overview
> HN15 35 U.S.C.S. § 132(b) requires that the Patent and Trademark Office prescribe regulations to provide for the continued examination of applications for patent at the request of the applicant. 35 U.S.C.S. § 132(b).

Administrative Law > Judicial Review > Standards of Review > Clearly Erroneous Review
> HN16 Judicial review of agency rulemaking under 5 U.S.C.S. § 706(2)(A) is guided by the standard that states that while a court is not to substitute its judgment for that of the agency, it must still consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.

Governments > Legislation > Effect & Operation > Retrospective Operation
> HN17 Because retroactivity is not favored in the law, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.

Governments > Legislation > Effect & Operation > Retrospective Operation
Patent Law > U.S. Patent & Trademark Office Proceedings > General Overview
> HN18 Congress did not expressly grant the Patent and Trademark Office the power to promulgate retroactive rules. 35 U.S.C.S. § 2(b)(2).

Governments > Legislation > Effect & Operation > Retrospective Operation
> HN19 A regulation is retroactive only if it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.

Governments > Legislation > Effect & Operation > Retrospective Operation
> HN20 There is a presumption against statutory retroactivity to cases involving vested rights.

Trade Secrets Law > General Overview
> HN21 Trade secrets are property rights. 35 U.S.C.S. § 122(b)(1).

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection
Governments > Legislation > Vagueness
> HN22 To satisfy due process requirements, regulations must be sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
> HN23 There is irreparable harm sufficient to warrant an injunction in cases where monetary damages are inadequate, particularly in the case of government action later found to be unlawful.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
> HN24 Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction. Injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm. The mere cost of implementing otherwise reasonable regulations is not in itself irreparable harm. However, a plaintiff should not be forced into the position of choosing to either violate an

allegedly invalid ordinance and suffer the inherent consequences of doing so or comply with the same and suffer a loss with little hope of recovery.

**COUNSEL:** [**1] For SmithKline Beecham Corporation, doing business as GlaxoSmithKline, SmithKline Beecham PLC, Glaxo Group Limited, doing business as GlaxoSmithKline, Plaintiffs: Elizabeth Marie Locke, LEAD ATTORNEY, Kirkland & Ellis LLP, Washington, DC; Craig Crandall Reilly, Richard McGettigan Reilly & West PC, Alexandria, VA; Daniel Sean Trainor, Kirkland & Ellis LLP, Washington, DC.

For Jon W. Dudas, in his official capacity as Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, United States Patent and Trademark Office, Defendants: Lauren A. Wetzler, LEAD ATTORNEY, United States Attorney's Office, Alexandria, VA.

For American Intellectual Property Law Association, Interested Party: Thomas J. O'Brien, LEAD ATTORNEY, Morgan, Lewis & Bockius, Washington, DC.

For HEXAS, LLC, The Roskamp Institute, Tikvah Therapeutics, Inc., Interested Parties: Dawn-Marie Bey, King & Spalding LLP, Washington, DC.

For Pharmaceutical Research and Manufacturers of America, Interested Party: James Murphy Dowd, LEAD ATTORNEY, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC.

For Biotechnology Industry Organization, Interested Party: Randall Karl Miller, [**2] LEAD ATTORNEY, Arnold & Porter LLP, McLean, VA.

**JUDGES:** James C. Cacheris, UNITED STATES DISTRICT COURT JUDGE.

**OPINION BY:** James C. Cacheris

**OPINION**

[*656] **MEMORANDUM OPINION**

This matter is before the Court on: (1) Plaintiffs Smithkline Beecham Corporation and Glaxo Group Limited's ("GSK") Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction; (2) Defendants Jon W. Dudas and United States Patent and Trademark Office's ("PTO") Motion to Strike Exhibit E of the Memorandum in Support of GSK's Motion; (3) the Motion of *Amicus Curiae* American Intellectual Property Law Association ("AIPLA") for Leave to File its Brief in Support of GSK's Motion; (4) HEXAS, LLC ("Hexas"), The Roskamp Institute, and Tikvah Therapeutics, Inc.'s ("Tikvah") Joint Motion in Support of Motion for Leave to File *Amici Curiae* Brief in Support of GSK's Motion; and (5) the Motion of *Amicus Curiae* Elan Pharmaceutical Corp. for Leave to File its Brief in Support of GSK's Motion. For the reasons stated below, the Court will grant GSK's motion, deny the PTO's motion, and grant the motions for leave to file as amici.

**I. Background**

GSK is the second largest pharmaceutical company in the world and is responsible for developing and marketing [**3] drugs that treat numerous ailments, including cancer, cardiovascular disease, respiratory diseases, HIV, and depression. The patent system encourages companies like GSK to engage in the research and development of new drugs by providing them with the legal protection that enables them to recover the significant costs that accompany development and regulatory approval of new drugs. This case deals with potential changes to this system brought on by the PTO's modification of several long-established rules.

