## IN THE UNITED STATES THE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE ST. CROIX CHIPPEWA | ) | |
| INDIANS OF WISCONSIN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:07-cv--02210-RJL |
| | ) | |
| DIRK KEMPTHORNE, et al. | ) | Next Scheduled Court Deadline: |
| | ) | Federal Defendants' Response to |
| Defendants. | ) | Plaintiff's Motion to Seal on |
| | ) | February 1, 2008 |

## NOTICE OF FILING

The St. Croix Chippewa Indians of Wisconsin ("Plaintiff"), by and through counsel,
hereby files with this Court as Exhibit A hereto the Indian Gaming Paper dated February 20,
2004 ("Indian Gaming Paper"). This document contains redactions on pages 2 and 14 as agreed
to by the parties.

As recited in the Indian Gaming Paper (page 1) to then Secretary Norton wanted to be
informed as to ". . .what discretion, if any, the law provides her in regard to the approval of
off-reservation Indian gaming acquisitions that are great distances from an established
reservation, so-called 'far-flung lands'."

The Indian Gaming Paper provided Secretary Norton with an answer -- supported by a
detailed analysis. It was authored by senior officials within the Interior Department. Its
conclusions were supported by the Chairman of the National Indian Gaming Commission. This
document has extraordinary significance to the issues presented herein in that it delineates the
Interior Department's own view that the distance of a proposed casino from an established
reservation could <u>not</u>, consistent with Congressional intent, be used as a basis to deny

152686

off-reservation casino applications. Ignoring its own analysis, the Plaintiff submits that the Interior Department has and will continue to use distance as a basis for denying off-reservation casino applications, including the Plaintiff's.

To place the Guidance Memorandum into proper context, a brief recitation of the surrounding events is important. On July 9, 2003, Aurene Martin, the Acting Assistant Secretary - Indian Affairs testified before the Senate Committee of Indian Affairs with respect to IGRA. In her written testimony, she informed the Congress that a review was being conducted for the Secretary of the law relating to whether or not IGRA, under its two-part determination, would allow the Secretary to use as a factor the distance between the proposed gaming establishment and the tribe's reservation. On July 13, 2004, Ms. Martin, then holding the position of Principal Deputy Assistant, Secretary -- Indian Affairs testified before the House Committee on Resources, at an oversight hearing on off-reservation, restored and newly-acquired lands. She stated in her written testimony: "We have spent substantial effort examining the overall statutory scheme that Congress has formulated in the area of Indian self-determination and economic development." She went on to state that the two-part IGRA determination, on its face, did ". . .not contain any express limitation on the distance between the proposed gaming establishment and the tribe's reservation. . . ." Id. She then stated that the Department's review concluded that while the trust acquisition regulations provide broad discretion, IGRA does not authorize the Secretary to consider criteria other than the best interests of the tribe (and its members) and any detriment to the surrounding community. Id. While not identified as such in her testimony, it is clear that the Indian Gaming Paper embodied the substantial examination to which she referred.

The Plaintiff's First Amended Complaint asserts, *inter alia*, that the Guidance Memorandum issued by Assistant Secretary Artman on January 3, 2008 ("Guidance Memorandum"), in describing the negative impact that a distant off-reservation casino would have on reservation life, had no basis by way of evidence, studies or empirical data to support its postulated theories.  Amended Complaint, ¶¶ 47-49.  Count I (¶ 59) similarly asserted that the Guidance Memorandum was issued without factual support and the Interior Department did not consider all important aspects of the issue and otherwise relied on factors which Congress did not intend for it to consider.  For these reasons, the Amended Complaint asserts (¶ 59) that the Guidance Memorandum is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law in violation of 5 U.S.C. § 706(2)(A).  Count III of the Amended Complaint asserts in its ¶ 64 that the issuance by the Federal Defendants of the Guidance Memorandum constituted an *ultra vires* action which was in excess of the Interior Department's statutory jurisdiction, authority or limitations, or short of statutory right and was therefore unlawful pursuant to 5 U.S.C. § 706(2)(C).  Count V of the Amended Complaint (¶ 69) asserts that the issuance of the Guidance Memorandum was in violation of the trust responsibilities owed by the Federal Defendants to Indian tribes, including the Plaintiff.

Perhaps nothing could more convincingly evidence the substantial merit in Plaintiff's allegations than the Interior Department's own extensive analysis and conclusions as embodied in the Indian Gaming Paper.  As briefly described below, the Interior Department itself carefully looked at the issue as to whether Congress, in enacting the Indian Reorganization Act and the Indian Gaming Regulatory Act ("IGRA") intended that distance of a proposed enterprise, including a casino, could be used as a limiting factor.  The answer was no.

The Interior Department's own analysis was that Congress well understood that many tribes, because of remote areas in which their established reservations were located, would necessarily need to establish commercial enterprises at some substantial distances away from their established reservations.  Despite this conclusion, the entire underlying premise of the Guidance Memorandum was that a distance beyond what was viewed as "commutable" would have a negative impact on reservation life.  The Plaintiff submits that there is no legitimate reason for the Interior Department to have ignored its own analysis.

According to the Supreme Court in <u>Motor Vehicle Manufacturers Association of the United States, Inc  v. State Farm Mutual Automobile Insurance Company</u>, 463 U.S. 29 (1983), an agency's decision such as this is arbitrary and capricious in that it "has relied on factors which Congress has not intended it to consider. . ." and it has ". . .entirely failed to consider an important aspect of the problem. . . ."  <u>State Farm</u>, 463 U.S. at 43.  The Indian Gaming Paper's recitation of Congressional intent, and the reasons why distance could not be used as a limiting factor, make it overwhelmingly clear that the Guidance Memorandum's reliance on the "commutable" distance notion directly conflicts with Congressional intent.

