IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN, <br><br> *Plaintiff*, <br><br> *v.* <br><br> DIRK KEMPTHORNE, in his official capacity as Secretary of the Interior, GEORGE T. SKIBINE,[1] in his official capacity as Acting Deputy Assistant Secretary for Policy and Economic Development, and THE DEPARTMENT OF THE INTERIOR, <br><br> *Defendants.* | Civ. No. 1:07-cv-02210-RJL |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL MEMORANDUM ON DEFENDANTS' MOTION TO DISMISS

Plaintiff St. Croix Chippewa Indians of Wisconsin originally filed the above-captioned action on December 7, 2007, alleging an arbitrary and capricious change in the Department of the Interior's process for reviewing applications by Indian Tribes to take land into trust for gaming. *See* Compl. ¶ 12 (Dkt. No. 1). Defendants filed a motion to dismiss the Complaint on December 21, 2007, for lack of subject matter jurisdiction, failure to state a claim under the Administrative Procedure Act, and lack of standing. *See* Defs.' Mem. P. & A. Supp. Defs.' Mot. to Dismiss (Dkt. No. 14). On January 10, 2008, in the midst of briefing the motion to dismiss, Plaintiff filed an Amended Complaint. *See* First Amend. Compl. (Dkt. No. 18). The Amended

---

[1] On May 23, 2008, Assistant Secretary Carl Artman resigned. On that same day, the Deputy Secretary issued a memorandum delegating all the authority of the Assistant Secretary to George T. Skibine, Acting Deputy Assistant Secretary for Policy and Economic Development. Mr. Skibine is hereby substituted for Mr. Artman pursuant to Federal Rule of Civil Procedure 25(d).

Complaint challenged a January 3, 2008, guidance memorandum to Bureau of Indian Affairs Regional Directors from then-Assistant Secretary Artman as a legislative rule that had not been through public notice and comment.  First Amend. Compl. ¶ 71.  Plaintiff, however, has still failed to identify a final agency action, as is required to validly state a claim under the Administrative Procedure Act.  Under *Bennett v. Spear*, the guidance memorandum does not impact any rights, create any obligations, or result in any legal consequences.  Thus, despite Plaintiff's Amended Complaint, the Court should grant Defendants' motion to dismiss.

I.      **January 3 Memorandum is Not a Final Agency Action As It Creates No New Rights or Obligations, and Results in No Legal Consequences.**

As recently as last month, the D.C. Circuit stated that "[a] 'final agency action' within the meaning of the [Administrative Procedure Act] is 'the consummation of the agency's decisionmaking process . . . by which rights or obligations have been determined or from which legal consequences will flow.'" *Venetian Casino Resort, LLC v. EEOC*, No. 06-5361, ___ F.3d ___, 2008 WL 2549912 at *5 (D.C. Cir. June 27, 2008) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  The two-pronged test in *Bennett* is the standard for determining whether a plaintiff in an Administrative Procedure Act (APA) action has identified a "final agency action" for purposes of validly stating a claim.[2]  The January 3 Memorandum, however, does not fulfill

---

[2]  Defendants' Reply Memorandum in Support of its Motion to Dismiss states: "The Administrative Procedures Act (APA) only constitutes a waiver of sovereign immunity where there is an identifiable 'final agency action.'" Defs.' Reply Mem. at 2 (Dkt. No. 19).  The D.C. Circuit has held, however, that identifying a final agency action is a requirement for stating a claim under the APA, rather than a jurisdictional requirement.  *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187–89 (D.C. Cir. 2006); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006).  *But see Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Ashcroft*, 360 F. Supp. 2d 64 (D.D.C. 2004) (finding the Court had no jurisdiction to hear the case where a final agency action had not been identified).

the requirements under *Bennett*.  The Memorandum requires nothing new of Plaintiff or the

Department of the Interior.  Instead, it only clarifies the applicability of current regulations to an

influx of applications that include land located a great distance from the applicant-Tribe's

reservation.  By simply guiding Bureau of Indian Affairs employees through review of the

applications, the Memorandum does nothing to disturb current regulatory requirements and is

therefore not a final agency action under the Administrative Procedure Act.

