UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ST. CROIX CHIPPEWA INDIANS OF WISCONSIN, </br></br>Plaintiff, </br></br>v. </br></br>DIRK KEMPTHORNE, *et al.*, </br></br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Case No. 07-2210 (RJL) |

MEMORANDUM OPINION
(September 30, 2008) [#14]

Plaintiff, the St. Croix Chippewa Indians of Wisconsin ("plaintiff" or "St. Croix"), filed suit[1] against defendants Dirk Kempthorne, in his official capacity as Secretary of the Department of Interior, and George T. Skibine,[2] in his official capacity as Acting Deputy Assistant Secretary for Policy and Economic Development (collectively "Interior" or "the Department" or "defendants"), seeking injunctive and declaratory relief for alleged violations of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 500 *et seq.*[3]

---

[1] Plaintiff filed its original complaint on December 7, 2007. (*See* Compl. [Dkt. #1].) Plaintiff then filed an amended complaint on January 10, 2008. (*See* Am. Compl. [Dkt. #18].)

[2] Assistant Secretary Carl J. Artman was originally named in this lawsuit. (*See* Am. Compl.) Artman resigned on May 23, 2008 and George T. Skibine was delegated all the authority of the Assistant Secretary. (*See* Defs.' Suppl. Mem. [Dkt. #46] at 1 n.1.) Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the court will automatically substitute that officer's successor. Accordingly, the Court substitutes George T. Skibine for Carl J. Artman.

[3] On December 10, 2007, plaintiff filed a motion for a temporary restraining order ("TRO") and a preliminary injunction. At the TRO hearing, plaintiff represented that a TRO was not needed; accordingly, the motion was treated as a motion for a preliminary injunction. (TRO Hr'g Tr. 15, Dec. 12, 2007.) The Court denied plaintiff's motion on February 22, 2008. *See St. Croix Chippewa Indians of Wis. v. Kempthorne*, 535 F. Supp. 2d 33 (D.D.C. 2008).

1

Currently before the Court is defendants' motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6). Upon review of the pleadings, the entire record, and the applicable law, the Court GRANTS defendants' motion.

## BACKGROUND

### II. Statutory Background

This lawsuit stems from St. Croix's application to Interior to have off-reservation land taken into federal trust for the purpose of establishing a gaming facility. In considering such off-reservation fee-to-trust gaming applications, the Secretary of the Interior's decision is governed by: (1) Section 5 of the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465, and its implementing regulations at 25 C.F.R. Part 151; *and* (2) the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*

### A. *The Indian Reorganization Act*

Section 5 of the IRA authorizes the Secretary of the Interior ("Secretary") to take lands into trust "for the purpose of providing land for Indians." 25 U.S.C. § 465. The IRA and its implementing regulations set out the policies and procedures governing the Secretary's decision to take land into trust.[4] *See id.*; 25 C.F.R. Part 151 ("Part 151 regulations"). The regulations provide that the Secretary may acquire land into trust "when [he] determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." 25 C.F.R. § 151.3(a)(3).

---

[4] The Court refers herein to the determination under IRA and its implementing regulations as the "Part 151 determination."

When deciding whether to acquire off-reservation land into trust, the regulations require consideration of a number of factors, including, *inter alia*: (1) the statutory authority for the acquisition; (2) the tribe's need for additional land; (3) the purposes for which the land will be used; (4) the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls; (5) any jurisdictional problems and potential conflicts of land use; and (6) compliance with the National Environmental Policy Act. *See* 25 C.F.R. § 151.10(a)-(c), (e)-(h). Additionally, the regulations direct the Secretary to consider the relative location of the proposed acquisition to the Indian reservation. In particular, the regulations prescribe that "as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give *greater scrutiny* to the tribe's justification of anticipated benefits from the acquisition . . . [and] . . . *greater weight* to the concerns raised" by state and local governments "as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments." *Id.* § 151.11(b), (d) (emphasis added).