Under both the old and new rules, to obtain patent protection an inventor first **[*657]** files a patent application with the PTO. The first application filed for a given invention is a "parent" or "initial" application. A parent application contains two primary parts: a "specification," which describes the invention and how to make and use it, and one or more "claims," which identify the scope of the legal protection that the invention should receive, and come in either "independent" or "dependent" forms. Once the application is filed, a patent examiner determines whether the claimed invention meets the statutory requirements found in Title 35 of the United State Code. If it is rejected, the **[**4]** examiner will issue an "Office Action" that contains the grounds for rejection. An applicant may then amend the claims, argue against the rejection, or present evidence to show why the invention is patentable. The patent examiner must respond by either allowing or rejecting the claim.

Upon receiving a final rejection, an applicant has four choices: (1) appeal to the Board of Patent Appeals and Interferences and from there to the Federal Circuit; (2) file a "request for continued examination" ("RCE") of the application; (3) file a "continuation" or "continuation-in-part" application; or (4) file an after final "amendment." A continuation application uses the same specification as the pending parent application and enjoys the benefit of the filing date of the parent application (the "priority date").

In situations where an applicant claims more than one independent invention in the initial application, the examiner may impose a "restriction requirement" that forces an applicant to separate their multiple independent inventions into "divisional" applications that claim a single invention. The applicant must then choose one of the inventions to prosecute in their initial application, and **[**5]** can prosecute the remaining inventions in their divisional applications, which claim the priority date of the parent application.

On January 3, 2006, the PTO proposed changes to its rules that would limit the number of continuing applications, RCEs, and claims that an applicant could make. The PTO justified the proposed changes on the ground that the growing number of continuing applications and increasing number and complexity of claims in applications had crippled the PTO's ability to examine newly-filed applications. After a four month public comment period where the PTO received more than 500 written comments, many of which expressed disapproval with the proposed rules, on August 21, 2007, the PTO published the Final Rules, titled "Changes to Practice for Continued Examination Filings, Patent Applications Containing Patentably Indistinct Claims, and Examination of Claims in Patent Applications." 72 Fed. Reg. 46716-46843 (Aug. 21, 2007) (to be codified at 37 C.F.R. pt. 1). The Final Rules are set to take effect on November 1, 2007.

Under the old system, an applicant could file an unlimited number of continuing applications, RCEs, and claims. The Final Rules modify that system in the **[**6]** several ways. First, Final Rules 78 and 114 allow an applicant to file two continuation or continuation-in-part applications, plus a single RCE, after an initial application as a matter of right. If the applicant wants to engage in further prosecution, a third continuation or continuation-in-part application or a second RCE can be filed with a "petition and showing" that explains why the amendment, argument, or evidence could not have been presented in one of the previously-filed applications. These Final Rules apply to all initial and continuing applications filed on or after November 1, 2007. In addition, under Final Rule 142, if the applicant submits an application with multiple independent inventions, with the **[*658]** examiner's permission a divisional application may be filed for each invention, and each divisional application will be treated as an initial application.

Second, Final Rule 75 permits an applicant to present a total of five independent claims and twenty-five total claims without providing any further information about those claims. An applicant who wants to exceed either of these limitations must provide an "examination support document" ("ESD") containing information about **[**7]** the claims that may assist the examiner in determining the patentability of the claimed invention. The requirements of an ESD are set out in Final Rule 265. These Final Rules apply to all applications filed on or after November 1, 2007, and all pending applications for which a first Office Action on the merits was not mailed before November 1, 2007.

Under the old system, GSK would traditionally prosecute patents in the following manner. When GSK discovered a potential class of new drug products (a "genus"), it would typically file an initial application containing a broad disclosure that includes numerous structurally-related compounds (a "species"). This

broad disclosure would include a number of different inventions and disclose more than it claims. Because GSK does not know until after extensive research is performed which member of the genus will be brought to market, it would file an initial application with the understanding that it will prosecute narrower or additional patent claims in subsequent continuing applications. [1] These continuing applications can claim the priority date of the parent application; consequently, publications and public information generated between the [**8] priority date and the date of the later-filed applications cannot be used against patentability.

**FOOTNOTES**

[1] "Continuation," "continuation-in-part," and "divisional" applications are all commonly referred to as "continuing applications."

GSK currently has roughly one hundred or more pending applications in which two or more continuing applications have been filed, and approximately thirty or more pending applications in which two or more continuing applications and a RCE have been filed. GSK also has several pending applications that have not yet received an Office Action on the merits and contain enough claims to trigger an ESD.