After thoroughly reviewing the legislative history of IGRA, the Indian Gaming Paper stated at 6:

> In any event, it is certain that if Congress had intended to limit
> Indian gaming on lands within established reservation boundaries
> or even within a specific distance from a reservation, it would
> have done so expressly within IGRA.  It clearly did not.  Nor has
> Congress amended IGRA to add a distance limitation or any other
> geographic limitation since its passage in 1988.

Turning to an analysis of the Indian Reorganization Act of 1934 (under which the Part 151 regulations were promulgated), the Indian Gaming Paper stated at 8:  "By its clear language, the IRA envisions off-reservation acquisitions that are free from state and local

taxation <u>and nowhere in the law does Congress purport to limit the exercise of that authority to</u>

<u>lands with-in a fixed distance from an existing reservation.</u>" (emphasis supplied). The Indian

Gaming Paper continued at 8:

> The major federal policy behind the IRA was to promote
> economic independence for tribes. <u>Nowhere in the IRA or its</u>
> <u>legislative history was there ever a discussion of mileage limits to</u>
> <u>lands that the tribes could acquire to engage in economic</u>
> <u>enterprises.  Hence, when Congress designed and passed IGRA, it</u>
> <u>must have understood that (at least since 1934) tribes could seek</u>
> <u>additional Indian lands</u> through the Department upon which they
> would conduct business enterprises for economic development
> and exercise full governmental jurisdiction. <u>In short, Congress</u>
> <u>delegated substantial responsibility to the Secretary within the</u>
> <u>statutory scheme for gaming on off-reservation lands, but it did so</u>
> <u>within a clear statutory framework</u>.  (emphasis supplied).

The Indian Gaming Paper further stated at 11:

> . . .in may [sic] respects, the two decisions - land acquisition
> under section 151 and the two-part determination under IGRA -
> dovetail.  In looking at best interest, under section 151 the
> Department analyzes whether the acquisition is beneficial to the
> tribe and is necessary to facilitate tribal self-determination,
> economic development, or Indian housing.

Directly contrary to the Guidance Memorandum, the Indian Gaming Paper did <u>not</u> view

distance as being a negative factor for reservation life despite the fact that tribal members might

have to travel a substantial distance from the reservation to the casino.  In fact, it was just the

opposite  It stated at 11:

> Another factor considered in the best interest determination is the
> impact on tribal employment, job training and career
> development, including impact to the tribe if members leave the
> reservation for employment at the gaming facility.  For a facility
> that is located a distance from the reservation, the Department
> may review whether housing is provided for members working at
> a proposed facility.  However, <u>if the tribe is using gaming</u>
> <u>proceeds at a distant facility to create job opportunities</u>
> <u>on-reservation, then while tribal members may have to travel a</u>
> <u>distance to casino employment, overall tribal employment may be</u>

> boosted by the economic gains of the distant facility. In addition, even without substantial job creation, a tribe may demonstrate best interest by projecting the benefits to tribe and tribal members from increased tribal income alone. Increased tribal services, improved education and health care are also benefits from increased tribal income that the Department may consider. (emphasis supplied).

The Indian Gaming Paper went on to analyze Congressional intent when dealing with substantial distances between a proposed casino and a tribe's established reservation. It stated at 13:

> Neither IGRA nor the IRA evince Congressional intent to prohibit off-reservation gaming or to limit it to close proximity to existing reservation lands. If IGRA was intended to bring substantial economic development opportunities to Indian tribes where none could be achieved solely because of the remoteness of reservation lands, Congress provided tribes the potential to prosper on Indian lands a distance from remote reservations. Conversely, if IGRA was intended to spur on-reservation economic development only - or lands that are so close that for all intents and purposes they are on-reservation - the purpose of the law would fail because existing isolated reservation lands would not provide the potential of the law. Accepting the inherent market limitations within some rural states, distance limitations should not be grafted onto IGRA. To do so could deny the very opportunity for prosperity from Indian gaming that Congress intended IGRA to foster. (emphasis supplied).

The Guidance Memorandum's clear conclusion was that distance could not be used as a basis to deny an off-reservation casino application under IGRA. And, distance to a proposed casino could not therefore be used as a basis to deny an application under Part 151 since the two "dovetail."

The D.C. Circuit has repeatedly held that guidance memoranda are fully ripe for review upon their issuance even though the agency has not taken any administrative action under the Guidance Memorandum in question. See General Electric Company v. Environmental Protection Agency, 290 F.3d 377, 388 (D.C. Cir. 2002) (the Court's consideration would not be

aided by further application of the Guidance Document to particular facts). See also Cement Kiln Recycling Coalition v. Environmental Protection Agency, et al., 493 F.3d 207 (D.C. Cir. 2007) (guidance document); Croplife America, et al. v. Environmental Protection Agency, et al., 329 F.3d 876 (D.C. Cir. 2003) EPA (directive appearing in a press release banning consideration of third-party human studies in evaluating the safety of pesticides); and, John Chiang v. Dirk Kempthorne, 503 F.Supp.2d 343 (D.D.C. 2007) (guidelines issued by the Interior Department). These cases are in conformity with the Supreme Court's holding in Ohio Forestry Association, Inc. v. Sierra Club, 523 U.S. 726, 737 (1998) that:

> [A] person with standing who is injured by a failure to comply with [statutory] procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.