The question of final agency action here closely mirrors two similar cases previously

before the District Court.  The first was *Sierra Club v. Mainella*, Civ. No. 04-2012, 2005 WL

3276264 (D.D.C. 2005), which involved a challenge to a National Park Service guidance

discussing criteria for exemptions under oil and gas regulations.  Among other things, the

guidance "describe[d] [Park Service] compliance responsibilities in evaluating a request for an

exemption . . . ." *Id.* at *3.  Several requests for exemptions were approved following release of

the guidance.  *Id.*  Like Plaintiff here, the plaintiff in *Mainella* argued the guidance set forth a

new interpretation of regulations and departed from past, long-standing practice.  *Id.* at *8.  The

Court sided with the Park Service in holding the guidance only reiterated the regulation itself,

and therefore had no new legal impact.  *See id.* at *12.

A year later, the D.C. Circuit heard a case on appeal from the district court involving

letters from the National Highway Traffic Safety Administration outlining guidelines for

regional car recalls.  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798,

800 (D.C. Cir. 2006).  Like Plaintiff here, the challengers argued the letters were de facto

legislative rules and therefore in violation of the APA absent public notice and comment.  *Id.*

Analyzing under *Bennett*, the court held the letters did not determine any rights or obligations,

nor have any legal consequences. *Id.* at 808. In so holding, the Circuit looked at both the letters' language and on-the-ground consequences. *Id.* at 809–11. The Circuit noted that, "'if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purposes of judicial review' under the APA." *Id.* at 811 (quoting *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005)). The court found the letters' only consequences to be the industry's voluntary compliance therewith. *Id.*

Just as in *Mainella* and *Center for Auto Safety*, the language of January 3 Memorandum here sets forth no requirements, and the document only reiterates current regulations with no on-the-ground legal consequences. The Department has received an influx of applications requesting the Department take land into trust for gaming that "is a considerable distance" from Indian reservations, in some cases up to 1,400 miles. *See* Guidance Mem. at 1 (attached hereto as Attachment 1). Faced with changes in the nature of land-into-trust applications, the Memorandum advises Department staff responsible for application review on how to analyze the applications under current regulations. Guidance Mem. at 1–2. The document is replete with advisory terms likes "should" and "could". *See, e.g.,* Guidance Mem. at 3 (stating applications should be reviewed in accordance with the document). Nowhere does the Memorandum state that an application <u>must</u> be denied under a given circumstance. In the absence of mandatory language, the Memorandum does not create any obligation. *See Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C. Cir. 2007).

Further, the Memorandum also does nothing to change existing regulations. If anything, the Memorandum underscores that it is 25 C.F.R. § 151.11(b) which sets forth the factors for the Department to consider when exercising its <u>discretionary authority</u> to acquire lands into trust.

*See* Guidance Mem. at 1.  Most tellingly, the Guidance explicitly states:

> A greater scrutiny of the justification of the anticipated benefits and the giving greater weight to the local concerns must <u>still</u> be given to all off-reservation land into trust applications, <u>as required in 25 C.F.R. § 151.11(b)</u>.  This memorandum <u>does not diminish that responsibility</u>, but only provides guidance for those applications that exceed a daily commutable distance from the reservation.

Guidance Mem. at 3 (emphasis added).  The regulation's "greater scrutiny" requirement still applies "as long as the requested acquisition is off-reservation regardless of the mileage between the tribe's reservation and proposed acquisition."  Guidance Mem. at 3.  And a "reviewer must [still] give a greater weight to the concerns of the state and local governments no matter what the distance is between the tribe's reservation and the proposed off-reservation acquisition."  Guidance Mem. at 5.

Contrary to Plaintiff's argument, it is the regulations, not the Memorandum, that require the scrutiny to be greater as the distance between the reservation and the proposed acquisition increase.  *See* 25 C.F.R. § 151.11(b).  By putting a label of "commutable distance" on that requirement, the Department is not creating a new standard, new obligations, or any legal consequences.  There is no threshold distance that will lead to an application systematically being denied.  Instead, the Memorandum merely suggests that no application should be granted "unless it carefully and comprehensively analyzes the potential negative impacts on reservation life and clearly demonstrates why these are outweighed by the financial benefits of tribal ownership in a distant gaming facility."  Guidance Mem. at 4.  The Secretary remains free to exercise his discretion on taking land into trust.