A tribe seeking to have land held in trust by the United States must initiate this process by filing a written request with the Secretary. 25 C.F.R. § 151.9. Upon receipt of such an application, the Secretary "notif[ies] the state and local governments having regulatory jurisdiction over the land to be acquired," to give them an opportunity "to provide written comments as to the acquisition's potential impacts." *Id.* § 151.10. The Secretary has delegated decisional authority for off-reservation gaming applications to the Assistant Secretary-Indian Affairs. (Defs.' Mot. to Dismiss [Dkt. #16] at 4.) Both the Regional Director of the Bureau of Indian Affairs ("BIA") and the Office of Indian

Gaming make recommendations to the Assistant Secretary-Indian Affairs as to whether the transaction complies with the land acquisition regulations and the requirements in IGRA. (*Id.*)

### B. *The Indian Gaming Regulatory Act*

IGRA was enacted in 1988 "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Under IGRA, federally recognized tribes may conduct gaming on "Indian lands" within their jurisdiction, including lands "held in trust by the United States for the benefit of any Indian tribe." *Id.* § 2703(4), (5). A request to establish an off-reservation gaming facility must be approved by the Secretary in accordance with IGRA, which provides that off-reservation gaming is permitted *only* if:

> [T]he Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands [1] would be in the best interest of the Indian tribe and its members, and [2] would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination . . . .[5]

*Id.* § 2719(b)(1)(A).

---

[5] The Court refers herein to the determination under IGRA as the "two-part IGRA determination."

4

## II. Factual Background[6]

In July 2001, the St. Croix Chippewa Indians of Wisconsin,[7] together with the Bad River Band of Lake Superior Chippewa Indians, submitted an application to the Midwest Regional Office of the BIA to take land, located in Beloit, Wisconsin, into federal trust for the purpose of developing a gaming casino on the land. (Am. Compl. ¶¶ 1, 6, 26.) This application (hereinafter "Beloit application") was forwarded to the Central Office of the BIA on January 8, 2007, with a favorable recommendation. (*Id.* ¶¶ 9, 27.) That application is still pending before the Department. (*See* Am. Compl. ¶ 27; Defs.' Mot. to Dismiss, Ex. 1 (Skibine Decl.) ¶ 7.)

On July 13, 2007, St. Croix's outside counsel wrote a letter to then-Assistant Secretary Artman to inquire when review of the Beloit application would be complete and whether the Part 151 determination would be made before the two-part IGRA determination. (Am. Compl. ¶ 28; Adler Aff., Ex. B [Dkt. #4-7].) In response, George Skibine, Acting Deputy Assistant Secretary-Policy and Economic Development, wrote in pertinent part:

> The [Beloit] application . . . is currently under review in this office and a decision will be made only after an exhaustive and deliberative review of all relevant criteria, factual information, and legal requirements. We will make a determination on whether to take land into trust pursuant to Part 151 prior to making the two-part Secretarial determination under IGRA. We believe that it is the appropriate and logical sequence for the decision-making process. We do not believe that this represents a policy

---

[6] The facts set forth in the background section are taken from plaintiff's Amended Complaint and the documents quoted therein, which plaintiff has incorporated by reference.

[7] St. Croix is a federally-recognized Chippewa tribe. (*See* Am. Compl. ¶ 1.)

> change since the Department has never before specified a
> particular sequence for making the two decisions involved in
> this process.

(Adler Aff., Ex. C [Dkt. #4-7] (hereinafter "Skibine Letter").) It is Skibine's representation that Interior will make the Part 151 determination *prior* to making the two-part IGRA determination that plaintiff takes issue with. Indeed, St. Croix contends that this procedure is a change in historical practice at Interior and violates the APA. (Am. Compl. ¶¶ 39, 57-66.)

In addition, plaintiff challenges a January 3, 2008 memorandum by then-Assistant Secretary Artman, which provided certain guidance to BIA regional directors when reviewing off-reservation fee-to-trust gaming applications.[8] (Am. Compl. ¶ 40; memorandum *attached to* Defs.' Suppl. Mem. [Dkt. #46-2] (hereinafter "Guidance Memo").) Although the stated purpose of the Guidance Memo was to provide further clarification on the Part 151 regulations when taking land into trust for gaming purposes where the land is a considerable distance from the tribe's reservation, (Guidance Memo at

---

[8] The Guidance Memo deals exclusively with Section 151.11 of the Part 151 regulations. It does *not* provide further clarification on the two-part IGRA determination:

> The IRA has nothing directly to do with Indian gaming. The [IGRA], adopted more than 50 years after the IRA, sets the parameters of Indian gaming. One requirement is that if gaming is to occur on off-reservation lands those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by the IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities far from existing reservations. Whether land should be taken into trust far from existing reservations for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

(Guidance Memo at 2.)