On October 9, 2007, GSK filed a Complaint against the PTO seeking a preliminary injunction staying the implementation of the Final Rules until the resolution of the lawsuit, a permanent injunction against the implementation of the Final Rules, a declaratory judgment that the Final Rules are contrary to law, and a request that the Final Rules be vacated. Two days later, GSK filed an Amended Complaint against the PTO seeking the same relief. On October 15, 2007, GSK moved for a TRO and preliminary injunction enjoining the implementation of the Final Rules. On October 19, [**9] the PTO moved to strike the declaration of Harry F. Manbeck, Jr., Exhibit E of the Memorandum in Support of GSK's Motion. In addition, numerous entities have filed motions for leave to file *amicus curiae* briefs, including: (1) AIPLA on October 25; (2) HEXAS, The Roskamp Institute, and Tikvah, jointly, on October 26; and (3) Elan Pharmaceuticals on October 29. These motions are currently before the Court.

## II. Standard of Review

**HN1** The Federal Circuit has generally treated the grant or denial of a preliminary injunction as a procedural matter and thus has applied the procedural law of the regional circuit in which the case was brought. *See Texas Instruments, Inc. v. Tessera, Inc.,* 231 F.3d 1325, 1328 (Fed. [*659] Cir. 2000); *Mikohn v. Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 894 (Fed. Cir. 1998). However, where "the issue pertains to or is unique to patent law," the Federal Circuit has applied its own law to both substantive and procedural issues "intimately involved in the substance of enforcement of the patent right." *Amana Refrigeration, Inc., v. Quadlux, Inc.,* 172 F.3d 852, 856 (Fed. Cir. 1999) (citations omitted); *see also Mikohn,* 165 F.3d at 894 (stating that the Federal Circuit has [**10] given "dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues"). To the extent that GSK's Motion deals with the propriety of the Final Rules under the patent laws, the Court will apply the law of the Federal Circuit with respect to the issuance of a preliminary injunction. *See Mylan Pharms., Inc. v. Thompson,* 268 F.3d 1323, 1329 n.1 (Fed. Cir. 2001) (finding that Federal Circuit law applied to a preliminary injunction motion involving the enforcement of patent rights); *Texas Instruments,* 231 F.3d at 1328 (finding that Federal Circuit law applied to a preliminary injunction motion involving substantive issues in an area of law within the unique jurisdiction of the Federal Circuit).

**HN2** The four factors relevant to the Court's decision to grant or deny a preliminary injunction are: "(1) the likelihood of [the plaintiff's] success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest." *Abbott Labs. v. Andrx Pharms., Inc.,* 473 F.3d 1196, 1200-01 (Fed. Cir. 2007) (citations omitted [2] "These factors, taken individually, are not dispositive; rather, [**11] the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citations omitted).

**FOOTNOTES**

2 Alternately, under Fourth Circuit law the standard for preliminary injunctions is substantially similar. See *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 193 (4th Cir. 1977).

HN3 The Court has broad discretion in deciding whether to allow a non-party to participate as an *amicus curiae*. *See, e.g., Hoptowit v. Ray,* 682 F.2d 1237, 1260 (9th Cir. 1982); *Waste Mgmt., Inc. v. City of York,* 162 F.R.D. 34, 36 (M.D. Pa. 1995). Such non-party participants have "been allowed at the trial level where they provide helpful analysis of the law, they have a special interest in the subject matter of the suit, or existing counsel is in need of assistance." *Bryant v. Better Business Bureau,* 923 F. Supp. 720, 727 (D. Md. 1996) (internal citations omitted); *see also Northern Sec. Co. v. United States,* 191 U.S. 555, 556, 24 S. Ct. 119, 48 L. Ed. 299 (1903). However, "[a] motion for leave to file an amicus curiae brief . . . should not be granted unless the court 'deems the proffered **[**12] information timely and useful.'" *Bryant,* 923 F. Supp. at 727-28 (citing *Yip v. Pagano,* 606 F. Supp. 1566, 1568 (D.N.J. 1985)).

HN4 The admissibility of expert testimony is governed by Federal Rule of Evidence 702, amended effective December 1, 2000 to reflect the Supreme Court's rulings in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). It provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may **[*660]** testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. A district court's decision with respect to the admissibility of expert scientific testimony "is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria **[**13] of relevance and reliability." *Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir. 1999); *see also Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 200 (4th Cir. 2001) (noting the Supreme Court's statement in *Kumho Tire* that trial judges "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable") (quoting *Kumho Tire,* 526 U.S. at 152); *United States v. Barnette,* 211 F.3d 803, 816 (4th Cir. 2000) (noting the Fourth Circuit's consistent practice of giving "great deference" to a trial Court's *Daubert* ruling).

## III. Analysis

GSK seeks a TRO and a preliminary injunction preventing the PTO from implementing the Final Rules, the PTO moves to strike the declaration of Harry F. Manbeck, Jr., Exhibit E of the Memorandum in Support of GSK's Motion, and numerous entities have filed three separate motions for leave to file *amicus curiae* briefs. The Court will address the *amicus* issue and the PTO's motion first before turning to GSK's motion.