The challenges raised by the Amended Complaint to the Interior Department's decision to make the Part 151 determination first and to the arbitrary and capricious nature of the Guidance Memorandum are fully ripe for review by this Court. The conclusions reached in the Indian Gaming Paper, from which the Interior Department has impermissibly departed, underscore why a

review by this Court of the issues raised by the Amended Complaint at this time

could not get any riper.

Respectfully submitted,

_____/s/  Robert M. Adler_____

Robert M. Adler, Bar #62950
Gerald H. Yamada, Bar #194092
O'CONNOR & HANNAN, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
(202) 887-1428
Fax:  (202) 785-4047
Radler@oconnorhannan.com
Gyamada@oconnorhannan.com

*Attorneys for the St. Croix Chippewa
Indians of Wisconsin*

Of Counsel:
Andrew Adams, III
St. Croix Chippewa Indians of Wisconsin
24663 Angeline Avenue
Webster, WI 54893

Dated:  January 29, 2008

152686                                                  8

# EXHIBIT A

**Indian Gaming Paper**

Date:            February 20, 2004

From:            Michael Rossetti
                 Counselor to the Secretary

                 Aurene Martin
                 Principal Deputy Assistant Secretary-Indian Affairs

                 Christopher Chaney
                 Associate Solicitor-Division of Indian Affairs

                 Edith Blackwell
                 Deputy Associate Solicitor-Division of Indian Affairs

## I. Purpose of Indian Gaming Paper

Secretary Norton has asked what discretion, if any, the law provides her in regard to the approval of off-reservation Indian gaming acquisitions that are great distances from an established Indian reservation, so-called "far-flung lands."

In addition to discussing this issue with the Secretary, it has been the subject of numerous discussions during the regular Indian gaming meetings which are chaired by the Office of the Assistant Secretary for Indian Affairs and include the Bureau of Indian Affairs' Office of Indian Gaming and the Office of the Solicitor. Given the importance of a thoughtful analysis of the issues raised by off-reservation gaming under existing law, the then Acting Assistant Secretary for Indian Affairs, the Counselor to the Secretary, the then Acting Associate Solicitor for the Division of Indian Affairs, the Chairman of the National Indian Gaming Commission and experienced gaming and trust acquisition staff from the Office of the Assistant Secretary for Indian Affairs, the Bureau of Indian Affairs and the Division of Indian Affairs held a two-day session on the topic. The Chairman of the National Indian Gaming Commission participated in the discussions regarding off-reservation gaming and concurs with the contents of this paper.

As Appendix A shows, pending before the Department are about a dozen proposals for two-part determinations for off-reservation casinos. These proposals are in various stages of development. The range in distance between the existing reservation and the proposed gaming site is from a few miles to over a thousand miles. Many have active community support. Further, some or all of the two-part determination decisions may ripen for review by the Department well before the State and the tribe have entered into a compact.

1

The statutes at play, the Indian Reorganization Act of 1934[1] (IRA) and the Indian Gaming Regulatory Act[2] (IGRA) require that the Department make fact-specific determinations for each acquisition. The former provides legal authority for the Secretary to receive lands in trust on behalf of tribes and the latter governs gaming on Indian lands. The purpose of this briefing note is to step back from fact-specific decision-making and analyze the interplay between these federal laws and the policies that they are based upon.

[ Intentionally deleted due to the Government's assertion of the deliberative process privilege, 5 U.S.C. § 552(b)(5) ]

## II. IGRA: The Creation of Federal Indian Gaming Policy by Congress

Generally, Congress has plenary power over Indian affairs.[3] In the area of Indian gaming, Congress exercised that power when it enacted IGRA[4] which embodies federal Indian gaming policy. And, unless Congress enacts amendments to IGRA, the Department must anchor its gaming policy in IGRA as it exists today.

In crafting and passing IGRA, Congress found that "a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government . . . [and] Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming

---

[1] 25 U.S.C. § 460 *et seq*

[2] 25 U.S.C. § 2701 *et seq*

[3] Congress possesses "exclusive and plenary power" to legislate with respect to Tribes and their members. *Washington v. Yakima Indian Nation*, 439 U.S. 463, 470-471 (1979); *accord e.g. Negonsott v. Samuels*, 507 U.S. 99, 103 (1993); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978). Such power "is drawn both explicitly and implicitly from the Constitution itself" – in particular, from its grants to Congress of the power "[t]o regulate Commerce . . . with the Indian Tribes," Art. II, § 2 Cl. 2. *Morton v. Mancari*, 417 U.S. 535, 551-552 (1974); *see Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832) (explaining that the Constitution, "by declaring treaties already made . . . to be the supreme law of the land, . . . admits [the Indian nations'] rank among those powers who are capable of making treaties").

[4] 25 U.S.C. § 2701 *et seq*

2

activity."[5]  Congress also declared that the purpose of its Indian gaming policy is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."[6]

Beyond its broad policy pronouncements, there is scant legislative history regarding the portion of IGRA that envisions gaming on Indian lands that are a distance from established reservations.[7]  Thus, other than relying upon the plain language and structure of the statute, one may review the context of the debate at the time that IGRA was enacted to glean Congressional intent regarding off-reservation Indian gaming policy.