In fact, the Memorandum recognizes that any impacts resulting from the potential gaming facility's distance from the reservation is a fact-specific analysis.  For one, the document

recognizes that the income stream from a gaming facility is of little or no relation to its distance from the reservation. Guidance Mem. at 3. Secondly, it notes only that negative impacts from having to commute to work at an off-reservation casino <u>could</u> be considerable, and that encouraging reservation residents to leave the reservation <u>could</u> have negative implication on the tribal community. Guidance Mem. at 4. Thus, the document only reiterates the logic behind § 151.11(b): there is a potentially indirect relationship between benefits and distance. An application was and still is required to survive greater scrutiny as that distance increases. The Department's restatement of an existing factor does not create an obligation at all, let alone a new one. *See Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).

Finally, the Memorandum also does not result in any on-the-ground consequences for Plaintiff or any other Tribe. As the distance between the proposed land and the reservation increases, a land-into-trust applicant still has to justify the anticipated benefits of the acquisition under greater scrutiny, and the Secretary still must give greater weight to jurisdictional concerns. The January 3 Memorandum simply attempts to describe what current regulations entail in light of relatively new and numerous applications to take land into trust that is a great distance from a Tribe's reservation. The document simply assists reviewers in identifying the necessary information within an application that will allow them to make the appropriate analysis.

The D.C. Circuit stresses, guidance documents are not final agency actions where they "do not purport to carry the force of law[,] . . . have not been published in the Code of Federal Regulations[,] . . . do not define 'rights or obligations[,]' . . . [and] are labeled 'policy guidelines,' not rules." *Ctr. for Auto Safety*, 452 F.3d at 808–09. The January 3 Memorandum does not purport to carry the force of law, does not define rights or obligations, and is both

labeled and read as guidance.  The Memorandum therefore does not meet the *Bennett* requirements for final agency action, and Plaintiff's Amended Complaint should be dismissed.

## II.    Plaintiff Lacks Standing Because It Has Not Suffered Any Injury From the January 3 Memorandum.

Plaintiff also argues that, in reviewing guidance documents, the D.C. Circuit has never "held that the underlying District Court action should not have properly been brought because the Guidance Memorandum had not been applied to make a decision or determination carrying out the terms or provisions of the Guidance Memorandum."  Pl.'s Supp. Mem. at 4 (Dkt. No. 45).  Plaintiff's argument is incorrect on two grounds.

First, none of the cases to which Plaintiff cites had an underlying district court action, as each was before the D.C. Circuit on a direct petition for review.  *See Cement Kiln Recycling Coal.*, 493 F.3d at 214 (jurisdiction based on Resource Conservation and Recovery Act)*; CropLife Am. v. EPA*, 329 F.3d 876, 878 (D.C. Cir. 2003) (challenge to directive under the Federal Food, Drug and Cosmetic Act); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 381 (D.C. Cir. 2002) (jurisdiction based on the Toxic Substance Control Act).  Second, Plaintiff misstates the D.C. Circuit's view on the ripeness of guidance documents for review.  In fact, in one of the very cases Plaintiff cites, the D.C. Circuit acknowledged that judicial review is inappropriate in situations where "the agency's practical application of a statement would be important." *Id.* at 216 (citation omitted).  Whether a "document is fit for review turns in significant part on whether that challenge can be resolved on the face of the document, or whether it depends as well on the way in which the document will be applied." *Id.*

In *Cement Kiln Recycling Coalition*, the agency document at issue made clear that whether its recommendations were appropriate in a given situation was a fact-specific question.

- 7 -

*Id.* at 227.  Similarly, the January 3 Memorandum only describes how applications involving "considerable distance" should be analyzed under existing regulations.  It puts forth no black-line rule for approval or denial.  Thus, the only time to determine whether the regulations were appropriately applied to a given application is after they have been applied.[3]  As of yet, however, no decision has been made on Plaintiff's application.  Any claimed misapplication of the regulatory factors, or claimed denial of the application itself, is therefore speculative.  Should Plaintiff's application be denied, and should Plaintiff believe its application was judged unlawfully under the regulations, it can make an appropriate and timely challenge under 5 U.S.C. § 706.  But, until that time, Plaintiff has not been injured and has no standing, and its claims are not ripe for review.