1-2), St. Croix contends that the Guidance Memo promulgated a substantive or legislative rule (as defined in 5 U.S.C. § 551(4)), (Pl.'s Suppl. Mem. [Dkt. #45] at 3). In particular, while the Part 151 regulatory provisions apply to *all* off-reservation land into trust applications, St. Croix contends that because it "provides guidance for those applications that exceed a *daily commutable distance* from the reservation,"[9] (Guidance Memo at 3 (emphasis added)), and it was issued "without prior consultations between the Interior Department and Indian tribes," (Am. Compl. ¶ 41), it violates the APA, (*see id.* ¶¶ 57-59, 62-64, 70-73).

To date, Interior has not issued a decision on plaintiff's application to take off-reservation land into trust in Beloit, Wisconsin for gaming purposes. (*See* Am. Compl. ¶ 27.) Nevertheless, plaintiff contends that its efforts "to have the BIA approve [the Beloit application] will, in all probability, be a futility," (*id.* ¶ 10), because "Secretary Kempthorne's negative personal views toward off-reservation gaming have led the BIA to craft [these] various artifices [*i.e.*, the Skibine Letter and the Guidance Memo] by which it can plausibly proceed to deny a number of pending off-reservation casino applications, including Plaintiff's," (*id.* ¶ 11). Thus, plaintiff seeks declaratory and

---

[9] The Guidance Memo defines "commutable distance" as "the distance a reservation resident could reasonably commute on a regular basis to work at a tribal gaming facility located off-reservation." (Guidance Memo at 3.) The Guidance Memo identifies specific questions and materials for the reviewer to evaluate when considering applications in which the land acquisition exceeds a "commutable distance" from the reservation. (*Id.* at 4-6.) For instance, when "giv[ing] greater scrutiny to the tribe's justification of anticipated benefits from the acquisition," 25 C.F.R. § 151.11(b), the Guidance Memo instructs the reviewer to address a number of questions, including, *e.g.*: "What is the unemployment rate on the reservation? How will it be affected by the operation of the gaming facility?" (Guidance Memo at 4.) Similarly, when "giv[ing] greater weight to the concerns raised" by state and local governments "as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments," 25 C.F.R. § 151.11(b), (d), the Guidance Memo instructs the reviewer to consider a number of materials, including, *e.g.*: "copies of any intergovernmental agreements negotiated between the tribe and the state and local governments, or an explanation as to why no such agreements exist." (Guidance Memo at 5.)

injunctive relief "in order to prevent [Interior] from denying the Beloit fee-to-trust and similar applications by (a) using its newly adopted unlawful procedure to make the Part 151 decision prior to the two-part IGRA determinations; and (b) relying on and applying its new unlawful guidance memorandum."[10] (*Id.* ¶ 13.) For the following reasons, plaintiff's claims must be dismissed.[11]

## LEGAL STANDARD

Defendants move to dismiss plaintiff's Amended Complaint for lack of subject matter jurisdiction under Rule 12(b)(1), on the grounds that plaintiff lacks standing and plaintiff's claims are not ripe for review, and for failure to state a claim under Rule 12(b)(6), on the ground that there is no final agency action before the Court. Under Rule 12(b)(1), "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence." *Lindsey v. United States*, 448 F. Supp. 2d 37, 42 (D.D.C. 2006) (citing, among other authorities, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "The [C]ourt, in turn, has an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Lindsey*, 448 F. Supp. 2d at 42-43 (alteration in original) (quoting *Abu Ali v. Gonzales*, 387 F. Supp. 2d 16, 17 (D.D.C. 2005)). Under Rule 12(b)(6), courts must dismiss plaintiff's claims if, assuming

---

[10] St. Croix has made no showing that it has authority to seek relief on behalf of other Indian tribes that have similar applications pending before Interior.

[11] Defendants initially filed their motion to dismiss in response to plaintiff's original complaint, which only asserted claims related to the Skibine Letter. (*See* Compl.) On January 10, 2008, in the midst of briefing on defendant's motion to dismiss, plaintiff filed an Amended Complaint, adding claims related to the Guidance Memo. (*See* Am. Compl.) Defendants did not file an additional motion to dismiss because "the defects raised in the original motion remain in the amended pleading." (Defs.' Reply [Dkt. #19] at 2 n.1.) The parties provided supplemental briefing on plaintiff's Guidance Memo claims in response to the Court's Order of July 1, 2008. (*See* Pl.'s Suppl. Mem. [Dkt. #45]; Defs.' Suppl. Mem. [Dkt. #46].)