### A. Motions for Leave to File Amicus Curiae Briefs

Plaintiffs Tafas and GSK have consented to the filing of the *amicus curiae* motions of Elan, Hexas, the Roskamp Institute, Tikvah, **[**14] and AIPLA. The PTO opposes all of the filings as untimely. However, the cases the PTO cites in support of their claim that these filings are untimely involve situations in which the motions to file as amicus were made months after the cases were filed and the courts had begun holding hearings. *See, e.g., Centeno-Bernuy v. Perry,* 302 F. Supp. 2d 128, 131 (W.D.N.Y. 2003) (finding that "the motion is untimely as the hearing has been completed and the preliminary injunction motion has

been submitted for decision"); *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft,* 282 F. Supp. 2d 1271, 1274 (D.N.M. 2002) (denying a motion to enter as an amicus after parties had "prepared numerous briefs . . . over a period of more than a year, . . . [and] presented evidence and arguments at a lengthy hearing"). Rather than frequently turning down amicus briefs on timeliness grounds, courts have accepted them as timely even when filed "on the eve of summary judgment motions." *Community Ass'n for Restoration of the Env't v. Deruyter Bros. Dairy,* 54 F. Supp. 2d 974, 975-976 (E.D. Wash. 1999). This case was filed on October 9, 2007, and the parties seeking to be heard as *amici curiae* filed their **[**15]** motions before the first hearing. Because these amicus briefs were filed a relatively short time after the case began, the Court will find that they are sufficiently timely.

The PTO also objects to AIPLA's proposed amicus brief on the grounds that it improperly contains new arguments not contained within GSK's brief. The Court agrees that it may not consider legal issues or arguments not raised by the parties. *See, e.g. Cellnet Communs. v. FCC,* 149 F.3d 429, 443 (6th Cir. 1998) (holding that HN5 "[t]o the extent that the amicus raises issues or make arguments that exceed those properly raised by the parties, [the Court] may not consider **[*661]** such issues"). However, the mere fact that a non-party seeks to put forth an opinion in the case does not disqualify it as an amicus. Although "[a]n amicus . . . is not a party to the litigation and participates only to assist the court[, n]evertheless, 'by the nature of things an amicus is not normally impartial' . . . and 'there is no rule . . . that amici must be totally disinterested.'" *Waste Mgmt., Inc. v. City of York,* 162 F.R.D. 34, 36 (D. Pa. 1995) (quoting *United States v. Gotti,* 755 F. Supp. 1157, 1158 (E.D.N.Y. 1991) and *Concerned Area Residents for the Environment v. Southview Farm,* 834 F. Supp. 1410, 1413 (W.D.N.Y. 1993)). **[**16]** Therefore, the Court will grant each of the three motions for leave to file an *amicus curiae* brief, but will not consider any legal issues or arguments therein that were not raised by the parties themselves.

### B. Admissibility of the Manbeck Declaration

Defendants move to strike the declaration of Harry F. Manbeck, Jr., Exhibit E of the Memorandum in Support of GSK's Motion, on grounds that it is not allowable under the Federal Rules of Evidence, it impermissibly augments the administrative record, and it is in violation of the local rules. The Court will take each concern in turn.

1) Expert Testimony

The PTO argues that the Manbeck Declaration is inappropriate in that it is primarily a rendering of legal conclusions and is therefore not relevant, helpful, or needed by the Court in its determination of whether a preliminary injunction is appropriate in this case. HN6 The Federal Circuit, which regularly hears questions of patent law, "has on numerous occasions noted the impropriety of patent lawyers testifying as expert witnesses and giving their opinion regarding the proper interpretation of a claim as a matter of law, the ultimate issue for the court to decide." *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.,* 122 F.3d 1040, 1042 (Fed. Cir. 1997). **[**17]** However, patent lawyers frequently testify as expert witnesses as to matters of PTO practice and procedure and to explain the complexities of patent prosecution, and a "judge can even advert to the testimony of patent law experts -- that is, patent lawyers -- for advice on the interpretation of claims." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 991 (Fed. Cir. 1995) (emphasizing the importance of expert witnesses in the field of patents to "reveal how others use and understand technical terms that may appear ambiguous or opaque to the judge, who rarely has the knowledge of those skilled in the field of the patent"). Insofar as the Manbeck Declaration renders legal conclusions, the Court agrees that it is inappropriate. However, the Court also recognizes its own limited knowledge of the intricacies of patent regulations and appreciates the need for experts in this matter.

In a situation similar to this one, a trial court declined to strike a patent lawyer's expert report upon allegations that it "consist[ed] solely of legal conclusions disguised as expert testimony." *Chamberlain Group, Inc. v. Interlogix, Inc.,* 2002 U.S. Dist. LEXIS 6998, 2002 WL 653893, *1 (N.D.Ill.,2002). The Court reasoned that excluding **[**18]** the entire report would be "an extraordinary measure" and chastised the moving party for "fail[ing] to identify specific portions of [the expert's] report that it contends should be stricken." *Id.* The report at issue "provide[d] an explanation of the prosecution history of the patents at issue, and the operation of the Patent and Trademark Office," thus helping the Court to understand the

patent issues in the case. *Id.*

Similarly, the PTO does not delineate particular portions of Manbeck's expert **[*662]** testimony that they wish to strike, claiming that the entire report is tainted. The Court recognizes that the Manbeck Declaration contains some impermissible legal arguments, but agrees with the *Chamberlain* Court that striking the entire report would be extraordinary, particularly given Manbeck's obvious qualifications in the field and clear ability to explain the complexities of patent regulation and the background of this matter. Therefore, the Court will accept the Declaration as the statement of an expert witness, but will not take into account any impermissible legal argument contained therein.