IGRA was enacted in the wake of *California v. Cabazon Band of Mission Indians*[8] which held that the State of California had no authority under Public Law 280 to enforce its bingo and card-game statutes on Indian reservations because such laws are regulatory and not prohibitory. For three years prior to that decision, Congress entertained bills aimed at regulating gaming on Indian reservations.  None of these bills passed because agreement could not be reached between interested states and Indian tribes on the type of games that Indian tribes should be permitted to operate.

In its deliberations, Congress heard testimony as part of its consideration of bills that predated IGRA.  Rep. Bereuter of Nebraska, who introduced one of the many gaming bills, testified that it was bad "public policy" to establish Indian gaming on lands that were not contiguous to a reservation against the wishes of the directly affected localities.[9]  Rep. Bereuter considered it inappropriate for the Secretary to put new lands into trust for gaming because, in his view, to do so would circumvent state law enforcement and result in lost revenue to state and local governments.[10]

---

[5] 25 U.S.C. § 2701 (4) and (5)

[6] 25 U.S.C. § 2702 (1)

[7] 25 U.S.C. § 2719

[8] 480 U.S. 202 (1987)

[9] *Indian Gambling Control Act, Part II, Hearings before the House Interior and Insular Affairs Committee*, 99th Cong., 1st Sess. 20, 21 (1985) (H.R. 3130 Testimony) .

[10] *Id.*

Congress ultimately considered and adopted IGRA within the context of a political debate between states and Indian tribes regarding the limitation of off-reservation gaming without the concurrence of directly affected local governments.[11] Simply put, Congress was well aware that states sought to protect their sovereign interest in safeguarding the public health, safety and welfare, as implicated by Indian gaming within their borders while Indian tribes sought to build upon their status as domestic dependent sovereigns through gaming as economic development.

In addressing the tension between states and tribes, Congress struck a balance between tribal sovereignty and states' rights. In IGRA, Congress enacted a prohibition on gaming on parcels acquired into trust after October 17, 1988, unless certain conditions were met. Specifically, IGRA provides that if lands are acquired in trust after October 17, 1988, the lands may not be used for gaming, unless one of the following statutory exceptions applies:

(1) the lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988;
(2) the Indian tribe has no reservation on October 17, 1988, and "the lands are located...within the Indian tribe's last recognized reservation within the State or States within which such Indian tribe is presently located"[12];
(3) the "lands are taken into trust as part of (i) a settlement of a land claim[13], (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal

---

[11] The debate was decidedly not over the legal authority of the Secretary to take lands into trust, wherever located, under the IRA.

[12] The statute contains an additional exception for lands within the State of Oklahoma. See 25 U.S.C. § 2719 (a)(2)(A).

[13] There are multiple land claims pending in the State of New York, two of which (Seneca Nation of Indians (Cuba Lake Claim) and Oneida (of New York and Wisconsin)) have settlement discussions underway under the supervision of a court-ordered federal mediator. A third New York land claim (St. Regis Mohawk) has been the subject of settlement discussions between the tribe and the State of New York. The St. Regis Mohawk and the New York Oneida are interested in gaming on lands within Sullivan and Ulster Counties which are located in the Catskills hundreds of miles from their respective New York reservations. The Oneida of Wisconsin and the Stockbridge Munsee, also of Wisconsin, also seek to game in the Catskills. The gaming site was established by state law, authorizing the governor to negotiate the establishment of three casinos within the two counties.

As nothing within IGRA requires a tribal applicant to make a particular election or series of elections if more than one statutory option is available to it, any New York tribe may seek a two-part determination from the Secretary even if it also settles its land claim.

4

acknowledgment process, or (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition."

In addition, Congress enacted an exception to this prohibition that would allow gaming on after-acquired off-reservation land only if the state concurred with the Secretary's determination under the statute. IGRA requires that before a tribe may game off-reservation on land acquired into trust after October 17, 1988, the tribe must obtain a "two-part determination"[14] wherein the Secretary must find that the gaming operation would be in the "best interest of the tribe and its members and not detrimental to the surrounding community," and the Governor must provide her concurrence.[15] Thus, Congress enacted a provision that addressed off-reservation gaming that was intended to give the Department and the local community a voice in deciding whether to allow gaming. Perhaps most importantly, it made the ability to conduct gaming contingent upon the Secretary's two-part determination coupled with action by the state's Governor.

One court has observed that through IGRA, Congress created "an example of 'cooperative federalism' in that it seeks to balance competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme."[16] More importantly, within the context of off-reservation gaming on lands acquired into trust after October 17, 1988, Congress fashioned a process that provided authority to a Governor that potentially limits the market opportunities of sovereign Indian tribes by making the Governor's concurrence a requirement in the siting of most off-reservation casinos.

Recognizing the high hurdle of receiving a Governor's concurrence, Congress enacted three exceptions to the two-part determination.[17] As mentioned above, the three exceptions are: (i) the settlement of a land claim[18]; (ii) the initial reservation of an Indian tribe acknowledged by

---

[14] 25 U.S.C. § 2719(b)(1)(A)

[15] See *Confederated Tribes of Siletz Indians v. United States*, 110 F.3d 688 (9th Cir.), cert. denied, 118 S.Ct. 625 (1997) (gubernatorial veto does not violate Appointments Clause or separation of powers).

[16] *Artichoke Joe's v. Norton*, 216 F.Supp.2d 1084, 1092 (E.D. Cal. 2002)

[17] 25 U.S.C. § 2719 (b)(1)(B). It is important to note that outside the context of the two-part determination under 25 U.S.C. § 2719(b)(1)(A) the Department's regulations for taking land into trust, 25 C.F.R. 151, provide for notice to the affected state and local government(s). Thus, the local community is never denied a meaningful opportunity for involvement while the land is being considered for trust status for the purpose of gaming.