### III.  Plaintiff's Attempts to Characterize the Guidance Memorandum as a Legislative Rule Are Premature.

Plaintiff alleges that the proper test to determine whether a guidance memorandum is "final" for purposes of APA is whether the document is, "by its own terms, binding."  Pl.'s Supp. Mem. at 5–7.  The cases Plaintiff relies upon for its rule, however, were not appeals from district court decisions, and instead involved the question of whether the agency document at issue was a legislative rule under the substantive authorizing statute that granted the Circuit Court jurisdiction.  *See, e.g., Gen. Elec.*, 290 F.3d at 381 ("Before we reach the merits, we must

---

[3]  Thus, the January 3 Memorandum is also not a "'consummation' of the agency's decisionmaking process" under the first prong of *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The Memorandum only provides guidance on interpreting the regulations, and does not predetermine an outcome on Plaintiff's application or any other.  The consummation of any agency decision on whether the benefits of Plaintiff's proposed casino outweigh the potential negative impacts of its distance from Plaintiff's reservation, as required by regulation, will come when a decision is made on Plaintiff's application.

consider whether the Document is a 'rule' subject to our review under § 19(a)(1)(A) of the

TSCA.").  And, even within petition for review cases, Plaintiff's across-the-board statements

about the reviewability of guidance documents are incorrect.  Agency action is still not

reviewable where an "agency has not yet made any determination or issued any order imposing

any obligation. . . , denying any right. . . , or fixing any legal relationship."  *Indep. Equip.*

*Dealers Ass'n*, 372 F.3d at 427 (quoting *Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d

726, 732 (D.C. Cir. 2003)).

 Further, under the APA, determining whether a document is a legislative rule is a slightly

different question than whether it is a "final agency action" for purposes of stating a claim.

*Compare* 5 U.S.C. § 553(b)(A) (exempting certain actions from requirements for public notice

and comment) *with* 5 U.S.C. § 704 (limiting judicial review to actions reviewable by statute or

final agency actions).  Certainly, a final agency action and a legislative rule are related in the

sense that demonstrating the latter would necessarily also demonstrate the former.  *Ctr. for Auto*

*Safety*, 452 F.3d at 806, 807.  But all final agency actions under the APA are not necessarily

legislative rules.  *Compare* 5 U.S.C. § 551(13) (defining "agency action") *with* 5 U.S.C. §

553(b)(A) (exempting certain actions from requirements for public notice and comment).  Only

if a document is identified as a final agency action does the question become whether it is a

substantive rule to which the APA's notice-and-comment requirements apply.  To state a claim

under the APA, Plaintiff must identify a "final agency action" and *Bennett* remains the judicial

standard.  *See* 5 U.S.C. § 704; *Ctr. for Auto Safety*, 452 F.3d at 807–08.  Here, Plaintiff has not

made that requisite showing.

**<u>CONCLUSION</u>**

Despite the Amended Complaint, Plaintiff has still failed to identify a final agency action

under the APA, and the Amended Complaint should therefore be dismissed.

Respectfully submitted this 25th day of July, 2008,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

By:      */s/ Kristofor R. Swanson*

SARA E. COSTELLO  (KS #20898)
KRISTOFOR R. SWANSON (Colo. #39378)
United States Department of Justice
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel: (202) 305-0466
Tel: 202-305-0248
Fax: (202) 305-0506
Email: sara.culley@usdoj.gov
Email: kristofor.swanson@usdoj.gov

*Attorneys for Defendants*

Of Counsel:

Jonathan Damm
U.S. Department of the Interior
Office of the Solicitor
Division of Indian Affairs



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240


TAKE PRIDE
IN AMERICA

**Memorandum**

**To:**   Regional Directors, Bureau of Indian Affairs
George Skibine, Office of Indian Gaming

**From:**  Assistant Secretary Carl Artman

**Date:**  January 3, 2008

**Subject:**  Guidance on taking off-reservation land into trust for gaming purposes

The Department currently has pending 30 applications from Indian tribes to take off-reservation land into trust for gaming purposes as part of the 25 U.S.C. § 2719(b)(1)(A) two-part determination. Many of the applications involve land that is a considerable distance from the reservation of the applicant tribe; for example, one involves land that is 1400 miles from the tribe's reservation. Processing these applications is time-consuming and resource-intensive in an area that is constrained by a large backlog and limited human resources.