the alleged facts to be true and drawing all inferences in plaintiff's favor, it appears that a plaintiff cannot establish "any set of facts consistent with the allegations in the complaint."[12] *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007); *see also Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## ANALYSIS

### I. Final Agency Action

Plaintiff seeks review of Interior's actions pursuant to the APA.[13] Federal courts, however, "are not authorized to review agency policy choices in the abstract." *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13, 18 (D.C. Cir. 2006). Where, as here, there is no specific statutory review provision, the APA provides a generic cause of action to "[a] person suffering legal wrong because of *agency action . . . or adversely affected or aggrieved by agency action.*"[14] 5 U.S.C. § 702 (emphasis added). This review under the APA, however, is further limited to "*final agency action*

---

[12] In making its determination on a 12(b)(6) motion, the Court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).

[13] Plaintiff additionally alleges that the defendants' actions are "violations of trust responsibilities owed by the Defendants to Indian tribes." (Am. Compl. ¶¶ 67-69.) For the reasons set forth below, because plaintiff lacks standing to bring this action and his claims are not ripe for judicial review, these claims must also be dismissed. *See infra* pp. 15-17.

[14] The APA defines an "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). While "[t]his list is expansive . . . [and] . . . [i]t is meant to cover comprehensively every manner in which an agency may exercise its power," our Circuit has "long recognized that the term [agency action] is not so all-encompassing as to authorize [courts] to exercise judicial review over everything done by an administrative agency." *Fund for Animals, Inc.*, 460 F.3d at 19 (internal citations and quotation marks omitted). Indeed, "[m]uch of what an agency does is in anticipation of agency action. Agencies prepare proposals, conduct studies, meet with members of Congress and interested groups, and engage in a wide variety of activities that comprise the common business of managing government programs." *Id.* at 19-20.

for which there is no other adequate remedy in a court."[15] *Id.* § 704 (emphasis added). As a general matter, agency action will only be considered "final" and therefore reviewable if two conditions are satisfied: "First, the action must mark the 'consummation' of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations omitted). Neither of the two actions cited by St. Croix (*i.e.*, the Skibine Letter and the Guidance Memo), however, amount to final agency action. How so?

### A. *Skibine Letter*

The Skibine Letter, on its face, is simply a communication in response to plaintiff's inquiry about the status of the Beloit application. It did not purport to make any final decision on plaintiff's application, nor was it the culmination of the Department's re-thinking of the application process for off-reservation fee-to-trust gaming applications. Stated simply, a letter that merely advises the recipient of the agency's position does not amount to a "consummation" of the agency's decision-making process. *See, e.g., Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan v. Ashcroft*, 360 F. Supp. 2d 64, 68 (D.D.C. 2004) (advisory letters from the

---

[15] "Although the final agency action requirement has been considered jurisdictional because, without it, the court . . . cannot reach the merits of the dispute, the APA grants a cause of action rather than subject matter jurisdiction." *Fund for Animals, Inc.*, 460 F.3d at 18 n.4 (internal citations and quotation marks omitted) (alteration in original). Accordingly, the "final agency action" inquiry is made under Rule 12(b)(6), not Rule 12(b)(1). *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Com'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).

General Counsel of National Indian Gaming Commission and a Department of Justice official did not constitute final agency action by the Commission); *Sabella v. United States*, 863 F. Supp. 1, 6 (D.D.C. 1994) (opinion letter from the National Oceanic Atmospheric Administration General Counsel was part of the "mass of interpretative correspondence" not reviewable by the courts).

However, even if the Court were to assume that the Skibine Letter reflected a consummation of the Department's decision-making process, the letter still does not amount to a final agency action because no "rights or obligations have been determined" from which "legal consequences will flow." *Bennett*, 520 U.S. at 177-78. The Skibine Letter does not make an ultimate determination on the Beloit application, nor does it impose any additional procedures or obligations on St. Croix. As such, the letter does "not yet [make] any determination or issue[] any order imposing any obligation on [St. Croix], denying any right of [St. Croix], or fixing any legal relationship." *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Com'n*, 324 F.3d 726, 732 (D.C. Cir. 2003); *see also Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004). Because the Skibine Letter is merely a statement by Interior "about what it plans to do . . . at some point . . ., it cannot be plucked out of context and made a basis for suit under the APA." *Fund for Animals, Inc.*, 460 F.3d at 22 (holding that agency action is not reviewable under the APA if it only adversely affects the party's rights on the "contingency of future administrative action") (internal citations and quotation marks omitted). Accordingly, the Skibine Letter is not a reviewable final agency action and all claims based on this letter must be dismissed under Rule 12(b)(6).