2) Augmentation of administrative record

The PTO alleges that the Manbeck Declaration "impermissibly **[**19]** introduces into the administrative record . . . material that was not before the USPTO when it enacted the Final Rules." Mem. in Supp. of Defs.' Mot. to Strike Ex. E at 6. Generally, "judicial review of agency action pursuant to the APA is confined to the agency's administrative record." *American Canoe Ass'n v. United States EPA,* 46 F. Supp. 2d 473, 475 (E.D. Va. 1999) (citing *Camp v. Pitts,* 411 U.S. 138, 142, 93 S. Ct. 1241, 36 L. Ed. 2d 106, (1973)). The Manbeck Declaration does contain analysis that goes beyond mere explanation of the administrative record. However, *HN7* "[e]ven in APA record review cases, circumstances may justify expanding the record or permitting discovery," including "such a failure in the record to explain administrative action as to frustrate judicial review, the agency's reliance on materials or documents not included in the administrative record, or the need to supplement the record to explain or clarify technical terms or other difficult subject matter included in the record." *Id.* at 477 (internal citations omitted); *see also Public Power Council v. Johnson,* 674 F.2d 791, 793-94 (9th Cir. 1982) (holding that "there may be circumstances to justify expanding the record or permitting discovery," **[**20]** including "ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds for decision," situations "when it appears the agency has relied on documents or materials not included in the record," and other circumstances as "necessary to permit explanation or clarification of technical terms or subject matter involved in the agency action under review" as "background information"). *HN8* Not only are there situations in which external information can be helpful to the Court, but the D.C. Circuit has pointed out that it can be reversible error for a district court to avoid going outside the administrative record in some situations. *Esch v. Yeutter,* 278 U.S. App. D.C. 98, 876 F.2d 976, 992 (D.C. Cir. 1989). It recognized that extra-record evidence can be important in scenarios "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly" and "in cases where relief is at issue, especially at the preliminary injunction stage," among others. *Id.* at 991.

In this consideration of a preliminary injunction, given that the subject matter is difficult and there are a number of terms used uniquely in the patent context, the **[**21]** Court finds that some explanatory material is appropriate. The Manbeck Declaration relies on statutes, court cases, Congressional documents, and the PTO's own publications, not on rare sources or information that the PTO was unaware of. In fact, the Court would find it extremely unusual if the PTO had not taken into consideration statutes, patent case law, and declarations of Congress in its promulgation of the Final Rules, even if they are explicitly referenced in the administrative record. Therefore, the Court will find that the external material relied upon in the Declaration is appropriate for the purpose **[*663]** of providing explanatory and background information for the Court.

3) Compliance with the Local Rules

The PTO's third argument is that the Manbeck Declaration is an extension of GSK's brief and an attempt to circumvent the Local Rules page requirement, rather than a truly separate exhibit. Local Rule 7(F)(3). *HN9* It is not inappropriate for a party to include exhibits or declarations in addition to its briefs, and the PTO itself included exhibits that explain the implications of the Final Rules. *See, e.g.,* Decl. of Andrew Faile, Ex. 4 to Defs.' Opp. to Pls.' Mot. for a TRO and Prelim. **[**22]** Inj. As discussed above, GSK includes the Manbeck Declaration in order to assist the Court in resolving a case that involves complex patent issues. Although the Declaration includes some legal conclusions, there are no significant arguments contained in

the Declaration that are not also found in the brief itself. The Manbeck Declaration is an exhibit, not a continuation of GSK's brief, and in no way violates the Local Rules of the Court.

For the foregoing reasons, the Court will deny the PTO's Motion to Strike the Manbeck Declaration, but will not consider those parts of the Exhibit which contain impermissible legal arguments.

### C. GSK's Motion for a TRO and Preliminary Injunction

In carefully weighing the factors of the Federal Circuit's balancing test, for the reasons stated below, the Court will grant GSK's Motion for a Preliminary Injunction.

1) Likelihood of Success on the Merits

GSK first argues that they will succeed on the merits because the PTO lacks the authority to promulgate substantive rules and therefore the PTO's interpretation of the Patent Act is not owed *Chevron* deference. *See Adams Fruit Co. v. Barrett,* 494 U.S. 638, 110 S. Ct. 1384, 108 L. Ed. 2d 585 (1990); *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). [**23]  More specifically, GSK argues that, because Congress did not grant the PTO the authority to construe provisions of the Patent Act except in certain, limited instances, *Chevron* deference to the PTO's interpretations of law in this area is inappropriate. Instead, under *Adams Fruit,* the PTO is entitled no deference. *Adams Fruit,* 494 U.S. at 649-50.