[18] Congress has reluctantly enacted separate legislation for the settlement of land claims to address gaming on at least two occasions, e.g. Torres-Martinez in California and Narragansett in
(continued...)

5

the Secretary under the Federal acknowledgment process[19]; and (iii) the restoration of lands for and Indian tribe that is restored to Federal recognition.[20] These exceptions were added at the proverbial eleventh hour of passage of IGRA leaving scant legislative history. However, one compelling reason for providing these exemptions is the high hurdle of a Governor's concurrence and the need to provide tribes that did not exist at the time of IGRA's passage with at least one meaningful opportunity for the economic development of gaming without having to seek the Governor's concurrence and without any geographic limitations beyond those inherent in the particular statutory exception.

In any event, it is certain that if Congress had intended to limit Indian gaming on lands within established reservation boundaries or even within a specific distance from a reservation, it would have done so expressly within IGRA. It clearly did not. Nor has Congress amended IGRA to add a distance limitation or any other geographic limitation since its passage in 1988.

---

[18](...continued)
Rhode Island. While the Senate Indian Affairs Committee has noted that Congress may not welcome settlement agreements that provides for the opportunity to game as a means to resolve pending litigation, that kind of approach may be required to settle land claims pending in the State of New York.

[19] Few tribes acknowledged through the Part 83 process have asked the Department to declare an initial reservation. The Solicitor's office has issued one opinion that provides that an initial reservation can include non-contiguous parcels. Memorandum re: Trust Acquisition for the Huron Potawatomi, from Acting Associate Solicitor, DIA to Regional Director to Midwest Region, December 13, 2000. The question of whether the Huron Potawatomi's parcels meets the initial reservation exception of IGRA is currently being litigated in *Citizens Exposing Truth About Casinos v. Norton*, Case No. 1:02CV01754-TPJ (D.D.C. filed August 30, 2002).

[20] The Department has addressed the restored lands for restored tribes on several occasions. Originally, the Department held that this exception only applied to Congressionally restored tribes and to lands that Congress specifically mentioned in the restoration legislation. Several courts held that this was too narrow an interpretation of the exception. The Department, and National Indian Gaming Commission, revised their positions in decisions regarding the Grand Traverse Tribe and the Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians. In these opinions, both the Department and the National Indian Gaming Commission found that the restored lands exception applied to lands in which a tribe could demonstrate an historical connection, a temporal connection between the time the tribe acquired the land and when it was restored, and geographical proximity to the current location of the tribe. These revised opinions have been upheld by two District Courts.

6

### III. IGRA and the IRA: Departmental decision-making for new off-reservation gaming acquisitions.

When a tribe seeks to establish an off-reservation gaming operation on lands it did not have in trust when IGRA was enacted, the Secretary is faced with two decisions. First, she must decide whether to take the land into trust under the procedures and standards in Part 151. In addition, unless falling within one of the other exceptions, the Secretary must make a two-part determination under IGRA that the proposed gaming activity is in the best interest of the tribe and not detrimental to the local community and the governor must give her concurrence.[21]

It is important to note that the Part 151 process and IGRA work in tandem and that IGRA is not legal authority to take land into trust.[22] Rather, IGRA is an independent requirement to be satisfied before gaming activity may be conducted on off-reservation lands taken in trust after October 17, 1988.[23] If an application is rejected under Part 151 or either prong of the two-part determination under IGRA, then gaming is not permitted on the land as sought by the applicant tribe.

### A.  The IRA and the Secretary's Authority to Acquire Land into Trust for Tribes

In 1934, Congress enacted the IRA, marking a sweeping change in government policy towards Indian affairs by encouraging tribal economic development and self determination and abolishing the allotment program.  Congress recognized that one of the key factors for tribes in developing and maintaining their economic and political strength lay in the protection of the tribes' land base.  Accordingly, Congress enacted the IRA which provides, in part:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, <u>within or without existing reservations,</u> including trust or otherwise restricted allotments, whether the allottee is living or deceased, for the purpose of providing land for Indians. . .

---

[21] 25 U.S.C. § 2719 (b)(1)(A)

[22] There are no regulations under 25 U.S.C. § 2719 although a proposed rule (25 C.F.R. 292) was published for comment in 2000. Federal Register, Vol. 65, No 179, September 14, 2000 at 55471-55473. However, the Department has internal procedures for reviewing applications for gaming and gaming-related trust land acquisitions and two-part determinations. See Checklist for Gaming Acquisitions, Gaming-Related Acquisitions and IGRA Section 20 Determinations (October 2001).

[23] Because Congress was aware of the authority of the Secretary to take lands into trust under the IRA, 25 U.S.C. § 2719 (c) provides that nothing in that section shall "affect or diminish the authority and responsibility of the Secretary to take land into trust."

Title to any lands or rights acquired pursuant to [Section 465] this title shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465 (emphasis added).