The decision whether to take land into trust, either on-reservation or off-reservation, is discretionary with the Secretary. Section 151.11 of 25 C.F.R. Part 151 sets forth the factors the Department will consider when exercising this discretionary authority with respect to "tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation." Section 151.11(b) contains two provisions of particular relevance to applications that involve land that is a considerable distance from the reservation. It states that, as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give:

    1)        greater scrutiny to the tribe's justification of anticipated benefits from the acquisition; and

    2)        greater weight to concerns raised by state and local governments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

Part 151, however, does not further elaborate on how or why the Department is to give "greater scrutiny" and "greater weight" to these factors as the distance increases. The purpose of this guidance is to clarify how those terms are to be interpreted and applied,

1

Attachment 1

particularly when considering the taking of off-reservation land into trust status for gaming purposes.

Core Principles

As background to the specific guidance that follows, it is important to restate the core principles that underlie the Part 151 regulations and that should inform the Department's interpretation of, and decisions under, those regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations". The IRA contains also provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which was just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised discretion regarding trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing directly to do with Indian gaming. The Indian Gaming Regulatory Act of 1988 (IGRA), 25 U.S.C. § 2701 et seq., adopted more than 50 years after the IRA, sets the parameters of Indian gaming. One requirement is that if gaming is to occur on off-reservation lands those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities far from existing reservations. Whether land should be taken into trust far from existing reservations for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

Implementation of Guidance

This guidance should be implemented as follows:

1. All pending applications or those received in the future should be initially reviewed in accordance with this guidance. The initial review should precede any effort (if it is not already underway) to comply with the NEPA requirements of section 151.10(h).

Attachment 1

2.  If the initial review reveals that the application fails to address, or does not adequately address, the issues identified in this guidance, the application should be denied and the tribe promptly informed. This denial does not preclude the tribe from applying for future off-reservation acquisitions for gaming or other purposes. However, those future applications will be subject to these same guidelines.

3.  A greater scrutiny of the justification of the anticipated benefits and the giving greater weight to the local concerns must still be given to all off-reservation land into trust applications, as required in 25 C.F.R. § 151.11(b). This memorandum does not diminish that responsibility, but only provides guidance for those applications that exceed a daily commutable distance from the reservation.

<u>Greater Scrutiny of Anticipated Benefits</u>

The guidance in this section applies to all applications, pending or yet to be received, that involve requests to take land into trust that is off-reservation. Reviewers must, in accordance with the regulations at 25 C.F.R. 151.11(b), "give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" as the distance between the acquisition and the tribe's reservation increases. The reviewer should apply this greater scrutiny as long as the requested acquisition is off-reservation regardless of the mileage between the tribe's reservation and proposed acquisition. If the proposed acquisition exceeds a commutable distance from the reservation the reviewer, at a minimum, should answer the questions listed below to help determine the benefits to the tribe. A commutable distance is considered to be the distance a reservation resident could reasonably commute on a regular basis to work at a tribal gaming facility located off-reservation

As noted above, section 151.11(b) requires the Secretary to "give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" of trust land "as the distance between the tribe's reservation and the land to be acquired increases." The reason for this requirement is that, as a general principle, the farther the economic enterprise - in this case, a gaming facility - is from the reservation, the greater the potential for significant negative consequences on reservation life.

Tribes typically view off-reservation gaming facilities as providing two economic benefits to the tribe. The first is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, and thus can have a positive effect on reservation life. Obviously, the income stream from a gaming facility is not likely to decrease as the distance from the reservation increases. In fact, off-reservation sites are often selected for gaming facilities because they provide better markets for gaming and potentially greater income streams than sites on or close to the reservation.