11

### B. *Guidance Memo*

Plaintiff additionally claims that the Guidance Memo promulgated a "substantive or legislative" rule and, as such, constitutes a "final agency action" subject to judicial review. (*See* Am. Compl. ¶ 71; Pl.'s Suppl. Mem. at 3.) Defendants, on the other hand, contend that the Guidance Memo is not a final agency action because it simply clarifies the applicability of current regulations, and creates no additional legal obligations or consequences. (*See* Defs.' Suppl. Mem. at 2-7.) I agree!

For an action to be considered a "final agency action" under the *Bennett* framework, the action must: (1) mark the "consummation" of the agency's decisionmaking process; and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal citations and quotation marks omitted). Although the Guidance Memo appears to be the "consummation" of the Department's decision-making process,[16] it fails *Bennett's* second prong. How so?

In determining whether any rights, obligations, or legal consequences have been determined or imposed on the parties, courts traditionally look at a number of factors: (1) the agency's own characterization of the action, (2) whether the action was published in the Federal Register or the Code of Regulations, (3) whether the action has binding

---

[16] There is nothing tentative or interlocutory about the Guidance Memo. It characterizes the Interior's position concerning the internal processing of off-reservation fee-to-trust gaming applications under IRA and its implementing regulations. (*See* Guidance Memo at 6 ("Regional directors shall use this clarification to guide their recommendations or determinations on future applications to take off-reservation land into trust.").) Accordingly, the Guidance Memo represents the consummation of the Department's decisionmaking on this issue. *See Nat'l Ass'n of Home Builders v. Norton*, 298 F. Supp. 2d 68, 77 (D.D.C. 2003) ("[A]ll that the consummation condition requires is that a decision-making process was brought to completion.").

effects on the agency or has instead genuinely left the agency and its decisionmakers free to exercise discretion, and (4) whether the action imposed any rights or obligations or otherwise bound the private parties. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806-07 (D.C. Cir. 2006) (citing *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006); *CropLife Am. v. E.P.A.*, 329 F.3d 876, 883 (D.C. Cir. 2003); *Molycorp, Inc. v. E.P.A.*, 197 F.3d 543, 545 (D.C. Cir. 1999); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987)). Unfortunately for St. Croix, these factors demonstrate that the Guidance Memo is *not* a reviewable final agency action.

First, on its face, the Guidance Memo is merely an internal communication to Interior employees, aimed at assisting agency reviewers in their assessment of off-reservation fee-to-trust gaming applications. It identifies specific questions and materials, relevant to the Part 151 regulations, that the reviewer should consider when the distance between the reservation and the acquired land exceeds a "commutable distance," but does not amend or change the regulations themselves. (*See* Guidance Memo at 1, 3); *see, e.g., Sierra Club v. Mainella*, 2005 WL 3276264, at *12 (D.D.C. 2005) (finding no final agency action where "the reiteration of [a regulatory provision] in the . . . Guidance does not give rise to new legal obligations or legal consequences"); *Ctr. for Auto Safety, Inc.*, 342 F. Supp. 2d 1, 24 (D.D.C. 2004) (same). Second, the Guidance Memo does not purport to be a "rule" change, and it has never been published in the Code of Regulations or the Federal Register. Third, the Guidance Memo does not have binding effects on the agency or its employees. It does not command the reviewer to deny or grant the pending application in a given circumstance. (*See* Guidance Memo at 3-6.) Notably, it leaves the

ultimate decision "to take land into trust, either on-reservation or off-reservation," (Guidance Memo at 1), in the discretion of the Secretary. *See, e.g., Ctr. for Auto Safety, Inc.*, 342 F. Supp. 2d at 24 (finding no final agency action where letter left agency "free to exercise its discretion in enforcing regional recalls").

Finally, the Guidance Memo does not afford any rights to, or impose any obligations on, St. Croix. Simply stated, it does not impose any additional requirements on plaintiff with respect to the pending application process, nor has plaintiff alleged otherwise. Thus, where "the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purposes of judicial review." *See Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005). Additionally, as stated previously, the Guidance Memo is a general statement regarding the agency's policy on off-reservation fee-to-trust gaming applications; it clearly does not make a specific determination on plaintiff's Beloit application. In circumstances like this – where the agency has spoken only in generic, non-binding terms – it is our Circuit's "long-standing practice . . . to require the complaining party to challenge the specific implementation of the broader agency policy." *Fund for Animals, Inc.*, 460 F.3d at 22. Accordingly, because the Guidance Memo does "not yet [make] any determination or issue[] any order imposing any obligation . . ., denying any right . . ., or fixing any legal relationship," *Reliable Automatic Sprinkler Co.*, 324 F.3d at 732, it is not a reviewable final agency action. All claims based on this memorandum must also be dismissed under Rule 12(b)(6).