**HN10**⬆Section 2(b)(2) of Title 35 empowers the PTO to "establish regulations, not inconsistent with law," for several enumerated purposes, the most relevant of which include regulations to "govern the conduct of proceedings in the Office," 35 U.S.C. §§ 2(b)(2)(A), and to "facilitate and expedite the processing of patent applications." 35 U.S.C. § 2(b)(2)(C). The PTO thus has the power to "set reasonable deadlines and requirements for the prosecution of applications." *In re Borgese,* 303 F.3d 1362, 1368 (Fed. Cir. 2002). Section 2(b)(2) does not, however, vest the PTO with any general substantive rulemaking power. *Merck & Co. v. Kessler,* 80 F.3d 1543, 1550 (Fed. Cir. 1996). This conclusion is further evidenced by the fact that, since 2005, Congress has debated and considered whether it should grant the PTO substantive rulemaking authority. See Manbeck [**24]  Decl., Ex. E to Mem. in Support of Pls.' Mot. for a TRO and Prelim. Inj. at P 11; H.R. 1908, 110th Cong., § 14 (a) (2007).

The PTO contends that the Final Rules fall within the scope of their Section 2(b)(2) authority because they "govern the conduct of proceedings in the Office" and "do not affect the truly substantive rights of the patent applicant." Defs.' Opp'n to Pls.' Mot. at 22. Specifically, the PTO asserts that the Final Rules do not affect the [*664] substantive eligibility requirements for obtaining a patent. *Id.; see also* 35 U.S.C. §§ 101, 102, and 103. They further assert that even if the procedures created by the Final Rules sometimes affect substantive outcomes, that does not place the Final Rules outside of the PTO's rulemaking authority. Defs.' Opp'n to Pls.' Mot. at 22.

In *In re Van Ornum,* cited by the PTO, the Federal Circuit's predecessor court upheld a PTO rule that required a particular disclaimer from applicants seeking more than one patent on an invention. 686 F.2d 937, 945 (CCPA 1982). The Court found that the rule was "substantive in that it relates to a condition under which a patent will be granted," but noted that "[m]uch of the content of the PTO rules is 'substantive' [**25]  in this respect." *In re Van Ornum,* 686 F.2d 937, 945 (CCPA 1982). As GSK rightly notes, however, the Court in *In re Van Ornum* also held that the regulation at issue comported with statutory and case law. *Id.* That case, then, is helpful to the PTO only if this Court disagrees with GSK's additional contention that the Final Rules are inconsistent with the Patent Act. As the Court will explain, GSK raises serious concerns as to whether the Final Rules comport with the Patent Act. In addition, the Court also believes that GSK has created a colorable question as to whether the Final Rules are truly substantive. Thus, the Court will find that there is a genuine possibility that GSK will succeed on this issue.

GSK's second claim, alluded to by the Court above, is that Final Rules 78, 114, 75, and 265 exceed the plain language of Title 35. As to Final Rule 78, which limits the number of continuing applications, GSK contends that Section 120 of Title 35 prohibits the PTO from limiting the number of continuing applications

that may be filed. [HN11]Section 120 states that later-filed applications "shall have the same effect" as pending previously-filed applications, thus allowing the former to take [**26] the priority date of the latter. 35 U.S.C. § 120. In *In re Henriksen,* the Federal Circuit's predecessor court found that under Section 120 "there is no statutory basis for fixing an arbitrary limit to the number of prior applications through which a chain of copendency may be traced to obtain the benefit of the filing date of the earliest of a chain of copending applications." 399 F.2d 253, 254, 55 C.C.P.A. 1384 (CCPA 1968). While Final Rule 78 does not present an absolute bar on more than two continuing applications, GSK asserts that the "could not have" evidentiary burden of the petition and showing is a "de facto limit" on further continuing applications because the PTO will deny a petition in "almost all circumstances." Mem. in Support of Pls.' Mot. for a TRO and Prelim. Inj. at 19; Ex. A to Pls.' Mem. at 46769-77.