By its clear language, the IRA envisions off-reservation acquisitions that are free from state and local taxation and nowhere in the law does Congress purport to limit the exercise of that authority to lands with-in a fixed distance from an existing reservation.[24] The legislative history confirms that Congress believed that tribal economic prosperity could occur only if the devastating loss of Indian lands was stopped and if some of those lost lands were restored to tribes. "The economic future of the great majority of the Indians, is, for the immediate present and for some time to come, to be found on the land." 78 Cong. Rec. 11,728 (1934)(extended statements of Rep. Howard). The IRA was to give the Indians "at least a modest measure of economic security and economic opportunity." Id. at 17,727. The Supreme Court on several occasions has discussed the purposes behind the IRA and found that its purpose was to "rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism," Mescalero Apache Tribe v. Jones, 411 U.S. 145, 152 (1973)(quoting House report at 6), and to "establish the machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." Morton v. Mancari, 417 U.S.533, 542 (1973).

The major federal policy behind the IRA was to promote economic independence for tribes. Nowhere in the IRA or its legislative history was there ever a discussion of mileage limits to lands that the tribes could acquire to engage in economic enterprises. Hence, when Congress designed and passed IGRA, it must have understood that (at least since 1934) tribes could seek additional Indian lands through the Department upon which they would conduct business enterprises for economic development and exercise full governmental jurisdiction. In short, Congress delegated substantial responsibility to the Secretary within the statutory scheme for gaming on off-reservation lands, but it did so within a clear statutory framework.

(1) Regulatory Process under the IRA and Part 151

The IRA and its implementing regulations at 25 C.F.R. Part 151, dictate the standards and the process by which the Secretary acquires lands in trust for tribes or individual Indians. In addition to guiding the Secretary's decision-making, the Part 151 regulations require that a tribe submit an application for lands wherever it is located. The application must state the tribe's need

---

[24] While Indian tribes are "invested with the right of self-government and jurisdiction over the persons and property within the limits of the territory they occupy," Merrion v. Jicarilla Apache Tribe, 445 U.S. 130, 140 (1982), nothing in the law appears to limit tribes acquiring new lands into trust by requiring occupancy as a precondition to obtaining off-reservation lands for the purposes of gaming.

for the land; purpose for which the land will be used; any potential jurisdictional problems or land use conflicts and compliance with all necessary environmental laws.[25]  In addition, for off-reservation acquisitions, the regulations require that the Secretary consider the distance from the parcel to be placed in trust from the tribe's reservation boundaries and if the parcel is to be used for business purposes, the tribal business plan.[26]

Under the regulations, once a discretionary on-reservation or off-reservation acquisition is submitted, the BIA notifies state and local governments, having regulatory jurisdiction over the land, of the application and requests their comments concerning potential impacts on regulatory jurisdiction, real property taxes and special assessments. The decision to acquire land into trust for a tribe is appealable to the Interior Board of Indian Appeals and to federal district court once the administrative appeal process is completed.[27]  Thus, under the Administrative Procedure Act, a decision to take land into trust may be challenged in District Court, and the Department must show that it followed the standards and procedures in the Part 151 regulations.

### (2) Challenges to the Secretary's Authority under the IRA

Some states and local jurisdictions have challenged the Secretary's authority to acquire land into trust for Indians most often claiming that the IRA is an unconstitutional delegation of Congressional authority. The non-delegation doctrine arises from Article I, Section I of the Constitution which states that "all legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I, § 1.  In a delegation challenge, the question is whether the statute has delegated legislative power to the executive branch.

Every court to have considered whether the IRA offends the Constitution has upheld it against non-delegation challenges, with the exception of the Eighth Circuit's short-lived decision in *South Dakota v. Dep't of Interior*,[28] which was vacated by the Supreme Court in, *Dep't of Interior v. South Dakota*.[29]

---

[25] 25 C.F.R. 151.10

[26] 25 C.F.R. 151.11

[27] 25 C.F.R. 151.12(b)

[28] 69 F.3d 878 (1995)

[29] 519 U.S. 919 (1996)(granting certiorari, vacating and remanding to the Secretary for reconsideration of administrative decision).

9

In *South Dakota*, the Eighth Circuit held that the IRA violated the non-delegation doctrine and that the Secretary therefore had no authority to acquire lands in trust for the Lower Brule Sioux Tribe.[30] The court found that the apparent lack of the opportunity for judicial review was a factor weighing in favor of a non-delegation challenge.[31] Since the Eighth Circuit decision, the Department has revised its regulations to allow a 30 day time period between the Department's decision to accept land into trust and the transfer of the land into trust.[32] Thus, the regulations now assure that challenges to acquisition decisions may be brought before the lands are transferred into trust.[33]

Every court that has addressed the non-delegation issue since the Eight Circuit's vacated decision in *South Dakota* has upheld the constitutionality of the IRA. In *United States v. Roberts*,[34] the Tenth Circuit rejected the Eighth Circuit's analysis in *South Dakota* and found the IRA to provide sufficient standards for the Secretary's exercise of discretion. In addition, when courts have addressed other statutes directing the Secretary to accept land into trust for Indian tribes, they have uniformly found these statutes to be acceptable conferrals of authority. *See Churchill County v. United States*, No. CV-N-00-0075-ECR-RAM, 2001 U.S. Dist. LEXIS 18489, at *6 (D. Nev. March 21, 2001) (statute mandating Secretary accept certain lands into trust was not "impermissible delegation of legislative power").

**B.  The IRA and IGRA provide the standards governing the Secretary's decision-making regarding new off-reservation gaming operations.**

When a tribe is proposing an off-reservation casino on after-acquired lands, the Secretary is usually presented with the decision whether to take the lands-into-trust under Part 151 at the same time as making a two-part determination.  For the two-part determination, IGRA requires

---

[30] 69 F.3d at 878

[31] *Id.* at 881

[32] *See* 61 Fed. Reg. 18082 (April 24, 1996) (codified at 25 C.F.R. § 151.12(b) (2002)).