The second benefit of off-reservation gaming facilities is the opportunity for job training and employment of tribal members. With respect to this benefit, the location of the

Attachment 1

gaming facility can have significant negative effects on reservation life that potentially worsen as the distance increases. If the gaming facility is not within a commutable distance of the reservation, tribal members who are residents of the reservation will either: a) not be able to take advantage of the job opportunities if they desire to remain on the reservation; or b) be forced to move away from the reservation to take advantage of the job opportunity.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. High on-reservation unemployment rates, with their attendant social ills, are already a serious problem on many reservations. A gaming operation on or close to the reservation allows the tribe to alleviate this situation by using their gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the existence of the off-reservation facility would require or encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the applicant tribe and may mitigate some potential negative impacts, no application to take land into trust beyond a commutable distance from the reservation should be granted unless it carefully and comprehensively analyzes the potential negative impacts on reservation life and clearly demonstrates why these are outweighed by the financial benefits of tribal ownership in a distant gaming facility.

As stated above, some of the issues that need to be addressed in the application if the land is to be taken into trust is off-reservation and for economic development are:

What is the unemployment rate on the reservation? How will it be affected by the operation of the gaming facility?

How many tribal members (with their dependents) are likely to leave the reservation to seek employment at the gaming facility? How will their departure affect the quality of reservation life?

How will the relocation of reservation residents affect their long-term identification with the tribe and the eligibility of their children and descendants for tribal membership?

What are the specifically identified on-reservation benefits from the proposed gaming facility? Will any of the revenue be used to create on-reservation job opportunities?

Attachment 1

As long as it remains the policy of the Federal government to support and encourage growth of reservations governed by tribal governments, these are important questions that must be addressed before decisions about off-reservation trust land acquisitions are made. The Department should not use its IRA authority to acquire land in trust in such a way as to defeat or hinder the purpose of the IRA. It should be noted that tribes are free to pursue a wide variety of off-reservation business enterprises and initiatives without the approval or supervision of the Department. It is only when the enterprises involve the taking of land into trust, as is required for off-reservation Indian gaming facilities, that the Department must exercise its IRA authority.

Greater Weight

Section 151.11(b) also requires the Secretary to give "greater weight" than he might otherwise to the concerns of state and local governments. Under the regulations, state and local governments are to be immediately notified of a tribe's application to take land into trust, and are to file their comments in writing no later than 30 days after receiving notice. The reviewer must give a greater weight to the concerns of the state and local governments no matter what the distance is between the tribe's reservation and the proposed off-reservation acquisition. This is the second part of the two part review required by section 151.11(b).

The regulations identify two sets of state and local concerns that need to be given "greater weight:" 1) jurisdictional problems and potential conflicts of land use; and 2) the removal of the land from the tax rolls. The reason for this requirement of giving "greater weight" is two-fold. First, the farther from the reservation the proposed trust acquisition is, the more the transfer of Indian jurisdiction to that parcel of land is likely to disrupt established governmental patterns. The Department has considerable experience with the problems posed by checkerboard patterns of jurisdiction. Distant local governments are less likely to have experience dealing with and accommodating tribal governments with their unique governmental and regulatory authorities. Second, the farther from the reservation the land acquisition is, the more difficult it will be for the tribal government to efficiently project and exercise its governmental and regulatory powers.

With respect to jurisdictional issues, the application should include copies of any intergovernmental agreements negotiated between the tribe and the state and local governments, or an explanation as to why no such agreements exist. Failure to achieve such agreements should weigh heavily against the approval of the application.

With respect to land use issues, the application should include a comprehensive analysis as to whether the proposed gaming facility is compatible with the current zoning and land use requirements of the state and local governments, and with the uses being made of adjacent or contiguous land, and whether such uses would be negatively impacted by the traffic, noise, and development associated with or generated by the proposed gaming facility. Incompatible uses might consist of adjacent or contiguous land zoned or used for: National Parks, National Monuments, Federally designated conservation areas,

5

Attachment 1

National Fish and Wildlife Refuges, day care centers, schools, churches, or residential developments. If the application does not contain such an analysis, it should be denied.

Conclusion

The Office of Indian Gaming will review the current applications. If an application is denied subsequent to this review, the applicant tribe will be notified immediately. Tribes receiving a denial subsequent to this review may resubmit the application with information that will satisfy the regulations. Regional directors shall use this clarification to guide their recommendations or determinations on future applications to take off-reservation land into trust.

Attachment 1