14

## II. Ripeness and Standing

The Court further concludes that because plaintiff's claims are not ripe and because plaintiff has failed to establish standing, the Amended Complaint must be dismissed pursuant to Rule 12(b)(1).

The ripeness doctrine is meant to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). In examining whether a claim is ripe for review, the Court must consider: "(1) whether delayed review would cause hardship to the plaintiff[]; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the [C]ourt[] would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Applying all three factors here, the plaintiff's claims are clearly not ripe for judicial review at this time. First, delayed review would not cause hardship to the plaintiff; St. Croix will only need to wait for the denial of its application – if it comes to pass – to adjudicate any claimed misapplication of the applicable regulations. Second, judicial intervention would be manifestly inappropriate at this time – well before the agency has completed its review of plaintiff's application. Third, this Court will certainly benefit from further factual development, specifically the grant or denial of the Beloit application. Accordingly, plaintiff's request for judicial intervention at this time is premature.

Finally, plaintiff also lacks standing to bring this action because, under Article III of the Constitution, it fails to "show that it has suffered an injury in fact, that there exists a causal link between that injury and the conduct complained of, and that a favorable decision on the merits will likely redress the injury." *U.S. Ecology, Inc. v. U.S. Dept. of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000) (citing *Lujan*, 504 U.S. at 560-61). The burden of establishing the existence of standing, of course, belongs to plaintiff as the party invoking federal jurisdiction. *Nat'l Ass'n of Home Builders*, 298 F. Supp. 2d at 80 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998)). Here, St. Croix's only claimed injury is the increased "possibility" that the Beloit application will be denied. While plaintiff contends its application may "in all probability" be denied, (Am. Compl. ¶ 10), such predictions are not enough to withstand the injury in fact requirement set out by the Supreme Court.[17] *Lujan*, 504 U.S. at 560. To the contrary, plaintiff must assert a legally protected interest which is "(a) concrete and particularized," and "(b)

---

[17] Plaintiff contends that the complained of injury is a "procedural harm" and the standing requirements are therefore relaxed. While the Supreme Court has recognized a lower standard for achieving standing when a plaintiff has suffered a procedural injury, *Lujan*, 504 U.S. at 573 n.7, plaintiff has failed to demonstrate that this lower standard is applicable here. In our Circuit, to demonstrate standing in a "procedural rights" case, plaintiff "must show *both* (1) that their procedural right has been violated, *and* (2) that the violation of that right has resulted in an invasion of their concrete and particularized interest." *Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) (citing *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996)).

Plaintiff has failed to identify a specific procedural right that has been violated. A simple assertion that "the APA grants the Plaintiff a procedural right to protect its interest by challenging the Interior's final agency action," (Pl.'s Opp'n at 10), is not enough. Without having been accorded a specific "procedural right," a plaintiff cannot assert standing on the violation of that phantom right. *See Ctr. for Law and Educ.*, 396 F.3d at 1157 ("[P]laintiff must show that the procedures in question are *designed* to protect some threatened concrete interest *of his* that is the ultimate basis of his standing.") (internal citations and quotation marks omitted); *see also Lujan*, 504 U.S. at 573 n.7 (plaintiff must have been "*accorded* a procedural right to protect his concrete interests") (emphasis added); *Mass. v. E.P.A.*, 127 S. Ct. 1438, 1453 (2007) (a litigant must have been "vested with a procedural right" to assert standing based on procedural harm).

actual or imminent, not conjectural or hypothetical." *Id.* (internal citations and quotation marks omitted). Plaintiff's rank speculations simply do not satisfy this constitutional requirement and this Court, therefore, has no jurisdiction to hear plaintiff's claims.[18]

## CONCLUSION

Thus for all of the foregoing reasons, the Court GRANTS defendant's Motion to Dismiss and dismisses all of St. Croix's claims with prejudice. An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[18] Because standing fails on the first of its three requisites, the Court need not address the remaining standing requirements – *i.e.*, causation and redressability.