Moreover, while *In re Bogese* found that *Henriksen* did not suggest that "the PTO must allow dilatory tactics in the prosecution of applications or that the PTO lacks inherent power to prohibit unreasonable delay in prosecution," 303 F.3d at 1368 n.6, *In re Borgese* rested on the doctrine of [HN12]prosecution laches, which permits the denial of an application where the applicant delays too long [**27] in filing a continuing application. Id. at 1368-69; see also *Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found.,* 277 F.3d 1361, 1365-66 (Fed. Cir. 2002) ("Symbol II") (finding that [HN13]Section 120 did not abrogate the doctrine of prosecution laches). GSK argues that, while the doctrine of prosecution laches still applies, Section 120 as interpreted in *Henriksen* prevents the PTO from crafting its own limitations to the number of continuation applications that may be filed. This sentiment is supported by *Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found.,* 422 F.3d 1378 (Fed. Cir. 2005) ("Symbol IV"), where the Federal Circuit held that the doctrine of [*665] prosecution laches "should be used sparingly lest statutory provisions be unjustifiably vitiated." Id. at 1385. This holding suggests that [HN14]a decision by the PTO to limit the number of continuing applications would run contrary to the mandate of Section 120. [3]

**FOOTNOTES**

3 A bill considered, but not passed, by Congress in 2005 suggests a similar conclusion. See H.R. 2795, 109th Cong., § 123 (June 8, 2005) ("The Director may by regulation limit the circumstances under which an application for patent, other than a divisional application [**28] that meets the requirements for filing under section 121, may be entitled to the benefit under section 120 of the filing date of a prior-filed application . . . .").

The PTO responds that Final Rule 78 is within its authority under Section 2(b)(2), is not an absolute bar to filing a third continuing application, and that the PTO will review petitions for a third application "on a case-by-case basis." Defs.' Opp'n to Pls.' Mot. at 26 n.20; Ex. 2 to Defs.' Opp'n at 46770-76. Nevertheless, the Court believes that, on balance, the law on this question tips in favor of GSK, and thus the Court will find that GSK has demonstrated a likelihood of success on this issue.

GSK further argues that 35 U.S.C. § 132 prohibits the promulgation of Final Rule 114, which governs RCEs. [HN15]Section 132(b) requires that the PTO "prescribe regulations to provide for the continued examination of applications for patent at the request of the applicant." 35 U.S.C. § 132(b). While GSK reads this language and finds that Congress did not grant the PTO the authority to restrict the number of RCEs that may be filed, the PTO argues that Final Rule 114 complies with Section 132 even though it requires that a petition and [**29] showing accompany the filing of a second RCE. Given the limited briefing of this issue by both parties, the Court will find that, for the purposes of this motion, neither party can claim a strong likelihood of success on this issue.

GSK makes a similar claim with respect to Final Rules 75 and 265, which limit the number of claims an applicant may file. Section 111 and 112, the relevant statutory provisions, are similar to Sections 120 and 132 in that they do not specify whether the PTO has the authority to place a limit on the number of claims an applicant may file. 35 U.S.C. §§ 111 and 112. The PTO argues that it is entitled to *Chevron* deference on this issue because of the ambiguity of Section 2(b)(2). GSK, however, has raised serious questions as to

Get a Document by Citation - 511 F. Supp. 2d 652
Case 1:07-cv-02210-RJL   Document 24-2   Filed 01/17/2008   Page 14 of 15
Page 13 of 14

whether the PTO is entitled to *Chevron* deference in this case. Nevertheless, given the limited briefing of this issue by both parties, the Court will find that, for the purposes of this motion, neither party can claim a strong likelihood of success on this issue.

The PTO justifies each of these rule changes on the grounds of administrative efficiency. GSK challenges this rationale as arbitrary and capricious because "it has not been adequately **[**30]** explained, ignores less-drastic and less-damaging alternatives to restricting abusive continuation applications, and is not supported by the PTO's statistics on the number of third or subsequent continuation applications." Mem. in Support of Pls.' Mot. for a TRO and Prelim. Inj. at 23. **HN16** Judicial review of agency rulemaking under 5 U.S.C. § 706(2)(A) is guided by *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). Under this standard, while a court "is not to substitute its judgment for that of the agency," it must still "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 43.

The PTO states that 2.7% of applications filed in 2006 would have required a petition **[*666]** and showing under Final Rules 78 and 114, amounting to approximately 11,000 continuation applications and RCEs. See Ex. 1 to Defs.' Mem. in Opp'n to Pls.' Not. at A05022, A05646. The PTO explained in the final Federal Register notice that, under the old system of unlimited continuation applications, applicants were engaging in unfocused practices that impeded the PTO's ability to effectively **[**31]** examine applications. Ex. 2 to Defs.' Opp'n to Pls.' Not. at 46720. The PTO expected that limiting continuation applications and RCEs would lead to more focused prosecution and enable the PTO to apply its resources to new applications. *See id.* at 46716-20. Similarly, limiting the number of claims in each application under Final Rules 75 and 265 would accomplish the same goal. *See id.* at 46721. Furthermore, the Federal Register reflects that the PTO considered weaker alternatives but concluded that those measures would be inadequate to achieve the PTO's goals. *See id.* at 46816-23, 46824-26, 46833-34. Though the Final Rules would reduce the PTO's backlog by only 2.7% and, by their own admission, are insufficient to reduce the backlog to a reasonable level, PTO models show that they will have an impact on the backlog. *See* Ex. 1 to Defs.' Opp'n to Pls.' Not. at A05645. Thus, the PTO's rationale appears to be sufficient to satisfy arbitrary and capricious review, and the Court will find that GSK has not shown a real likelihood of success on this issue.