[33] Outside the context of the IRA, and since vacating the Eighth Circuit's decision in *South Dakota*, the Supreme Court has provided additional guidance to courts faced with non-delegation doctrine challenges. In *American Trucking v. Whitman*, for example, the Court reviewed its non-delegation cases and found that the scope of discretion in the statute directing the EPA Administrator to "set 'ambient air quality standards . . . allowing an adequate margin of safety, [which] are 'requisite to protect the public health'" fell well within the outer limits of the Court's non-delegation precedents. *Am. Trucking*, 531 U.S. at 472. The Court emphasized that it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law," *Id.* at 474-475 (quoting *Mistretta*, 488 U.S. at 416).

[34] 185 F.3d 1125, 1136-38 (10th Cir. 1999), *cert. denied*, 529 U.S. 1108 (2000).

the Secretary find that the proposed casino is in the best interest of the tribe and not detrimental to the local community. These are the only criteria IGRA provides for a Secretarial two-part determination.

Under Part 151, the Secretary has broad discretion to take the land into trust if it is in the best interest of the tribe. Within the context of off-reservation gaming, current 151 regulations require the Department to give greater scrutiny to the "tribe's justification of anticipated benefits from the acquisition . . . [and] greater weight to the concerns raised" by the local community the farther the proposed acquisition is from the tribe's reservation. Thus, to a degree, the Secretary may have more discretion to decline a request to take land into trust under part 151, than to disapprove a two-part determination. However, where there is vigorous community support, the Secretary be vulnerable to allegations that her decision was arbitrary and capricious under the Administrative Procedure Act.

However, in may respects, the two decisions – land acquisition under section 151 and the two-part determination under IGRA – dovetail. In looking at best interest, under section 151 the Department analyzes whether the acquisition is beneficial to the tribe and is necessary to facilitate tribal self-determination, economic development, or Indian housing. With a gaming acquisition, it is usually easy for a tribe to establish that the land acquisition is beneficial to economic development. While the Department does not have regulations implementing the two-part determination, best interest historically has been analyzed by examining a number of discernable factors.

The first prong of the two-part determination is whether the proposed gaming is in the best interest of the tribe. Examination of the economic benefit to the tribe and its members is one component of best interest. Here, the Department reviews the overall proposal to ensure that the tribe and its members will receive true economic benefit from the proposed facility. If, for example, the proposed venture requires the tribe to take on a disproportionate amount of debt, that may be a factor weighing against best interest. Conversely, if the tribe is receiving economic benefit that can be used on-reservation to improve tribal government and to assist its members, those factors may weigh in favor of a best interest finding.

Another factor considered in the best interest determination is the impact on tribal employment, job training and career development, including impact to the tribe if members leave the reservation for employment at the gaming facility. For a facility that is located a distance from the reservation, the Department may review whether housing is provided for members working at a proposed facility. However, if the tribe is using gaming proceeds at a distant facility to create job opportunities on-reservation, then while tribal members may have to travel a distance to casino employment, overall tribal employment may be boosted by the economic gains of the distant facility. In addition, even without substantial job creation, a tribe may demonstrate best interest by projecting the benefits to tribe and tribal members from increased tribal income alone. Increased tribal services, improved education and health care are also benefits from increased tribal income that the Department may consider.

11

A less tangible benefit is the improvement in the relationship between the tribe and the community near the gaming facility where the tribe and the local government have the opportunity to work together to maximize the number of jobs available to local residents. Often, related benefits flow to tribe and tribal members from increased tourism generated by the gaming operation. Increased tourism creates other economic development ventures, providing the tribe an opportunity to have greater positive exposure in the community where the facility is located. Finally, within the context of best interest, the Secretary considers, the possible adverse impact on the tribe and plans to mitigate potential adverse impacts.

The second prong of the two-part determination is whether the gaming facility is detrimental to the local community. As part of this analysis, the Department complies with the process under the National Environmental Policy Act (NEPA), which may result in the issuance of either a Finding of No Significant Impact or a Record of Decision on an Environmental Impact Statement. The NEPA process provides information regarding potential impacts on the land and the local community.

The Secretary also reviews the impact on social structure, infrastructure, services, housing, community character and land use. In addition, the Secretary should examine the impact on economic development, income and employment within the community. The costs of impacts and sources of revenue to address them are usually addressed and considered. Finally, programs for compulsive gamblers may be noted by the Department.

However, as local communities seek economic development, many have sought out Indian tribes to establish gaming operations in their environs. In addition, many states view gaming revenue as potential state revenue. Thus, the Department is frequently faced with local communities that support the proposed gaming facility, where there are also clear benefits inuring to the tribe, making a negative two-part determination less likely as both a legal and practical matter.

## IV. Conclusion: IGRA Envisions Off-reservation Gaming and Builds upon the Foundation of the IRA

Through the passage of IGRA, Congress made clear that the purpose of IGRA is to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."[35] In IGRA, Congress provided a statutory basis for tribes to engage in Indian gaming off-reservation as a means to promote tribal economic development. The statutory two-part determination, provides for specific Departmental review and an independent decision by the Governor of the state. Also, it appears self-evident that Congress, in enacting the two-part determination, was fully aware that tribes could seek to have land taken into trust pursuant to the IRA, thus making off-reservation gaming a possibility. While some now argue that, in 1988 Congress may not have envisioned that states and tribes would enter into compacts that would locate gaming sites on

---

[35] 25 U.S.C. § 2702(1).