GSK also takes issue with the alleged retroactive application of the Final Rules. According to GSK, the Final Rules apply retroactively because **[**32]** they "apply legal consequences to past events completed before the effective date [of November 1, 2007] where none attached before." Mem. in Support of Pls.' Mot. for a TRO and Prelim. Inj. at 24. **HN17** Because retroactivity is not favored in the law, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988). **HN18** Congress did not expressly grant the PTO those powers. See 35 U.S.C. § 2(b)(2).

However, the United States Supreme Court has found that **HN19** a regulation is retroactive only if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994). The PTO, citing *Landgraf,* argues that the Final Rules are not retroactive because the filing of an initial application does not create any "rights" or amount to "transactions already completed." Defs.' Opp'n to Pls.' Mot. at 33 (citations omitted). The PTO cites a number **[**33]** of cases dictating that patent applications do not give rise to property rights that create retroactivity concerns under *Landgraf. See Marsh v. Nicols, Shepherd & Co,* 128 U.S. 605, 612, 9 S. Ct. 168, 32 L. Ed. 538 (1888) ("Until the patent is issued, there is no property right in it; that is, no such right as the inventor can enforce."); *Brenner v. Ebbert,* 398 F.2d 762, 764, 130 U.S. App. D.C. 168, 1968 Dec. Comm'r Pat. 124 (D.C. Cir. 1968) ("We have considerable doubt whether appellees' allowed but unissued patent is 'property' as that term is used in the fifth amendment."); *Mullins Mfg. Co. v. Booth,* 125 F.2d 660, 664 (6th Cir. 1942) ("The right of [the Defendant] to his invention while his application is pending is an inchoate right, which matures as property when the patent issues."); *De Ferranti v. Lyndmark,* 30 App. D.C. 417, at 425, 1908 Dec. Comm'r Pat. 353 (1908) ("[I]n a patent no vested right of which the applicant

cannot be deprived is acquired under the preliminary proceedings leading up to its issuance.").

[*667] *Landgraf,* however, does not limit HN20 "the presumption against statutory retroactivity to cases involving 'vested rights.'" *Landgraf,* 511 U.S. at 275 n.29. Moreover, GSK does not argue that it has rights in pending patents. Instead, GSK contends that the Final Rules "impose new duties" [**34] that did not exist under the old rules. Pls.' Reply Mem. at 17. The requirement of filing a petition and showing to justify more than two continuing applications or a second RCE and the requirement of filing an ESD under Final Rules 75 and 265 qualify as impositions of new duties with respect to already-completed transactions - here, the initial applications.

In addition, as GSK noted at oral argument, by seeking patent protection inventors like GSK sacrifice their trade secrets, and the United State Supreme Court has found that HN21 trade secrets are property rights. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002, 104 S. Ct. 2862, 81 L. Ed. 2d 815 (1984); 35 U.S.C. § 122(b)(1). GSK, then, has voluntarily surrendered its property rights in exchange for a guarantee from the PTO that it will have a "full and fair opportunity to seek a spectrum of patent protection adequate to protect [its] investments." Brief for *Amicus Curiae* AIPLA at 3. While "an individual [that] discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret," loses that property right, *Ruckelshaus,* 467 U.S. at 1002, the Final Rules retroactively alter the [**35] bargain on which inventors like GSK rely in making their decision to surrender their rights. The Final Rules thus impair GSK's right to this bargain.

Furthermore, while procedural rules often do not raise retroactivity concerns when applied to pending applications, see *Landgraf,* 511 U.S. at 275, there remains a serious question as to whether the Final Rules even qualify as procedural. Given all of these factors, the Court will find that GSK has demonstrated a real likelihood of success on the issue.

Finally, GSK claims that Final Rule 265, which delineates the requirements of an ESD, is unconstitutionally vague because it fails to provide "any boundaries on the scope of the search." Mem. in Support of Pls.' Mot. for a TRO and Prelim. Inj. at 26. Specifically, GSK complains that the "rule does not indicate whether the applicant must conduct electronic searches, manual searches, or both; in which countries' databases the applicant must search; or which libraries it must search." *Id.* at 27. According to GSK, the ESD requirement forces applicants to "search the patent literature of the entire world, as well as unspecified yet relevant 'non patent literature.'" Pls.' Reply Mem. at 18-19.

The [**36] PTO responds that, under *Marsh,* GSK does not have a vested property right in its patent application and therefore cannot bring a constitutional vagueness challenge. Defs.' Opp'n to Pls.' Mot. at 35. Regardless, the PTO also contends that the ESD requirements are sufficiently clear for applicants to be able to comply. The D.C. Circuit has found that HN22 to satisfy due process requirements, regulations "must be sufficiently specific . . . that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require." *Freeman United Coal Mining*