12

lands located far from the reservation, there is no evidence that Congress intended to include a limitation on that activity within the law. Moreover, the suggestion that "reservation shopping" has run amok is without a basis. To the contrary, states have exercised their statutory prerogative to deny tribes access to lands for gaming under the two-part determination in all but three instances, proving that the framework of IGRA has been working.[36]

Further, a plain reading of IGRA and its very purpose supports the conclusion that off-reservation gaming is clearly contemplated by the law. Otherwise the balance of State, Federal, and Tribal power of the two-part determination would be unnecessary. This conclusion also acknowledges (at least implicitly) the history of locating reservations in remote areas so as not to conflict with non-Indian settlers. IGRA marks a departure from this history of blanket isolation of tribes where prosperous non-agrarian economic development is unlikely, in part, by employing a structure that envisions state and local participation in a decision to allow off-reservation gaming. IGRA implicitly recognizes the limitations of economic opportunities on the reservation by specifically providing for a mechanism to allow off-reservation gaming and permits a tribe to exercise jurisdiction on new Indian lands for that purpose.

However, Congress did not provide carte blanche to Indian tribes and depressed local communities. Rather, it designed a system of checks and balances through the concurrence of the Governor. This unusual statutory device grants the Governor a concurrence in what could have been created as an exclusive grant of authority to the Secretary. Further, Congress expressly narrowed the Secretary's discretion to two discrete prongs. It also requires consideration of the impacts on the local community which coincidentally furthers the Secretary's policy emphasis upon consultation with affected local governments.

Neither IGRA nor the IRA evince Congressional intent to prohibit off-reservation gaming or to limit it to close proximity to existing reservation lands. If IGRA was intended to bring substantial economic development opportunities to Indian tribes where none could be achieved solely because of the remoteness of reservation lands, Congress provided tribes the potential to prosper on Indian lands a distance from remote reservations. Conversely, if IGRA was intended to spur on-reservation economic development only – or lands that are so close that for all intents and purposes they are on-reservation – the purpose of the law would fail because existing isolated reservation lands would not provide the potential of the law. Accepting the inherent market limitations within some rural states, distance limitations should not be grafted onto IGRA. To do so could deny the very opportunity for prosperity from Indian gaming that Congress intended IGRA to foster.

---

[36]The three two-part determinations that received gubernatorial concurrences are: Forest County Potawatomi (Wisconsin, 1990), Kalispel Tribe (Washington, 1998) and Keweenaw Bay Indian Community (Michigan, 2000). In contrast, almost a dozen two-part determination have failed to receive gubernatorial concurrence since 1988. One positive two-part determination is under review by the Governor of Louisiana (Jena Band, December 2003).

[ Intentionally deleted due to the Government's
assertion of the deliberative process privilege, 5 U.S.C. § 552(b)(5) ]

---

[37]In an informal data call conducted by the Bureau of Indian Affairs, the Bureau reported on February 7, 2003 that approximately 13 acquisitions were well known to have occurred more than 50 miles from the boundary of the reservation, the former reservation if no current reservation exists today, or, trust lands if no current or former reservation exists today.

14

*APPENDIX A*

Acquisitions Pending Review

| Applicant Tribe and State where Gaming is Proposed | Location and Mileage from Proposed Gaming Site | Action Requested |
|---|---|---|
| St. Regis Mohawk (of New York) Gaming State: New York | The Catskills, Monticello, New York, 350 miles from New York Reservation | Requested: 151 Application and two-part determination |
| Stockbridge-Munsee (of Wisconsin) Gaming State: New York | The Catskills, Monticello, New York, 1035 miles from Wisconsin Reservation Note: Tribe has recently purchased fee lands within the New York land claim area | Requested: 151 Application and two-part determination |
| Keweenaw Bay Indian Community (of Michigan) Gaming State: Michigan | Marquette Airport, Marquett, MI, 65 miles from Reservation | Requested:151 Application and two-part determination pending before the Midwest Region. |
| Bad River (of Wisconsin) Gaming State: Wisconsin | Beloit, Wisconsin 339 miles from Reservation | Requested: Requested:151 Application and two-part determination pending before the Midwest Region. |
| St. Croix (of Wisconsin) Gaming State: Wisconsin | Beloit, Wisconsin 332 miles from Reservation | Requested: Requested:151 Application and two-part determination pending before the Midwest Region. |
| Lac Du Flambeau (of Wisconsin) Gaming State: Wisconsin | Schulzburg, Wisconsin 281 miles from Reservation | Requested: Requested:151 Application and two-part determination pending before the Midwest Region. |
| Tule River (of California) Gaming State: California | Tule County, California 16 miles from Reservation | Requested:Requested:151 Application and two-part determination pending before the Pacific Region. |

15

| Jena Band of Choctaw (of Louisiana) Gaming State: Louisiana | Logansport, Louisiana 63 miles from "three-parish area" Note: Band is a landless tribe. | Requested: 151 Application and initial reservation proclamation, or, in the alternative, a two-part determination |
|---|---|---|
| Miami (of Oklahoma) Gaming State: Indiana | Terre Haute, Vigo County, Indiana 477 miles from Oklahoma Reservation | Requested: |
| Fort Mohave (of Arizona) Gaming State: California | Needles, San Bernardino, CA 2.5 miles from Reservation. | Requested:151 Application and two-part determination pending before the Pacific Region. |

16